# Exhibit A

UNITED STATES OF AMERICA

Before the

COMMODITY FUTURES TRADING COMMISSION

_____

In the Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives

_____

# ORDER

## BACKGROUND

By a submission dated June 12, 2023 (the "Submission"), KalshiEX LLC ("Kalshi"), a designated contract market ("DCM"), filed a certification of congressional control political event contracts (the "Congressional Control Contracts"), pursuant to section 5c(c)(1) of the Commodity Exchange Act ("CEA") and Commodity Futures Trading Commission ("CFTC" or "Commission") Regulation 40.2. On June 23, 2023, the Commission commenced review of the Submission pursuant to Commission Regulation 40.11(c), because the Commission determined that the Submission comprised contracts that may involve, relate to, or reference an activity enumerated in Commission Regulation 40.11(a)(1) and CEA section 5c(c)(5)(C)(i). By letter dated June 23, 2023, the Commission informed Kalshi of its determination to commence review of the Congressional Control Contracts pursuant to Commission Regulation 40.11(c), and requested that Kalshi suspend the listing and trading of the Congressional Control Contracts during the pendency of the review period. In addition, on June 23, 2023, the Commission

opened a comment period to request public comments to assist the Commission's evaluation of the Submission.  The public comment period ended on July 24, 2023.[1]

The Congressional Control Contracts are cash-settled, binary (yes/no) contracts based on the question: "Will <chamber of Congress> be controlled by <party> for <term>?"  Kalshi describes the Congressional Control Contracts as event contracts.  The settlement values of the Congressional Control Contracts are determined by the party affiliation of the leader of the identified chamber of the United States Congress on the expiration date.  In the case of the House of Representatives, the leader is the Speaker of the House ("Speaker"), and in the case of the Senate, the leader is the President Pro Tempore ("Pres Pro Temp").  Upon settlement, an absolute amount is paid to the holder of one side of the contract, and no payment is made to the counterparty.  All contracts trading on Kalshi are fully-collateralized.

The Congressional Control Contracts have a notional value of one dollar with a minimum price fluctuation of $0.01, and must be purchased in multiples of 5,000 contracts per order.  The Congressional Control Contracts have tiered position limits, depending on the category of market participant and whether that market participant has "demonstrated established economic hedging need," which may be demonstrated to Kalshi according to means and methods established by Kalshi.

The  terms of the Congressional Control Contracts prohibit certain individuals and entities from trading the contracts, namely: 1) candidates for federal or statewide public office; 2) paid campaign staffers on Congressional campaigns; 3) paid employees of Democratic and Republican Party organizations; 4) paid employees of political action committees ("PACs") and

---

[1] The Commission received 1,378 comments, including four comments that were received after the close of the public comment period but were added to the comment file.  *See* https://comments.cftc.gov/PublicComments/CommentList.aspx?id=7394.

"Super PACs" (independent expenditure only political committees); 5) paid employees of major polling organizations; 6) existing members of Congress; 7) existing paid staffers of members of Congress; 8) household members and immediate family members of any of the above; and 9) "any of the above listed institutions themselves."

## LEGAL STANDARD

Under CEA section 5c(c)(5)(C)(i), the Commission may determine that contracts in certain excluded commodities, as defined in CEA section 1a(19), are contrary to the public interest if the contracts involve: (1) activity that is unlawful under any Federal or State law; (2) terrorism; (3) assassination; (4) war; (5) gaming; or (6) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.[2]

CEA section 5c(c)(5)(C)(ii) provides that "[n]o . . . contract . . . determined by the Commission to be contrary to the public interest under [CEA section 5c(c)(5)(C)(i)] may be listed or made available for clearing or trading on or through a registered entity[,]" including a DCM (such as Kalshi).[3]

Commission Regulation 40.11(a)(l) provides that registered entities, including DCMs, "shall not list for trading or accept for clearing" any contract based upon an excluded commodity, as defined in CEA section 1a(19)(iv), that "involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law. . ."[4]  Commission Regulation 40.11(a)(2) further provides that registered entities, including DCMs, "shall not list for trading or accept for clearing" any contract based upon an excluded

---

[2] CEA section 5c(c)(5)(C)(i); 7 U.S.C. § 7a-2(c)(5)(C)(i).
[3] CEA section 5c(c)(5)(C)(ii); 7 U.S.C. § 7a-2(c)(5)(C)(ii).
[4] 17 C.F.R. §§ 40.11(a)-(a)(1).

commodity, as defined in CEA section 1a(19)(iv), that "involves, relates to, or references an activity that is similar to an activity enumerated in [Commission Regulation] 40.11(a)(1) … and that the Commission determines, by rule or regulation, to be contrary to the public interest."[5]

Under Commission Regulation 40.11(c), when a contract that is submitted to the Commission by a registered entity, pursuant to Commission Regulation 40.2 or Commission Regulation 40.3, is based upon an excluded commodity, as defined in CEA section 1a(19)(iv), "which may involve, relate to, or reference" an activity enumerated in Commission Regulation 40.11(a)(1) or Commission Regulation 40.11(a)(2), the Commission is authorized to commence a 90-day review of the contract.[6]  Commission Regulation 40.11(c)(1) requires the Commission to request that the registered entity suspend the listing or trading of such contract during the 90-day review period.[7]  The Commission must ultimately issue an order approving or disapproving such contract by the end of its review or at the end of any extended period agreed to or requested by the registered entity.[8]

---

[5] 17 C.F.R. §§ 40.11(a)-(a)(2).
[6] 17 C.F.R. § 40.11(c).
[7] 17 C.F.R. § 40.11(c)(1).
[8] 17 C.F.R. § 40.11(c)(2).

## FINDINGS

Having reviewed the complete record in this matter, including the Submission and the public comments received, the Commission makes the following findings and determinations pursuant to CEA section 5c(c)(5)(C) and Commission Regulation 40.11:

### The Congressional Control Contracts Involve Enumerated Activities

**WHEREAS,** the Commission has evaluated whether the Congressional Control Contracts involve an activity enumerated in CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1).

**WHEREAS,** the term "involve" is not defined for purposes of CEA section 5c(c)(5)(C)(i).

**WHEREAS,** an undefined term in a statute is generally given its ordinary meaning.[9] To determine the ordinary meaning of undefined statutory terms, courts typically look to dictionary definitions for guidance.[10]

**WHEREAS,** definitions of the word "involve" include "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence."[11]

---

[9] *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788 (1995); *See also*, *Morrisette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240 (1952) (holding that undefined statutory words that are not terms of art are given their ordinary meanings, frequently derived from the dictionary).

[10] *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000).

[11] *See Involve Definition,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involve (last visited September 7, 2023); Random House College Dictionary 703 (Revised ed. 1979); Riverside University Dictionary 645 (1983); *see also* Roget's International Thesaurus 1040 (7th ed. 2010) (giving as synonyms "entail" and "relate to").

**WHEREAS,** the Commission has considered assertions by Kalshi and some commenters that, under CEA section 5c(c)(5)(C)(i), contracts "involve" an enumerated activity only if that activity is the contract's underlying.

**WHEREAS,** when the CEA refers to a contract's underlying, it uses the word "underlying,"[12] or it refers to what the contract is "based on"[13] or "based upon."[14]

**WHEREAS,** CEA section 5c(c)(5)(C)(i) itself uses "based upon" to refer to the underlying: it applies with respect to "contracts … in [certain] excluded commodities that are *based upon* the occurrence, extent of an occurrence, or contingency" (emphasis added).[15]  The underlying must therefore be a kind of excluded commodity, but that is all that CEA section 5c(c)(5)(C)(i) says about the underlying.

**WHEREAS,** in CEA section 5c(c)(5)(C)(i), the requirement that the contract "involve" an enumerated activity is separate:

> In connection with the listing of … ***contracts … in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency*** … the Commission may determine that ***such … contracts … are contrary to the public interest if the …*** ***contracts … involve*** [an enumerated activity] (emphasis added).[16]

**WHEREAS,** in context, "based upon" and "involve" have different meanings for purposes of CEA section 5c(c)(5)(C)(i): "based upon" refers to the contract's underlying (as it does elsewhere in the CEA), and "involve" refers to the enumerated activities and retains its broader ordinary meaning.  In other words, the contract must be "based upon" a type of excluded

---

[12] *E.g.*, 7 U.S.C. §§ 6c(d)(2)(A)(i), 20(e), 25(a)(1)(D)(ii).
[13] *E.g.*, 7 U.S.C. §§ 2(a)(1)(C)(i)(I), 2(a)(1)(C)(iv), 6b(e).
[14] *E.g.*, 7 U.S.C. § 2(a)(1)(C)(ii).
[15] CEA section 5c(c)(5)(C)(i); 7 U.S.C. § 7a-2(c)(5)(C)(i)
[16] *Id.*

commodity, and the contract must "involve" an enumerated activity.  But the contract need not

be "based upon" an enumerated activity.

      **WHEREAS,** Congress's choice of the broader term "involve" means that CEA section

5c(c)(5)(C)(i) can capture both contracts whose underlying *is* one of the enumerated activities,

and contracts with a different connection to one of the enumerated activities because, for

example, they "relate closely" to, "entail," or "have as an essential feature or consequence" one

of the enumerated activities.[17]

      **WHEREAS,** the legislative history of CEA section 5c(c)(5)(C) supports the plain

meaning of the term "involve,"[18] and indicates that the question for the Commission in

determining whether a contract "involves" one of the activities enumerated in CEA section

5c(c)(5)(C)(i) is whether the contract, considered as a whole, involves one of those activities.[19]

---

[17] The types of activities enumerated in CEA section 5c(c)(5)(C)(i) – including terrorism, war, and activities that are unlawful under federal or state law – of themselves support a broad reading of the term "involve," to ensure that the Commission has the authority that Congress intended to prevent trading on Commission-regulated markets that is contrary to the public interest.  *See* footnotes 29 and 31, *infra*

[18] In a colloquy with Senator Diane Feinstein on the Senate floor regarding the proposed Dodd-Frank Act provision that ultimately was enacted as CEA section 5c(c)(5)(C), Senator Blanche Lincoln, then-Chair of the Senate Committee on Agriculture, Nutrition and Forestry, stated that, among other things, the provision was intended to "prevent gambling through futures markets" and to restrict exchanges from "construct[ing] an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament."  *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), *available at* https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf.  None of the Super Bowl, the Kentucky Derby, or the Masters Golf Tournament are, of themselves, "gaming."  Rather, the statement of Senator Lincoln, who is identified in the colloquy as one of the authors of CEA section 5c(c)(5)(C), focuses on the overall characteristics of the contract.  It does not base the evaluation of whether the contract involves an enumerated activity – here, "gaming" – on the underlying alone.  Indeed, it is difficult to conceive of a contract whose underlying event, itself, is "gaming."  If "involve" were to refer only to a contract's underlying, contracts based on the outcome of sporting events such as horse races and football games would not qualify, because sports typically are not understood to be "gaming" – they are understood to be "games."  In effect, if "involve" were to refer only to a contract's underlying, the scope of certain prongs of CEA section 5c(c)(5)(C)(i) could effectively be limited to a null set of event contracts, which could not have been Congress's intent.

[19] For example, giving the term its ordinary meaning, a contract "involves" one of the activities enumerated in CEA section 5c(c)(5)(C)(i) if trading in the contract amounts to the enumerated activity.

<u>Gaming</u>

**WHEREAS,** the term "gaming" is not defined in the CEA or Commission regulations.

**WHEREAS,** as discussed above, an undefined term in a statute is generally given its ordinary meaning, and to determine the ordinary meaning of undefined statutory terms, courts typically look to dictionary definitions for guidance. In addition, courts consider the construction of similar terms in other statutes, as well as the purpose of the statute being interpreted.[20]

**WHEREAS**, the term "gaming" includes betting or wagering on elections, as demonstrated by the following:

    A.    Dictionaries define the term "gaming" to mean "gambling."[21]

    B.    Under most state laws, "gambling" involves a person staking something of value upon the outcome of a game, contest, or contingent event.[22]

---

[20] *See, e.g., Sanders v. Jackson*, 209 F.3d 998, 1000-02 (7th Cir. 2000).

