**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KALSHIEX LLC,

               Plaintiff,

     v.

COMMODITY FUTURES TRADING
COMMISSION,

               Defendant.

No. 23-cv-03257-JMC

Memorandum in Support of
Motion for Summary Judgment

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Jacob (Yaakov) M. Roth (D.C. Bar 995090)
Joshua B. Sterling (D.C. Bar 479320)
John Henry Thompson (D.C. Bar 90013831)
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939

Amanda K. Rice (D.C. Bar 1019208)*
JONES DAY
150 W. Jefferson Avenue, Suite 2100
Detroit, MI 48226
(313) 733-3939

Samuel V. Lioi*
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939

*admitted *pro hac vice*

*Counsel for Plaintiff*
*KalshiEx LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iii

INTRODUCTION ..............................................................................1

BACKGROUND ...............................................................................3

    A.    Event Contracts Are Established Tools for Hedging Risks and Aggregating Information.......................................................3

    B.    Political Event Contracts Allow for Hedging of Political Risk and Collection of Valuable Predictive Data. ......................6

    C.    Congress Allows Regulated Exchanges To List Event Contracts, Subject to a Narrow List of Exceptions. ...................7

    D.    Kalshi Proposes To List the Congressional Control Contracts.....................................................................9

    E.    The CFTC Issues an Order Rejecting Kalshi's Contracts........11

LEGAL STANDARD..........................................................................13

ARGUMENT ..................................................................................13

    I.    THE ORDER IS PREMISED ON A LEGAL ERROR AS TO WHEN EVENT CONTRACTS "INVOLVE" AN ENUMERATED ACTIVITY. .............................14

    A.    The Commission's Shifting Interpretation of "Involve" Is Wrong. ...................................................................15

    B.    The Order's Attacks on the Event-Based Reading Are Meritless. ...............................................................21

    II.    THE ORDER ALSO MISCONSTRUES THE "GAMING" AND "UNLAWFUL ACTIVITY" CATEGORIES. ............................................................23

    A.    Trading Congressional Control Contracts Does Not Amount to "Gaming."..................................................24

    B.    Trading Congressional Control Contracts Is Also Not "Unlawful" Activity...................................................31

    III.    THE ORDER'S PUBLIC-INTEREST FINDING IS ARBITRARY AND CAPRICIOUS. ...........................................................................34

    A.    The CFTC Imposed and Misapplied an Arbitrarily Heightened "Direct Effects" Standard for Evaluating Economic Utility. ........................................................35

    B.    The CFTC Ignored the Evidence of Non-Economic Benefits. ..................................................................40

## TABLE OF CONTENTS
(continued)

**Page**

C.    The CFTC Rested on Implausible, Unsubstantiated Speculation About Election Integrity. ....................................... 41

CONCLUSION................................................................................................. 45

# TABLE OF AUTHORITIES

**Page**

### CASES

*Am. Agric. Movement, Inc. v. Bd. of Trade*,
  977 F.2d 1147 (7th Cir. 1992) .............................................................. 20

*Bankamerica Corp. v. United States*,
  462 U.S. 122 (1983) ............................................................................. 18

*Bd. of Trade v. Christie Grain & Stock Co.*,
  198 U.S. 236 (1905) ............................................................................. 28

*Bibbo v. Dean Witter Reynolds, Inc.*,
  151 F.3d 559 (6th Cir. 1998) .............................................................. 20

*Blackmon-Malloy v. U.S. Capitol Police Bd.*,
  575 F.3d 699 (D.C. Cir. 2009) ............................................................. 18

*Boim v. Quranic Literacy Inst.*,
  291 F.3d 1000 (7th Cir. 2002) ............................................................ 15

*Brown v. Gardner*,
  513 U.S. 115 (1994) ............................................................................. 17

*Brown v. NHTSA*,
  673 F.2d 544 (D.C. Cir. 1982) ............................................................. 17

*\*Carlson v. Postal Regul. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019) ....................................................... 40, 41

*Clark v. Martinez*,
  543 U.S. 371 (2005) ............................................................................. 18

*Clarke v. CFTC*,
  74 F.4th 627 (5th Cir. 2023).......................................................... 7, 11

*Comm'r v. Clark*,
  489 U.S. 726 (1989) ............................................................................. 19

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989) .................................................................. 18

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015) ...................................................... 39

*Dole v. United Steelworkers of Am.*,
    494 U.S. 26 (1990) ................................................................... 29

*Horsehead Res. Dev. Co. v. Browner*,
    16 F.3d 1246 (D.C. Cir. 1994) ................................................. 43

*James Madison Ltd. ex rel. Hecht v. Ludwig*,
    82 F.3d 1085 (D.C. Cir. 1996) ................................................. 19

*Jones v. Hendrix*,
    599 U.S. 465 (2023) ................................................................. 18

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980) ............................................... 20, 31

*Ludlow v. Mabus*,
    793 F. Supp. 2d 352 (D.D.C. 2011) ......................................... 13

*\*Miss. Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989) ............................................................. 20, 33

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012) ................................................................. 17

*Mohasco Corp. v. Silver*,
    447 U.S. 807 (1980) ................................................................. 17

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................... 34

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ............................................... 34

*Nat'l Tel. Co-op. Ass'n v. FCC*,
    563 F.3d 536 (D.C. Cir. 2009) ................................................. 13

*NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*,
    80 F.4th 413 (2d Cir. 2023) ..................................................................... 15

*Petit v. U.S. Dep't of Educ.*,
    675 F.3d 769 (D.C. Cir. 2012) ............................................................... 13

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007) ............................................................................... 17

*\*Ratzlaf v. United States*,
    510 U.S. 135 (1994) ........................................................................ 17, 18

*\*Reno v. Bossier Par. Sch. Bd.*,
    528 U.S. 320 (2000) ........................................................................ 17, 18

*Sierra Club v. Salazar*,
    177 F. Supp. 3d 512 (D.D.C. 2016) ...................................................... 39

*Sullivan v. Stroop*,
    496 U.S. 478 (1990) ............................................................................... 17

*\*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
    599 U.S. 419 (2023) ........................................................................ 19, 28

*United States v. Slatten*,
    865 F.3d 767 (D.C. Cir. 2017) ............................................................... 19

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................................... 28

*Yates v. United States*,
    574 U.S. 528 (2015) ............................................................................... 29

*Ysleta Del Sur Pueblo v. Texas*,
    596 U.S. 685 (2022) ............................................................................... 20

STATUTES

5 U.S.C. § 706............................................................................................. 13

7 U.S.C.

§ 1a ................................................................................... 7, 19, 33

§ 2 ............................................................................ 8, 20, 21, 31, 33

§ 5 ...................................................................................................... 35

§ 7a-2 .................................................... 1, 7, 8, 9, 10, 12, 14, 16, 19

§ 25 .................................................................................................... 21

25 U.S.C. § 2703 ........................................................................... 25

31 U.S.C.

§ 5361 ................................................................................................ 25

§ 5362 ......................................................................................... 25, 29

§ 5363 ................................................................................................ 25

§ 5364 ................................................................................................ 25

§ 5365 ................................................................................................ 25

§ 5366 ................................................................................................ 25

§ 5367 ................................................................................................ 25

4 Pa. Stat. & Cons. Stat. Ann. ................................................ 26

18 Pa. Stat. & Cons. Stat. Ann. .............................................. 26

Ala. Code § 13A-12-20 ...................................................... 29, 31, 32

Alaska Stat. Ann.§ 11.66.280 ........................................... 29, 31, 32

Ariz. Rev. Stat.

§ 13-3301 ................................................................................. 31, 32

§ 16-1015 ......................................................................................... 30

Ark. Code. Ann. § 5-66-104 ...................................................... 25

Cal. Bus. & Prof. Code § 19805 .............................................. 25

Colo. Rev. Stat. Ann.

§ 18-10-102 ............................................................................. 31, 32

§ 44-30-103 ..................................................................................... 25

Conn. Gen. Stat. § 12-557b ...................................................... 25

Del. Code Ann. Title 11 § 1403 .............................................. 29

Fed. R. Civ. P. 56 ............................................................................... 12

Fla. Stat.
    § 849.01 ....................................................................................... 25
    § 849.08 ....................................................................................... 25
    § 849.14 ....................................................................................... 29

Ga. Code Ann. § 16-12-21 ................................................................. 30

Haw. Rev. Stat. § 712-1220 ................................................ 29, 31, 32

Idaho Code § 18-3801 .............................................................. 31, 32

Ind. Code § 35-45-5-1 ...................................................................... 31

Iowa Code § 725.7 ........................................................................... 25

Kan. Stat. Ann.
    § 21-6403 ..................................................................................... 31

Ky. Rev. Stat.
    § 238.505 ..................................................................................... 25
    § 528.010 ..................................................................................... 29

La. Stat.
    § 14:90 ......................................................................................... 29
    § 27:205 ....................................................................................... 25

Mass. Gen. Laws Chapter 23K § 2 ................................................. 25

Md. Code Ann., Crim. Law § 12-101 .............................................. 26

Me. Rev. Stat. Title 17-A § 952 ................................................ 29, 32

Mich. Comp. Laws
    § 168.931 ..................................................................................... 30
    § 750.301 ..................................................................................... 32

Minn. Stat. § 609.75 ........................................................................ 31

Miss. Code. Ann.
  § 75-76-5 ......................................................................................... 26
  § 97-33-1 ......................................................................................... 32

Mo. Rev. Stat.
  § 313.800 ......................................................................................... 26
  § 572.010 ......................................................................... 29, 31, 32

N.C. Gen. Stat. § 14-292 ....................................................................... 26

N.H. Rev. Stat. Ann. § 647:2 ............................................................... 32

N.J. Stat.
  § 2C:37-1 ......................................................................................... 32
  § 5:12-22 ......................................................................................... 26
  § 19:34-24 ....................................................................................... 30

N.M. Stat. Ann.
  § 30-19-1 ......................................................................................... 31
  § 60-2E-3 ......................................................................................... 26

N.Y. Penal Law § 225.00 ................................................................. 29, 33

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1301 ............................... 26

Neb. Rev. Stat. § 28-1101 ..................................................................... 30

Nev. Rev. Stat. §§ 463.0152 ................................................................. 26

