# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KalshiEx LLC,

        Plaintiff,

              v.

Commodity Futures Trading Commission,

        Defendant.

Case No. 23-cv-03257-JMC

## (PROPOSED) BRIEF OF AMICUS CURIAE PROFESSOR JOSEPH A. GRUNDFEST IN SUPPORT OF PLAINTIFF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

STATEMENT OF INTEREST ............................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................... 2

ARGUMENT ........................................................................................................................... 4

I.     THE CFTC'S INTERPRETATION OF "GAMING" IS INCONSISTENT WITH
THE STATUTE. ............................................................................................................. 4

     A.    The CFTC's Logic Violates the Presumption of Consistent Usage. ........................ 4

     B.    Elections Are Not "Games," and Trading Political Event Contracts Is Not
"Gaming." .............................................................................................................. 6

     C.    The CFTC Engaged in Policy Analysis, Not Statutory Construction. ................... 10

II.    THE CFTC'S PUBLIC INTEREST ANALYSIS IS ARBITRARY AND
CAPRICIOUS. ............................................................................................................... 11

     A.    The Proposed Contracts Serve Legitimate Hedging Purposes. ............................ 12

     B.    The Proposed Contracts Generate Legitimate Non-Hedging Public
Benefits. ............................................................................................................... 14

     C.    The Order Fails to Adequately Explain Its Concerns Regarding
Manipulation. ....................................................................................................... 17

CONCLUSION ...................................................................................................................... 18

# TABLE OF AUTHORITIES[*]

**CASES**

*Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427 (1932).......................5

*Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984) ........................................11

*Getty v. Federal Savings & Loan Insurance Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) .................................................................................................16

*Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023) ...............................3, 11

*Motor Vehicle Manufacturers Ass'n, of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)............................................15

*Relentless, Inc. v. Department of Commerce*, 144 S. Ct. 325 (2023) .........................3, 11

**STATUTES**

7 U.S.C. § 7a-2(c)(5)(C) .....................................................................4

7 U.S.C. § 7a-2(c)(5)(C)(i)(II) .............................................................5

7 U.S.C. § 7a-2(c)(5)(C)(i)(III) ...........................................................5

7 U.S.C. § 7a-2(c)(5)(C)(i)(IV)............................................................5

7 U.S.C. § 7a-2(c)(5)(C)(i)(V) ............................................................5

**OTHER AUTHORITIES**

Jawad M. Addoum & Alok Kumar, *Political Sentiment and Predictable Returns*, 29 Rev. Fin. Stud. 3471 (2016)............................................................13

*American Heritage Dictionary of the English Language* (4th ed. 2000) .......................7

William J. Baumol & William G. Bowen, *Performing Arts: The Economic Dilemma* (1966) ............................................................................9

Philip Bond, Alex Edmans & Itay Goldstein, *The Real Effects of Capital Markets*, 4 Ann. Rev. Fin. Econ. 339 (2012) ......................................................7, 15

James M. Buchanan & Gordon Tullock, *The Calculus of Consent: Logical Foundations of Constitutional Democracy* (1962) .........................................9

---

[*] Authorities upon which amicus chiefly relies are marked with an asterisk.

Stijn Claessens, Erik Feijen & Luc Laeven, *Political Connections and Preferential Access to Finance: The Role of Campaign Contributors*, 88 J. Fin. Econ. 554 (2008) ................................................................................................................13

Joseph A. Grundfest, *Disimplying Private Rights of Action Under the Federal Securities Laws: The Commission's Authority*, 107 Harv. L. Rev. 961 (1994) ......................2

Joseph A. Grundfest & A.C. Pritchard, *Statutes with Multiple Personality Disorders: The Value of Ambiguity in Statutory Design and Interpretation*, 54 Stan. L. Rev. 627 (2002) ............................................................................................2

Joseph A. Grundfest, *The Limited Future of Unlimited Liability: A Capital Markets Perspective*, 102 Yale L.J. 387 (1992) ....................................................................1

Joseph A. Grundfest, *The Limits of Delaware Corporate Law: Internal Affairs, Federal Forum Provisions, and* Sciabacucchi, 75 Bus. Law. 1319 (2020) .............................2

Joseph A. Grundfest & Peter H. Huang, *The Unexpected Value of Litigation: A Real Options Perspective*, 58 Stan. L. Rev. 1267 (2006) ..............................................2

Michael Hanke, Sebastian Stöckl & Alex Weissensteiner, *Political Event Portfolios*, 118 J. Bank Fin. 1 (2020) ........................................................................13