[21] *See, e.g., Gaming Definition*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/gaming (defining the noun "gaming" as "the practice or activity of playing games for stakes: gambling") (last visited March 14, 2023); *Gaming Definition*, Dictionary.com, https://www.dictionary.com/browse/gaming (defining "gaming" as "gambling") (last visited Sept. 7, 2023); *Gaming Definition*, Black's Law Dictionary, https://thelawdictionary.org/gaming/ (last visited September 10, 2023) (refers to gambling as gaming and cross-refers the definition to gambling).

[22] *See, e.g.,* GA. CODE ANN. § 16-12-21(a)(1) (West 2020) (". . . A person commits the offense of gambling when he . . .[m]akes a bet upon the partial or final result of any game or contest or upon the performance of any participant in such game or contest . . . ."); KY. REV. STAT. ANN. § 528.010(6)(a) (West 2023) ("'Gambling' means staking or risking something of value upon the outcome of a contest, game, gaming scheme, or gaming device which is based upon an element of chance, in accord with an agreement or understanding that someone will receive something of value in the event of a certain outcome."); MICH. COMP. LAWS § 750.301 (2023) ("Any person or his or her agent or employee who, directly or indirectly, takes, receives, or accepts from any person any money or valuable thing with the agreement, understanding or allegation that any money or valuable thing will be paid or delivered to any person where the payment or delivery is alleged to be or will be contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain . . . ."); N.Y. PENAL LAW § 225.00(2) (McKinney 2015) ("A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."); TEX. PENAL CODE ANN. § 47.02(a) (West 2019) ( "A person commits an offense [of gambling] if he: (1) makes a bet on the partial or final result of a game or contest or on the performance of a participant in a game or contest . . . ."); VA. CODE ANN. § 18.2-325(1) (West 2022) ("'Illegal gambling' means the making, placing, or receipt of any bet

C.       The Unlawful Internet Gambling Enforcement Act ("UIGEA"), a federal statute, defines the term "bet or wager" as "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome . . ."[23]

D.       To bet or wager on elections is to stake something of value upon the outcome of contests of others, namely, contests between electoral candidates.

E.       Several state statutes, on their face, link the terms "gaming" or "gambling" to betting or wagering on elections.[24]

---

or wager . . . of money or other consideration or thing of value, made in exchange for a chance to win a prize, stake, or other consideration or thing of value, dependent upon the result of any game, contest, or any other event the outcome of which is uncertain or a matter of chance . . .").

[23] 31 U.S.C. § 5362(1)(A).  The UIGEA, 31 U.S.C. §§ 5361-5367 (2006), prohibits gambling businesses from knowingly accepting payments in connection with the participation of another person in a bet or wager that involves the use of the Internet and that is unlawful under any federal or state law.  Unlike the Wire Act, 28 U.S.C. § 1084 (1961), the UIGEA defines a "bet or wager", but it criminalizes it only if it is connected with unlawful Internet gambling that violates any federal or state law.  *See* 31 U.S.C. § 5362.  The UIGEA does not alter the definitions in other federal and state laws and expressly excludes any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the CEA from the definition of "bet or wager."  *See id*. at § 5362 (1)(E).

[24] *See*, *e.g.*, 720 ILL. COMP. STAT. ANN. 5/28-1 (West 2011) ("A person commits gambling when he . . . [m]akes a wager upon the result of any game, contest, or any political nomination, appointment or election . . . ."); NEB. REV. STAT. § 28-1101(4) (2011) ("A person engages in gambling if he or she bets something of value . . . upon the outcome of a game, contest, or election . . . ."); N.M. STAT. ANN. § 44-5-10 (1978) ("Bets and wagers authorized by the constitution and laws of the United States, or by the laws of this state, are gaming within the meaning of this chapter."); N.D. CENT. CODE. ANN. § 12.1-28-01 (West 2011) ("Gambling means risking any money . . . upon . . . the happening or outcome of an event, including an election . . . over which the person taking the risk has no control."). *See also* GA. CODE. ANN. § 16-12-21(a)(2) (West 2011) ("A person commits the offense of gambling when he . . . [m]akes a bet upon the result of any political nomination, appointment, or election . . . ."); MISS. CODE ANN. § 97-33-1 (West 2011) ("If any person . . . shall wager or bet . . . upon the result of any election . . . he shall be fined in a sum not more than Five Hundred Dollars . . . ."); S.C. CODE ANN. § 16-19-90 (2011) ("Any person who shall make any bet or wager of money . . . upon any election in this State shall be guilty of a misdemeanor . . . ."); TEX. PENAL CODE ANN. § 47.02(a)(2) (West 2011) ("A person commits an offense if he . . . makes a bet on the result of any political nomination, appointment, or election . . . .").

**WHEREAS**, the Congressional Control Contracts involve "gaming," pursuant to CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1), because taking a position in the Congressional Control Contracts would be staking something of value upon the outcome of a contest of others. The Congressional Control Contracts are premised on the outcome of Congressional election contests, which ultimately determine the party affiliation of the Speaker and the Pres Pro Temp.[25]

---

[25] Kalshi argues that elections are not "contests" even if they are at base competitions, and that, if the Congressional Control Contracts constitute gaming, all event contracts are also arguably gaming. Certain commenters agreed, with one arguing that the Congressional Control Contracts are no more like gaming than anything else trading in traditional financial markets, and another arguing that recognizing the Congressional Control Contracts as gaming would imply that all futures contracts are gaming. The Commission disagrees, and notes, first, that it is common parlance to refer to elections as contests. *See, e.g.*, *A Frozen Needle in GOP Contest*, The Washington Post (Sept. 3, 2023); *Biden: Dems revitalizing manufacturing*, Houston Chronicle (Sept. 10, 2022) (discussing the "contest to control Congress"). One commenter similarly stated that elections fall squarely within the definition of a "contest," citing the following definition in the Cambridge English Dictionary: "a competition to do better than other people, esp. to win a prize or achieve a position of leadership or power: 'In the last election, he survived a close contest against a political newcomer.'" Moreover, the Commission reiterates that many state statutes, on their face, specifically link the terms gaming and gambling to betting or wagering on elections. As such, unlike all futures contracts (or all financial instruments), the Congressional Control Contracts fall squarely within statutory definitions of gaming. More generally, the Commission notes that a common thread throughout the large majority of definitions of "gaming" and "gambling" is the act of staking something of value on the outcome of a contest of others. To take a position in the Congressional Control Contracts would be to stake something of value upon the outcome of a contest of others, since the Congressional Control Contracts are premised on the outcome of contests between electoral candidates (which ultimately determine the party affiliation of the Speaker and the Pres Pro Temp). By contrast, futures contracts traditionally have not been premised on the outcome of a contest of others. As discussed *infra*, futures contracts traditionally have served hedging and risk management functions, and have therefore been designed to correlate to direct and quantifiable changes in the price of commodities or other financial assets or instruments. As also discussed *infra*, the economic impacts of the outcome of contests for Congressional control are too diffuse and unpredictable to serve the hedging and risk management functions that futures contracts have traditionally been intended to serve.

Activity That Is Unlawful Under State Law

**WHEREAS,** in many states, betting or wagering on elections is prohibited by statute[26] or

common law.[27]

---

[26] ARIZ. REV. STAT. ANN. § 16-1015 ("A person who, before or during an election provided by law, knowingly makes, offers or accepts a bet or wager . . . upon any contingency whatever arising out of [an] election, is guilty of a class 2 misdemeanor."); ARK. CODE ANN. § 7-1-103 (20) (West) ("No person shall make any bet or wager upon the result of any election . . . ."); COLO REV. STAT. ANN. § 31-10-1531 (West) ("It is unlawful for any person, including any candidate for public office, before or during any municipal election, to make any bet or wager with a qualified elector or take a share or interest in, or in any manner become a party to, any such bet or wager or provide or agree to provide any money to be used by another in making such bet or wager upon any event or contingency whatever arising out of such election."); GA. CODE. ANN. § 16-12-21(a)(2) (West 2011) ("A person commits the offense of gambling when he . . . [m]akes a bet upon the result of any political nomination, appointment, or election . . . ."); IDAHO CODE ANN. § 18-2314 (West) ("Every person who makes, offers, or accepts any bet or wager upon the result of any election . . . is guilty of a misdemeanor."); 720 ILL. COMP. STAT. ANN. 5/28-1 (West 2011) ("A person commits gambling when he . . . [m]akes a wager upon the result of any game, contest, or any political nomination, appointment or election . . . ."); MD CODE, ELECTION LAW § 16-902 ("A person may not make a bet or wager on the outcome of an election held under this article."); MICH COMP. LAWS ANN. § 168.931 (I) (West) ("A person shall not keep a room or building for the purpose, in whole or in part, of recording or registering bets or wagers, or of selling pools upon the result of a political nomination, appointment, or election."); MISS. CODE. ANN. § 97-33-1 (West 2011) ("If any person . . . shall wager or bet . . . upon the result of any election . . . he shall be fined in a sum not more than Five Hundred Dollars . . . ."); NEB. REV. STAT. § 28-1101(4) (2011) ("A person engages in gambling if he or she bets something of value . . . upon the outcome of a game, contest, or election . . . ."); NEV. REV. STAT. ANN. § 293.830 (West) ("Any person who makes, offers or accepts any bet or wager upon the result of any election . . . is guilty of a gross misdemeanor."); N.J. STAT. ANN. § 19:34-24 (West)("No person shall make, lay or deposit any bet, wager or stake, to be decided by the result of any election . . . or by any contingency connected with or growing out of any election."); N.C. GEN. STAT. ANN. § 163-274 ("It shall be unlawful . . . [f]or any person to bet or wager any money or other thing of value on any election."); N.D. CENT. CODE. ANN. § 12.1-28-01 (West 2011) ("'Gambling' means risking any money . . . upon . . . the happening or outcome of an event, including an election . . . ."); OKLA STAT. ANN. TIT. 21, § 181 (West) ("Every person who makes, offers or accepts any bet or wager upon the result of any election . . . is guilty of a misdemeanor."); OR. REV. STAT. ANN. § 260.635 (West) ("No candidate shall make or become party to a bet of anything of pecuniary value on any event or contingency relating to a pending election" and "[n]o person, to influence the result of any election, shall make a bet of anything of pecuniary value on the result of a pending election, or on any event relating to it."); 18 PA. STAT. § 5514 (West) ("A person is guilty of a misdemeanor of the first degree if he . . . receives, records, registers, forwards, or purports or pretends to forward, to another, any bet or wager upon the result of any political nomination, appointment or election . . . ."); S.C. CODE ANN. § 16-19-90 (2011) ("Any person who shall make any bet or wager of money . . . upon any election in this State shall be guilty of a misdemeanor . . . ."); TENN. CODE ANN. § 2-19-129 (West) ("A person commits a Class C misdemeanor if such person makes any bet or wager of money or other valuable thing upon any election."); TEX. PENAL CODE ANN. § 47.02(a)(2) (West 2011) ("A person commits an offense if he . . . makes a bet on the result of any political nomination, appointment, or election . . ."); W. VA. CODE ANN. § 3-9-22 (West) ("It shall be unlawful to bet or wager money or other thing of value on any election held in this state"). A number of states also have more limited statutes in place. See, e.g., S.D. CODIFIED LAWS § 12-26-19 ("Any person who shall directly or indirectly make a bet with a voter depending upon the result of any election, with the intent thereby to procure the challenge of such voter or to prevent his voting at an election, is guilty of a Class 2 misdemeanor."); WIS. STAT. ANN. § 6.03 (West) ("No person shall be allowed to vote in any election in which the person has made or become interested, directly or indirectly, in any bet or wager depending upon the result of the election.").