Ohio Rev. Code Ann. § 2915.01 ..................................................... 26, 31

Okla. Stat. Ann. Title 21 § 981 ........................................................... 31

Or. Rev. Stat.
  § 167.117 ..................................................................................... 31, 32
  § 260.635 ......................................................................................... 30

R.I. Gen. Laws § 41-9-1 ....................................................................... 26

S.C. Code Ann. § 3-11-100 ................................................................... 26

S.D. Codified Laws § 22-25-1 ............................................................... 26

Tenn. Code Ann. § 39-17-501 ...................................................................... 31

Tex. Penal Code Ann. § 47.02 ..................................................................... 30

Utah Code Ann. § 76-10-1101 ................................................................. 29, 31

Va. Code Ann.
 § 18.2-325 ............................................................................................... 32
 § 58.1-4100 ............................................................................................. 26

Vt. Stat. Ann. Title 13 § 2141 ..................................................................... 26

Wash. Rev. Code § 9.46.0237 .............................................................. 29, 31, 32

Wis. Stat. Ann. § 945.01 .............................................................................. 31

Wyo. Stat. Ann. § 6-7-101 ...................................................................... 31, 32

## OTHER SOURCES

*Game, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) ............................ 27

*Game, New Oxford American Dictionary* (3d ed. 2010) ............................................ 24

*Gaming, American Heritage Dictionary* (4th ed. 2009) ............................................ 24

*Gaming, Bouvier Law Dictionary* (2011 ed.) ................................................... 24

*Gaming, Cambridge Dictionary of American English* (2d ed. 2008) ........................ 24

*Gaming, Concise Oxford English Dictionary* (11th ed., rev. 2008) ........................... 24

*Gaming Contract, Chambers Dictionary* (13th ed. 2014) .......................................... 24

*Involve, American Heritage Dictionary* 921 (4th ed. 2009) ....................................... 15

Steven Nickolas, *How Can Derivatives Be Used for Risk Management?*,
 Investopedia (Sept. 29, 2022) .............................................................................. 15

**INTRODUCTION**

Plaintiff KalshiEx LLC (Kalshi) operates a regulated exchange that allows the purchase and sale of event contracts. Event contracts entitle purchasers to payment based on whether particular events occur. Similar to futures and other derivatives, these instruments are tools to hedge risks; they also harness the "wisdom of crowds" to generate reliable predictive data. Under the Commodity Exchange Act (CEA), event contracts are presumptively permissible for trading on regulated exchanges. The Commodity Futures Trading Commission (CFTC or Commission) may prohibit an event contract only if it (1) "involve[s]" unlawful activity, terrorism, assassination, war, gaming, or a "similar activity" specified by regulation, *and* (2) is determined by the CFTC to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

In June 2023, Kalshi sought to list event contracts on whether a particular party will control the House of Representatives or the Senate on a particular date (Congressional Control Contracts). Because those contracts do not "involve" unlawful activity, terrorism, assassination, war, gaming, or any similar activity that the CFTC has specified by regulation, the Commission had no power to prohibit them. Nor are they contrary to the public interest in any event. Quite the opposite. Uncertainty surrounding political events poses economic risks—no less than uncertainty over oil supply, hurricanes, or pandemics. As hundreds of academics, business owners, and former CFTC officials thus explained in formal comments, the Congressional Control Contracts would enable hedging against economic risks associated with partisan control of Congress while generating valuable predictive data.

Nevertheless, the CFTC prohibited Kalshi from listing its contracts. Its Order contorts and misapplies the CEA's text, ignores its structure and purpose, allows a narrow exception to swallow the rule, and engages in faulty, unsupported reasoning. It is unlawful and must be vacated for three independent reasons.

*First*, in concluding that Kalshi's contracts "involve" enumerated activities, the Commission misunderstood the meaning of that word in this statutory framework. An event contract "involves" an enumerated activity if its *underlying event* is or closely relates to that activity. For example, a contract contingent on a terrorist attack on American soil would "involve" terrorism. That intuitive interpretation of "involve" makes sense of every enumerated activity—and plainly does not reach the contracts here. The CFTC instead claimed it can ban an event contract if *trading* on the contract would *amount to* "gaming" or "unlawful activity." But that construction violates basic interpretive principles: It attributes disparate meanings to a single statutory term. It renders the other listed activities superfluous. It upends exclusive federal jurisdiction over regulated exchanges. And it ultimately flips the statute's default rule by subjecting *all* event contracts to public-interest scrutiny.

*Second*, even if the Commission were empowered to ban event-contract trading that would amount to "gaming" or "unlawful activity," trading on the contracts here would not. Elections are not games, so trading contracts on them is not "gaming." Nor does the "unlawful activity" category empower States to ban event contracts through their gambling statutes. Again, the Commission's broader interpretations of these terms would swallow both the rule and the other enumerated exceptions.

*Finally*, even if the Congressional Control Contracts were properly subject to public-interest scrutiny, the CFTC's analysis was arbitrary and capricious. The Commission dismissed comments from renowned economists, investors, and business owners, all of whom confirmed the concrete, real-world hedging benefits of Kalshi's contracts. It instead improvised heightened requirements that misunderstand how risk hedging works—and ignored the evidence that Kalshi's contracts meet even that test. On the other side of the ledger, the Commission merely offered unfounded and implausible speculation about election integrity, as if the Congressional Control Contracts *create* economic exposure to electoral outcomes rather than *reflect* it.

In short, the CFTC's decision to prohibit Kalshi's contracts contradicts both the statute and the record. This Court should vacate the challenged Order.

## BACKGROUND

### A.    Event Contracts Are Established Tools for Hedging Risks and Aggregating Information.

Derivatives are tools to mitigate risk. *See* Administrative Record (AR) at 37, 101; *see also* Steven Nickolas, *How Can Derivatives Be Used for Risk Management*?, Investopedia (Sept. 29, 2022). Event contracts—which are a form of derivative—fit that mold. *See* AR 37–40, 101. They are financial instruments that specify a future event with different potential outcomes, a payment structure for those outcomes, and a date when the contract expires. *See* AR 27–28, 3163. These contracts typically center on a yes-or-no question—*e.g.*, whether 30-year mortgage rates will exceed 8% at the end of the year, or whether average temperatures in California will hit an all-time high by the end of the summer.

The buyer of an event contract takes a "yes" position on whether its underlying event will occur. For every such purchase, a counterparty (or seller) implicitly takes a "no" position. AR 28. An event contract can typically be bought or sold at a price between 1¢ and 99¢. AR 27. At the contract's expiration, the seller must pay the buyer $1 if the underlying event occurs, and $0 if not. AR 28, 33. Contracts can be bought or sold at any time before their expiration. AR 33. Until that date—*i.e.*, while it remains uncertain whether the event will occur—the contract price will fluctuate. *See* AR 28. Event contract prices, like stock prices, are determined by market forces, not set by the exchange on which the contracts or stocks are traded. *See* AR 58, 1398. Traders arrive at those prices based on all available information at the time of the transaction. *See* AR 27–28, 1479. As a result, the prices of event contracts reflect the market's real-time probabilistic belief about whether the underlying event will occur. AR 1398, 1479.

Event contracts give traders direct exposure to the economic ramifications of real-world events. AR 1478. Although traders can (and do) use many other financial instruments to capture related economic forces, few can do so as precisely as an event contract. For example, a trader can purchase a futures contract on the S&P 500 stock index to take a position on whether the national economy will grow, as movement in that index tends to correlate with movement in GDP. But that would be an imprecise way to address whether the next GDP report will actually show economic growth. An event contract on the next GDP announcement can provide that targeted exposure.

Businesses and individuals use event contracts—like other derivatives—to hedge against the risk of an event happening. *E.g.*, AR 1528. For example, a beachfront property owner might buy contracts predicting that a hurricane will make landfall nearby, because the payout from those contracts could offset economic losses the owner is likely to incur if a storm hits. Such an event contract is distinct from— and serves a different function than—an insurance policy. The property owner could buy insurance to cover damage actually incurred from a storm. But unlike an event contract, that policy would not hedge the risk of other losses associated with a hurricane hitting, such as lost rental revenues or higher costs of food and water. Of course, not everyone who trades an event contract is hedging risk—some simply seek a return. That is true of all derivative markets; indeed, a robust market depends in part on the liquidity provided by speculators. *See, e.g.*, AR 1310, 2748.

Beyond their hedging benefits to businesses and individuals, event contracts also generate informational value for the public. AR 1392–93, 1550–52, 2991–93. As explained, traders' expectations determine the contract price, which reflects the market's collective view of the odds that an event will occur. Prediction markets thus serve as high-powered and highly effective information-aggregation tools, generating insights for researchers, businesses, individuals, and governments. *See, e.g.*, AR 1444, 1528, 1550. The resulting data about the market's perception of the event's likelihood can be used, in turn, to determine prices for assets whose value depends on the occurrence of the event; this is known as "price-basing." AR 1550, 3006–08.

B.     **Political Event Contracts Allow for Hedging of Political Risk and Collection of Valuable Predictive Data.**

Politics—no less than economic trends or weather—is beset with uncertainty. AR 1550, 2990.  And political events—no less than recessions or droughts—can have vast economic consequences.   AR 2990–93.   To quote Harvard Professor Jason Furman, former Chairman of President Obama's Council of Economic Advisors: "Congressional control impacts legislation, policy, and the business environment in ways that have direct economic consequence to businesses and workers.  This risk is conceptually identical to climate risk, business interruption risk, and other similar risks that can and should be managed using the financial markets." AR 1551.

Large financial institutions design bespoke derivatives for corporate customers and wealthy individuals to hedge against risks associated with political events.  *See, e.g.*, AR 3367.  For example, they used complex structured products to prepare for Brexit, the 2016 election, and other world-changing political events.  AR 1404, 1422, 1598.   But many individuals and businesses lack access to these specialized instruments.  Political event contracts help level the playing field.

They also have other benefits.   Better information about the likelihood of political events helps individuals to structure their lives, businesses to manage their affairs, and officials to make policy.  AR 1549.  It also helps to determine prices for assets exposed to political risk.  AR 3367.  But traditional polls and other methods of measuring public attitudes often cannot replicate the real-time responsiveness or neutrality of market data.  AR 1452–53, 1556.  That is why media outlets routinely rely on event markets when reporting on political developments.  AR 1495.