Michael Hanke, Sebastian Stöckl & Alex Weissensteiner, *Recovering Election Winner Probabilities from Stock Prices*, 45 Fin. Rsch. Letters 102 (2022) .....................13, 15

Friedrich A. Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519 (1945) ..................................................................................................................9

Paula Hill, Adriana Korczak & Piotr Korczak, *Political Uncertainty Exposure of Individual Companies: The Case of the Brexit Referendum*, 100 J. Banking & Fin. 58 (2019) ............................................................................................13

Seema Jayachandran, *The Jeffords Effect*, 49 J. L. & Econ. 397 (2006) .......................................13

KalshiEx, LLC, Comment Letter on Commission's Specific Questions Related to KalshiEx, LLC's Proposed Congressional Control Contracts (July 23, 2023) (CFTC Comment No. 72716), AR2728-30 ............................................................14

Brian Knight, *Are Policy Platforms Capitalized into Equity Prices? Evidence from the Bush/Gore 2000 Presidential Election*, 90 J. Pub. Econ. 751 (2006) ..............................13

Bento J. Lobo, *Jump Risk in the U.S. Stock Market: Evidence Using Political Information*, 8 Rev. Fin. Econ. 149 (1999) ............................................................13

*Oxford English Dictionary*, www.oed.com (last accessed Jan. 30, 2024) ......................................7

Adam Ozimek, Comment Letter (Sept. 22, 2022) (CFTC Comment No. 72467), AR1404-05 ....14

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ................................................................5

Erik Snowberg, Justin Wolfers & Eric Zitzewitz, *Partisan Impacts on the Economy: Evidence from Prediction Markets and Cloes Elections*, 122 Q.J. Econ. 807 (2007) .........................................................................................................................13

Alexander F. Wagner, Richard J. Zeckhauser & Alexandre Ziegler, *Company Stock Price Reactions to the 2016 Election Shock: Trump, Taxes, and Trade*, 130 J. Fin. Econ. 428 (2018) ......................................................................................13

*Webster's Third New International Dictionary* (1993) ................................................................7

Tomasz Piotr Wisniewski, *Is There a Link Between Politics and Stock Returns? A Literature Survey*, 47 Int'l Rev. Fin. Analysis 15 (2016) ........................................13

Eric Zitzewitz, Comment Letter on Review of KalshiEx LLC's Proposed Congressional Control Contracts Pursuant to Commodity Futures Trading Commission Regulation 40.11(c) (Sept. 24, 2022) (CFTC Comment No. 72449), AR1484-1523 ...............................................................................14

iv

# STATEMENT OF INTEREST[1]

Professor Joseph A. Grundfest is the W.A. Franke Professor of Law and Business, Emeritus, and Senior Faculty, Rock Center for Corporate Governance, at Stanford Law School. Professor Grundfest is a nationally prominent expert on capital markets, corporate governance, and securities litigation. Before joining the Stanford Law School faculty in 1990, Professor Grundfest was a commissioner of the Securities and Exchange Commission and served on the staff of the President's Council of Economic Advisors as counsel and senior economist for legal and regulatory matters.

Professor Grundfest has expertise specific to the operation of derivatives markets and statutory construction, the primary subject matters of this dispute. He holds U.S. Patent 8,452,620 B1, Parametric Directors and Officers Insurance and Reinsurance Contracts, and related Financial Instruments (granted May 28, 2013), which describes the construction of novel derivatives products and markets related to the outcome of litigation events. While serving as an SEC Commissioner he was actively involved in legislative and regulatory matters related to the evolution of stock market-based futures and other derivative products. His scholarship explores various aspects of derivatives analytics, including a *Yale Law Review* article[2] explaining how derivative instruments could be used to avoid pass-through stockholder liability, and a *Stanford Law Review* article describing how litigation can be modeled as a derivative—more precisely, a

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and D.D.C. Local Civil Rule 7(o)(5), amicus states that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person other than amicus contributed money that was intended to fund preparing or submitting this brief.

[2] Joseph A. Grundfest, *The Limited Future of Unlimited Liability: A Capital Markets Perspective*, 102 Yale L.J. 387 (1992).

real option.[3] He has also taught about the design and operation of derivative markets, particularly in connection with the financial crisis of 2008–2009.

As for statutory interpretation, one of Professor Grundfest's *Harvard Law Review* articles describes a novel form of regulatory constraint and demonstrates the interpretation's consistency with statutory text and legislative intent.[4] Another *Stanford Law Review* article describes the strategic use of textual ambiguities as a mechanism that supports legislative compromise and describes the judicial response to the ensuing interpretive challenges.[5] A recent *Business Lawyer* article addresses the interaction of federal and state law, and the "narrow interpretation" doctrine that is applied to certain forms of securities fraud litigation.[6]

Professor Grundfest, with other professors, submitted a comment letter to the CFTC in the underlying administrative proceeding urging the CFTC to permit Kalshi to list the proposed event contracts. Professor Grundfest respectfully disagrees with the CFTC's order and has an interest in explaining to this Court why that order should be overturned.