11

**WHEREAS,** the Congressional Control Contracts involve "activity that is unlawful under … State law," pursuant to CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1), because taking a position in the Congressional Control Contracts would be staking something of value upon the outcome of contests between electoral candidates (which ultimately

---

[27] Alabama, *White v. Yarbrough*, 16 Ala. 109, 110 (1849) ("A wager on an election is void as against public policy"); Arkansas, *Williams v. Kagy*, 3 S.W.2d 332, 333-34, 176 Ark. 484, 3 (1928) ("Even before the passage of the statute quoted, this court ruled . . . that wagers upon elections then pending are calculated to endanger the peace and harmony of society and have a corrupting influence upon the morals and are contrary to sound policy"); Colorado, *Maher v. Van Horn*, 60 P. 949, 17-18 (Colo. 1900) ("[W]ager contracts on the result of elections are contrary to public policy and void and will not be enforced by the courts"); Delaware, *Gardner v. Nolen*, 3 Del. 420, 420 (Del. Super. Ct. 1842) ("As within the policy of prohibiting betting on elections, an election wager cannot be recovered though laid after the closing of the polls"); Georgia, *McLennan v. Whidon*, 48 S.E. 201, 202-03, 120 Ga. 666 (1904), quoting *Leverett v. Stegal*, 23 Ga. 259 (1857) (finding that all gambling contracts are illegal but noting that "If there be any class of gambling contracts which should be frowned upon more than another it is bets on elections. They strike at the foundations of popular institutions, corrupt the ballot box, or, what is tantamount to it, interfere with the freedom and purity of elections"); Indiana, *Worthington v. Black*, 13 Ind. 344, 344-345 (1859) ("It has been often decided that wagers upon the result of an election are against the principles of sound policy, and consequently illegal . . ."); Iowa, *David v. Ransom*, 1 Greene 383, 383-85 (Iowa 1848) ("A wager or bet made between parties on the result of an election is void.  If the wager is made before an election, illegal votes are often secured, and others induced, contrary to the better judgment of the voter; or if made after an election, the parties interested might be led to exert a corrupt influence upon the canvassing, and returns of the votes"); Kansas, *Reynolds v. McKinney*, 4 Kan. 94, 101 (1866) ("[A bet] involving an inquiry into the validity of the election of a public officer. … was therefore, illegal and void on principles of public policy"); Massachusetts, *Ball v. Gilbert*, 53 Mass. 397, 400-02 (1847) (a wager upon the event of an election to a public office - at the federal, state, or local level -  is illegal and void on numerous public policy grounds); Missouri, *Hickerson v. Benson*, 8 Mo. 8 (1843) (wagers on the result of public elections and collateral matters are "clearly" against public policy and "sound morality" and consequently illegal and void at common law); Nebraska, *Specht v. Beindorf*, 56 Neb. 553, 76 N.W. 1059 (1898) (promissory note premised on the election of a public official is a wager on the result of an election and void on grounds of public policy); New York, *Rust v. Gott*, 1828 WL 1964 (N.Y. Sup. Ct. 1828) (wager on the event of an election is illegal and void, even where made after the poll of election is closed but before the canvass is complete); North Carolina, *Bettis v. Reynolds*, 34 N.C. 344, 345-48 (1851) ("the practice of betting on elections has a direct tendency to cause undue influence[,]" and even where neither party was a voter, a wager on the result of a Presidential election void as against public policy); Oregon, *Willis v. Hoover*, 9 Or. 418, 419-20 (1881) (wagers on the result of public elections are illegal and void upon grounds of public policy); Rhode Island, *Stoddard v. Martin*, 1 R.I. 1, 1 (1828) (all wagers on elections and judicial decisions "are of immoral tendency, against sound policy," and therefore void); Tennessee, *Russell v. Pyland*, 21 Tenn. 131, 133 (1840) (a note premised on the outcome of an election is illegal and void under common law principles); Texas, *Thompson v. Harrison*, 1842 WL 3625, at *1 (Tex. 1842) (wagers on the result of public elections are "contrary to good morals" and void on grounds of public policy); Wisconsin, *Murdock v. Kilbourn*, 6 Wis. 468, 470-71 (1857) (wager upon the event of a public election is contrary to public policy, illegal, and void).

determine the party affiliation of the Speaker and the Pres Pro Temp), and in many states such conduct is illegal.[28]

### The Congressional Control Contracts Are Contrary to the Public Interest

**WHEREAS,** the Commission has evaluated whether the Congressional Control Contracts are contrary to the public interest.

**WHEREAS**, the legislative history of CEA section 5c(c)(5)(C) indicates Congressional intent for the Commission to consider, among other things, in its evaluation of whether a contract is contrary to the public interest for purposes of that provision, a form of the "economic purpose test" that was applied to determine whether a contract was contrary to the public interest under former CEA section 5(g) prior to its deletion by the Commodity Futures Modernization Act of 2000 ("CFMA").[29]

---

[28] Kalshi argues that many state gaming laws carve out exceptions for Commission-regulated products and, relatedly, that the Commission's jurisdiction over futures and swaps preempts any state gaming laws as to those products. Seen in this context, Kalshi argues, the state laws that prohibit betting or wagering on elections do not and cannot refer to Commission-regulated event contracts, and the Congressional Control Contracts are therefore not unlawful under state law. This misses the point. CEA section 2(a)(1) grants the Commission "exclusive jurisdiction" over futures and swaps traded on a DCM. 7 U.S.C. § 2(a)(1). This "preempts the application of state law," *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), so transacting these products on a DCM cannot, in and of itself, be an "activity that is unlawful under any … State law." On the other hand, these products may still "involve … activity" that is unlawful under a state law, in the sense, for example, that transactions in the products may "relate closely" to, "entail," or "have as an essential feature or consequence" an activity that violates state law. *See* Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/involve (last visited Oct. 12, 2022); Random House College Dictionary 703 (Revised ed. 1979); Riverside University Dictionary 645 (1983). Here, state laws (that are not preempted by the CEA) prohibit wagering on elections. Taking a position in the Congressional Control Contracts would be staking something of value on the outcome of contests between electoral candidates, such that wagering on elections is "an essential feature or consequence" of the contracts. Thus, while transactions in the Congressional Control Contracts on a DCM do not violate, for example, state bucket-shop laws, they nevertheless involve an activity that is unlawful in a number of states—wagering on elections. To permit such transactions on a DCM would undermine important state interests expressed in statutes separate and apart from those applicable to trading on a DCM.

[29] 7 U.S.C. § 7(g), *as amended* by the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 8 Stat. 1389 (1974). In the colloquy between Senator Feinstein and Senator Lincoln on the Senate floor regarding the proposed Dodd-Frank Act provision that ultimately was enacted as CEA section 5c(c)(5)(C), Senator Feinstein referenced the Commission's pre-CFMA authority "to prevent trading that is contrary to the public interest," and asked Senator Lincoln whether, with respect to CEA section 5c(c)(5)(C), the intent was to "define 'public interest' broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used

**WHEREAS,** the general "Findings and Purpose" provision of the CEA, at CEA section 3, states that "[t]he transactions subject to [the CEA] . . . are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair, and secure financial facilities,"[30] and thus recognizes hedging – and, in particular, price hedging (the "managing [of] price risks") – as a public interest that transactions subject to the CEA are intended to serve.

**WHEREAS,** the Commission has the discretion to consider other factors in its evaluation of whether a contract is contrary to the public interest for purposes of CEA section 5c(c)(5)(C), and the legislative history of CEA section 5c(c)(5)(C) supports consideration of whether a contract may threaten the public good.[31]

---

predominantly by speculators or participants not having a commercial or hedging interest." Senator Feinstein asked whether the Commission would "have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use[,]" and Senator Lincoln replied, "That is our intent." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), *available at* https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf. Pre-CFMA Commission guidelines articulated the economic purpose test as an evaluation of "whether [a] contract reasonably can be expected to be, or has been, used for hedging and/or price basing on more than an occasional basis." 17 C.F.R. § 5, Appendix A- Guideline No. l (repealed 2001). The colloquy between Senators Feinstein and Lincoln suggests a modification of the "on more than an occasional basis" standard; it suggests that the Commission should consider whether a contract is used predominantly by speculators or market participants not having a commercial or hedging interest.

[30] CEA section 3(a); 7 U.S.C. § 5(a). Section 3 further states that it is the purpose of the CEA to serve such public interests "through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission." CEA section 3(b); 7 U.S.C. § 5(b).

[31] In the colloquy on the Senate floor, Senator Lincoln further confirmed for Senator Feinstein that CEA section 5c(c)(5)(C) would empower the Commission to prevent trading in contracts "that may serve a limited commercial function but threaten the public good by allowing some to profit from events that threaten our national security." Senator Lincoln cited terrorist attacks, war and hijacking as examples of events that "pose a real commercial risk to many businesses in America," but stated that "a futures contract that allowed people to hedge that risk would also involve betting on the likelihood of events that threaten our national security. That would be contrary to the public interest." Senator Feinstein thanked Senator Lincoln for this confirmation, concluding that, "[a] futures market is for hedging." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), available at https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf.

**WHEREAS,** in light of the foregoing, in evaluating whether the Congressional Control Contracts are contrary to the public interest, the Commission has considered the contracts' hedging utility and price-basing utility.[32]  Additionally, the Commission has considered the potential impact that trading in the Congressional Control Contracts may have on election integrity, or the perception of election integrity – as well as the extent to which permitting trading in the Congressional Control Contracts could require the Commission to assume a role in overseeing the electoral process.[33]

Hedging and Price Basing Utility

**WHEREAS,** control of a chamber of Congress does not, in and of itself, have sufficiently direct, predictable, or quantifiable economic consequences for the Congressional Control Contracts to serve an effective hedging function.

**WHEREAS,** the Commission has considered comments from Kalshi and others that state that Congressional control impacts a wide variety of assets and cash flows, for a variety of

---

[32] *See* footnote 29, *supra*.

[33] In making findings regarding whether the Congressional Control Contracts are contrary to the public interest, the Commission distinguishes two staff no-action positions referenced by some commenters that have been issued by the Commission's Division of Market Oversight ("Division") to two academic institutions.  Subject to specified terms, these no-action positions state that the Division will not recommend enforcement action against the academic institutions for operating, without registration as a DCM, SEF, or foreign board of trade, small-scale not-for-profit markets that offer trading in political and economic indicator event contracts for academic purposes. CFTC Staff Letter No. 93-66 (June 18, 1993), issued to the University of Iowa, *available at* https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf; CFTC Staff Letter No. 14-130 (Oct. 29, 2014), issued to Victoria University of Wellington, New Zealand, *available at* https://www.cftc.gov/csl/14-130/download.  The terms of these staff no-action positions contemplate that each market will be operated by the relevant academic institution for academic purposes and without compensation. The terms of the no-action positions also contemplate limitations on, among other things, the number of market participants and the number of contracts that each market participant may hold.  In issuing the no-action positions, the Division did not recognize the political event contracts that would be offered by the markets as having hedging or price-basing utility.  In issuing each of the no-action positions, the Division explicitly noted that it was not rendering an opinion on the legality of the academic institutions' activities under state law.  Kalshi has not submitted that the Congressional Control Contracts would be subject to analogous limitations to those contemplated under the Division's no-action positions, including limitations providing for the market for the Congressional Control Contracts to be operated on a small-scale, not-for-profit basis for academic purposes.

entities, and that market participants already engage in behavior aimed at hedging risks related to Congressional control.  Kalshi notes that Congress has extensive powers to influence the economy and that shifts in political power often portend changes in policy.

**WHEREAS,** the Commission has considered detailed examples provided by Kalshi of statements from private research firms attempting to predict broad-ranging economic impacts of various political outcomes, and academic research indicating that the marketplace generally considers political risks in its operation (citing, for example, links between changes in the price of equities and other assets, and expected changes in Congressional control).

**WHEREAS,** the Commission has also considered similar assertions from commenters that the effect of Congressional control on the economy is sufficiently predicable and measurable for the Congressional Control Contracts to have a hedging purpose.

**WHEREAS,** conversely, several commenters expressed the view that the economic effects of Congressional control are too attenuated and unpredictable for the Congressional Control Contracts to serve as an effective hedging tool.