6

For all of these reasons, markets for political event contracts are widespread. PredictIt, for example, "is a futures market for politics" that allows trading on electoral outcomes. *Clarke v. CFTC*, 74 F.4th 627, 633 (5th Cir. 2023). CFTC staff have long permitted it to operate under a no-action letter (although there is now active litigation arising from the Commission's recent efforts to rescind it). *See id.* at 633–44. The University of Iowa's IEM platform is another well-known market for political event contracts, one the CFTC has likewise permitted for decades. AR 73, 1509, 3008. Similar markets exist (and have long existed) in other countries around the world. *See, e.g.*, AR 1416. And unregulated, illegal markets—which lack the safeguards of regulated exchanges like Kalshi's—provide analogous services online and offshore. *See, e.g.*, AR 1752, 1822.

## C.   Congress Allows Regulated Exchanges To List Event Contracts, Subject to a Narrow List of Exceptions.

Under federal law, "[e]vent contracts" are regulated as "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). While agricultural products like "wheat, cotton, rice, corn, [and] oats" are the most familiar commodities, the CEA defines "excluded commodities" to include non-tangible items like interest rates, certain financial instruments, economic indices, and risk metrics. *Id.* § 1a(9), (19)(i)–(iii). Relevant here, "excluded commodities" also include *events*— in the statutory parlance, any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv).

An entity must seek and receive CFTC designation as a regulated exchange to offer event contracts or other derivatives broadly for public trading.  *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.100.  The CFTC has "exclusive jurisdiction" over derivatives traded on regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  Exchanges are subject to comprehensive oversight and must comply with requirements governing recordkeeping, reporting, liquidity, system safeguards, conflicts of interest, disciplinary procedures, market surveillance, compliance resources, and more.  *Id.* § 7(d); 17 C.F.R. pt. 38.

While event contracts are presumptively lawful, *see* 7 U.S.C. § 7a-2(c)(5)(B), Congress in 2010 amended the CEA to prohibit event contracts if they (i) fall within certain narrow categories and (ii) are "determined by the Commission to be contrary to the public interest," *id.* § 7a-2(c)(5)(C)(i)–(ii).  The Commission may undertake a public-interest review *only* if the contract "involve[s]": "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."  *Id.* § 7a-2(c)(5)(C)(i).  Unless the contract involves one of those activities, the CFTC has no public-interest determination to make.

Consistent with the CEA's text, then, the process for reviewing event contracts proceeds in two basic steps:  *First*, the CFTC must determine whether the contract "involve[s]" one of the enumerated "activit[ies]."  *Id.* § 7a-2(c)(5)(C)(i).  If not, the Commission must allow the contract to be listed without further scrutiny.  *Second*, if the contract does "involve" a listed activity, the CFTC "may determine" that it is "contrary to the public interest" and, if so, bar its listing.  *Id.*

The Commission has promulgated an implementing regulation that largely mirrors the statute: An exchange "shall not list for trading" any event contract "that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law," or "an activity that is similar to an [enumerated] activity … that the Commission determines, by rule or regulation, to be contrary to the public interest."  17 C.F.R. § 40.11(a)(1)–(2).  But the CFTC has not exercised its authority to determine, "by rule or regulation," that a contract involving any activity "similar" to the five enumerated ones is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI).  As a result, public-interest scrutiny applies only if a contract "involves" unlawful activity, terrorism, assassination, war, or gaming.

### D.   Kalshi Proposes To List the Congressional Control Contracts.

Kalshi is a regulated exchange that allows the public to buy and sell event contracts.  Kalshi seeks to democratize investing opportunities once restricted to large corporations and the super-rich.  The CFTC unanimously authorized Kalshi to operate its exchange in 2020.  *See* AR 1314.  Contracts traded on Kalshi's exchange involve events that run the gamut from economics to climate, public health, and transportation—*e.g.*, the number of major hurricanes that will form over the Atlantic next year, or whether China's GDP growth will exceed a certain rate.  AR 1314, 1394, 1405. Kalshi also lists contracts that involve political events, *e.g.*, whether the federal government will shut down, whether the debt ceiling will be lifted by a deadline, and whether particular nominees will be confirmed by the Senate.  *See Events*, Kalshi, https://kalshi.com/events.

This case involves Congressional Control Contracts, which enable buyers to take positions on which political party will control the House of Representatives or the Senate on a particular future date.  AR 26, 32.  These are cash-settled, yes/no contracts based on the question: "Will <chamber of Congress> be controlled by <party> for <term>?"  The contract defines control by reference to the party affiliation of the Speaker (for the House) or President Pro Tempore (for the Senate).  AR 27.  To avoid potential conflicts of interest, the contracts' terms prohibit certain individuals and institutions from purchasing them (including candidates for office; paid employees of Members of Congress, congressional campaigns, party organizations, PACs, Super PACs, or major polling organizations; existing Members of Congress; and household and immediate family members of the above).  AR 35.

On June 12, 2023, Kalshi certified to the CFTC that the Congressional Control Contracts comply with applicable law.  AR 26.  That certification enables a regulated exchange to list a contract for trading.  7 U.S.C. § 7a-2(c)(1).  But a split Commission chose to initiate a review of the contracts and thereby suspend the listing of the contracts.  *See id.* § 7a-2(c)(2).  In announcing its review, the CFTC indicated that the Congressional Control Contracts may involve an enumerated activity.  AR 148.  Two Commissioners dissented, with one expressly observing that the contracts did "not fall within the categories enumerated in the CEA."  Mersinger Dissenting Statement, CFTC.gov (June 23, 2023), https://www.cftc.gov/PressRoom/SpeechesTestimony/ mersingerstatement062323; Pham Dissenting Statement, CFTC.gov (June 23, 2023), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement062323.

During the ensuing public comment period, academics, businesses, investors, former CFTC and SEC officials, human-rights activists, and nonprofits all expressed support for the Congressional Control Contracts.[1] Most commenters attested to the economic and informational value of political event contracts generally and the Congressional Control Contracts specifically.[2] And many attested that they would actually buy Congressional Control Contracts to hedge risk.[3] Overall, the comments reinforced that Congressional Control Contracts are not merely legal—and therefore must be approved for trading—but also have significant societal value.

### E.    The CFTC Issues an Order Rejecting Kalshi's Contracts.

On September 22, 2023, the CFTC issued an order (the Order) prohibiting Kalshi from listing its Congressional Control Contracts.    AR 1–23 (Order). Commissioner Mersinger again dissented.    Mersinger Dissenting Statement, CFTC.gov (Sept. 22, 2023), https://www.cftc.gov/PressRoom/SpeechesTestimony/ mersingerstatement092223.    Commissioner Pham abstained, citing the CFTC's recent defeat in its litigation against PredictIt.  *See Clarke*, 74 F.4th 627; *see also* Pham Abstention Statement, CFTC.gov (Sept. 22, 2023), https://www.cftc.gov/ PressRoom/SpeechesTestimony/phamstatement092223.

---

[1] *See, e.g.*, AR 1312–23, 1378–79, 1380–82, 1388–90, 1392–1403, 1404–05, 1443–45, 1448–53, 1474–75, 1477–81, 1527–29, 1537–38, 1541–45, 1549–52, 1555–57, 1558–60, 1573–78, 1584–85, 1602, 1616–23, 1744, 1745–46.

[2] *See, e.g.*, AR 1413–41, 1474–75, 1477–81; 1527–29, 2277–345.

[3] *See, e.g.*, AR 1348, 1375–76, 1386–87, 1391, 1532, 1533, 1539–40, 1590–91, 1597, 1613, 3367.

In the Order, the Commission correctly observed that it "may determine that contracts in certain excluded commodities … are contrary to the public interest if the contracts involve" any of the enumerated activities.  Order at 3.  But it then went on incorrectly to find that Kalshi's Congressional Control Contracts are subject to public-interest review because they "involve" two enumerated activities: "gaming" and "unlawful" activity.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (V).

In so finding, the Commission did not (and could not) determine that elections are themselves "gaming" or unlawful activity.  Rather, the Commission reasoned that a contract "involve[s]" those enumerated activities if *trading on the contract* would *amount to* "gaming" or unlawful activity.  *See* Order at 5–7.  The Commission then declared that trading these contracts would amount to gaming and unlawful activity, relying on dictionary definitions and state statutes that broadly define "gambling" to include staking money on the outcome of any "game, contest, or contingent event." *Id.* at 8.  Finally, having found that the Congressional Control Contracts were subject to public-interest review, the Commission determined that they were "contrary to the public interest" because they supposedly had no legitimate economic purpose and would threaten election integrity.  *Id.* at 13–23.

Kalshi then filed this lawsuit under the Administrative Procedure Act (APA), asking this Court to vacate the Order because it "exceeds the Commission's statutory authority, is contrary to law, and is arbitrary and capricious."  Compl. ¶¶ 83–93, ECF 1 (Nov. 1, 2023).  Kalshi now moves this Court to grant summary judgment in its favor.  Fed. R. Civ. P. 56.

12

## LEGAL STANDARD

Summary judgment based on the administrative record is the "appropriate mechanism to resolve an APA challenge to agency action." *Ludlow v. Mabus*, 793 F. Supp. 2d 352, 354 n.1 (D.D.C. 2011). A court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory … authority." 5 U.S.C. § 706(2)(A), (C). In so doing, the court must "interpret … statutory provisions" for itself and "decide all relevant questions of law." *Id.* § 706. "The APA's arbitrary-and-capricious standard requires that agency [actions] be reasonable and reasonably explained." *Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009).

## ARGUMENT

This Court should vacate the Commission's Order and declare that Kalshi may list its Congressional Control Contracts for trading. The CEA requires the CFTC to first assess whether an event contract falls into one of the discrete categories listed in the statute; if it does not, no public-interest review applies. Kalshi's contracts are not subject to public-interest review because they do not "involve" any of the enumerated activities. Those activities describe *events* that could *underlie* a contract, not the act of *trading on the contract itself*. And since partisan control of Congress does not "involve" terrorism, assassination, war, gaming, or unlawful activity, Kalshi is entitled to list its contracts—period. The statute is unambiguous on these points once traditional tools of statutory construction are applied, as they must be. *See, e.g.*, *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781–82 (D.C. Cir. 2012).