## SUMMARY OF ARGUMENT

The CFTC erred in holding that political event contracts "involve gaming." "Gaming" refers to playing games, like roulette or the slots, or betting on the outcome of games, such as the Super Bowl. But elections are not "games" as that term is used in the statute. The CFTC failed to

---

[3] Joseph A. Grundfest & Peter H. Huang, *The Unexpected Value of Litigation: A Real Options Perspective*, 58 Stan. L. Rev. 1267 (2006).

[4] Joseph A. Grundfest, *Disimplying Private Rights of Action Under the Federal Securities Laws: The Commission's Authority*, 107 Harv. L. Rev. 961 (1994).

[5] Joseph A. Grundfest & A.C. Pritchard, *Statutes with Multiple Personality Disorders: The Value of Ambiguity in Statutory Design and Interpretation*, 54 Stan. L. Rev. 627 (2002).

[6] Joseph A. Grundfest, *The Limits of Delaware Corporate Law: Internal Affairs, Federal Forum Provisions, and* Sciabacucchi, 75 Bus. Law. 1319 (2020).

apply the appropriate canons of statutory construction when it reasoned that, because an election is a type of "contest," participating in political event prediction markets must be "gaming." That logic leads to irrational and unsustainable interpretations of the statute. The CFTC's policy views on prediction markets, whatever their merit, do not authorize the CFTC to take statutory interpretation into its own hands. The Supreme Court is currently considering two cases that challenge the extent of deference that courts owe to agency interpretations of the statutes they administer.[7] But whatever the outcome of those pending cases, the CFTC's interpretation of "gaming" is so irreconcilable with the statute's plain text and purpose that it clearly cannot stand.

The CFTC's public-interest analysis is also fatally flawed. The proposed contracts serve an empirically supportable hedging function, and the CFTC's analysis of the utility of hedging was far too narrow. It also failed to recognize the non-economic benefits of prediction markets. Finally, the CFTC concluded that KalshiEX's prediction markets might lead to election manipulation, but it failed to explain *why* it reached that conclusion in the face of abundant contrary evidence. The CFTC's reasoning is especially troubling because it can extend to many prediction markets that are not related to elections—thus causing a major and unwarranted expansion of the CFTC's regulatory authority in a manner that would, contrary to the statute's plain text, cause multitudes of event contracts to be forbidden by the agency.

---

[7] *Relentless, Inc. v. Dep't of Com.*, 144 S. Ct. 325 (2023) (mem.) (granting cert on question whether the Court should overrule *Chevron*); *Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (mem.) (same).

**ARGUMENT**

I.   **THE CFTC'S INTERPRETATION OF "GAMING" IS INCONSISTENT WITH THE STATUTE.**

The CFTC concluded that political event contracts "involve gaming" within the meaning of the Commodity Exchange Act, thus authorizing the CFTC to ban them.  Indeed, the CFTC's decision to reject the proposed contract hinges critically on the determination that the proposed election contract "involves" a "game": if an election is not a game, or does not "involve" a game, the CFTC has no statutory basis upon which to reject the contract.  The definition of "gaming" and of the term "involve" is thus outcome dispositive. But here, the CFTC's decision misreads the statute and gives the CFTC arbitrary and unrestrained authority far exceeding the Act's intended scope.

**A.   The CFTC's Logic Violates the Presumption of Consistent Usage.**

Under the Commodity Exchange Act, the CFTC "may determine" that event contracts "are contrary to the public interest" if the event contracts "involve—(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C).

The CFTC concluded that it had authority to ban KalshiEX's proposed political event contracts because they "involve … gaming."  As KalshiEX correctly argues, the CFTC's statutory analysis is wrong.  An event contract "involves" an activity only if *the underlying event* constitutes that activity.  For example, an event contract "involves" terrorism, assassination, or war if the event *underlying* the event contract is terrorism, assassination, or war.

The CFTC, however, did not assess whether the event underlying KalshiEX's contracts constituted "gaming." Instead, the CFTC assessed whether the act of *trading* KalshiEX's contracts would be "gaming." That reasoning is wrong.

As Justice Scalia explained, "[a] word or phrase is presumed to bear the same meaning throughout a text," and this presumption "makes sense when applied … pragmatically."[8] As the Supreme Court put it, "[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932).