**WHEREAS,** the Commission finds that while control of a chamber of Congress may ultimately have economic effects, those eventual economic effects are both diffuse and unpredictable.  While the likelihood of adoption of a given policy may increase or decrease based on the composition of Congress, many intervening events and variables exist between control of a chamber of Congress and the actual implementation of such a policy.[34]  Furthermore,

---

[34] There are several steps required to enact legislation.  Proposed legislation must be approved by both chambers of Congress and by signature of the president or a Congressional override of a presidential veto.  During that process, the nature of proposed legislation can change in dramatic ways.  Beyond that, legislation requires implementation and is subject to judicial review.  All of these dynamics make it difficult to predict the nature, magnitude, and timing of policy outcomes resulting from a given party's control of a chamber of Congress.

the likelihood of implementation is not dependent on control of a chamber of Congress alone; it also depends upon many other things, including, for example, whether a party controls one or both chambers of Congress, the size of its majority, votes by individual party members, and the political affiliation of the president.

**WHEREAS,** control of a chamber of Congress could, following a number of independent intervening events, generally affect a wide variety of personal liabilities and economic factors, but that does not establish that the Congressional Control Contracts can be used for specific, identifiable hedging purposes and thus does not establish the hedging utility of the Congressional Control Contracts. Rather, it further indicates that control of a chamber of Congress does not have a direct, predictable, or quantifiable impact on any commodity or other financial asset. [35]

**WHEREAS,** the Congressional Control Contracts result, upon settlement, in a payout of either $1 or $0, depending on the party in control of the relevant chamber of Congress, with settlement and payout occurring only once every two years, to coincide with the election cycle.

---

[35] Kalshi implies that the Congressional Control Contracts should be permitted to trade because certain other contracts currently trading on Commission-regulated exchanges involve a degree of removal from the actual risk that is intended to be hedged. As a preliminary matter, the Commission notes that an exchange's certification of a product for trading pursuant to CEA section 5c(c)(1) and Commission Regulation 40.2 does not entail or amount to Commission approval of that product. Further, while Kalshi does not cite to specific contracts in most of the examples it provides, the contracts that Kalshi appears to be referring to for comparison generally have more specific and targeted hedging utility than the Congressional Control Contracts and are otherwise materially different from such contracts. For example, Heating and Cooling Degree Day futures contracts that Kalshi appears to reference do not settle based on an overarching nationwide heating degree day/cooling degree day calculation – they settle based on a calculation at a very specific location. Similarly, real estate index contracts that Kalshi appears to reference settle based on the value of the index in a specific metropolitan area, with the index itself based on real estate price values. In contrast, the Congressional Control Contracts are based on which political party will control the relevant chamber of Congress – they are not based on or tied to any actual price or related values. Furthermore, certain of the event contracts that Kalshi appears to reference do not fall within the scope of CEA section 5c(c)(5)(C) and Commission Regulation 40.11 – which apply with respect to contracts in certain types of excluded commodities – and most of the contracts that Kalshi appears to reference are not event contracts at all.

**WHEREAS,** the payout for the Congressional Control Contracts is not tied in any way to actual or estimated losses incurred elsewhere, and a loss on the Congressional Control Contracts is not offset by a related gain elsewhere, as is the case for contracts with hedging and risk management capabilities.

**WHEREAS,** the binary payout of the Congressional Control Contracts further limits their utility as a vehicle for hedging any eventual economic effects resulting from which party controls a chamber of Congress, as does their frequency of settlement.

**WHEREAS,** price-basing occurs when producers, processors, merchants, or consumers of a commodity establish commercial transaction prices based on the futures price for that or a related commodity.[36]

**WHEREAS**, the Commission has considered comments from Kalshi and others that the outcome of Congressional elections could affect the pricing of a number of diverse commercial transactions because the outcome could impact the pricing of various commodities underlying those transactions.

**WHEREAS,** other commenters stated that the Congressional Control Contracts cannot have price-basing utility for the same reason that they do not have hedging utility – namely, that the economic ramifications of an election are indirect and unpredictable, and therefore cannot help determine the price of a commodity or financial asset in a predictable manner.

**WHEREAS,** even if some level of political risk may be embedded in the pricing of many commercial transactions, that does not, in itself, support a finding that the Congressional Control Contracts serve a price-basing function.

---

[36] *See* CFTC Futures Glossary, *available at* https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#P.

**WHEREAS**, since the economic effects of control of a chamber of Congress are diffuse and unpredictable, the price of the Congressional Control Contracts is not directly correlated to the price of any commodity, and so the price of the Congressional Control Contracts could not predictably be used to establish commercial transaction prices.

**WHEREAS,** in light of the foregoing, the Commission finds that it has not been demonstrated that the Congressional Control Contracts could reasonably be expected to be used for hedging and/or price basing on more than an occasional basis or that the Congressional Control Contracts could reasonably be expected to be used predominantly by market participants having a commercial or hedging interest.

<u>Election Integrity and the Commission's Role in the Electoral Process</u>

**WHEREAS,** more than 600 commenters – a significant proportion of the public commenters on the Submission – expressed concerns about the effect that the Congressional Control Contracts could have on election integrity, including concerns that the Congressional Control Contracts are inconsistent with ideals of democracy and the sanctity of the electoral process.

**WHEREAS,** these commenters included members of Congress, who expressed concern about the potential impact of the Congressional Control Contracts on the electoral process. A comment letter from six United States Senators stated that "[e]stablishing a large-scale, for-profit political event betting market in the United States … would profoundly undermine the sanctity and democratic value of elections … There is no doubt that mass commodification of our

democratic process would raise widespread concerns about the integrity of our electoral process."[37]

**WHEREAS**, the Congressional Control Contracts could potentially be used in ways that would have an adverse effect on the integrity of elections, or the perception of integrity of elections – for example, by creating monetary incentives to vote for particular candidates, even when such votes may be contrary to a voter's (or an organized group of voters') political preferences or views of such candidates.

**WHEREAS**, the Congressional Control Contracts raise concerns that conduct designed to artificially affect the electoral process could also, intentionally or otherwise, manipulate the market in the Congressional Control Contracts, or that the market in the Congressional Control Contracts could be manipulated to influence elections or electoral perceptions. In particular, several commenters (including members of Congress) stated that the Congressional Control Contracts could incentivize the spread of misinformation by individuals or groups seeking to influence perceptions of a political party or a party candidate's success.

**WHEREAS**, the public interest in guarding against such misinformation is all the more pressing in the context of contracts rooted in the outcome of United States federal elections.[38]

---

[37] The signatories to the letter are Senators Jeffrey Merkley, Sheldon Whitehouse, Edward Markey, Elizabeth Warren, Chris Van Hollen, and Diane Feinstein (the "Six Senators"). Senator Amy Klobuchar filed a separate comment letter expressing "concern" with the Submission. The comment letter from the Six Senators underscores differences between a potential market for the Congressional Control Contracts and the markets for political event contracts in respect of which the Division has previously issued staff no-action positions. Kalshi is a for-profit entity seeking to offer a broad-based market in the Congressional Control Contracts. Kalshi has not submitted that the Congressional Control Contracts would be subject to analogous limitations to those contemplated under the Division's no-action positions. In particular, Kalshi has not submitted that the markets for the Congressional Control Contracts would be operated on a small-scale, not-for-profit basis for academic purposes.

[38] Kalshi cites to a paper on the history of election betting in the United States for the premise that such betting did not negatively affect the political process. *See* Paul Rhode and Coleman Strumpf, "Historical Presidential Betting Markets," Journal of Economic Perspectives, Vol. 18, No. 2 (Spring 2004). The Commission notes that the markets examined in that study existed in a very different historical context – before 1940 – and that the study nonetheless

**WHEREAS**, the Congressional Control Contracts have no underlying cash market with bona fide economic transactions to provide directly correlated price forming information. Rather, price forming information for the Congressional Control Contracts is driven in large measure by polling, voter surveys, and other informational sources that are unregulated, frequently have opaque underlying processes and procedures, and may not follow scientifically reliable methodologies.  This differs from the informational sources (*e.g.*, government issued crop forecasts, weather forecasts, federal government economic data, market-derived supply and demand metrics for commodities, market-based interest rate curves, etc.) used for pricing the vast majority of commodities underlying Commission-regulated derivatives contracts.

**WHEREAS,** the opaque and unregulated sources of price forming information for the Congressional Control Contracts may increase the risk of manipulative activity relating to the trading and pricing of the contracts, while decreasing Kalshi's and the Commission's ability to detect such activity.

**WHEREAS**, the Commission has considered assertions by Kalshi and other commenters that the Congressional Control Contracts would serve as a check on misinformation and inaccurate polling, stating that market-based alternatives tend to be more accurate than polling or other methods of predicting election outcomes.

---

acknowledges both attempts to manipulate the odds and concerns that the betting markets provided a potential means of influencing elections.  Several other commenters noted specific examples of manipulation or attempted manipulation incidents on election markets, while others downplayed these incidents.

**WHEREAS,** there is also research suggesting that election markets may incentivize the creation of "fake" or unreliable information in the interest of moving the market, and a number of commenters also raised this concern.[39]

**WHEREAS,** the Congressional Control Contracts prohibit certain individuals and entities likely to have a stake in the outcome of elections from trading in the contracts – including paid employees of political campaigns and major polling organizations.  However, these trading prohibitions would not prevent such individuals and entities from engaging in other activity – intended to create the impression of likely electoral success or failure on the part of a particular political candidate or candidates – that could artificially move the market in the Congressional Control Contracts.

**WHEREAS,** the trading prohibitions for the Congressional Control Contracts also do not exclude all individuals or entities who could have a motivation to create the impression of likely electoral success or failure on the part of a political candidate or candidates.[40]

**WHEREAS,** if trading in the Congressional Control Contracts were to be permitted, the Commission, as regulator of the markets in those contracts, would be required to investigate suspected manipulation in those markets.  By extension, the Commission could find itself investigating election-related activities – potentially including the outcome of an election itself. Several commenters stated that this was not a role for which the Commission is equipped or

---

[39] *See* Yeargain, Tyler, "Fake Polls, Real Consequences: The Rise of Fake Polls and the Case for Criminal Liability," Missouri Law Review, Volume 85, Issue 1 (Winter 2020) *citing* Enten, Harry, "Fake Polls are a Real Problem," *available at* https://fivethirtyeight.com/features/fake-polls-are-a-real-problem/ (Aug. 22, 2017) (noting how a seemingly false or unreliable poll caused significant movement on an event contract market and suggesting that such poll could have been, or at least could be, created to cause such market movement; further arguing that such false polls can have a real and detrimental effect on elections).

[40] Such individuals and entities could include, for example, Congressional campaign volunteers, consultants to Congressional campaigns, or donors or other supporters of political parties or individual Congressional candidates.

well-suited, with two members of the House of Representative stating in a joint comment letter that "because the CFTC is not equipped or authorized to enforce election laws, the prospect of the Commission assuming the role of an 'election cop' raises very serious concerns about the misalignment of such a role with the CFTC's historic mission and mandate as established by Congress."[41]

**Therefore**, the Commission FINDS that:

Pursuant to section 5c(c)(5)(C)(i) of the Commodity Exchange Act and Commission Regulation 40.11, the Congressional Control Contracts: (1) involve gaming and activity that is unlawful under State law; and (2) are contrary to the public interest.

**Accordingly, IT IS HEREBY ORDERED THAT:**

Pursuant to CEA section 5c(c)(5)(C)(ii) and Commission Regulation 40.11(a)(1), the Congressional Control Contracts are prohibited and shall not be listed or made available for clearing or trading on or through Kalshi.

**The provisions of this Order shall be effective as of this date.**


By the Commission.

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission


Date:  September 22, 2023

---

[41] Comment Letter of Reps. Sarbanes and Raskin at 3.