13

In concluding otherwise, the Commission first adopted an untenable reading of "involve" that changes, chameleon-like, based on the category of activities at issue. It then misconstrued the two activities it invoked, converting the "gaming" exception into an a justification for scrutinizing *any* event contract and the "unlawful activity" exception into an invitation for 50 state legislatures to upend an exclusively federal regime. None of that is consistent with the statute. Under a proper reading of the CEA, Kalshi's contracts are not subject to public-interest review at all.

The CFTC's public-interest analysis was arbitrary and capricious in any event. It employed a legally misguided standard. And, under that erroneous standard, the Commission trumpeted unsubstantiated, implausible speculation about the alleged perils of the Congressional Control Contracts, while ignoring the record evidence of their demonstrated economic and social benefits.

## I.   THE ORDER IS PREMISED ON A LEGAL ERROR AS TO WHEN EVENT CONTRACTS "INVOLVE" AN ENUMERATED ACTIVITY.

Contracts contingent on congressional control do not "involve" "terrorism," "assassination," "war," "gaming," or "unlawful" activity. 7 U.S.C. § 7a-2(c)(5)(C)(i). Elections do not constitute—or even relate to—any of those things. Accordingly, the CFTC has no power to review (much less ban) the Congressional Control Contracts. Concluding otherwise, the CFTC reasoned that an event contract "involves" certain enumerated activities (but not others) if *buying or selling it* would "amount[] to" one of those activities. Order at 7 n.19. That convoluted reading flunks basic canons of statutory interpretation. And the Commission's criticisms of the common-sense, event-focused reading are meritless. That alone should be the end of this case.

**A.      The Commission's Shifting Interpretation of "Involve" Is Wrong.**

The meaning of the word "involve" is context-dependent.  Dictionaries typically offer a range of possible definitions.  *See, e.g.*, *Involve*, *American Heritage Dictionary* 921 (4th ed. 2009) ("[t]o contain as a part; include"; "[t]o have as a necessary feature or consequence"; "[t]o engage as a participant"; etc.); *see also Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1009–10 (7th Cir. 2002) ("[D]ictionary definition[s] of 'involve' demonstrate[] the many levels of participation that could constitute involvement.").  As a result, context is crucial to identifying the word's meaning in a particular statute or framework.  *See Boim*, 291 F.3d at 1010; *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 419 (2d Cir. 2023).

Consider, for example, a theater that requires parents to accompany minors under 13 to any screening that "involves" violence or drug use.  In context, the policy obviously refers to the content of the underlying film.  The theater is not saying that parents must be present if the minors plan to use drugs or beat each other up during the movie, even though that interpretation may be semantically possible.

Here too, context makes clear that an event contract "involves" an enumerated activity when the *underlying event* constitutes or relates to that activity.  That is the only reading of "involve" that works across all categories of enumerated activities.  The Commission's contrary interpretation—which asks whether *trading the contract* amounts to the enumerated activity—makes no sense as applied to most of the listed activities.  And, more broadly, it is inconsistent with the CEA's structure and purpose because it allows the exceptions to swallow the rule (and each other).

15

1.     **Consistent Meaning.**  The natural, event-focused interpretation is the only reading of "involve" that makes sense of every enumerated category.  Indeed, as applied to three of the five extant activities—terrorism, assassination, and war—it is the *only* reading.  An event contract "involve[s] … terrorism" if the underlying event is or relates to a terrorist attack.  7 U.S.C. § 7a-2(c)(5)(C)(i)(II).  A contract "involve[s] … assassination" if the underlying event is or relates to the murder of a public official. *Id.* § 7a-2(c)(5)(C)(i)(III).  And a contract "involve[s] … war" if the underlying event is or relates to a military campaign.  *Id.* § 7a-2(c)(5)(C)(i)(IV).  The CFTC's "amounts to" reading does not work with any of these activities, because buying or selling an event contract can *never* "amount to" terrorism, assassination, or war.  As to the terrorism, assassination, and war exceptions, the word "involve" can therefore *only* refer to the event underlying a contract.

That event-focused reading fits the remaining enumerated categories, too.  The "gaming" category reaches contracts contingent on *games*—for example, whether someone will win the Powerball lottery by a certain date, or whether a certain team will win the Super Bowl.  It thus functions as a check on attempts to launder casino-style or sports gambling through the derivatives markets.  *Id.* § 7a-2(c)(5)(C)(i)(V); *see also infra* at 22–23.  The unlawful-activity category captures contracts contingent on illegal acts—for example, whether a company will defraud investors, or whether a famous painting will be stolen.  It thus functions as a check on contracts that could incentivize crime.  *Id.* § 7a-2(c)(5)(C)(i)(I).  All of that makes perfect sense, and gives the word "involve" a consistent and coherent meaning across all applications.

16

The Order does not dispute that terrorism, assassination, and war require an event-focused interpretation of "involve." Instead, it adopts a different interpretation of the very same word as applied to the "gaming" and "unlawful" activities. For those (and only those) categories, the Commission posits, "involve" refers to the act of *buying or selling* the contract, not the contract's *event*. *See* Order at 7 n.19.

That shape-shifting approach ignores the basic rule of statutory construction that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). If a term's "meaning is clear as used in one place, it will be construed to have the same meaning in the next place." *Brown v. NHTSA*, 673 F.2d 544, 546 n.5 (D.C. Cir. 1982). That presumption applies even where a term appears across different sections of an act. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990). And it hardens as the gap between appearances shrinks. *See, e.g.*, *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (same section); *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (observing that "presumption [is] surely at its most vigorous when a term is repeated within a given sentence"); *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 455–56 (2012).

Not surprisingly, the consistent-meaning canon is most potent as to "a *single* formulation," which must mean the same thing "each time it is called into play." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994). Consistent with that principle, courts "refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending on which object it is modifying." *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 329 (2000). For example, the Supreme Court

"reject[ed] as unreasonable" a construction of "the phrase 'other than' to mean one thing when applied to 'banks' and another thing as applied to 'common carriers'" when the phrase "modifies both words in the same clause." *Bankamerica Corp. v. United States*, 462 U.S. 122, 129 (1983).  Similarly, it rejected a construction of the "phrase 'abridging the right to vote on account of race or color' [to] mean[ ]" one thing "when it modifies 'effect,' but [to] mean[ ]" something else "when it modifies 'purpose.'" *Reno*, 528 U.S. at 329.  In these cases and others, the Court has recognized that, where a term "applies without differentiation to all … categories … that are its subject," giving the term "a different meaning for each category would … invent a statute rather than interpret one." *Clark v. Martinez*, 543 U.S. 371, 378 (2005).

The Order flouts that bedrock interpretive principle.  Rather than read "a *single* formulation … the same way each time it is called into play," *Ratzlaf*, 510 U.S. at 143, the CFTC gives "involve" a "different meaning for each category" of enumerated activities, *Clark*, 543 U.S. at 378.  A contract "involves" terrorism, assassination, or war if the contract is contingent on its occurrence.  But a contract "involves" gaming or unlawful activity if *purchasing* it would *amount to* that activity. The Commission's interpretation of "involve" must fail for that reason alone.

**2.   Context.**  Statutory context confirms that conclusion.  Courts interpret provisions "with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury,* 489 U.S. 803, 809 (1989); *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 708 (D.C. Cir. 2009).  And statutory components should be construed to work "in harmony" rather than "at cross-purposes." *Jones v. Hendrix*,

599 U.S. 465, 478 (2023); *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1093 (D.C. Cir. 1996).  Accordingly, courts refuse to construe discrete exceptions in a way that would "read out the rule."  *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017); *Comm'r v. Clark*, 489 U.S. 726, 739 (1989).  Yet the Order's inconsistent "amounts to" gloss would work "at cross purposes" with the rest of the CEA and, indeed, upend the statutory scheme in at least two different ways.

*First*, the default under the CEA is that regulated exchanges may list event contracts without special scrutiny.  7 U.S.C. § 7a-2(c)(5)(B) (requiring CFTC approval "unless" contract would violate statute or regulations).  As discussed below, however, the Order defines "gaming" to mean staking money on any "contingent event."  Order at 8 & n.21–22; *see infra*, Part II.A.  Yet, by definition, anyone who trades an event contract is staking money on a contingent event.  7 U.S.C. § 1a(19)(iv) ("commodity" includes any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" and "associated with" economic consequences).  As a result, the Order's interpretation of "involve" (at least when combined with its interpretation of "gaming") affords the CFTC a roving mandate to review—and potentially to ban— *any* event contract.  That flips the statutory default, dramatically expanding the CFTC's own power and transforming an orderly regime of narrow exceptions into an across-the-board public-interest test.  It thus improperly swallows both the rule and the other carefully enumerated categories.  *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) (articulating the "interpretive principle that every clause and word of a statute should have meaning").

*Second*, the act-of-trading approach makes a hash of the "unlawful activity" exception too. Congress had no need to authorize public-interest review of contracts whose trading is already illegal under *federal* law. And if a *State* tried to ban trading in event contracts, its law would be preempted by the CFTC's "exclusive jurisdiction" over derivatives markets. 7 U.S.C. § 2(a)(1)(A); *see also Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) (explaining that CEA "preempts the application of state law" for regulated markets); *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992) (CEA preempts "application[s] of state law [that] would directly affect trading on or the operation of a futures market"); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563 (6th Cir. 1998). So taken at face value, the CFTC's interpretation of "involve" would leave the "unlawful activity" exception "with no work to perform"—another violation of the presumption against superfluity. *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022).

Alternatively, reading "involve" to turn the "unlawful activity" exception into a backdoor way for States to effectively reverse-preempt the CEA would improperly short-circuit exclusive federal regulation of event contracts. *But see Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (applying presumption against "making the application of [a] federal act dependent on state law"). It would also invite confusion by making an indeterminate nationwide survey of 50 state laws a prerequisite for review of any event contract. These contextual difficulties, like the others, are readily avoided by adopting the simple, intuitive, consistent, event-focused interpretation of "involve" that makes sense of the entire scheme.

20

**B.      The Order's Attacks on the Event-Based Reading Are Meritless.**

The Order attempts to justify its inconsistent, convoluted reading of "involve" by criticizing the simpler, event-focused interpretation.  But neither of its arguments holds water.  Indeed, both rest on demonstrably false premises.