The CFTC's statutory analysis, however, violates this canon. The CFTC's analysis requires that the word "involve" mean one thing with respect to 7 U.S.C. § 7a-2(c)(5)(C)(i)(II), (III), and (IV) (contracts that "involve" terrorism, assassination, or war), and something entirely different with respect to § 7a-2(c)(5)(C)(i)(V) (contracts that "involve" gaming). In subsections (II), (II), and (IV), a contract "involves" terrorism, assassination, or war if the underlying event is or relates to terrorism, assassination, or war. But in subsection (V), under the CFTC's reading, a contract "involves" gaming if the act of buying or selling the contract is itself gaming. The CFTC's interpretation of the word "involve" as bearing two totally different meanings within the same sentence is untenable under the presumption of consistent usage, and defies common logic. This error is an independent and sufficient cause to grant Plaintiff's motion for summary judgment.

---

[8] Antonin Scalia & Bryan A. Garner, *Reading Law* 170-71 (2012).

**B.** **Elections Are Not "Games," and Trading Political Event Contracts Is Not "Gaming."**

Even if the CFTC was correct that it has the authority to regulate "gaming," it would still lack authority to ban KalshiEX's prediction markets because participating in those markets is not "gaming."  Contrary to the CFTC's view, having a financial stake in the outcome of a future event and playing a "game" are not the same thing. More to the point, congressional elections are not games, and contracts indexed to the outcomes of those elections are also not games and do not "involve" games.

"Gaming" means playing a game.  It is what people do at a casino or during their weekly poker night.  When people play roulette or the slots, they are "gaming."  Likewise, people who *bet* on games—like people who go to a casino and put down money on the Super Bowl—might be said to engage in "gaming."

But an election is not a "game," and putting down money on the outcome of an election is not "gaming."  Of course, every person who purchases a political event contract has a financial stake in the outcome of a future event.  And often, the person does so for purposes unrelated to hedging.  But that is true for *all* financial markets, whether derivative or not. A retail investor who purchases Apple stock, or options on Apple stock, or an SP500 mini contract, is not hedging any risk, but that does not mean that the investor is gaming or involved in a game. If that were true, a huge swath of financial contracts that have been blessed for decades by the CFTC would have to be prohibited.  The Commission's logic on this point is dramatically overbroad and proves far, far too much. This is an additional, independent reason the Commission's interpretation must fail.

Further, non-hedging traders add exceptional value to secondary markets, including derivative markets. It is commonly understood that "[a] financial market is a place where many speculators with different pieces of information meet to trade, attempting to profit from their

information. Prices aggregate these diverse pieces of information and ultimately reflect an accurate assessment of firm value,"[9] or, in this case, of the probability of an event coming to fruition. The participation of these non-hedging investors can thus improve market performance, not detract from it.

The CFTC also offered no persuasive explanation of how "gaming" could be transmuted to "all event contracts where the underlying event involves people contesting something."  The CFTC's reasoning is as follows: (1) some dictionaries equate "gaming" with "gambling," and (2) "[u]nder most state laws, 'gambling' involves a person staking something of value upon the outcome of a game, contest, or contingent event."  Order at 8 & n.22 (CFTC Sept. 22, 2023) ("Order").  The CFTC also pointed to a federal statute defining "bet or wager" as "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance."  Order at 9.

This reasoning fails at multiple levels.  The fact that some dictionaries use "gambling" and "gaming" in the same breath does not imply that broad statutory definitions of "gambling" always mean the same thing as "gaming."  Dictionaries commonly include multiple definitions of each term, an observation sufficient to prove that the terms are not synonymous.[10]

Likewise, a federal statute defining "bet or wager" sheds little light on what the word "gaming" means.  Indeed, it would be absurd if "gaming" stretched as broadly as the statutes cited

---

[9] Philip Bond, Alex Edmans & Itay Goldstein, *The Real Effects of Capital Markets*, 4 Ann. Rev. Fin. Econ. 339, 340 (2012).

[10] *E.g.*, *American Heritage Dictionary of the English Language* 721-22 (4th ed. 2000) (providing eight definitions for "gambl[ing]" and two for "gaming"); *Webster's Third New International Dictionary* 932-33 (1993) (providing four definitions for "gambling" and two for "gaming"); *Oxford English Dictionary*, www.oed.com (last accessed Jan. 30, 2024) (providing nine definitions for "gambling" and fourteen definitions for "gaming").

by the CFTC.  To the extent the CFTC believes that "staking something of value upon the …
contingent event" (Order at 8) is enough to make an activity "gaming," all derivatives markets
would constitute gaming and therefore be illegal and the CFTC would put itself out of business.
Anyone who buys wheat futures is "staking something of value"—their money—on a "contingent
event"—an increase or decrease in the cost of wheat in the future. By the CFTC's logic, they are
involved in a "corn game" that cannot be permitted on an approved contract market. The
contradiction is obvious.