# Public Statements & Remarks

## Statement of Chairman Rostin Behnam Regarding CFTC Order to Prohibit Kalshi Political Control Derivatives Contracts

**September 22, 2023**

Today's Order prohibits listing or otherwise making available for clearing or trading certain Congressional Control Contracts on or through KalshiEx LLC ("Kalshi") based on findings that such political event contracts involve both gaming and activity that is unlawful under State law, and are contrary to the public interest.[1]  The Commodity Exchange Act (CEA) enumerates certain categories of commodities for which derivatives may be contrary to the public interest if listed on an exchange.  These include contracts that involve gaming or activity that violates State or Federal Law.  Kalshi's Congressional control contracts fall into both of these categories.  Betting or wagering on elections, as proposed by Kalshi, meets the definition of gaming.  And in many states, betting or wagering on elections is prohibited by statute or common law.  The analysis conducted, determinations reached, and process followed resulting in the Commission's Order are squarely within our duty and discretion.

The Commission's consideration of the Congressional Control Contracts and ultimate vote was guided by careful analysis of statutory language and Congressional intent, and informed by the 1,378 public comments[2] submitted in response to questions aimed at informing our review.

The Commission has previously considered whether other event contracts that involve political events could satisfy the application of the prongs of the public interest test embedded in the CEA. For almost two decades, registered and prospective registered entities alike have attempted to develop and list products that would elude the definition of gaming and essentially reduce key facets of the democratic process to a source of revenue for some, fascination and entertainment for others, and, critically, an unmandated duty for the CFTC.  The approval of political event contracts of the type presented in the Order would require the CFTC to exercise its oversight and enforcement authorities in the manner of an election cop.  Our new authorities would per se include monitoring elections, candidates, and countless participants in the political machinations that proliferate in the media and cyberspace in an effort to prevent manipulation and false reporting within the political system—something that the CFTC currently lacks the mandate to do.

It makes sense for the CFTC to have authority to combat fraud, manipulation, and false reporting in underlying commodity markets.  But it is impractical for the CFTC to combat them in the underlying market here—a political contest.  The implications of such authority are vast, and could extend in a multitude of directions beyond the election itself, political fundraising and polling, to name just two.

For these reasons, I agree with the Commission's determination today that Kalshi's Congressional control contracts should be prohibited.

---

[1] *See* CEA section 5c(c)(5)(C)(ii); 7 U.S.C. § 7a-2(c)(5)(C)(ii).

[2] https://comments.cftc.gov/PublicComments/CommentList.aspx?id=7394 (https://comments.cftc.gov/PublicComments/CommentList.aspx?id=7394).

**-CFTC-**

Case 1:23-cv-03257-JMC   Document 1-1   Filed 10/01/23   Page 27 of 36

# Public Statements & Remarks

## Dissenting Statement of Commissioner Summer K. Mersinger Regarding Order on Certified Derivatives Contracts with Respect to Political Control of the U.S. Senate and House of Representatives

September 22, 2023

I respectfully dissent from the Order Prohibiting Listing for Trading of Certified Derivatives Contracts with Respect to Political Control of the U.S. Senate and House of Representatives (the "Order"). I cannot support the Commission[1] taking this trip "through the looking glass"[2] in order to cover up the fact that for over 13 years, it has failed to follow the process that Congress specifically authorized for situations like this: A notice-and-comment rulemaking.

As I have stated publicly before,[3] my dissent should not be taken as an endorsement of the contracts before us. But even if the Commission thinks these contracts are a bad idea, that does not give us the authority to re-write the statute to claim an authority that Congress did not give us because we have been derelict in applying the authority that Congress did give us. Accordingly, I respectfully dissent.

### The CFTC's Statutory Authority

Our governing statute, the Commodity Exchange Act ("CEA"), grants the CFTC the authority to prohibit an "event contract" from being listed for trading if it involves one of five specifically enumerated activities and is contrary to the public interest.[4]

The Order rejects event contracts with respect to control of the U.S. Senate and House of Representatives ("Congressional Control Contracts") that KalshiEx, LLC ("Kalshi"), a registered exchange (referred to in the CEA as a "designated contract market" or "DCM"), wants to list for trading. The Order —

1. Finds that the Congressional Control Contracts involve an enumerated activity even though none of the enumerated activities mentions Congressional control, or elections, by—

   - Mischaracterizing the nature of the contracts; and

   - Adding words to the statute that are not there.

2. Finds that the Congressional Control Contracts are contrary to the public interest on the basis of an "economic purpose test" that—

   - Is not mentioned in the statute;

   - Has been eliminated for other purposes as a result of amendments to the CEA; and

   - Was not designed for the type of contract at issue.

### Event Contracts in Brief

CEA Section 5c(c)(5)(C), which was added to the CEA in 2010 by the Dodd-Frank Act,[5] provides that the Commission may determine that event contracts based upon the occurrence, extent of an occurrence, or contingency are "contrary to the public interest" if they "involve" one of five enumerated categories: 1) activity that is unlawful under any Federal or State law; 2) terrorism; 3) assassination; 4) war; or 5) gaming.

1. The Commission's Event Contracts Rule is Inconsistent With, and Contradicts, the CEA

The Commission's practice of adding words to the CEA's event contract provisions began early, when it implemented CEA Section 5c(c)(5)(C) by promulgating CFTC Rule 40.11[6] about a year after enactment of the Dodd-Frank Act.[7] Whereas CEA Section 5c(c)(5)(C) grants the Commission discretion to determine whether a DCM's event contract is contrary to the public interest if the contract "involves" one of the enumerated categories, Rule 40.11 refers to an event contract that "involves, relates to, or references" an enumerated category.

Even worse, Rule 40.11 contradicts the statute. CEA Section 5c(c)(5)(C) grants the Commission discretion to determine *whether* a DCM's event contract that involves an enumerated activity is contrary to the public interest. CFTC Rule 40.11(a), by contrast, provides that a DCM "*shall not* list for trading" a contract that involves (or relates to, or references) an enumerated activity (emphasis added). Read literally, Rule 40.11(a) removes entirely the flexibility that Congress granted the Commission to evaluate DCM event contracts from a public interest perspective.

Our rules should provide market participants and the public with clarity and certainty as to how the Commission interprets the CEA. Unfortunately, the Commission's Rule 40.11 regarding event contracts creates confusion rather than clarity by adding words that are not present in the statute and contradicting the provisions of the CEA they purport to construe.

I cannot support an Order that is based, in part, on a rule with these legal shortcomings. For purposes of my vote and this Statement, therefore, I have analyzed Kalshi's Congressional Control Contracts pursuant to the statutory provisions in CEA Section 5c(c)(5)(C), not the provisions of CFTC Rule 40.11.

2. The Commission's Prior Order Regarding Event Contracts is Distinguishable, and Wrong

The Order generally adheres to the Commission's only public interpretation of CEA Section 5c(c)(5)(C) back in 2011-2012, which prohibited event contracts that another DCM, the North American Derivatives Exchange ("Nadex"), sought to list for trading.[8] Nadex sought to list contracts that were similar to Kalshi's Congressional Control Contracts, but importantly, Nadex also sought to list 10 U.S. Presidency binary contracts.

The Commission's rejection of the Nadex request undoubtedly was influenced by the Nadex request to let traders take a position directly on the result of a Presidential election. Kalshi has not made that request—its contracts are limited to Congressional control. Thus, the Commission's action regarding Nadex is distinguishable.

But even if the Nadex contracts on Congressional control are considered separately, in the words of Socrates, "it is better to change an opinion than to persist in a wrong one."[9] While restating the conclusions of the Nadex Order might be the path of least resistance, I believe that we should embrace the wisdom of Socrates and change our opinion, rather than persist in a wrong one.

**Kalshi's Congressional Control Contracts Do Not Involve an Enumerated Activity that is Subject to a Public Interest Review Under the CEA**

The Congressional Control Contracts are cash-settled, binary (yes/no) contracts based on which political party will control a chamber of the U.S. Congress for a given term. The settlement values of the Congressional Control Contracts are determined by the party affiliation of the Speaker of the House of Representatives and the President Pro Tempore of the Senate.[10]

As noted above, to be subject to a public interest review, CEA Section 5c(c)(5)(C) requires that an event contract "involve" an enumerated activity. But the enumerated activities in CEA Section 5c(c)(5)(C) do not mention Congressional control.

Accordingly, in an effort to find an enumerated activity into which it can squeeze the Congressional Control Contracts nonetheless, the Order focuses on individual elections for the House and Senate: "The Congressional Control Contracts are premised on the outcome of Congressional election contests, which ultimately determine the party affiliation of the Speaker and the [President Pro Tempore]."[11]

    1. The Order's Focus on Individual Elections is Flawed

There are three flaws in the Order's focus on individual Congressional elections as the source of an enumerated activity subject to a public interest review. First and foremost, just as the enumerated activities in CEA Section 5c(c)(5)(C) do not mention Congressional control, they also do not mention elections, either. Congress easily could have listed Congressional control, or elections, or both, as enumerated activities subject to a public interest review; it did not.

Second, the Order's focus on individual Congressional elections mischaracterizes the nature of Kalshi's Congressional Control Contracts. While it is generally custom for the House to elect as Speaker a member of the party in the majority,[12] and for the Senate to select as President Pro Tempore the longest-serving Senator from the party of the majority, these are not requirements under the Constitution. In fact, before 1890, the President Pro Tempore was not selected based on an election outcome at all. Rather, the Senator to hold that office was selected every time the Vice President was not present in the Senate Chamber.[14] Additionally, in years when the Senate has been closely divided, the legislative body has seen more than one President Pro Tempore designate a second Senator as "president pro tempore emeritus."[15]

The Speaker of the House does not have to be an elected member of the House or a candidate formally nominated by the two dominant parties.[16] There even has been discussion of the possibility of a non-sitting House member being nominated for Speaker.[17] There also are numerous press accounts during times of narrow divide in the House that led to speculation about the majority party's lacking the necessary votes for Speaker, which would allow the minority party's Speaker nominee to win the majority of votes.[18]

The point is that the selection of the Speaker of the House and the President Pro Tempore of the Senate are decisions that are independent of the individual Congressional elections that precede them. While it may be customary that the party affiliation of these officials is premised on the outcome of the elections, that is neither legally required nor guaranteed. The Order's focus on individual Congressional elections in determining whether the Congressional Control Contracts are subject to a public interest review mischaracterizes the nature of these contracts given their method of settlement.

Third, and relatedly, Kalshi's Congressional Control Contracts do not directly involve any particular election. No one election will determine which party wins, and which party loses, on a Congressional Control Contract. Rather, given its settlement mechanism, the result of a Congressional Control Contract depends indirectly on the cumulative outcomes of 435 elections for the House, and approximately 33 elections for the Senate (combined with the party affiliations of the other approximately 67 Senators for whom there are no elections).

Again, to be subject to a public interest review, CEA Section 5c(c)(5)(C) requires that an event contract "involve" an enumerated activity. There is little doubt that an event contract directly on the election of a particular candidate to a particular office—such as the U.S. Presidency contracts that Nadex sought to list for trading—"involves" an election. But to reach Kalshi's Congressional Control Contracts, the Order reads CEA Section 5c(c)(5)(C) as requiring that an event contract "involve, directly or indirectly," an enumerated activity. The statute, however, contains no such reference to indirect involvement of the type presented here.[19]

Thus, the Order's focus on individual elections is flawed. Elections are not an enumerated activity in CEA Section 5c(c)(5)(C). And the Order, without any discussion or analysis: 1) mischaracterizes the settlement method of the Congressional Control Contracts as the inexorable result of individual elections; and 2) erroneously treats the indirect relationship between the Congressional Control Contracts and individual elections the same as the direct relationship of an event contract on the result of a specific election.[20]

    2. The Congressional Control Contracts Do Not Involve Gaming or Activity that is Unlawful Under State Law

Even if we overlook these fundamental flaws in its analysis and accept the Order's focus on individual elections, the Order fails to establish that the Congressional Control Contracts involve the enumerated activities of: 1) gaming; and 2) activity that is unlawful under State law. Neither category applies.