**1.      Other Statutory Uses.**  The Order first asserts that "involve[s]" must mean something broader than "based on" because the CEA uses the latter (or the term "underlying") when referring to a contingent event or commodity on which a contract is based.  Order at 6.  But in fact, Congress used all three of those terms— "involves," "based on," and "underlying"—in different ways across different contexts. Most relevant here, the CEA repeatedly *does* use "involve" to refer to the underlying commodity or subject of a contract or transaction.[4]  That is fully consistent with the natural event-focused reading of the term.  Meanwhile, when Congress in the CEA wished to say that one act *amounts to* another, it said so *without* using the word "involve."[5]  The broader statutory text thus disproves the Order's claim that the CEA always uses terms other than "involve" to refer to a contract's basis.  (And of course, the Commission must concede that "involve" does *exactly that* as to the terrorism, assassination, and war categories.  *See* Order at 7; *supra* at 16.)

---

[4] *See, e.g.*, 7 U.S.C. §§ 2(c)(2)(D)(ii)(III)(aa) ("the typical commercial practice in cash or spot markets for the commodity *involved*"); 6c(b) ("transaction *involving* any commodity regulated under this chapter"); 15b(d)–(h) ("cotton *involved*" in contracts); 23(b)(1) ("transactions *involving* different commodities"); 2(a)(1)(D)(i) ("contracts[] and transactions *involving* … a security futures product") (all emphases added).

[5] *See* 7 U.S.C. § 25(a)(1)(D)(ii) (private right of action available where "violation *constitutes* … a manipulation of the price of [a] contract" (emphasis added)).

In any event, the Commission's assumption that "involve" must carry some broadening effect is entirely consistent with the event-focused reading of the text. A contract might "involve" an activity (even if it is not strictly "based on" that activity) if its underlying event is *closely tied* to an enumerated activity. For instance, a contract on whether the Ukrainian military will acquire certain munitions in 2024 might be said to "involve … war," even though its underlying event is not itself an act of war. A contract on whether a certain CEO will be arrested for fraud might be said to "involve" unlawful activity even though the arrest is not itself unlawful. In other words, Congress could have chosen the term "involve" to prevent *circumvention* through contracts that are based on events technically distinct from, but still closely related to, the enumerated activities. The intuition that "involve" is broader than some alternatives therefore does not warrant, let alone require, dramatically shifting the statute's focus from the *underlying event* to the *act of trading*.

**2.   Null Sets.** The Order also posits that the "gaming" category would be "a null set" under an event-based interpretation of "involve," since no event contract's "underlying event, itself, is 'gaming.'" Order at 7 n.18. Here too, the premise fails. Consider a contract on whether someone wins the Powerball before a certain date. The lottery—a quintessential game of chance—forms the underlying contingency. Or consider contracts pegged to the outcome of the World Series of Poker or other gaming tournaments. Those are clearly contracts involving "gaming," and thus subject to public-interest review under a common-sense reading of the CEA. Indeed, according to the CFTC itself, the "gaming" category encompasses contracts based on sporting

events.  *See id.* at 8.  And contracts contingent on sports betting are not hypothetical.  *See* CFTC Release No. 8345-20, *CFTC Announces Review of RSBIX NFL Futures Contracts Proposed by Eris Exchange, LLC* (Dec. 23, 2020) (contracts predicated on point spreads and total points in NFL games).  The only relevant legislative history, moreover, confirms that contracts on "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" were *precisely* what Congress had in mind as "gaming" contracts.  156 Cong. Rec. S5907 (daily ed. July 15, 2010).

*     *     *

In sum, statutory context confirms that an event contract "involves" a listed "activity" if it is *contingent* on that activity.  The CFTC's "amounts to" reading breaks fundamental rules of statutory interpretation and scrambles the CEA's structure and function.  Because Congressional Control Contracts do not "involve" any enumerated activity under the proper construction of that term, this Court need go no further.  Kalshi is entitled to list these contracts on its regulated exchange.

## II.    THE ORDER ALSO MISCONSTRUES THE "GAMING" AND "UNLAWFUL ACTIVITY" CATEGORIES.

Even under the Commission's erroneous "amounts to" reading of "involve," the Order's analysis still fails.  Its overbroad definition of "gaming" would fundamentally alter the statutory scheme governing event contracts and render every other category superfluous.  And its approach to "unlawful activity" is self-defeating, because States cannot—and have not purported to—ban federally regulated derivatives.  Trading a Congressional Control Contract therefore does not "amount to" either "gaming" or a violation of state law.  This legal error too requires vacatur of the Order.

23

### A.    Trading Congressional Control Contracts Does Not Amount to "Gaming."

To sweep the trading of Congressional Control Contracts into the "gaming" category, the Order reasons that (1) "gaming" means "gambling," which some statutes define to include staking money on the "outcome of a game, contest, or contingent event"; and (2) "taking a position in the Congressional Control Contracts would be staking something of value upon the outcome of a contest." *See* Order at 8–10.  That logic hinges on an overbroad interpretation of "gaming" that cannot be squared with ordinary usage and is flatly foreclosed by statutory context.

1.    **Ordinary Meaning.**  To begin, the CEA says "gaming," not "gambling." And in plain English, "gaming" typically refers to "playing at games of chance for money."  *Gaming*, *Concise Oxford English Dictionary* (11th ed., rev. 2008); *see also Gaming*, Merriam-Webster.com ("playing games for stakes"); *Game*, *New Oxford American Dictionary* (3d ed. 2010) ("games of chance for money").  "Gaming" is most closely associated with "casino gambling."  *Gaming*, *American Heritage Dictionary* (4th ed. 2009); *see also Gaming*, *Cambridge Dictionary of American English* (2d ed. 2008) ("industry in which people gamble by playing cards and other games in casinos").  It can describe betting on other games too.  *See gaming contract*, *Chambers Dictionary* (13th ed. 2014) ("a wager upon any game (eg a horse race or football match)"); *Gaming*, *Bouvier Law Dictionary* (2011 ed.) ("[a] contract to enter a game of skill or chance that one might win or lose"; parties "play a game with certain rules at cards, dice, or another contrivance").  But the common denominator, as the term's root itself suggests, is the existence of a *game*.

24

That is just as true in federal and state statutes as it is in common parlance. Federal statutes, the most relevant source for determining congressional intent, use "gaming" to refer to betting on *games*. *See, e.g.*, 25 U.S.C. § 2703(6)–(8) (defining "gaming" classes in Indian Gaming Regulatory Act). Indeed, the only federal statute that the Order cites to justify its sweeping reading of "gaming" never uses that term, except to cross-reference other laws (such as the Indian Gaming Regulatory Act). *See* 31 U.S.C. §§ 5361–5367. Congress instead used "bet or wager"—not "gaming"—to refer to "staking ... something of value upon the outcome of a contest of others." *Id.* § 5362(1)(A). And it expressly *excluded* derivatives regulated under the CEA—like event contracts—from such "bet[s]" and "wager[s]." *Id.* § 5362(1)(E)(iv).

State legislatures likewise overwhelmingly use "gaming" and related terms to refer to playing or betting on *games*, not to encompass any staking of money on a contingency. *See, e.g.*, Iowa Code § 725.7(1) ("illegal gaming" means "[p]articipat[ing] in a game for any sum"); Mass. Gen. Laws ch. 23K, § 2 ("gaming" means "dealing, operating, carrying on, conducting, maintaining or exposing any game for pay").[6]

---

[6] *See also, e.g.*, Ark. Code. Ann. §§ 5-66-104 (prohibiting "gaming devices"), 5-66-106 (prohibiting "bet[ting] any money ... on any game"); Cal. Bus. & Prof. Code § 19805(f) (defining "gambling" as "to deal, operate, carry on, conduct, maintain, or expose for play a controlled game"); Colo. Rev. Stat. Ann. § 44-30-103(22) (defining "gaming" as "physical and electronic versions of slot machines, craps, roulette, and the card games of poker and blackjack"); Conn. Gen. Stat. § 12-557b(6); Fla. Stat. §§ 849.01 (prohibiting any "gaming table or room, or gaming implements or apparatus, ... for the purpose of gaming or gambling"); 849.08 (defining "gambling" as "play[ing] or engag[ing] in any game at cards ... or other game of chance"); 720 Ill. Comp. Stat. 5/28-1(a)(1) ("A person commits gambling when he or she ... plays a game of chance or skill for money"); Ky. Rev. Stat. § 238.505 (defining "charitable gaming" by reference to games of chance); La. Stat. § 27:205 (defining legal "gaming operations" and "gaming activities" as "the offering or conducting of any game or