Recognizing the absurdity of this position, the CFTC suggested that its decision might be
limited to prediction markets for *elections* because an election is a type of "contest."  *See* Order at
9 ("To bet or wager on elections is to stake something of value upon the outcome of contests or
others, namely, contests between electoral candidates."); *id.* at 10 n.25 ("To take a position in the
Congressional Control Contracts would be to stake something of value upon the outcome of a
contest of others, since the Congressional Control Contracts are premised on the outcome of
contests between electoral candidates (which ultimately determine the party affiliation of the
Speaker and the Pres Pro Temp).").  According to the CFTC, limiting "gaming" to "contests"
would draw the appropriate line because "futures contracts traditionally have not been premised
on the outcome of a contest of others."  *Id.* at 10 n.25.

This reasoning again fails and is also dramatically overbroad.  Even if an election campaign
might in some sense be said to be a "contest," that does not mean that purchasing political event
contracts is "gaming."  Whether something is "gaming" turns on whether it involves playing a
game, not on whether the event underlying the event contract is a "contest."  Moreover, a
substantial literature characterizes the outcome of market processes as equivalent to the results of
elections in which market participants vote with currency on a weighted voting basis, rather than

8

through a one-person-one-vote mechanism. Put another way, every market can be reframed as a weighted voting process, or as a contest between buyers (who want lower prices) and sellers (who want higher prices) as to where to set the equilibrium price.[11] Thus, if every market is also a game, and the Commission offers no principled basis upon which to conclude otherwise, then no derivative on any market could be approved under the Commission's logic because every derivative would "involve gaming." Again, this interpretation of the statute makes no sense because it would negate the very existence of the markets that the statute is designed to regulate. But the agency provides no rational basis to prevent that interpretation from being applied to every market process. The agency's interpretation of the statutory language is thus unreasonable at best, and irrational at worst.

The state statutes cited by the CFTC also fail to support its position. At most, those statutes show that the word *gambling* can refer to betting on the outcome of a game *or* a contest—which, in context, is something similar to a "game." So, if one bets on the outcome of the Super Bowl— a "game"—or the Olympic 100-meter dash—which might not qualify as a "game," but is a type of "contest"—then one is engaging in "gambling." These statutes do not show that "gaming" encompasses betting on the outcome of a *contest*, and certainly do not show that "gaming" encompasses participating in a political prediction market. Indeed, these statutes are irrelevant multiple times over—they distinguish between "game" and "contest"; distinguish between "game"—the underlying event (such as a football game)—and "gambling"—the act of betting

---

[11] James M. Buchanan & Gordon Tullock, *The Calculus of Consent: Logical Foundations of Constitutional Democracy* (1962); William J. Baumol & William G. Bowen, *Performing Arts: The Economic Dilemma* (1966) (explaining that markets are akin to electoral processes in which firms compete for consumer "votes" by offering better products and prices); Friedrich Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519 (1945) (analogizing prices to the outcome of voting processes in which consumers express preferences for goods and services instead of candidates).

money (which the CFTC is referring to as "gaming"); and say nothing about whether "contest" encompasses elections.

Under the CFTC's view, playing craps, roulette, poker, blackjack, rummy, and mah jongg and entering into positions in political event prediction markets are all "gaming"—the first six because they involve actual gaming, and the seventh because the underlying event in the event contract involves a kind of competition. Meanwhile, under the CFTC's view, markets that involve predicting anything that *isn't* a "contest"—whether Congress will enact immigration reform, whether the Supreme Court will overrule *Chevron*, whether there will be 1 million new COVID cases, or anything else—are *not* gaming because the underlying events are not competitive. It is simply impossible to wring this line from the word "gaming." An event contract turning on whether a candidate will win an election (which the CFTC thinks is "gaming") is clearly more similar to an event contract turning on whether Congress will pass a particular statute (which is not "gaming" under the CFTC's view) than it is to mah jongg.

Further, the CFTC's interpretation of "gaming" would appear to encompass any event contract turning on the outcome of a process that involves competition—which could give that term an unexpectedly broad scope. For example, the business world is sharply competitive. Would prediction markets turning on, for example, which company would be the market leader in a particular area constitute "gaming" because companies compete against each other?