***The Order recognizes that neither the CEA nor the Commission's rules define the term "gaming."*[21]** *In the Rule 40.11 Adopting Release implementing CEA Section 5c(c)(5)(C), the Commission acknowledged that "the term 'gaming' requires further clarification," and said that the Commission may issue a future rulemaking concerning event contracts that involve "gaming."*[22] *But no such future Commission rulemaking has been forthcoming.*

Lacking any definition or clarification of the term "gaming" with which to evaluate the Congressional Control Contracts, the Order attempts to divine the term's "ordinary meaning" through the following tortured chain of reasoning:

- Gaming means gambling;

- Several state statutes link gambling to betting or wagering on elections; and, therefore,

- The Congressional Control Contracts constitute gaming.[23]

The Order engages in this sophistry because, based on the descriptions provided in the Order, 7 of the 8 state statutes that it cites that use either the term "gaming" or the term "gambling"—use "gambling."[24]  As a result, the statement in the Order that several state statutes, "on their face," link the term "gaming" to betting or wagering on elections[25] is misleading.

Alas, though, the Order's linguistic gymnastics equating "gaming" with "gambling" are undermined by one of the very state statutes it cites.  The cited Kentucky statute defines "gambling" as "staking or risking something of value upon the outcome of a contest, game, *gaming scheme, or gaming device* which is based upon an element of chance . . ."[26]  If "gaming" means "gambling," then there would be no need for the statute's redundant definition of "gambling" as a "gaming scheme, or gaming device."

Indeed, one has to ask:  If Congress intended for "gambling" to be an enumerated activity, is it more likely that Section 5c(c)(5)(C) would have:

- Included "gambling" in its list of enumerated activities; or

- Enumerated "gaming" and hoped the Commission would consider "gaming" to mean "gambling"?

That the answer is the former becomes even clearer when it is noted that the one federal statute cited in the Order—the Unlawful Internet *Gambling* Enforcement Act[27]—uses the word "gambling" (not "gaming") in its very title.

The Order eschews a much more natural interpretation of the ordinary meaning of "gaming" in Section 5c(c)(5)(C):  Risking money on the result of a *game*.  Cambridge Dictionary defines "gaming" as "the risking of money in games of chance, especially at a casino; gaming machines/tables."[28]

In fact, this was how Senators Lincoln and Feinstein viewed gaming in the very colloquy about CEA Section 5c(c)(5)(C) that is cited in the Order.  In responding to Senator Feinstein's question about the Commission's authority under Section 5c(c)(5)(C) to determine that a contract is a gaming contract, Senator Lincoln said that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament."[29]  Thus, the legislative history associates gaming with sporting events, *i.e.,* games.[30]

With respect to the enumerated category of activity that is unlawful under State law, I do not question that placing bets or wagers directly on the result of an election of a public official would violate the statutes and common law cited in the Order.  But as discussed above, the Congressional Control Contracts do not settle directly on the election of any individual Representative or Senator.  The Order does not cite any authority that any state statute or common law could be used—and no instance in which it has been used—to prosecute a person for staking something of value upon the political party that will control the U.S. House of Representatives or Senate as an indirect result of a multitude of elections (and, in the Senate, the party affiliations of Senators who are not even up for election).[31]

Again, if Congress had intended for event contracts involving Congressional control to be an enumerated activity, it easily could have done so, either by explicitly enumerating it or by enumerating event contracts that involve, directly or indirectly, elections.  Confronted instead with Congressional silence, I do not believe the Commission can simply decree that the Congressional Control Contracts are subject to a public interest review.  And this is especially the case when Congress provided the Commission with another path – a notice-and comment rulemaking – which path the Commission has failed to follow for many years now.

*In addition to the five enumerated categories of activity set out above, CEA Section 5c(c)(5)(C) also includes a sixth category providing that the Commission may determine that an event contract that involves "other similar activity" to the enumerated categories is contrary to the public interest.  Congress included an important caveat, though:  The Commission can only exercise its discretion to determine that a contract involving "other similar activity" is contrary to the public interest by rule or regulation.*[32]

Thus, Section 5c(c)(5)(C) contains a ready-made process for the Commission to determine, through a public rulemaking, whether event contracts involving Congressional control are appropriate for listing and trading by DCMs like Kalshi.  Further, a rulemaking process would allow the Commission to fix the obvious legal shortcomings in existing Rule 40.11, which implements CEA Section 5c(c)(5)(C), as discussed above.

At any point during the 13 years since the enactment of the Dodd-Frank Act, the Commission could have undertaken such a public rulemaking process as specifically provided for in Section 5c(c)(5)(C).  Such a rulemaking could have, among other things, defined the term "gaming," identified activities that the Commission considers "similar" to the enumerated activities and would therefore be subject to a public interest review, and set forth standards and criteria the Commission would use in determining whether to exercise its discretion to undertake such a public interest review.[33]

The Commission has been aware that there is significant interest in event contracts relating directly to elections, and to Congressional control, for a very long time.  In 2008, two years before the Dodd-Frank Act became law, the Commission was already struggling with the treatment of event contracts.  In its "Concept Release on the Appropriate Regulatory Treatment of Event Contracts," the Commission stated:

[E]vent contracts may be based on eventualities and measures as varied as the world's population in the year 2050, *the results of political elections*, the outcome of particular entertainment events.  The Commission's staff has received a substantial number of requests for guidance on the propriety trading various event contracts under the regulatory rubric of the Commodity Exchange Act . . .[34]

In addition, the Commission's staff has issued two no-action letters permitting the offer of political indicator event contracts to U.S. persons without registration as a DCM, which relief remains in effect today.[35]  Finally, as noted above, in 2011, Nadex (a registered DCM like Kalshi) sought to list event contracts based on majority control of the House and Senate similar to Kalshi's Congressional Control Contracts, as well as 10 U.S. Presidency binary contracts.

Yet, rather than undertake the hard work of a rulemaking process to build a foundation for evaluating event contracts such as the Congressional Control Contracts, the Commission has squandered the decade since the enactment of the Dodd-Frank Act and the issuance of the Nadex Order. Even during the year since Kalshi initially submitted its contracts,[36] the Commission still has not initiated a rulemaking process as expressly provided for in the CEA. [37]  **It is wholly inconsistent with principles of "good government" for the Commission to subject DCM event contracts to a public interest review without providing any regulatory certainty as to the definitions and standards it will apply in doing so.**

**A Commission Rulemaking on Event Contracts Should Address the Flawed Public Interest Review in The Order, Too**

A rulemaking process on event contracts, as contemplated by Congress, also would enable the Commission, for the first time, to interpret the "contrary to the public interest" standard in CEA Section 5c(c)(5)(C) (both generally, and with respect to event contracts on Congressional control and directly on elections in particular).  Specifically, such a rulemaking should establish the identifiable factors the Commission will consider when evaluating event contracts pursuant to that standard.

Such a rulemaking is vitally important because the public interest review set out in the Order is fundamentally flawed—which is another reason for my dissent.

1. The Order Improperly Resurrects, Based on a Single and Ambiguous Colloquy, the Economic Purpose Test that the CFTC Previously Removed for Other Purposes

The CEA does not define "public interest" for purposes of CEA Section 5c(c)(5)(C).  The Order relies on legislative history of Section 5c(c)(5)(C) to conclude that Congress purportedly intended, for purposes of a public interest review of an event contract, to resurrect "a form of the economic purpose test" that the Commission had used to determine whether contracts were contrary to the public interest—until that public interest requirement was removed from the CEA by the Commodity Futures Modernization Act of 2000 ("CFMA").[38]

The legislative history that the Order is relying on with respect to the resurrection of the economic purpose test consists of a single colloquy between Senator Dianne Feinstein and Senator Blanche Lincoln, reading in relevant part as follows:

Mrs. Feinstein: . . . Will the CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to hedging or economic use?

Mrs. Lincoln:  That is our intent.  The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public intere because they exist predominantly to enable gambling through supposed event contracts.  It would be quite easy to construct an 'event contract' arou sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.  These types of contracts would not serve any real commercial purpose.  Rather, they would be used solely for gambling.[39]

To be clear, the Dodd-Frank Act did not codify the economic purpose test in the CEA.  And I cannot accept the Commission's conclusion that this isolated colloquy between two Senators establishes an intent by the whole of Congress that the Commission conduct its public interest reviews of event contracts based on the economic purpose test that had been eliminated as a result of amendments to the statute a decade earlier.

After all, neither Senator Feinstein nor Senator Lincoln used the term "economic purpose test."  As someone who spent over a decade working in Congress, and who was present on the Senate floor for countless colloquies and even had a hand in preparing talking points for similar floor discussions, I am confident that if the Senators believed we should resurrect the economic purpose test, they would have said just that.[40]

2. The Order Applies an Economic Purpose Test That Was Not Designed for Contracts Like the Congressional Control Contracts

The two prongs of the economic purpose test, which the Order adopts as a primary component of its public interest review of the Congressional Control Contracts, evaluate:  1) the contract's utility for price basing; and 2) whether the contract can be used for hedging purposes.

The Order states the price basing prong of the economic purpose test as follows:  "[P]rice-basing occurs when producers, processors, merchants, or consumers of a commodity establish commercial transaction prices *based on the futures price* for that or a related commodity."[41]  As the Order thus indicates, the price basing prong of the economic purpose test was designed primarily for the traditional futures contracts that were listed and traded on futures exchanges for decades before Congress enacted the CFMA in 2000.  The Order confirms this by attributing the foregoing statement of price basing to the CFTC's "*Futures* Glossary."[42]  Further, the Feinstein-Lincoln colloquy makes clear that the Senators' statements about economic purpose were made with futures contracts in mind.[43]

The Order then finds that the Congressional Control Contracts fall short with respect to price basing:  "[T]he price of the Congressional Control Contracts is not directly correlated to the price of any commodity, and so the price of the Congressional Control Contracts could not predictably be used to establish commercial transaction prices."[44]  This is not surprising, given that traditional futures contracts differ significantly from binary (yes/no) event contracts such as Kalshi's Congressional Control Contracts.

As noted above, the Commission's own Event Contract Concept Release in 2008 recognized that unlike traditional futures contracts, event contracts do not necessarily relate to market prices.  The Commission stated that "[i]n general, event contracts are neither dependent on, nor do they necessarily relate to, market prices or broad-based measures of economic or commercial activity," and elaborated as follows:

Since 2005, the Commission's staff has received a substantial number of requests for guidance on the propriety of offering and trading financial agreements that may primarily function as *information aggregation vehicles*.  These event contracts generally take the form of financial agreements linked to eventualities or measures that *neither derive from, nor correlate with, market prices* or broad economic or commercial measures.[45]

In other words, the structure of a wide array of event contracts (described by the Event Market Concept Release as "information aggregation vehicles") may preclude them from satisfying the Order's price basing requirement.  This is the inevitable result of imposing an economic purpose test that was not designed for event contracts.

The same is true with respect to the hedging purpose prong of the economic purpose test. That is, the Order holds the Congressional Control Contracts to a hedging purpose requirement that may be difficult for them to meet because that test was not designed for this type of contract. The Order itself recognizes this when it says that "the binary payout of the Congressional Control Contracts . . . limits their utility as a vehicle for hedging any eventual economic effects resulting from which party controls a chamber of Congress."[46]

Thus, the Order determines that the Congressional Control Contracts are contrary to the public interest by using an economic purpose test that was not designed for such contracts. As a result, it imposes price basing and hedging requirements that many event contracts, due to their structure, may have little chance to pass. A public rulemaking process should fully explore whether this is appropriate, or whether the Commission should instead develop a standard for a public interest review of event contracts that is appropriately tailored and well-suited to the nature of the contracts being reviewed.

3. The Order Improperly Rejects, Without Discussion or Analysis, Comments from Experts that the Congressional Control Contracts Meet the Economic Purpose Test

Notwithstanding the foregoing questions as to whether the economic purpose test should be applied to Kalshi's Congressional Control Contracts, several distinguished economists, academics, and professional market participants have submitted comment letters explaining how the Congressional Control Contracts meet the price basing and hedging purpose prongs of that test.[47] The Order acknowledges some of these comments in a cursory manner, but summarily dismisses them, saying only that "the Commission has considered [their] assertions."[48] The Order does not point to any economic analyses or academic studies to rebut these comments from experts in their fields.