Consistent with ordinary usage, federal law, and state law, "gaming" must

therefore involve a *game*. Mere betting—in the absence of an underlying "game"—

---

gaming device in accordance with" state law); Md. Code Ann., Crim. Law § 12-101(d)(1)(ii) (defining "gaming device" as "a game or device at which money … is bet, wagered, or gambled"); Miss. Code. Ann. § 75-76-5(*l*) ("'Gaming' or 'gambling' means to deal, operate, carry on, conduct, maintain or expose for play any game as defined in this chapter"); Mo. Rev. Stat. § 313.800(13) (defining legal "gambling game[s]" as "games of skill or games of chance on an excursion gambling boat"); Nev. Rev. Stat. §§ 463.0152 ("'Game' or 'gambling game' means any game played with cards, dice, equipment or any mechanical or electronic device or machine for money"); 463.0153 ("'Gaming' or 'gambling' means to deal, operate, carry on, conduct, maintain or expose for play any game as defined [by law]"); N.J. Stat. § 5:12-22 (defining "gaming" and "gambling" as "[t]he dealing, operating, carrying on, conducting, maintaining or exposing for pay of any game"); N.M. Stat. Ann. § 60-2E-3(P) (defining "gaming" as "offering a game for play"); N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1301(20) (defining "gaming" and "gambling" as "dealing, operating, carrying on, conducting, maintaining or exposing for pay of any game"); N.C. Gen. Stat. § 14-292 (defining "gambling" as operating, playing, or betting on "any game of chance"); Ohio Rev. Code Ann. §§ 2915.02(A)(2) (defining illegal "gambling" by reference to "any game of chance"), 2915.01(D) (defining "game of chance" as "poker, craps, roulette, or other game in which a player gives anything of value in the hope of gain"); 18 Pa. Stat. & Cons. Stat. Ann. § 5513(a)(1) (defining illegal "gambling" as maintaining a "slot machine or any [other] device to be used for gambling purposes"); 4 Pa. Stat. and Cons. Stat. Ann. § 1103 (defining legal "gaming" as "licensed placement, operation and play of slot machines, table games and interactive games"); 41 R.I. Gen. Laws § 41-9-1 (defining "gambling" by reference to "horseracing, dog racing, and jai alai"); S.C. Code Ann. § 3-11-100(2) ("'Gambling' or 'gambling device' means any game of chance and includes, but is not limited to, slot machines, punchboards," etc.); S.D. Codified Laws §§ 22-25-1 (defining "gambling" as "wager[ing] on a sporting event or engag[ing] in gambling in any form with cards, dice, or other implements or devices"); 42-7B-1 (authorizing "limited gaming" including "card games, slot machines, craps, roulette, keno, and wagering on sporting events" in certain areas); Vt. Stat. Ann. tit. 13, § 2141 (defining "gambling" by reference to "play or hazard at any game"); Va. Code Ann. § 58.1-4100 (defining "casino gaming" and "game[s]" to mean "baccarat, blackjack, twenty-one, poker, craps, dice, slot machines, roulette wheels, Klondike tables, Mah Jongg, electronic table games, hybrid table games, punchboards, faro layouts, numbers tickets, push cards, jar tickets, or pull tabs, or any variation of the aforementioned games, and any other activity that is authorized by the Board as a wagering game or device").

does not constitute "gaming." If two employees stake $5 on whether their boss will show up for work on Monday, they have certainly made a bet, but no one would say that they are "gaming." Likewise, if a business buys derivatives pegged to the future price of pork bellies, that might be colloquially characterized as "betting" on that market, but it certainly is not "gaming."

Purchasing one of Kalshi's Congressional Control Contracts is not "gaming," either. Elections are not games. They are not remotely analogous to casino games, lotteries, bingo, or even sporting events. Elections, unlike "games," are not staged for entertainment or to facilitate speculation for sport. *See Game*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) ("engaged in for diversion or amusement"); *see also* AR 1315 ("Gaming describes wagering money on an occurrence that has no inherent economic value itself other than the money wagered."). Rather, elections—again, unlike games—have extrinsic effects outside the contest itself, and indeed carry significant economic consequences in the real world. Buying or selling election event contracts therefore does not amount to "gaming."

2. **Statutory Context.** The Order defined "gaming" more broadly, citing a few dictionaries and state laws that define "gambling" (not "gaming") to include staking money on *any* contingent event beyond the parties' control. *See* Order at 8–9. But as discussed above, that interpretation of "gaming" (when combined with the Commission's interpretation of "involve") would turn the statutory default on its head and render the remaining categories superfluous. *See supra* at 19.

27

Again, defining "gaming" that broadly would subject *every* event contract to heightened public-interest review, because anyone who trades an event contract is by definition staking money on a contingency beyond his control.  Yet, as Justice Holmes observed over a century ago: "It seems to us an extraordinary and unlikely proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers."  *Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905).  Indeed, that construction would render superfluous all of the other enumerated activities—ignoring the "interpretive principle that every clause and word of a statute should have meaning."  *Polansky*, 599 U.S. at 432.  And it would grant the CFTC a roving commission to scrutinize the social utility of all event contracts—a sweeping, surprising power Congress would not hide in a single word.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").  Especially when that word on its face—and based on its legislative history (*supra* at 23)—appears to be concerned with casinos and sports, not with the premise of the entire industry.  Statutory context thus forecloses the Commission's overbroad approach to "gaming."  Giving the term its ordinary meaning—betting on *games*—avoids all of those pitfalls.

Perhaps aware that its logic would scramble the statutory scheme—but still determined to wedge Kalshi's contracts into a suspect category—the CFTC gestured at a potential limiting principle: "gaming" could be limited to wagers on "contests," supposedly including elections.  *See* Order at 9–10 & n.25.  That attempt to thread the needle both misconstrues "gaming" and mischaracterizes elections.

To start, "gaming" is defined by reference to "games," not "contests." *See supra*, Part II.A.1.  In fact, the Order cites no dictionary or statutory definition of "gaming" that invokes "contests."  And its lone federal statute refers to "contest[s] of others" but not to "gaming."  *See* 31 U.S.C. § 5362(1)(A).

States that define "gambling" by reference to "contests" or otherwise refer to "contests" in their gambling statutes do not bridge the gap.  *See* Order at 8 n.22 & 9 n.24 (collecting 13 state statutes).  Even setting aside that "gaming" is different from "gambling," *elections* are not "contests" for purposes of those laws.  More than half of the cited statutes use the phrase "contest *of chance*," which is an obvious reference to traditional gambling activities, not elections.[7]  The others use the word "contest" in ways that likewise plainly exclude elections.  Delaware and Florida, for example, ban "wagers upon the result of any trial or contest … of skill, speed or power of endurance of human or beast."  Del. Code Ann. tit. 11, § 1403(1); Fla. Stat. § 849.14.  Louisiana defines "gambling" as "any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value."  La. Stat. § 14:90(A)(1)(a).[8]

The word "contest" in these statutes must be understood "by the company it keeps."  *Yates v. United States*, 574 U.S. 528, 543 (2015); *see also Dole v. United*

---

[7] *See* Ala. Code § 13A-12-20(4); Alaska Stat. Ann. § 11.66.280(2)–(3) (defining "contest of chance" as "a contest, game, gaming scheme, or gaming device"; defining "gambling" as staking "something of value upon the outcome of a contest of chance"); Haw. Rev. Stat. § 712-1220; Me. Rev. Stat. tit. 17-A, § 952(3)–(4); Mo. Rev. Stat. § 572.010(4); N.Y. Penal Law § 225.00(2); Wash. Rev. Code § 9.46.0237.

[8] *See also* Ky. Rev. Stat. § 528.010(6)(a) ("the outcome of a contest, game, gaming scheme, or gaming device"); Utah Code Ann. § 76-10-1101(a) (same).

*Steelworkers of Am.*, 494 U.S. 26, 36 (1990) ("The traditional canon of construction, *noscitur a sociis*, dictates that words grouped in a list should be given related meaning."). In context, these statutes clearly use "contest" to reach events that are not usually called "games" but share key attributes with them—*e.g.*, horseraces or boxing matches. Such "contests" are staged purely for entertainment and to facilitate betting. They have no independent significance; their outcomes carry no economic risks. AR 1315. Elections are nothing like the other terms on those lists. They have extrinsic effects and vast economic consequences. They therefore cannot be treated as "contests" under any State's gambling laws. Indeed, many States that define "gambling" to include betting on "contests" *separately* ban betting on elections—a wholly unnecessary step if "contests" already captured elections.[9]

In short, the Commission is trying to have it both ways by reading "gaming" to reach elections, yet resisting the overbroad "any contingency" construction that would obviously upend the CEA. But there is no viable middle road here. The only workable construction of "gaming" requires the presence of a *game*. Because the Congressional Control Contracts do not involve a game, and trading them does not amount to betting on a game, this statutory exception is not implicated by Kalshi's contracts.

---

[9] *See* Ariz. Rev. Stat. Ann. § 16-1015; Ga. Code Ann. § 16-12-21(a)(1)–(2) (separate prohibitions for betting on a "game or contest" and betting "upon the result of any … election"); 720 Ill. Comp. Stat. 5/28-1; Mich. Comp. Laws § 168.931(l); Neb. Rev. Stat. § 28-1101(4); N.J. Stat. § 19:34-24; Or. Rev. Stat. § 260.635; Tex. Penal Code Ann. § 47.02(a) (person commits "gambling" if he "(1) makes a bet on the partial or final result of a game or contest" *or* (2) "makes a bet on the result of any … election"). *See also infra*, Part II.B (addressing significance of these prohibitions).

**B.    Trading Congressional Control Contracts Is Also Not "Unlawful" Activity.**

The Order similarly misreads the "unlawful" activity exception.  Even under the Commission's erroneous reading of "involve," that exception does not apply here because buying or selling a Congressional Control Contract does not amount to illegal activity.  The Commission's contrary reasoning is incoherent.

The Commission contends that purchasing one of Kalshi's contracts would be illegal in jurisdictions that prohibit betting on elections by statute or common law.  *See* Order at 11–13 & nn.26–27.  But those statutes cannot be construed to ban the trading of event contracts on federally regulated exchanges; as explained above, the federal scheme vests exclusive jurisdiction over such trading in the Commission and thus preempts any contrary state laws.  *See* 7 U.S.C. § 2(a)(1); *Leist*, 638 F.2d at 322; *supra* at 20.  Recognizing as much, most of the state gambling laws cited by the Order expressly *carve out* lawful business transactions, including commodity futures and other derivatives.[10]  Those carve-outs reflect what federal law has long acknowledged: Although many bona fide transactions falling under CFTC jurisdiction may *look like* gambling to a layman, they are nothing like craps, lotteries, or horseracing.

---

[10] *See* Ala. Code § 13A-12-20(4); Alaska Stat. Ann. § 11.66.280(3)(A); Ariz. Rev. Stat. § 13-3301(6); Colo. Rev. Stat. Ann. § 18-10-102; Haw. Rev. Stat. § 712-1220; Idaho Code § 18-3801(2), (5); Ind. Code § 35-45-5-1(d)(2); Kan. Stat. Ann. § 21-6403(a)(1); Minn. Stat. § 609.75, Subd. 3(1)–(2); Mo. Rev. Stat. § 572.010(4); N.M. Stat. Ann. § 30-19-1(B); N.D. Cent. Code Ann. § 12.1-28-01; Ohio Rev. Code Ann. § 2915.01; Okla. Stat. Ann. Tit. 21, § 981(1)(a); Or. Rev. Stat. § 167.117(7)(a); Tenn. Code Ann. § 39-17-501(2)(A); Utah Code Ann. § 76-10-1101(c)(i); Wash. Rev. Code § 9.46.0237; Wis. Stat. Ann. § 945.01(1)(a); Wyo. Stat. Ann. § 6-7-101(a)(iii)(B)–(C).