### C.    The CFTC Engaged in Policy Analysis, Not Statutory Construction.

The CFTC also took the view that "the economic impacts of the outcome of contests for Congressional control are too diffuse and unpredictable to serve the hedging and risk management functions that futures contracts have traditionally been intended to serve." Order at 10 n.25. As explained below, Professor Grundfest respectfully disagrees with the CFTC's assessment of the utility of event prediction markets. But even setting the CFTC's policy views aside, the CFTC's

analysis does not support its statutory interpretation of "gaming."  Whether an election is a type of "contest"—the statutory standard invented by the CFTC—has little to do with whether a particular event contract would "serve[] … hedging and risk management functions."  *Id.*  The CFTC would likely deny the hedging utility of a prediction market on whether Congress would pass a *statute*, yet even under the CFTC's view, such a prediction market would not count as "gaming."  The CFTC should have interpreted "gaming" as written rather than rewriting it to conform to its policy views on the particular prediction market proposed by KalshiEX.

The CFTC's analysis is not entitled to deference under *Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984).  Under *Chevron*, courts defer to agency interpretations only if they are *reasonable* interpretations of *ambiguous* statutes—not when agencies rewrite unambiguous statutes.  Moreover, if the Supreme Court overrules or narrows *Chevron* in *Relentless, Inc. v. Department of Commerce*, No. 22-1219, or *Loper Bright Enterprises v. Raimondo*, No. 22-451, then this case is an even more straightforward candidate for vacatur.  Because this Court should interpret "gaming" without deference to the agency's obviously incorrect construction, the outcome of this case turns on the Court's (not the agency's) interpretation of "gaming," applying traditional statutory-construction techniques, rather than the agency's policy views about prediction markets.  And there is no path by which traditional statutory construction supports the outcome reached by the CFTC.

## II.    THE CFTC'S PUBLIC INTEREST ANALYSIS IS ARBITRARY AND CAPRICIOUS.

Assuming the CFTC has statutory authority to conduct a "public interest" analysis, that analysis must conform with the Administrative Procedure Act.  Here, it did not.  The CFTC committed three errors of law:

- It adopted an arbitrary and unsupported view of what "hedging" means and, as a result, ignored the proposed contracts' legitimate hedging purposes.

- It ignored the fundamental point that the "public interest" goes beyond hedging.

- It did not explain *why* it rejected the empirical evidence offered by KalshiEX and its supporters.

**A.    The Proposed Contracts Serve Legitimate Hedging Purposes.**

First, the CFTC was dead wrong on what qualifies as "hedging utility."  The CFTC acknowledged that "control of a chamber of Congress could, following a number of independent intervening events, generally affect a wide variety of personal liabilities and economic factors." Order at 17.  But, in the CFTC's view, "that does not establish that the Congressional Control Contracts can be used for specific, identifiable hedging purposes and thus does not establish the hedging utility of the Congressional Control Contracts." *Id.*  Thus, according to the CFTC, an event contract has hedging utility only if it "can be used for specific, identifiable hedging purposes."

As a matter of basic economics, this reasoning is indefensible.  A political event contract plainly *can* be used for "specific, identifiable hedging purposes."  Financial market participants routinely consider the probability of a particular candidate winning an election to accurately price assets.  It is inevitable that some businesses benefit when Republicans are in charge and other businesses benefit when Democrats are in charge.  As those probabilities change, the value of the assets change.  For this reason, political event contracts have bona fide hedging utility: they reduce a company's exposure to the risk associated with a particular candidate winning.  Suppose a company knows that if one candidate wins, it will likely be able to drill for oil on a particular piece of land, and if that candidate loses, it likely will not.  The company's value may swing dramatically

depending on the outcome of the election—making it prudent to purchase a political event contract as a hedge.  That hedging purpose is both "specific" and "identifiable."

Indeed, significant economic research confirms that "outcomes of elections or referendums have an impact on financial markets."[12] A 2022 article by Michael Hanke, Sebastian Stöckl, and Alex Weissensteiner documents that the probability of the outcome of the 2020 presidential election could be derived from observed stock market prices, meaning that election expectations cause stock price changes.[13]  The same line of research establishes the existence of "Democratic stocks" and "Republican stocks"—stocks that outperform when Democrats control and stocks that outperform when Republicans control—and that it is possible to construct "long-short portfolios that show a positive return conditional on correctly forecasting the election outcome."[14]  Prediction markets are thus "useful both for investors who want to speculate on the election outcome and for those who want to reduce the exposure of their portfolio (or hedge against) the election outcome."[15]

---

[12]  Michael Hanke, Sebastian Stöckl & Alex Weissensteiner, *Recovering Election Winner Probabilities from Stock Prices*, 45 Fin. Rsch. Letters 102 (2022).