Rather, the Order simply decrees with respect to price basing that "the price of the Congressional Control Contracts could not predictably be used to establish commercial transaction prices." It ignores the input of several academics who commented to the contrary:

In our experience observing the market, financial market participants routinely use the probability of various parties' controlling Congress (and the Presidency) to accurately price various assets. An accurate valuation of many investments, assets, physical commodities, and the value of services requires an accurate assessment of the future trajectory of the political environment. The political environment has significant and predictable impac on business, and it is a significant factor that affects valuations.[49]

Similarly, the Order simply decrees with respect to hedging:

[C]ontrol of a chamber of Congress could, following a number of independent intervening events, generally affect a wide variety of personal liabilities economic factors, but that does not establish that the Congressional Control Contracts can be used for specific, identifiable hedging purposes and th does not establish the hedging utility of the Congressional Control Contracts.[50]

There are several deficiencies in the Order's hedging analysis. First, the Order focuses on hedging with respect to particular public policies, and fails to meaningfully address the point raised by Christopher Hehmeyer (with 45 years of experience in the futures business), who focused not on "the contract's utility for hedging *policy risk* that is associated with Congressional control," but rather "on the contract's utility for hedging the *direct risk* that stems from Congressional control and elections in general," citing as examples media companies and consultancies, among others.[51]

What is more, given the Order's acknowledgement that control of a chamber of Congress could generally affect a wide variety of personal liabilities and economic factors, its conclusion regarding hedging simply amounts to a view that the Congressional Control Contracts may not be particularly good hedging vehicles. Indeed, the Order makes that explicit elsewhere when it states that "control of a chamber of Congress does not, in and of itself, have sufficiently direct, predictable, or quantifiable economic consequences for the Congressional Control Contracts *to serve an effective hedging function*."[52]

Market participants should be permitted to make their own choices about what financial products meet their hedging needs.[53] It is simply not the CFTC's role to deny them that choice altogether because we feel a given product is not "effective enough" for hedging purposes.

*If the Commission is going to insist on determining whether an event contract is contrary to the public interest based on an economic purpose test that is not mentioned in the CEA and was not designed for these types of contracts, it should engage in notice-and-comment rulemaking and specifically address the arguments and conclusions of those who share their professional expertise with us – rather than dismiss them out-of-hand, as in the Order.*

**The Order's Unfortunate Consequences**

The Commission's issuance of this Order prohibiting the listing for trading of Kalshi's Congressional Control Contracts will lead to several unfortunate consequences that, I regret, will reflect poorly on the Commission.

First, it puts the Commission in the untenable position of prohibiting a registered and regulated exchange from listing event contracts relating to Congressional control, while the Iowa Electronic Market and Victoria University of Wellington currently can undertake the same activity outside of the regulatory framework of the CEA. I recognize that the staff no-action relief to these latter markets is based on their representations that they are small, non-profit markets. Still, having found that contracts on Congressional control constitute gambling and are contrary to the public interest, it is difficult to understand how the Commission can credibly say that a little unregulated gambling in this area for academic purposes is acceptable.

Second, absent a notice-and-comment rulemaking process, the Commission continues to shroud its approach to event contracts in mystery. The Order contravenes Congress' direction that the CFTC promote responsible innovation,[54] and undermines the CFTC's commitment to its own stated Core Values of being "Forward-Thinking" (*i.e.*, challenging ourselves to stay ahead of the curve) and providing "Clarity" (*i.e.*, providing transparency to market participants about our rules and processes).[55]

Finally, while the Commission can (and should) still undertake a rulemaking process to define terms such as "gaming" and "contrary to the public interest," and to identify the factors the Commission will use to determine whether DCM event contracts involve activity similar to the enumerated categories in CEA Section 5c(c)(5)(C) and are contrary to the public interest—doing so after issuing this Order is hardly "good government." If such a rulemaking were to conclude that event contracts such as the Congressional Control Contracts are permissible, Kalshi (like Nadex before it) will have been deprived of an opportunity to list a potentially profitable new business line, and market participants will have been deprived of the opportunity to hedge risks acknowledged by many economists, academics, and derivatives professionals as genuine. On the other hand, if such a rulemaking were to conclude that such event contracts are impermissible, it will inevitably be viewed by many as intended simply to rubber-stamp the conclusion that the Commission has already reached in this Order.

**Conclusion**

Which brings me back to where I began. Congress could have enumerated event contracts involving Congressional control (and/or indirectly on elections) in the Dodd-Frank Act. It did not do so. Instead, Congress entrusted the CFTC with the discretion to determine, through a rulemaking process: 1) whether such contracts are similar to any of the enumerated activities in CEA Section 5c(c)(5)(C)); and, if so, 2) whether they are contrary to the public interest.

Again, my dissent should not be taken as an endorsement of Kalshi's Congressional Control Contracts. Commenters have raised serious concerns about election integrity that warrant careful consideration by the Commission. Kalshi inevitably runs the risk that even if the Commission permits it to list for trading its Congressional Control Contracts at this time, the CEA provides that the Commission may prohibit it from doing so in a proper rulemaking in the future.

***As discussed above, my dissent is based on my view that, whether the Commission's conclusion is right or wrong, the analysis in the Order is inconsistent with the authority that Congress has granted us at best, and exceeds that authority at worst. It is further based on my view that it is important for the Commission to make this determination the right way—by undertaking a public rulemaking process as authorized by the CEA to establish a legal framework for exercising its discretion to determine whether event contracts, including those relating to Congressional control, may be prohibited from trading because they are contrary to the public interest.***

This is not merely elevating form over substance. A notice-and-comment rulemaking would require the Commission to provide a comprehensive discussion and analysis of all relevant issues and opposing viewpoints. It could not, as it does in this Order, simply dismiss without discussion or analysis comments contrary to its preferred result out of hand.

Since there has been no rulemaking process, and in light of the substantial deficiencies in the Order regarding whether Kalshi's Congressional Control Contracts are subject to a public interest review and, if so, whether they are contrary to the public interest, I respectfully dissent.

[1] This Statement will refer to the agency as the "Commission" or "CFTC." All web pages cited herein were last visited on September 21, 2023.

[2] Lewis Carroll, *Through the Looking-Glass and What Alice Found There* (Chicago, W.B. Conkey Co. 1900).

[3] *See* Dissenting Statement of Commissioner Summer K. Mersinger Regarding Commencement of 90-Day Review Regarding Certified Derivatives Contracts with Respect to Political Control of the U.S. Senate and House of Representatives (June 23, 2023), available at Dissenting Statement of Commissioner Summer K. Mersinger Regarding Commencement of 90-Day Review Regarding Certified Derivatives Contracts with Respect to Political Control of the U.S. Senate and House of Representatives | CFTC (https://www.cftc.gov/PressRoom/SpeechesTestimony/mersingerstatement062323).

[4] CEA Section 5c(c)(5)(C)(i)(I)-(V), 7 U.S.C. § 7a-2(c)(5)(C)(i)(I)-(V).

[5] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act").

[6] CFTC Rule 40.11, 17 C.F.R. § 40.11.

[7] *See* Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011) ("Rule 40.11 Adopting Release").

[8] *See* CFTC Order Prohibiting North American Derivatives Exchange's Political Event Derivatives Contracts (April 2, 2012) ("Nadex Order"), available at https://www.cftc.gov/PressRoom/PressReleases/6224-12 (https://www.cftc.gov/PressRoom/PressReleases/6224-12.).

[9] *See* Liz Flynn, "20 Socrates Quotes that Apply to Business," Money Inc. (March 29, 2020), available at https://moneyinc.com/socrates-quotes/ (https://moneyinc.com/socrates-quotes/).

[10] *See* Order at 2.

[11] *Id.* at 10 (footnote omitted).

[12] *See* Speakers of the House (1789 to Present), U.S. House of Representatives, History, Art & Archives, available at https://history.house.gov/People/Office/Speakers-Intro/#:~:text=The%20Speaker%20is%20elected%20at,the%20new%20Congress%20is%20elected (https://history.house.gov/People/Office/Speakers-Intro/#:~:text=The%20Speaker%20is%20elected%20at,the%20new%20Congress%20is%20elected).

[13] *See* About the President Pro Tempore, United States Senate, available at https://www.senate.gov/about/officers-staff/president-pro-tempore.htm#:~:text=The%20Constitution%20instructs%20the%20Senate,conceived%20as%20a%20temporary%20replacement (https://www.senate.gov/about/officers-staff/president-pro-tempore.htm#:~:text=The%20Constitution%20instructs%20the%20Senate,conceived%20as%20a%20temporary%20replacement).

[14] *See* About the President Pro Tempore: Historical Overview, United States Senate, available at https://www.senate.gov/about/officers-staff/president-pro-tempore/overview.htm (https://www.senate.gov/about/officers-staff/president-pro-tempore/overview.htm).

[15] *See* About the President Pro Tempore: Presidents Pro Tempore, United States Senate, at n.5, available at https://www.senate.gov/about/officers-staff/president-pro-tempore/presidents-pro-tempore.htm (https://www.senate.gov/about/officers-staff/president-pro-tempore/presidents-pro-tempore.htm).

[16] Valerie Heitshusen, *Speakers of the House: Elections, 1913-2023*, Congressional Research Service, 4 (September 14, 2023), available at https://crsreports.congress.gov/product/pdf/RL/RL30857 (https://crsreports.congress.gov/product/pdf/RL/RL30857). In 12 of the 15 elections since 1997, at least one member has voted for a candidate who was not formally nominated by either major party. In every initial ballot for the Speaker since 2013 (excluding 2017) at least one candidate receiving a vote or votes was not a member of the U.S. House of Representatives. *Id.*

[17] *See* Pete Williams, Can an Outsider be Speaker of the House?, NBC News (October 9, 2015), available at https://www.nbcnews.com/politics/congress/can-outsider-be-speaker-house-n441926 (https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.nbcnews.com%2Fpolitics%2Fcongress%2Fcan-outsider-be-speaker-house-n441926&data=05%7C01%7CTArbit%40CFTC.gov%7C8a8e2e7270fb4488488b408dab8fc3bbf%7Cff902a6348374fa7905b52887c7f3cff%7C0%7C0%7C638025690719050791%7CUnkn

[18] *See* Sarah Ferris, John Bresnahan, and Heather Caygle, Pelosi Faces Tight Margins for Speaker's Vote, Politico (December 11, 2020), available at https://www.politico.com/news/2020/12/11/nancy-pelosi-speaker-vote-444409 (https://www.politico.com/news/2020/12/11/nancy-pelosi-speaker-vote-444409)); Philip Ewing, Pelosi is Narrowly Reelected Speaker, NPR (January 3, 2021), available at https://www.npr.org/2021/01/03/952422397/pelosi-poised-to-be-reelected-speaker-but-slimmer-majority-makes-it-tight (https://www.npr.org/2021/01/03/952422397/pelosi-poised-to-be-reelected-speaker-but-slimmer-majority-makes-it-tight); and Benjamin Siegel and John Parkinson, Pelosi Wins Tight Race for House Speaker, ABC News (January 3, 2021), available at https://abcnews.go.com/Politics/nancy-pelosi-faces-razor-thin-margin-house-speaker/story?id=75017441 (https://abcnews.go.com/Politics/nancy-pelosi-faces-razor-thin-margin-house-speaker/story?id=75017441).