The Order ultimately admits as much, acknowledging that "transacting these products … *cannot, in and of itself*, be an 'activity that is unlawful under any … State law.'"  Order at 13 n.28 (emphasis added).  That concession is dispositive: Because States cannot prohibit "trading in" event contracts, purchasing them cannot "amount to" activity prohibited by state law.  *Id.* at 7 n.19; *see also supra* at 20.

Realizing this flaw, the Order tries to introduce yet a *third* reading of the word "involve."  Even if trading in these contracts is legal, the Order posits, it nevertheless "entail[s]" or "relate[s] closely" to illegal activity.  Order at 13 n.28.  What does that even mean?  How can an activity "entail" illegality without being illegal?  How "closely" must a legal activity "relate" to an illegal one?  In how many States?  The Order provides no answers to justify its bizarre interpretive manipulation.  Here too, the Commission's "interpretation" appears to be merely an outcome-driven effort to block the Congressional Control Contracts—not honest statutory construction.

In any event, taking the Order's incoherent reasoning at face value would once again upend the CEA's regulatory scheme by empowering state legislatures to dictate the regulation of event contracts.  As the Order acknowledges, a number of States treat staking money on *any* contingent future event as illegal gambling.[11]  New York,

---

[11] *See, e.g.*, Ala. Code § 13A-12-20(4) ("future contingent event not under his control or influence"); Alaska Stat. Ann. § 11.66.280(3); Ariz. Rev. Stat. § 13-3301(8); Colo. Rev. Stat. Ann. § 18-10-102; Haw. Rev. Stat. Ann. § 712-1220; Idaho Code § 18-3801; Me. Rev. Stat. tit. 17-A, § 952; Mich. Comp. Laws § 750.301; Miss. Code Ann. § 97-33-1; Mo. Ann. Stat. § 572.010; N.H. Rev. Stat. Ann. § 647:2; N.J. Stat. § 2C:37-1; N.D. Cent. Code Ann. § 12.1-28-01; Or. Rev. Stat. § 167.117(7); Va. Code Ann. § 18.2-325(1); Wash. Rev. Code Ann. § 9.46.0237; Wyo. Stat. Ann. § 6-7-101.

for example, prohibits "risk[ing] something of value upon … a future contingent event not under [one's] control," N.Y. Penal Law § 225.00(2)—which closely tracks the federal definition of an event contract, 7 U.S.C. § 1a(19)(iv)(I).  On the Commission's view, therefore, trading any event contracts would "relate closely" to activity that is unlawful in New York.  *See* Order at 13 n.28.  As a result, the Order would apparently subject *every* event contract to public-interest review.  That would moot the provision conferring "exclusive jurisdiction" on the CFTC, 7 U.S.C. § 2(a)(1)(A), and vest 50 state legislatures with control over application of a federal statute.  That cannot be right.  *See Holyfield*, 490 U.S. at 43 ("We start … with the general assumption that 'in the absence of a plain indication to the contrary, … Congress when it enacts a statute is not making the application of the federal act dependent on state law.'").

*     *     *

Even with the benefit of its novel and misdirected interpretation of "involve," the Commission is forced to bob and weave to justify subjecting the Congressional Control Contracts to public-interest review.  Those efforts fail, because trading these event contracts cannot be squeezed into the categories of either "gaming" or "unlawful activity"—at least not without mangling the CEA's structure, rendering every other exception surplusage, and turning the principle of federal supremacy on its head.  Of course, Congress is free to forbid trading of political event contracts, or to authorize the Commission to do so—it would be as simple as adding contracts that "involve" "elections" to the enumerated activities in the statute.  But Congress did not do that, and the Commission's efforts to rewrite the CEA are futile.

33

III.   THE ORDER'S PUBLIC-INTEREST FINDING IS ARBITRARY AND CAPRICIOUS.

For the reasons already explained, the Commission had no authority to subject Kalshi's Congressional Control Contracts to public-interest review in the first place, because its conclusion that the contracts "involve" "gaming" or "unlawful" activity is erroneous as a matter of law on multiple levels. That is enough to require vacatur of the Order, and so the Court need not go further. But even assuming a public-interest analysis were authorized, the Commission's finding that the Congressional Control Contracts are contrary to the public interest is arbitrary and capricious. This is yet another independent basis for vacating the Order.

An agency's decision is arbitrary and capricious if it relies on improper factors, ignores important considerations, or offers explanations that are implausible or run counter to the evidence. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency also acts arbitrarily and capriciously when it fails to "meaningfully address comments and evidence that undercut its conclusion." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1112–14 (D.C. Cir. 2019).

The Commission violated those rules of reasoned decisionmaking here. *First*, it announced an arbitrarily heightened standard for assessing the economic utility of Kalshi's contracts, and then disregarded evidence showing that they satisfy even that arbitrary standard. *Second*, the Commission ignored record evidence of non-economic benefits, failing to account for their impact on the public interest. *Third,* the CFTC credited unsubstantiated and unreasonable speculation about the contracts' threat to "election integrity," again while ignoring the contrary record materials.

A. **The CFTC Imposed and Misapplied an Arbitrarily Heightened "Direct Effects" Standard for Evaluating Economic Utility.**

The Order centered its public-interest inquiry around "economic purpose," asking whether the Congressional Control Contracts have economic utility. Insisting on *some* economic purpose is sensible, given that the CEA itself identifies the role of its regulated transactions as serving "a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a).

The problem for the Commission, of course, is that partisan control of Congress has vast economic consequences—both directly and through its influence on policy. That is why major financial institutions routinely offer projections on the economic impacts of election outcomes. Ahead of the 2020 federal election, for instance, Bank of America analyzed the likely effects of different congressional outcomes on fiscal stimulus, tariffs, tax rates, and regulations. *See* AR 2991. Researchers, too, have consistently found that the balance of political power affects the prices of equities, commodities, and other assets. AR 2992–93 (collecting studies). Businesses and individuals agree: A software company serving green-energy ventures explained in a comment that its success hinges in part on political outcomes, including control of Congress and associated policy changes. *See* AR 1597. A fund founder set forth how biotech startups face congressional risks, including cuts to research funding and stalled regulatory appointments. *See* AR 1567–68. And the CEO of a recycling robotics firm recounted that legislation expanding recycling is likely to rise or fall depending on which party triumphs. *See* AR 1533.

35

Because control of Congress has meaningful economic effects, Congressional Control Contracts would further an "economic purpose" by allowing firms to manage those risks (*i.e.*, hedging) and enabling the market to price them (*i.e.*, price-basing). That is not their *only* possible use, but their economic purpose is undeniable.

Unable to dispute that reality, the Commission changed the standard. The economic effects of congressional control, the CFTC opined, are too "diffuse and unpredictable" to warrant hedging or price-basing because they depend on other factors—*e.g.*, which bills end up on the legislative agenda, presidential vetoes, and litigation. Order at 16–17. In other words, the Commission concluded that elections lack *direct* economic effects, and therefore that the Congressional Control Contracts would serve no economic purpose. That analysis is wrong—and shirks the reasoned decision-making requirement—twice over. The CFTC's novel test is misguided in its own right, and the Commission also misapplied it here.

*First*, insisting on "direct" effects misunderstands the economic function of hedging and price-basing. The point of hedging is to *mitigate risk*, not (like insurance) to *offset precise losses*. And risk is all about uncertainty. Consider a hotel that acquires contracts on a hurricane impacting the Gulf of Mexico. Whether such a hurricane would *actually* harm the hotel's bottom line depends on various factors, including where the storm strikes, whether it damages the hotel, and whether news coverage deters tourists. *See* AR 2999. Indeed, if the hurricane ends up hitting neighboring beaches but leaving the immediate coastline untouched, the hotel could bring in *more* revenue by attracting a larger share of the business. But the *risk* of

36

loss climbs if a storm materializes *at all*—and that risk warrants hedging.  As this example illustrates, it is commonplace for businesses to buy hedging instruments without "certainty that the event … will actually manifest in net harm for the company."  *See* AR 1528.  And for the same reasons, a market in event contracts facilitates price-basing, even assuming the event only carries indirect and uncertain economic effects.  Determining the risk of a hurricane, to return to the hypothetical, would help the market to accurately judge the value of the hotel.

Political risks are no different.  As renowned investor Jorge Paolo Lemann explained, "[a]n investment may look very different if hypothetical legislative and regulatory events" occur—and if an election outcome makes those events "materially more likely," it "poses significant risk to the parties in the deal."  AR 1590.  For example, if Republicans take control of Congress in 2024, renewable-energy subsidies will not vanish overnight.  But a Republican win would present a serious *risk* of cuts. The Congressional Control Contracts would allow green-energy firms to hedge that risk.  *See* AR 1597 (firm would hedge against risk that a "hostile" government "could be elected," not merely "that a particular policy will be enacted"); AR 1553 (investor explaining how business "risks indisputably rise when certain Congresses come into power, and hedging instruments are needed to mitigate that risk").  Likewise, the Congressional Control Contracts would allow the market to more accurately price firms and assets that are exposed to political risks—"direct" or otherwise.  *See* AR 1423–26 (explaining price-basing utility of election contracts); AR 1452–53 (same).

*Second*, the Commission's analysis fails as a factual matter—put differently, the CFTC ignored the evidence that the Congressional Control Contracts satisfy its own "direct effects" standard. Which party wins control of Congress *does* have direct economic effects, and therefore *does* warrant hedging and price-basing even on the Commission's flawed understanding of those functions.

Consider a consulting firm with deep ties to one party. Congressional control by the other party would directly harm that firm's business, separate and apart from any policy changes the new Congress might enact. Kalshi's contracts would allow the firm to hedge against that risk, and allow others to determine the firm's value more accurately. *See* AR 3001. Moreover, the record proves that the partisan balance of political power can *itself* influence investor behavior independent of any particular legislation.[12] Indeed, it features specific assets whose value is directly linked to partisan control. For example, JP Morgan projected that Democratic victory in the 2020 election would boost the price of, among other things, "China-exposed stocks" and "renewables." AR 2991. Sure enough, the Democratic Party's Senate takeover *did* trigger a large rally in the green-energy sector—well before the new majority passed any laws.[13] Similarly, President Bush's election in 2000 raised the value of

_____

[12] *See, e.g.*, AR 1348 (cannabinoid company explaining that "potential" adverse actions by Congress influence investor behavior); AR 1597 (green-energy software firm explaining that a potential cofounder did not join the venture due to concerns about harmful election outcomes).