[13]  *Id.*; *see also, e.g.*, Bento J. Lobo, *Jump Risk in the U.S. Stock Market: Evidence Using Political Information*, 8 Rev. Fin. Econ. 149 (1999); Jawad M. Addoum & Alok Kumar, *Political Sentiment and Predictable Returns*, 29 Rev. Fin. Stud. 3471 (2016); Stijn Claessens, Erik Feijen & Luc Laeven, *Political Connections and Preferential Access to Finance: The Role of Campaign Contributors*, 88 J. Fin. Econ. 554 (2008); Michael Hanke, Sebastian Stöckl & Alex Weissensteiner, *Political Event Portfolios*, 118 J. Bank Fin. 1 (2020); Paula Hill, Adriana Korczak & Piotr Korczak, *Political Uncertainty Exposure of Individual Companies: The Case of the Brexit Referendum*, 100 J. Banking & Fin. 58 (2019); Seema Jayachandran, *The Jeffords Effect*, 49 J. L. & Econ. 397 (2006); Brian Knight, *Are Policy Platforms Capitalized into Equity Prices? Evidence from the Bush/Gore 2000 Presidential Election*, 90 J. Pub. Econ. 751 (2006); Erik Snowberg, Justin Wolfers & Eric Zitzewitz, *Partisan Impacts on the Economy: Evidence from Prediction Markets and Cloes Elections*, 122 Q.J. Econ. 807 (2007); Alexander F. Wagner, Richard J. Zeckhauser & Alexandre Ziegler, *Company Stock Price Reactions to the 2016 Election Shock: Trump, Taxes, and Trade*, 130 J. Fin. Econ. 428 (2018); Tomasz Piotr Wisniewski, *Is There a Link Between Politics and Stock Returns? A Literature Survey*, 47 Int'l Rev. Fin. Analysis 15 (2016).

[14]  Hanke et al., *supra* note 12, at 103.

[15]  *Id.*

Similar research was presented to the CFTC by multiple commenters.[16] An organized, regulated election prediction market would therefore better allow investors to hedge against the electoral risk that is evidently embedded in stock market prices.

Kalshi's large position limits and order sizes also reinforce the proposed contracts' value for hedging purposes. These regulatory safeguards reduce the number of casual speculators and increase the number of participants who purchase the contracts for risk-mitigation purposes.

Indeed, today, investors *do* hedge against adverse elections outcomes, but they do so through indirect and inefficient hedging strategies. It would be more efficient and transparent if businesses and investors could simply enter into such hedging arrangements directly.

**B.       The Proposed Contracts Generate Legitimate Non-Hedging Public Benefits.**

Even assuming that political event contracts lack hedging value, an assumption contrary to evidence, the CFTC failed to consider a basic point: there is more to life than hedging.

The CFTC stated:

> [I]n evaluating whether the Congressional Control Contracts are contrary to the public interest, the Commission has considered the contracts' hedging utility and price-basing utility.  Additionally, the Commission has considered the potential impact that trading in the Congressional Control Contracts may have on election integrity, or the perception of election integrity—as well as the extent to which permitting trading in the Congressional Control Contracts could require the Commission to assume a role in overseeing the electoral process.

---

[16] *E.g.*, KalshiEx, LLC, Comment Letter on Commission's Specific Questions Related to KalshiEx, LLC's Proposed Congressional Control Contracts at App. C at 4-6 (July 23, 2023) (CFTC Comment No. 72716) (discussing evidence of election risk and hedging need and reviewing literature finding that "changes in political control result in changes to the prices of traded assets"), AR2728-30; Eric Zitzewitz, Comment Letter on Review of KalshiEx LLC's Proposed Congressional Control Contracts Pursuant to Commodity Futures Trading Commission Regulation 40.11(c) at 1 (Sept. 24, 2022) (CFTC Comment No. 72449), AR1404-05; Adam Ozimek, Comment Letter and Attachments (Sept. 22, 2022) (CFTC Comment No. 72467), AR 1484-1523 (discussing benefits and accuracy of prediction markets and citing literature discussing elections).

Order at 15 (footnotes omitted).  In other words, in assessing the public interest, the CFTC considered: (1) "hedging utility and price-basing utility," and (2) potential harmful outcomes related to election integrity.

This analysis presents a paradigmatic case of an agency "entirely fail[ing] to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n, of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  There is a crucial aspect of the public interest that the CFTC failed to consider: the non-economic value of prediction markets in predicting the future. Prediction markets assemble the wisdom of crowds to achieve estimates of election outcomes that are superior to predictions by any one pundit alone.[17]  In a world with miniscule poll response rates, sky-high polarization, and rampant fake news, prediction markets offer an objective indicator of the probability of particular election outcomes.  The public interest supports combatting fake news and providing a better mechanism for the revelation of truth.