[19] Congress knows how to reference indirect activity, as our research has identified 18 instances in which it has used the phrase "directly or indirectly" elsewhere in the CEA. *See* CEA Sections 1a(7), 1a(14), 2(a)(1)(C)(v)(IV), 2(a)(8), 4a(1), 4a(b)(1) and (2), 4b(e), 4c(a)(4)(A), 4f(c)(1)(1), 4i (three times), 4o(1), 4t(a)(1)(A) and (B), 4t(c), and 5b(a)(1); 7 U.S.C. §§ 1a(7), 1a(14), 2(a)(1)(C)(v)(IV), 2(a)(8), 6a(a)(1), 6a(b)(1) and (2), 6b(e), 6c(a)(4)(A), 6f(c)(1)(i), 6i (three times), 6o(1), 6t(a)(1)(A) and (B), 6t(c), and 7a-1(a)(1). Most notably, CEA Section 2(a)(8), 7 U.S.C. § 2(a)(8), provides that no Commissioner or employee of the Commission "shall . . . *participate, directly or indirectly,* in any registered entity operations or transactions of a character subject to regulation by the Commission." (Emphasis added) Congress thus specifically brought indirect "participation" within the scope of CEA Section 2(a)(8), but it chose not to do so with respect to indirect "involvement" in CEA Section 5c(c)(5)(C) with respect to event contracts.

[20] In another context, the Order cites dictionary definitions of the word "involve" that include "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence." *See* Order at 5 and n.11. If it is being suggested that the word "involve" therefore necessarily encompasses indirect involvement, I disagree. For example: If my son plays in his team's soccer game, he is directly "involved" in that game; if I watch the game from the stands, I am indirectly "involved" in the game. There is a distinction between direct and indirect involvement, and unlike other provisions of the CEA, Congress did not say that its use of the word "involve" in CEA Section 5c(c)(5)(C) includes indirect involvement such as the indirect relationship of the Congressional Control Contracts to individual Congressional elections.

[21] *See* Order at 8.

[22] Rule 40.11 Adopting Release, 76 Fed. Reg. at 44785.

[23] *See* Order at 8-9.

[24] *Id.*, n.22 and 24. The 7 cited state statutes that the descriptions in the Order indicate refer to "gambling" and not "gaming" are Georgia, New York, Texas, Virginia, Illinois, Nebraska, and North Dakota. The only cited state statute that uses the term "gaming" as opposed to "gambling" is New Mexico.

[25] *Id.* at 9.

[26] *Id.* at 8 n.22 (citing Ky. Rev. Stat. Ann. § 528.010(6)(a) (West 2023)) (emphasis added).

[27] *Id.* at 9 (citing the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367) (emphasis added).

[28] *See* "gaming" definition, CAMBRIDGE DICTIONARY, available at https://dictionary.cambridge.org/us/dictionary/english/gaming (https://dictionary.cambridge.org/us/dictionary/english/gaming).

[29] 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Senator Dianne Feinstein and Senator Blanche Lincoln), available at http (https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf)s://www.congress.gov/111 (https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf)1/crec/2010/07/15/CREC-2010-07-15-senate.pdf (https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf) ("Feinstein-Lincoln colloquy"). Senator Lincoln was then the Chair of the Senate Committee on Agriculture, Nutrition, and Forestry, which is the CFTC's authorizing committee.

[30] In a footnote, the Order asserts that "[n]one of the Super Bowl, the Kentucky Derby, or the Masters Golf Tournament are, of themselves, 'gaming,'" and that "sports typically are not understood to be 'gaming'—they are understood to be 'games.'" It cites no statute, legislative history, court decision, or other authority, to support either assertion. *See* Order at 7 n.18.

[31] At least one state statute cited in the Order could not be used for that purpose, since the Order indicates that it is expressly limited to municipal elections. *See* Order at 11 n.26 (citing Colo. Rev. Stat. Ann. § 31-10-1531 (West)).

[32] CEA Section 5c(c)(5)(C)(i)(VI); 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI).

[33] Actually, since event contracts generally take the form of binary options, the Commission had statutory authority even before the Dodd-Frank Act to engage in a rulemaking process pursuant to its plenary authority over trading in options pursuant to CEA Section 4c(b), 7 U.S.C. § 6c(b).

[34] Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669 (May 7, 2008) (footnotes omitted, emphasis added) ("Event Contract Concept Release").

[35] *See* CFTC Letter No. 93-66 (Division of Trading and Markets, June 18, 1993), issued to the Iowa Electronic Market, available at https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf (https://www.cftc.gov/sites/default/files/idc/groups/public/%40lrlettergeneral/documents/letter/93-66.pdf), and CFTC Letter No. 14-130 (Division of Market Oversight, October 29, 2014), issued to Victoria University of Wellington in New Zealand, available at https://www.cftc.gov/csl/14-130/download (https://www.cftc.gov/csl/14-130/download). In both cases, the markets were to be operated on a non-profit basis, for academic and research purposes only, and subject to certain limitations intended to keep the markets relatively small.

[36] Kalshi initially submitted a prior version of its Congressional Control Contracts for Commission approval on July 20, 2022 (the "2022 Submission"), but later withdrew that request on May 16, 2023, before the Commission had issued a decision. On June 12, 2023, Kalshi certified the Congressional Control Contracts that are the subject of the Order. Although the certified contracts currently before the Commission include three revisions to address concerns that were voiced about the prior iteration of the contracts, they are materially similar to the original contracts, and as a result, the vast majority of substantive public comments from the 2022 Submission continue to apply. Accordingly, this Statement will cite to comment letters submitted on both the 2022 Submission and the current Congressional Control Contracts that are before us.

[37] The CFTC's Spring 2023 regulatory agenda, published as part of the government-wide Unified Agenda of Federal Regulatory and Deregulatory Actions, includes an event contracts rulemaking. *See* Regulatory Information Service Center, Unified Agenda of Regulatory and Deregulatory Actions (Spring 2023), available at Agency Rule List - Spring 2023 (reginfo.gov) (https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPub=true&agencyCode=&showStage=active&agencyCd=3038&csrf_token=E8E9F0700F7A4D2C99221E64D861757B70E2... Sadly, though, the stated target date for issuance of a notice of proposed rulemaking on event contracts was September 2023, which target obviously will be missed.

[38] Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000). The Order notes that the pre-CFMA economic purpose test looked to "whether the contract reasonably can be expected to be, or has been, used for hedging and/or price basing on more than an occasional basis." But it then goes a step further and asserts that the legislative history of CEA Section 5c(c)(5)(C) indicates Congressional intent to modify the economic purpose test to be used by the Commission in conducting its public interest reviews of event contracts to consider instead "whether a contract is used predominantly by speculators or market participants not having a commercial or hedging interest." *See* Order at 13-14 and n.29.

[39] Feinstein-Lincoln colloquy, n.29, *supra*,

[40] The Order tries to bolster the basis for applying the economic purpose test by citing to the Congressional findings in CEA Section 3(a), 7 U.S.C. § 5(a), that "[t]he transactions subject to [the CEA] . . . are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair, and secure financial facilities." But the question at hand is whether Congress, when it enacted the Dodd-Frank Act, intended to resurrect the economic purpose test and require that it be used by the Commission in determining whether an event contract that falls into an enumerated category is contrary to the public interest pursuant to CEA Section 5c(c)(5)(C). For the reasons set forth above, it did not.

[41] *See* Order at 18 (emphasis added; footnote omitted).

[42]*Id.* at 18 n.36 (emphasis added).

[43] Senator Lincoln cited terrorist attacks, war and hijacking as examples of events that "pose a real commercial risk to many businesses in America," but stated that "*a futures contract* that allowed people to hedge that risk [of terrorist attacks, war, and hijacking] . . . would be contrary to the public interest." Senator Feinstein thanked Senator Lincoln and concluded that "*[a] futures market* is for hedging." Order at 14 n.30 (quoting Feinstein-Lincoln colloquy, n.29, *supra*) (emphasis added).

[44] Order at 19.

[45] Event Contract Concept Release, 73 Fed. Reg. at 25669-25670 (emphasis added). More specifically, the Event Contract Concept Release noted that: 1) event contracts based on environmental measures (such as the volatility of precipitation or temperature levels) or environmental events (such as a specific type of storm within an identifiable geographic region) will "not predictably correlate to commodity market prices or other measures of broad economic or commercial activity;" and 2) event contracts based on general measures (such as the number of hours that U.S. residents spend in traffic annually or the vote-share of a particular candidate) "do not quantify the rate, value, or level of any commercial or environmental activity," and that contracts on general events (such as whether a Constitutional amendment will be adopted) "do not reflect the occurrence of any commercial or environmental event." *Id.* at 25671.

[46] Order at 18. *See also* European Securities and Market Authority ("ESMA"), Product Intervention Analysis – Measure of Binary Options at 14 (June 1, 2018) ("Unlike vanilla options, which are often used for hedging purposes, binary options provide a fixed payoff if a specified event occurs . . . This inherent feature of the [binary options] products limits the value of the product as a hedging tool . . ."), available at esma50-162-214_product_intervention_analysis_binary_options.pdf (europa.eu) (https://www.esma.europa.eu/sites/default/files/library/esma50-162-214_product_intervention_analysis_binary_options.pdf).

[47] *See, e.g.,* Letter from Jason Furman (filed September 18, 2022) (former Chairman of the Council of Economic Advisers under President Obama, serving as his Chief Economist); Letter from Robert Shiller (filed September 24, 2022) (recipient of Nobel Prize in Economic Sciences, joined by seven professors and academic researchers in economics, political science, and law); Letter from Christopher Hehmeyer (filed September 20, 2022) (futures market participant since 1977, former Chairman of the National Futures Association and board member of the Futures Industry Association); and Letter from Justin Wolfers (filed July 23, 2023) (professor of public policy and economics, University of Michigan, joined by four other professors of economics, law, and business).

[48] Order at 16; *see also* Order at 18.

[49] Wolfers, *et al.,* Letter at 1; *accord,* Shiller, *et al.,* Letter at 1.

[50] Order at 17.

[51] Hehmeyer Letter at 1 (emphasis in the original).

[52] Order at 15 (emphasis added).

[53] Commenters supported this view. *See* Wolfers, *et al.,* Letter at 2 (". . . the CFTC should not substitute its judgment for market participants' own assessment of their risks and how best to manage their risk"); *accord,* Shiller, *et al.,* Letter at 2 (same).

[54] CEA Section 3(b), 7 U.S.C. § 5(b).

[55] CFTC Core Values, Forward-Thinking and Clarity, available at https://www.cftc.gov/About/AboutTheCommission (https://www.cftc.gov/About/AboutTheCommission).

**-CFTC-**

# Public Statements & Remarks

# Statement of Commissioner Caroline D. Pham Regarding Political Event Contracts

**September 22, 2023**

Consistent with my earlier vote to abstain in May 2023, I abstain from voting on this order because I continue to believe that the United States Court of Appeals for the Fifth Circuit's Order in *Clarke v. CFTC*,[1] may prevent the Commission from taking action on KalshiEx, LLC's (Kalshi) congressional control political event contracts.

On May 1, 2023, the Fifth Circuit issued an Order enjoining the CFTC from "closing the PredictIt Market" or otherwise "prohibiting or deterring the trading of [PredictIt] Market contracts," until 60 days after a final judgment in that case.[2]

As I explained in my public statement when the Commission announced its review of the subject political event contracts pursuant to Commission Rule 40.11,[3] any Order by the Commission regarding the listing of Kalshi's political event contracts could be construed to implicate the Fifth Circuit's May 1 Order because the PredictIt Market also lists political event contracts.[4]

In fact, the Fifth Circuit, in a July 21, 2023 opinion, has already found that the Commission has violated the injunction in the May 1 Order.[5]  The Commission only narrowly avoided sanctions for violating the injunction because of the mercy of the court.

Because I cannot take any action that may be construed to again violate the Fifth Circuit's May 1 Order enjoining the Commission from otherwise "prohibiting or deterring the trading" of contracts listed on the PredictIt Market, and because political event contracts are listed on the PredictIt Market, I therefore must abstain from voting on Kalshi's political event contracts.

---

[1] *See Clarke v. CFTC*, No. 22-51124 (5th Cir. May 1, 2023) (unpublished order).

[2] *Id.*

[3] 17 C.F.R. § 40.11.

[4] *See* Dissenting Statement of Commissioner Caroline D. Pham on Political Event Contracts, U.S. Commodity Futures Trading Commission (June 23, 2023), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement062323 (https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement062323).

[5] *Clarke v. CFTC*, 74 F.4th 627, 641-43 (5th Cir. 2023).

**-CFTC-**