[13] *See* AR 1397. The iShares Global Clean Energy ETF surged 17% between December 31, 2020, and January 8, 2021, as Democratic candidates won runoff elections in Georgia to take control of the Senate; the Dow Jones Industrial average rose by only 1.6% over the same period. *Id.*; *see also* AR 1396 (other examples).

tobacco companies by 13%.[14]  Another example: When Senator Jeffords swung Senate control by joining the Democratic Party in 2001, valuations of firms that donated to Democrats rose, while Republican-aligned companies saw valuations fall.[15]  These well-documented patterns are far from "unpredictable."  Order at 10, 16, 18–19.  And so, not surprisingly, numerous commenters *specifically attested* that they would use the Congressional Control Contracts for hedging.[16]  There could hardly be any more probative or compelling evidence of the contracts' hedging purpose.

On all of these points, the CFTC "refused to engage with the commenters'" points and evidence, *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015), and instead "cherry-pick[ed]" observations that served its desired outcome, *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 540 (D.D.C. 2016).  Indeed, the Commission baldly asserted that the contracts would not serve any hedging function in the face of concrete contrary proof staring at it right from the pudding bowl.

In sum: In analyzing the economic purpose of Kalshi's Congressional Control Contracts, the Commission used a "direct effects" standard with no basis in law or economics, and then ignored copious record evidence that congressional elections *do* have direct economic effects.  That is textbook arbitrary-and-capricious reasoning.

---

[14] *See* AR 1365 (citing B. Knight, *Are policy platforms capitalized into equity prices? Evidence from the Bush/Gore 2000 Presidential Election*, 90 J. Pub. Econ. 751 (2006)).

[15] *See* AR 2993 (citing S. Jayachandran, *The Jeffords Effect*, 49 J. L. & Econ. 397 (2006)); *see also* AR 3004–05 (citing research).

[16] *See, e.g.*, AR 1348, 1375–76, 1386–87, 1391, 1532, 1533, 1539–40, 1590–91, 1597, 1613, 3367.

**B.      The CFTC Ignored the Evidence of Non-Economic Benefits.**

The Commission also ignored robust record evidence that event contracts like Kalshi's have important benefits beyond hedging and price-basing.  Nothing in the CEA suggests the CFTC is *limited* to weighing economic considerations.  Indeed, the Order itself devoted much of its analysis to amorphous political concerns.  *See* Order at 19–23.  Accordingly, the CFTC was obligated to consider the evidence that political prediction markets generate socially valuable data.  *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (agency must "respond to significant points and consider all relevant factors").  It failed to do so.

The record on this point is robust.  For example, a former chairman of the Council of Economic Advisers explained that the White House consulted prediction-market data "to understand what informed traders with money at stake would expect." AR 1549; *see also* AR 1451–53, 1494–99.  A Nobel laureate economist (among others) noted that influential studies have relied on the "powerful resource" of prediction data to develop "valuable" political, economic, and social insights.  AR 1750–53; *see also* AR 1404 (collecting research); AR 1438–39 (similar); AR 1452–53 (example of study using "prediction market prices to infer market beliefs" and thus make "accurate measurements of [climate] abatement costs").  And such data is not just useful for academics: It offers the general public a neutral, market-driven alternative to traditional polling, which has proven unreliable in recent years.  *See, e.g.*, AR 1577 (explaining why Kalshi's contracts would advance accuracy and transparency); AR 1543–44 (collecting media coverage relying on prediction markets

and research finding that such data outperforms traditional forecasting); AR 1584 (human-rights activist who relies on prediction markets as alternative to unreliable polls and fake media reports); AR 1437 (explaining how election contract markets can build social consensus and educate the public); AR 1499–503 (documenting advantages of political prediction markets over polls).

The Order makes no effort to engage with this evidence or explain why it is irrelevant to the public interest.  Instead, it dismisses out of hand "assertions … that market-based alternatives tend to be more accurate than polling or other methods of predicting election[s]," without questioning the factual basis of those claims.  Order at 21.  Once more, the CFTC did not merely err in weighing the evidence—it ignored it altogether.  The APA forbids that.  *See Carlson*, 938 F.3d at 344.

## C. The CFTC Rested on Implausible, Unsubstantiated Speculation About Election Integrity.

For the reasons above, the Commission engaged in arbitrary and capricious reasoning when analyzing the *benefits* of the Congressional Control Contracts.  But it also violated the APA's requirements in identifying their supposed *harms*.  The CFTC deemed Kalshi's contracts a threat to the "ideals of democracy and the sanctity of the electoral process."  Order at 19.  Rhetoric aside, the Order gives two main reasons why Kalshi's contracts would threaten election integrity: A market in election contracts would supposedly (1) spark electoral manipulation and misinformation; and (2) force the CFTC to play "election cop."  The Order fails to substantiate either aspect of this parade of horribles, and it ignores the contrary evidence.

41

*First*, the Order claims that Congressional Control Contracts would incentivize manipulation of elections, including by spreading misinformation. Yet the Order provides no real-world examples of market-induced manipulation, despite the long history of political prediction markets in the United States and other democracies. *See* AR 1528 (noting that "the U.S. allowed such markets for many years and the U.K. still does," yet "[n]o one questions the legitimacy of Margaret Thatcher or Tony Blair because people bet money on the outcome"). To the contrary, research in the record shows that the "likelihood of this kind of manipulation occurring is extremely remote." AR 1448; *see also* AR 1429–31.

Indeed, if anything, listing the contracts on federally regulated exchanges like Kalshi's would *ameliorate* manipulation concerns associated with unregulated and offshore markets.[17] And the neutral, market-driven data generated by a regulated exchange is the best way to *mitigate* the threats of misinformation, including from the fake polls that the CFTC purports to worry about (Order at 22). Again, that is what the record shows. *See* AR 1745 ("Real-world data repeatedly emphasizes the superior forecasting accuracy of prediction markets to polls and pundits."); AR 1576–77 (similar).

---

[17] *See, e.g.*, AR 1402 (discussing how a regulated exchange like Kalshi's is "in a better position to police the manipulation of markets by insider trading than the unregulated offshore exchanges (such as Polymarket) that currently serve as liquid exchanges that host a significant share of these trades" and "[b]ringing these trades onto federally regulated markets would mitigate the issues that the Commission is expressing concern over"); AR 1475 ("With a transparent order book it is very easy to see if someone is attempting to manipulate a market, immediately mitigating the impact of any short-lived price manipulation.").

The CFTC ignored all this evidence, instead musing that Kalshi's contracts could "creat[e] monetary incentives to vote for particular candidates, even when such votes may be contrary to a voter's … political preferences or views of such candidates." Order at 19–20.  But that "speculation," with no foundation in the record, cannot replace "examination of the relevant data and reasoned analysis."  *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994).

Nor is it credible: Would a voter really vote for a candidate he *opposes* in a ploy to influence an outcome contingent on *dozens* of federal elections?  *See* AR 1430 (concern that voters will "steal votes from themselves" is "speculative, abstract, and almost entirely absent from our experience with political prediction markets").  More fundamentally, the notion that a market in Kalshi's contracts would meaningfully alter incentives to manipulate elections or to distribute misinformation is utterly implausible: Given the enormous consequences of election outcomes, the massive sums already spent by political campaigns, and the sheer volume of inputs to the national political discourse, Kalshi's contracts would, at most, be a drop in the bucket. *See, e.g.*, AR 1528 ("implausible that anyone" buying these contracts would have enough "incentive" to "somehow then flip an election through concerted effort"); AR 1449 (concluding "that this election market almost certainly produces no additional manipulation risk relative to those produced by already existing markets"); AR 1577 ("concerns that a contract like Kalshi's might be used for manipulative purposes are easily exaggerated"); *see also* AR 3007–08 (collecting other sources).

*Second*, there is no reason to think the CFTC would need to anoint itself "election cop" if it permitted Kalshi's contracts. Order at 23. The Commission fretted that approving these contracts might one day force it to "investigat[e] election-related activities—potentially including the outcome of an election itself." *Id.* at 22. That suggestion is frankly absurd. The CFTC regulates countless derivatives markets involving commodities over which it lacks independent expertise or authority. For example, while the Commission oversees trading in futures contracts on the S&P 500, it does not regulate stocks; that is the job of the Securities and Exchange Commission, which the CFTC relies on to police the underlying market. Likewise, while the CFTC supervises trading on derivatives based on GDP data, it is the Federal Reserve that has responsibility for producing and ensuring the integrity of that data. *See, e.g.*, AR 2793–94. By the same token, the Federal Election Commission and many other state and federal regulators already shoulder the critical responsibility of ensuring that our elections are fair and secure. Event contracts based on political outcomes would not change that, or thrust this role onto the CFTC. The Order certainly provides no non-speculative reason for concluding otherwise. It arbitrarily—and irresponsibly—stokes fear about the integrity of elections without any basis in the record.

*       *       *

The Commission had no statutory authority to subject Kalshi's contracts to a public-interest inquiry in the first place. Regardless, its efforts to undertake one only violated the law yet again—by dismissing benefits that the record established while speculating about harms that the record refuted.

44

## CONCLUSION

For any and all of these reasons, this Court should grant Kalshi's motion for summary judgment, vacate the CFTC's Order, and declare that Kalshi is entitled to list the Congressional Control Contracts for trading.

Dated: January 25, 2024                Respectfully submitted,

Amanda K. Rice                          /s/ *Jacob (Yaakov) M. Roth*
(D.C. Bar 1019208)*                     Jacob (Yaakov) M. Roth (D.C. Bar 995090)
JONES DAY                               Joshua B. Sterling (D.C. Bar 479320)
150 W. Jefferson Avenue,                John Henry Thompson (D.C. Bar
Suite 2100                              90013831)
Detroit, MI 48226                       JONES DAY
(313) 733-3939                          51 Louisiana Avenue N.W.
                                        Washington, DC 20001
Samuel V. Lioi*                         (202) 879-3939
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190              *Counsel for Plaintiff*
(216) 586-3939                          *KalshiEx LLC*

*admitted pro hac vice