Prediction market probabilities also benefit academic research.  Some researchers use prediction market probabilities to assess how elections influence economic variables.[18]  For instance, they may analyze whether an increase in the market's assessment of the probability of a particular candidate prevailing is correlated with an increase or decrease in other economic variables.  Alternatively, they may use prediction markets to learn which events actually influence campaigns.  If a particular news story causes a candidate's probability of victory to spike (as measured through prices of political event contracts), researchers can predict that the news story impacted the election rather than attempting to reconstruct the reasons a particular candidate prevailed after the fact.  Legalizing prediction markets will increase participation and make them

---

[17] *See* Bond et al, *supra* note 9.

[18] *See, e.g.*, Hanke et al., *supra* note 12 and citations therein.

more liquid and more useful for academic purposes.  The CFTC ignored all of this; it concluded that because prediction markets cannot be used for hedging (a conclusion that was itself wrong), prediction markets *must* be bad.

True, the CFTC stated in passing that it had "considered assertions by Kalshi and other commenters that the Congressional Control Contracts would serve as a check on misinformation and inaccurate polling, stating that market-based alternatives tend to be more accurate than polling or other methods of predicting election outcomes."  Order at 21.  "Stating that a factor was considered, however, is not a substitute for considering it."  *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).

The CFTC also seems to have ignored the observation that if a person seeks to manipulate election outcomes, manipulating the event market would be a foolish mechanism by which to achieve that result. First off, traders in this market must identify themselves to intermediaries and therefore cannot remain hidden. Manipulators do not rationally gravitate to markets that mandate this level of transparency. Second, contributing to dark-money pools that can purchase advertising and engage in other forms of influence would likely be far more efficient in influencing outcomes than attempting to influence event contract prices. Third, markets can be self-correcting. If a manipulator tries to inflate the prices of a Democratic or Republican victory, the manipulator will only attract traders on the other side of the market. Dark-money contributions have no equivalent offsetting mechanisms because, they are, by definition, hidden and dark, and do not operate in markets that allow for the formation of offsetting positions.

The risk of manipulation is thus rationally analyzed as a comparative phenomenon. From that perspective, the proposed contract is highly unlikely to contribute to electoral manipulation precisely because of the existence of alternative, superior methods of manipulation. Indeed, if

anything, the self-correcting nature of the contract suggests that it is more likely to have an anti-manipulative effect.

The CFTC showed no signs of giving meaningful consideration to any of these non-economic benefits.  Affirming that reasoning is particularly troubling because it would allow the agency to apply that approach to *any* prediction market, not just congressional control contracts.  The Court should not allow the CFTC to extinguish, based on incomplete and unexplained reasoning, a tool of great potential social and academic value.

### C.      The Order Fails to Adequately Explain Its Concerns Regarding Manipulation.

Third, the CFTC did not adequately explain its conclusions regarding the risk of manipulation.  As Professor Grundfest and other commenters explained to the CFTC, several studies of existing prediction markets have shown that price "pump" attempts are short-lived and, as explained above, disciplined by the market's self-correcting mechanisms.  Moreover, the relatively low position limit means any one participant is unlikely to be able to move the market in a meaningful way as traders enter on the other side of the market to profit from the mispricing.  As for concerns about manipulation of elections, commenters offered abundant empirical and theoretical evidence suggesting it would not occur.

Of course, the CFTC, as an expert administrative agency, was free to review the evidence and make a predictive judgment as to the risk of manipulation.  But it gave no sign of having actually *made* such a predictive judgment.

The CFTC observed: "[T]here is also research suggesting that election markets may incentivize the creation of 'fake' or unreliable information in the interest of moving the market, and a number of commenters also raised this concern."  Order at 22.  But there also is research showing that election markets would *decrease* misinformation—as the CFTC acknowledged.  *Id.*

17

at 21.  With conflicting evidence in the record, the CFTC must show its work.  It did not.  Instead, it merely noted the existence of "research" suggesting that election prediction markets might be harmful, and then leapt to the conclusion that they *must* be contrary to the public interest.  It was incumbent on the CFTC to grapple with the conflicting evidence in the record and give a reasoned explanation of why it reached its conclusion.

## CONCLUSION

KalshiEx's motion for summary judgment should be granted.

Dated: February 1, 2023

Respectfully submitted,

JENNER & BLOCK LLP

By:  /s/ *Adam Unikowsky*

ADAM UNIKOWSKY
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 639-6000
aunikowsky@jenner.com

18