# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KALSHIEX LLC,

               Plaintiff,

     v.

COMMODITY FUTURES TRADING
COMMISSION,

               Defendant.

Civil Action No. 1:23-cv-03257 (JMC)

---

## Defendant Commodity Futures Trading Commission's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment

Defendant Commodity Futures Trading Commission files its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment. A memorandum of points and authorities is attached.

Dated: February 26, 2024

Respectfully submitted,

*/s/ Raagnee Beri*
Raagnee Beri
  *Senior Assistant General Counsel*

Robert A. Schwartz
  *General Counsel*
Anne W. Stukes
  *Deputy General Counsel*
Margaret P. Aisenbrey
  *Senior Assistant General Counsel*
Conor B. Daly
  *Counsel*
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, D.C. 20581-0001
Phone: (202) 418-5986
rberi@cftc.gov

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT......................................................................................1

THE CFTC AND REGULATORY FRAMEWORK.....................................................1

    A.  Brief Introduction to the CFTC, the Commodity Exchange Act, and Derivatives...................................................................................................1

    B.  The Public Interest in Regulated Derivatives Markets:  Hedging and Pricing.........................4

    C.  The CEA's "Special Rule" for Certain Event Contracts.........................5

    D.  Prior Application of the "Special Rule" to Political Event Contracts.........................8

AGENCY PROCEEDINGS IN THIS CASE ...............................................................8

SUMMARY OF ARGUMENT ....................................................................................14

STANDARD OF REVIEW ..........................................................................................17

ARGUMENT.................................................................................................................20

    I.      The Commission correctly concluded that the Congressional Control Contracts involve both gaming and activity that is unlawful under state law.................................................................................................................20

        A.  The Commission did not err in applying the ordinary meaning of "involve."..........................................................................................20

        B.  The Commission correctly determined that the Congressional Control Contracts involve gaming. ..............................................26

            1.      The Commission did not construe "gaming" to mean the staking of money on any contingent event. ..........................................27

            2.      The Commission's interpretation of "gaming" to include betting or wagering on a contest of others is consistent with the ordinary meaning of "gaming."....................................28

            3.      The Commission's definition of "gaming" is consistent with state and federal gambling statutes. ..............................29

            4.      The Commission arrived at the best interpretation of "gaming" given the statutory context. ..................................32

5.    Legislative history supports the Commission's interpretation of "gaming." ...................................................................................................33

C.   The Commission correctly concluded that the Congressional Control Contracts involve activity that is unlawful under state law...............................34

II.    The Commission reasonably determined that the Congressional Control Contracts are contrary to public interest....................................................................36

A.   Kalshi incorrectly relies on rulemaking cases and mischaracterizes the Commission Order in arguing that the Commission's public interest analysis was arbitrary and capricious. ...............................................................................................................38

B.   The Commission's application of the economic purpose test was not arbitrary or capricious. ...................................................................................39

C.   The Commission reasonably determined that the Congressional Control Contracts did not have a sufficient economic purpose for purposes of the CEA........................41

D.   The Commission was not arbitrary and capricious in addressing comments...........................................................................................................44

E.   The Commission reasonably determined that the Contracts could potentially be used in ways that would have an adverse effect on election integrity, or the perception of election integrity, and could put the Commission in the position of investigating election-related activities..........................................................................................45

CONCLUSION.......................................................................................................................52

## TABLE OF AUTHORITIES

**Cases:**                                                                                           **Page(s)**

*All Party Parliamentary Grp. on Extraordinary Rendition v. U.S. Dep't of Def.,*
   754 F.3d 1047 (D.C. Cir. 2014) ........................................................................................29

*Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n,*
   796 F.3d 18 (D.C. Cir. 2015) .............................................................................................32

*Am. Min. Cong. v. EPA,*
   824 F.2d 1177 (D.C. Cir. 1987) ........................................................................................32

*Baystate Franklin Med. Ctr. v. Azar,*
   950 F.3d 84 (D.C. Cir. 2020) .............................................................................................38

*Bd. of Cty. Comm'rs v. U.S. Dep't of Transp.,*
   955 F.3d 96 (D.C. Cir. 2020) .............................................................................................37

*Bldg. Owners & Managers Ass'n Int'l v. FCC,*
   254 F.3d 89 (D.C. Cir. 2001) ...................................................................................... 23, 33

*\*CBOE Futures Exch. v. SEC,*
   77 F.4th 971 (D.C. Cir. 2023) ...............................................................................20, 37, 50

*CFTC v. Glen Point Capital Advisors,*
   1:22-cv-10589, Dkt. 1 (S.D.N.Y. 2022) .............................................................................3

*CFTC v. McAfee,*
   No. 21-cv-1919 (JGK), 2022 WL 3969757 (S.D.N.Y. July 14, 2022)................................47

*CFTC v. Safeguard Metals, LLC,*
   2:22-cv-00691, Dkt. No. 201 (C.D. Cal. 2023) ...................................................................3

*CFTC v. Xie,*
   1:23-cv-01947, Dkt. No. 17, 2023 WL 8532325 (N.D. Ill. 2023) .......................................3

*Chamber of Commerce v. SEC,*
   412 F.3d 133 (D.C. Cir. 2005) ..........................................................................................20

*\*Chevron U.S.A. Inc. v. Natural Res. Def. Council,*
   467 U.S. 837 (1984) .........................................................................................................19

*Citizens for Resp. & Ethics in Washington v. FEC,*
   316 F. Supp. 3d 349 (D.D.C. 2018)
   971 F.3d 340 (D.C. Cir. 2020) ..........................................................................................17

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ...............................................................................................19, 21, 25

*Coburn v. McHugh,*
   679 F.3d 924 (D.C. Cir. 2012) .............................................................................................21

*Concert Inv., LLC v. Small Bus. Admin.,*
   616 F. Supp. 3d 25 (D.D.C. 2022) ......................................................... 17, 18, 38, 45

*Conf. Grp., LLC v. FCC,*
   720 F.3d 957 (D.C. Cir. 2013) .............................................................................................18

*Conn. Nat'l Bank v. Germain,*
   503 U.S. 249 (1992) ...............................................................................................................21

*Consumer Elecs. Ass'n v. FCC,*
   347 F.3d 291 (D.C. Cir. 2003) .............................................................................................34

*Crooks v. Mabus,*
   845 F.3d 412 (D.C. Cir. 2016) .............................................................................................50

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ...............................................................................................................47

*FCC v. Nat'l Citizens Comm. for Broad.,*
   436 U.S. 775 (1978) ...............................................................................................................20

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ...............................................................................................................18

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,*
   559 U.S. 280 (2010) ...............................................................................................................31

*In re Betcorp Ltd.,*
   400 B.R. 266 (Bankr. D. Nev. 2009) ...................................................................................29

*In re Blockratize,*
   CFTC No. 22-09, 2022 WL 73864 (Jan. 3, 2022) ...............................................................3

*In re Ceres Global Ag. Corp.,*
   CFTC No. 24-01, 2023 WL 8650000(Oct. 23, 2023)...........................................................3

*In re JPMorgan Chase & Co.,*
   CFTC No. 20-69, 2020 WL 5876730 (Sep. 29, 2020).........................................................48

*In re Polar Bear Endangered Species Act Listing,*
  709 F.3d 1 (D.C. Cir. 2013) ............................................................................................41

*Leist v. Simplot,*
  638 F.2d 283 (2d Cir. 1980).............................................................................................35

*Medica Ins. Co. v. Becerra,*
  No. 1:22-CV-1440-RCL, 2023 WL 6314571 (D.D.C. Sept. 28, 2023)..............................17

*Menkes v. U.S. DHS,*
  637 F.3d 319 (D.C. Cir. 2011)..........................................................................................19

*Mercy Hosp., Inc. v. Azar,*
  891 F.3d 1062 (D.C. Cir. 2018) ........................................................................................24

*MetLife v. Fin. Stability Oversight Counsel,*
  865 F.3d 661 (D.C. Cir. 2017) ..........................................................................................37

*Michigan v. Bay Mills Indian Cmty.,*
  572 U.S. 782 (2014) ..........................................................................................................29

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,*
  463 U.S. 29 (1983) ...............................................................................................18, 20, 37

*Nasdaq Stock Market LLC v. SEC,*
  38 F.4th 1126 (D.C. Cir. 2022) .........................................................................................20

*Nat'l Ass'n of Clean Air Agencies v. EPA,*
  489 F.3d 1221 (D.C. Cir. 2007) ........................................................................................19

*Nat'l Cable & Telecomms. Ass'n v. FCC,*
  567 F.3d 659 (D.C. Cir. 2009)..........................................................................................32

*Neustar, Inc. v. FCC,*
  857 F.3d 886 (D.C. Cir. 2017)..........................................................................................18

*Nuclear Energy Inst., Inc. v. EPA,*
  373 F.3d 1251 (D.C. Cir. 2004) ........................................................................................21

*Petit v. U.S. Dep't of Educ.,*
  675 F.3d 769 (D.C. Cir. 2012)..........................................................................................33

*Phoenix Herpetological Soc'y, Inc. v. United States Fish & Wildlife Serv.,*
  998 F.3d 999 (D.C. Cir. 2021).............................................................................19, 46, 48

*Pub. Citizen, Inc. v. U.S. HHS,*
  332 F.3d 654 (D.C. Cir. 2003)..........................................................................................19

v

*Rural Cellular Ass'n v. FCC,*
    588 F.3d 1095 (D.C. Cir. 2009) ............................................................................38

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012) .............................................................................45

*Stilwell v. Office of Thrift Supervision,*
    569 F.3d 514 (D.C. Cir. 2009) .............................................................................47

*Sw. Airlines Co. v. Saxon,*
    596 U.S. 450 (2022) ............................................................................................22

*Sw. Airlines Co. v. Transp. Sec. Admin.,*
    650 F.3d 752 (D.C. Cir. 2011) .............................................................................20

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
    566 U.S. 560 (2012) ............................................................................................22

*Tourus Recs., Inc. v. DEA,*
    259 F.3d 731 (D.C. Cir. 2001) .............................................................................51

*Truitt v. Kendall,*
    554 F. Supp. 3d 167 (D.D.C. 2021) .....................................................................17

*U.S. Sugar Corp. v. EPA,*
    830 F.3d 579 (D.C. Cir.)
    671 F. App'x 822 (D.C. Cir. 2016)
    671 F. App'x 824 (D.C. Cir. 2016) .......................................................................19

*United States v. Alexander,*
    331 F.3d 116 (D.C. Cir. 2003) .............................................................................22

*United States v. Fischer,*
    64 F.4th 329 (D.C. Cir. 2023) .....................................................................31, 34

*United States v. King,*
    325 F.3d 110 (2d Cir. 2003) ................................................................................22

*United States v. McKenney,*
    450 F.3d 39 (1st Cir. 2006) .................................................................................22

*United States v. Wilkinson,*
    986 F.3d 740 (7th Cir. 2021) .................................................................................6

*United States v. Williams,*
    931 F.3d 570 (7th Cir. 2019) ...............................................................................22

*United States v. Wilson,*
    290 F.3d 347 (D.C. Cir. 2002) ..................................................................................32

*Verizon v. FCC,*
    740 F.3d 623 (D.C. Cir. 2014) ........................................................................... 20, 50

## Legislative Materials:

156 Cong. Rec. S5906, 2010 WL 2788026 (daily ed. July 15, 2010) ..................................*Passim*

S. Rep. No. 93-1131, 93rd Cong., 2d Sess. 36, 1974 WL 11581 (1974) ...................................5

## Statutes:

Commodity Exchange Act:
    7 U.S.C. § 1a(19) ....................................................................................................6
    7 U.S.C. § 2(a)(1)(D)(i) .........................................................................................23
    7 U.S.C. § 2(e) .......................................................................................................3
    7 U.S.C. § 2(a)(1) .................................................................................................35
    7 U.S.C. § 2(a)(1)(C)(i)(I) ....................................................................................23
    7 U.S.C. § 2(a)(1)(C)(ii) ................................................................................. 7, 23
    7 U.S.C. § 2(a)(1)(C)(iv) ......................................................................................23
    7 U.S.C. § 5 .............................................................................................................4
    7 U.S.C. § 5(b) ......................................................................................................51
    7 U.S.C. § 5(a)-(b) ..................................................................................................2
    7 U.S.C. § 5(c)(5)(C)(i)-(ii) .................................................................................36
    7 U.S.C. § 6 .............................................................................................................3
    7 U.S.C. § 6a(a)(4)(A) ..........................................................................................23
    7 U.S.C. § 6c(b) ................................................................................................ 3, 23
    7 U.S.C. § 6c(d)(2)(A)(i) ......................................................................................23
    7 U.S.C. § 7(d)(3) ...................................................................................................4
    7 U.S.C. § 7(d)(4) ...................................................................................................4
    7 U.S.C. § 7a-2(c)(1) ..............................................................................................6
    7 U.S.C. § 7a-2(c)(4) ..............................................................................................6
    7 U.S.C. § 7a-2(c)(5) ..............................................................................................5
    7 U.S.C. § 7a-2(c)(5)(C) ................................................................................*Passim*
    7 U.S.C. § 9 .............................................................................................................2
    7 U.S.C. § 20(e) ....................................................................................................23
    7 U.S.C. § 25(a)(1)(D)(ii) .....................................................................................23

Pub. L. No. 106-554, 114 Stat. 2763 (2000) ...............................................................................5

Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367 ....................................3

5 U.S.C. § 706 ........................................................................................................................17

25 U.S.C. § 2703(6) ....................................................................................................32

25 U.S.C. § 2703(7) ....................................................................................................32

25 U.S.C. § 2703(8) ....................................................................................................32

720 Ill. Comp. Stat. Ann. 5/28-1 ...............................................................................30

Ala. Code § 13A-12-20(4) ..........................................................................................30

Ga. Code Ann. § 16-12-21(a)(1) ................................................................................30

Iowa Code § 725.7(1) .................................................................................................30

Ky. Rev. Stat. § 528.010(6)(a) ....................................................................................31

La. Stat. § 14:90(A)(1)(a) ...........................................................................................31

Mass. Gen. Laws ch. 23K, § 2 ...................................................................................30

Utah Code Ann. § 76-10-1101(a) ...............................................................................31

**Regulations:**

17 C.F.R. § CFR 5, Appendix A- Guideline No. 1 (repealed 2001) ...........................40

Commission Regulations:
    17 C.F.R. § 33.3 .....................................................................................................3
    17 C.F.R. § 40.2 ..........................................................................................5, 6, 8
    17 C.F.R. § 40.3 ..........................................................................................5, 6, 7
    17 C.F.R. § 40.11 ..............................................................................................*Passim*

Contract Market Designation, 40 Fed. Reg. 25,849 (June 19, 1975) ..........................5

Economic and Public Interest Requirements for Contract Market Designation, 40 Fed. Reg. 49,832
    (Nov. 3, 1982) ......................................................................................................40

Economic and Public Interest Requirements for Contract Market Designation, 64 Fed. Reg. 29,217
    (June 1, 1999) .......................................................................................................40

**Other Authorities:**

BetMGM Ontario,
    https://sports.on.betmgm.ca/en/sports/politics-61 (last visited Feb. 23, 2024) ............28

BetOnline,
https://www.betonline.ag/sportsbook/futures-and-props/congress-specials
(last visited Feb. 23, 2024)..................................................................................29

CFTC:

*Contracts & Products: Event Contracts,*
https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm
(last visted Feb. 23, 2024)......................................................................................2

*Glossary: A Guide to the Language of the Futures Industry,*
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/
index.htm (last visited Feb. 23, 2024)..............................................................2, 3, 4

Collin Sherwin, *Where can you bet on the 2024 US presidential election?,* DraftKings.com (July 22, 2022),
https://dknetwork.drafkings.com/2022/7/14/23216300/us-presidential-election-where-is-
betting-legal-2024-odds-joe-biden-donald-trump ..................................................21

*Contest*, The Britannica Dictionary,
https://www.britannica.com/dictionary/contest (last visited Feb. 23, 2024) ...................30

Fanduel Sportsbook,
https://canada.sportsbook.fanduel.com/en/sports/navigation/32473.25/32492.25
(last visited Feb. 23, 2024)..................................................................................29

*Gaming*:

Black's Law Dictionary, https://thelawdictionary.org/gaming/
(last visited Feb. 23, 2024)..................................................................................28

Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/gaming (last visited Feb. 23, 2024)...............28, 29

*Involve*:

Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/involve
(last visited Feb. 23, 2024)..................................................................................22, 35

Random House College Dictionary (revised ed. 1979)..................................................22, 35

Riverside University Dictionary (1983) ....................................................................22, 35

Roget's International Thesaurus (7th ed. 2010) ...........................................................22

Letter from Vincent McGonagle, Dir, Div. of Mkt. Oversight, to Neil Quigley, Deputy
  Vice-Chancellor, Research, Victoria Univ. of Wellington (Oct. 29, 2014)
  https://www.cftc.gov/csl/14-130/download .......................................................................................3

Tyler Yeargain, *Fake Polls, Real Consequences: The Rise of Fake Polls and the Case for Criminal Liability*,
  85 MISSOURI L. REV. 129 (2020) ....................................................................................................48

*Underlying*, Black's Law Dictionary (11th ed. 2019) ..................................................................................2

U.K. Gambling Commission, *License Conditions and Codes of Practice*
  (Jan. 31, 2024) https://www.gamblingcommission.gov.uk/
  licensees-and-businesses/lccp/print ...............................................................................................49

## PRELIMINARY STATEMENT

Before the Court is an order of the Commodity Futures Trading Commission ("Commission" or "CFTC"), which declined to grant plaintiff KalshiEX ("Kalshi") permission to offer "Congressional Control Contracts" on Kalshi's registered contract market. The proposed contracts would have enabled participants to take a position on the binary (yes/no) question: "Will <chamber of Congress> be controlled by <party> for <term>?". The CFTC made three determinations in its disapproval of the contracts, each of which was sound. One, it determined that the contracts involve "gaming" — that is, betting, wagering or gambling on elections. Two, it determined that the contracts involve activity that is unlawful under state law, as many states' laws prohibit betting, wagering, or gambling on elections. And three, it determined that the contracts are contrary to the public interest because, *inter alia*, they (i) cannot reasonably be expected to be used more than occasionally for commercial or hedging interests; (ii) could be used in ways that adversely affect the integrity and perception of integrity of elections; (iii) could be manipulated to influence elections or electoral perceptions; and (iv) could put the CFTC in the position of having to investigate election-related activities. Kalshi asks this Court to vacate the Commission's decision and order that Kalshi's election contracts be allowed to trade on a regulated contract market. The Court should instead rule in favor of the Commission, which was well within its discretion to refuse to nationally legalize gambling on elections via the financial markets it regulates.

## THE CFTC AND REGULATORY FRAMEWORK

### A. Brief Introduction to the CFTC, the Commodity Exchange Act, and Derivatives.

The CFTC is an independent federal agency that regulates derivatives markets, and administers the Commodity Exchange Act (the "CEA" or "Act"). A "derivative" is a financial

instrument, such as a future, option, or swap, whose price is directly dependent upon—that is,
"derived from"—the value of something else, such as an agricultural or financial commodity.[1]

Relevant here, an "event contract" is a type of derivative contract whose payoff is based on a
specified "underlying" "event, occurrence, or value."[2]  For example, an event contract might be
based on the occurrence, nonoccurrence, or extent of an occurrence of a weather event such as
snowfall or rainfall.  The asset or other factor that gives rise to the rights and obligations in a
derivative contract is called its "underlying."  *Underlying*, BLACK'S LAW DICTIONARY (11th ed. 2019).
In a futures contract, the "underlying" is generally a specified quality and quantity of the cash market
asset in the same commodity.  Thus, for example, in a corn futures contract, the "underlying" would
be corn.

The stated purposes of the CEA include to ensure "fair and financially secure trading
facilities" and protection of "all market participants from fraudulent or other abusive sales practices"
in the markets that it regulates.  7 U.S.C. § 5(a)-(b).  One way the CEA does this is with broad anti-
fraud and anti-manipulation authority.  The Act prohibits any person from directly or indirectly
employing or attempting to employ a manipulative or deceptive device or engaging in fraud in
connection with any product on a derivatives exchange, or any commodity in interstate commerce.
7 U.S.C. § 9.  Thus, the Commission's enforcement authority includes investigating and bringing
actions against persons who commit manipulative or fraudulent acts in connection with derivatives

---

[1] CFTC, *Glossary: A Guide to the Language of the Futures Industry*,
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last
visited Feb. 23, 2024).

[2] CFTC, *Contracts & Products: Event Contracts*,
https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm (last visited Feb. 23, 2024).

markets,[3] including registered exchanges, as well as manipulative or fraudulent acts in connection with an underlying commodity market.[4]

The CEA requires that futures and certain other derivatives instruments be traded only on regulated exchanges.  Retail customers' only legal avenue to trade futures contracts, or derivatives such as event contracts, is on a contract market registered with the CFTC.[5]  *See* 7 U.S.C. §§ 2(e), 6, 6c(b); 17 C.F.R. § 33.3; *see also In re Blockratize*, CFTC No. 22-09, 2022 WL 73864 (Jan. 3, 2022) (consent order).[6]

Kalshi is a type of regulated exchange called a "designated contract market" ("DCM").  As a regulated exchange, a DCM must comply with certain core principles laid out in 7 U.S.C. § 7(d),

---

[3] *See, e.g., In re Ceres Global Ag. Corp.*, CFTC No. 24-01, 2023 WL 8650000 (Oct. 23, 2023) (consent order) (attempted manipulation of the oats futures markets); *CFTC v. Xie*, 1:23-cv-01947, Dkt. No. 17, 2023 WL 8532325 (N.D. Ill. 2023) (consent order) (fraudulent trades in the futures market based on misappropriated information).

[4] *See, e.g., CFTC v. Glen Point Capital Advisors*, 1:22-cv-10589, Dkt. 1 (S.D.N.Y. 2022) (complaint) (manipulative scheme in cash market to trigger payout in corresponding derivative); *CFTC v. Safeguard Metals, LLC*, 2:22-cv-00691, Dkt. No. 201 (C.D. Cal. 2023) (consent order) (fraudulent solicitations in cash metals transactions).

[5] Legalized online sports betting websites and apps, such as FanDuel or Draft Kings, are not designated by the Commission as contract markets, but instead are permitted to operate under applicable state law and certain provisions in the Unlawful Internet Gambling Enforcement Act.  31 U.S.C. §§ 5361-5367. The rules and protections in the CEA and Commission Regulations do not apply to legalized betting websites and apps insofar as they do not operate in markets or offer products that are subject to the CFTC's jurisdiction.

[6] Separately, and without engaging in the process under 7 U.S.C. § 7a-2(c)(5)(C) and Regulation 40.11(a), the staff of the Commission's Division of Market Oversight issued a staff No-Action letter to Victoria University of Wellington, New Zealand in 2014.  Letter from Vincent McGonagle, Dir., Div. of Mkt. Oversight, to Neil Quigley, Deputy Vice-Chancellor, Research, Victoria Univ. of Wellington, (Oct. 29, 2014), https://www.cftc.gov/csl/14-130/download.  Victoria University, which is not registered with the CFTC as a contract market, had "propose[d] the creation of a small-scale, not-for-profit, online market for event contracts in the U.S. for educational purposes," limiting the traders on that proposed platform to 5,000 persons.  *Id.*  The No-Action request "was not in any way premised upon claims that its proposed event contracts have any hedging or price-basing utility." *Id.*  That No-Action letter is now the subject of litigation.  *Clarke v. CFTC*, 24-cv-00167 (D.D.C.).  Aristotle, which associates itself with the recipient of the No-Action letter, has filed an amicus brief in this matter in support of Kalshi.  Dkt. No. 26.

including, among other things, requirements to list contracts not readily susceptible to manipulation and to have the capacity to prevent manipulation and price distortion through surveillance and enforcement.  *See, e.g.*, 7 U.S.C. § 7(d)(3), (d)(4).

### B.    The Public Interest in Regulated Derivatives Markets:  Hedging and Pricing.

The CEA includes a Congressional finding that transactions subject to the Act "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities."  7 U.S.C. § 5.  In other words, there is a codified public interest in regulation of derivatives markets because such markets provide a means to "hedge" economic risks. As it relates to markets regulated by the Commission, "hedging" utility in derivatives markets is generally understood to be the use, by market participants, of derivatives to manage the various price risks incidental to their commercial activity.[7]  A further codified public interest in the regulation of derivatives markets is the concept of price discovery, or the process of determining the price level for a commodity through interaction of buyers and sellers, and based on supply and demand conditions.[8]

---

[7] For instance, airlines that need to buy jet fuel in the foreseeable future might manage the risk that the price will increase by entering into a derivative contract, *e.g.* a futures contract, to hedge against that risk.  It would take a "long" position, *i.e.*, a futures contract that will increase in value if the price of the airline's fuel increases.  On the other hand, a fuel supplier might manage the risk that the price of oil will decline by taking a "short" position, *i.e.*, a futures contract that will increase in value if the price of fuel goes down.  The derivatives markets also include "speculators" who trade to profit from price movements, despite having no use for the underlying commodity.  For instance, a trader might take long positions in oil derivatives simply based on a view that fuel prices will increase. Speculators are considered important because they help ensure that hedgers can find counterparties with whom to trade.

[8] CFTC, *Glossary: A Guide to the Language of the Futures Industry*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited Feb. 23, 2024).

From 1974 to 2000, the CEA required exchanges to demonstrate to the Commission that any new contract was in the public interest before it was permitted to be listed for trading on an exchange. *See* S. Rep. No. 1194, 93rd Cong., 2d Sess. 36 (1974). This meant that each contract to be traded on a DCM had to meet an "economic purpose test" and not otherwise be contrary to the public interest. *See* Contract Market Designation, 40 Fed. Reg. 25849 (June 19, 1975). To meet the economic purpose test, the DCM was "expected to establish that something more than occasional use of the contract for hedging or price basing[9] exists, or can reasonably be expected to exist." *Id.* at 25,850.[10]

Over the years, the procedure for designating a new contract was streamlined. In 2000, Congress added CEA Section 5c(c), which significantly changed the Commission's role in allowing or disallowing the trading of particular contracts, and empowered DCMs to "self-certify" that new contracts comply with the Act and CFTC regulations. *See* Pub. L. No. 106-554, 114 Stat. 2763 (2000); 7 U.S.C. § 7a-2(c)(5); 17 C.F.R. §§ 40.2, 40.3. In 2010, Congress enacted a "Special Rule" for certain event contracts, which is the subject of this case. 7 U.S.C. § 7a-2(c)(5)(C) (entitled "Special rule for review and approval of event contracts and swap contracts" ("Special Rule")).

### C.     The CEA's "Special Rule" for Certain Event Contracts.

For most derivatives contracts, a DCM can self-certify a new product and trade it within one business day of submission to the CFTC, without waiting for the Commission to take any action. 7

---

[9] Similar to price discovery, price basing occurs when producers, processors, merchants, or consumers of a commodity establish commercial transaction prices based on the futures price for that or a related commodity. AR 18.

[10] To make that showing, the market was required to provide evidence that 1) the prices in the futures transaction can reasonably be expected to be generally quoted and disseminated as a basis for determining prices to producers, merchants, or consumers of the commodity or its byproducts and 2) such transaction can be expected to be utilized by merchants or consumers engaged in handling the commodity or its byproducts as a means of hedging themselves against possible loss through fluctuations in price.

U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2.  Alternatively, a DCM may voluntarily submit their new products to seek pre-approval, in which case the Commission will review the submission and approve the product unless it violates a specific provision of the CEA or the Commission's regulations.  7 U.S.C. § 7a-2(c)(4)-(5); 17 C.F.R. § 40.3.

However, for certain event contracts, the Special Rule authorizes the Commission to review and determine whether a given contract or transaction should be disallowed as contrary to the public interest.  *See* CEA Section 5c(C)(5), codified at 7 U.S.C. § 7a-2(c)(5)(C).  The Special Rule provides that the Commission "may determine" that certain "agreements, contracts, transactions, or swaps in excluded commodities[11] that are *based upon* the occurrence, extent of an occurrence, or

---

11 "Excluded commodity" is a type of intangible commodity, and includes such things as interest rates, indices, and occurrences.  The CEA defines "excluded commodity" as:

> (i)an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

> (ii)any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

>> (I)not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

>> (II)based solely on one or more commodities that have no cash market;

> (iii)any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

> (iv)an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

>> (I)beyond the control of the parties to the relevant contract, agreement, or transaction; and

>> (II)associated with a financial, commercial, or economic consequence.

7 U.S.C. § 1a(19).  Despite their name, "excluded" commodities are subject to the CEA.  *See, e.g.*, *United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) (noting that broad-based indices are "excluded commodities" that "remain 'commodities' under the Act as a whole, including its fraud provisions").

contingency," *i.e.* event contracts, "are contrary to the public interest" "if the agreements, contracts, or transactions *involve*—

    (I)      activity that is unlawful under any Federal or State law;
    (II)     terrorism
    (III)    assassination;
    (IV)    war;
    (V)    gaming; or
    (VI)    other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."

7 U.S.C. § 7a-2(c)(5)(C)(i) (emphases added).  If an event contract or transaction therein "involve[s]" one of these enumerated activities and the Commission has determined the contract or transaction to be contrary to the public interest, that contract may not be listed or made available for trading through a registered entity.  7 U.S.C. § 7a-2(c)(5)(C)(ii).  With respect to "gaming," legislative history suggests that when the CFTC evaluates the public interest, it should consider whether the "proposed derivatives contract would be used predominantly by speculators or participants not having a commercial or hedging interest," and if so, the Commission is authorized to determine "that a contract is a gaming contract" rather than one that has a "hedging or economic use."  *See* 156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010).

       To establish a process for determining whether an event contract is prohibited from listing, the Commission enacted Regulation 40.11(c), which provides for a 90-day review period.  17 C.F.R. § 40.11(c).  If the Commission decides to engage in this review, it must request that the registered entity suspend the listing or trading of the contract under review. [12]  17 C.F.R. § 40.11(c)(1). Nothing in the CEA, CFTC regulations, or any other law requires that the CFTC engage in a notice and comment process or formal hearings in evaluating event contract submissions.

---

[12] For that reason, a DCM may choose to receive definitive resolution regarding an event contract that may be implicated by 7 U.S.C. § 7a-2(c)(5)(C) by submitting the product for Commission pre-approval under 17 C.F.R. § 40.3.

D.      **Prior Application of the "Special Rule" to Political Event Contracts.**

The Commission has completed a review under 7 U.S.C. § 7a-2(c)(5)(C) and Regulation

40.11(a) once before.  In December 2011, North American Derivatives Exchange (NADEX), a

DCM, self-certified a variety of political event contracts for the 2012 election cycle, including

contracts involving Democratic or Republican Control of the House of Representatives, Democratic

or Republican Control of the Senate, and United States President Binary Contracts.  The

Commission exercised its authority under the Special Rule to review the contracts, and issued an

order prohibiting their trading.  CFTC, *CFTC Order Prohibiting North American Derivatives Exchange's*

*Political Event Derivatives Contracts* (Apr. 2, 2012), available at

https://www.cftc.gov/PressRoom/PressReleases/6224-12.  The Commission found that these

contracts involved "gaming" and were contrary to the public interest.  *Id.*  Among other findings,

the Commission noted that the unpredictability of specific economic consequences of an election

meant the contracts could not reasonably be expected to be used for hedging on more than an

occasional basis and there was no situation where the contracts' prices could form the basis for

pricing a commercial transaction involving a physical commodity.  *Id.*

## AGENCY PROCEEDINGS IN THIS CASE

Kalshi is a financial services company that operates as a DCM that lists event contracts for

trading.  On June 12, 2023, Kalshi filed a product certification (the "2023 Submission") of the

Congressional Control Contracts (or "Contracts"), pursuant to Section 5c(c)(1) of the CEA and

Regulation 40.2.[13]  AR 24, 26.  Kalshi's website touts press coverage that describes the Congressional

---

[13] This product certification followed Kalshi's prior voluntary submission of a largely similar contract
for pre-approval in 2022 (the "2022 Submission").  AR 3058-3146.  While the 2022 Submission was
under review, Kalshi sought and received several extensions of the review period.  AR 3197, 3215,
3267.  Kalshi ultimately withdrew the 2022 Submission shortly before it made the 2023 Submission.
AR 3275.

Control Contracts as "Election Gambling," "Political Betting," "election betting," and an "Election-Betting Market."[14]

The Congressional Control Contracts are binary (yes/no) event contracts based on the question: "Will <chamber of Congress> be controlled by <party> for <term>?". AR 27. The Contracts permit market participants to choose which political party will control either the House of Representatives or Senate. AR 26. The settlement values of the Congressional Control Contracts are determined by the party affiliation of the leader of the identified chamber of Congress on the expiration date. AR 32. In the case of the House of Representatives, the leader is the Speaker of the House, and in the case of the Senate, the leader is the President Pro Tempore. AR 32. Upon settlement, the holder of one side of the contract is paid a dollar per contract, and holders of the opposite position receive nothing. AR 28.

Kalshi planned to list the Congressional Control Contracts every two years, corresponding to each Congressional term, with the contracts expiring at 10:00 A.M. Eastern Time on February 1 of the year the relevant Congressional term begins. AR 26, 33. The Contracts would have a notional value of one dollar with a minimum price fluctuation of $0.01 and would be purchased in multiples of 5,000 contracts per order. AR 32-33. During the time the contract is open, traders would have the ability to adjust their positions and trade freely. AR 28. The Contracts would have tiered position limits depending on the category of market participant—individual, entity, or eligible contract participant—and whether the participant has a "demonstrated established economic hedging need."[15] AR 32-33. An institutional trader would have been permitted to place a bet of up to $100,000,000. AR 32.

---

[14] *Press*, Kalshi, https://kalshi.com/blog/press (last visited Feb. 23, 2024).

[15] The 2023 Submission contract terms and conditions included some purported safeguards including a prohibition of trading by certain individuals and entities, including: 1) candidates for

Shortly after Kalshi submitted the Congressional Control Contracts, the CFTC commenced a 90-day review of the contracts based on its determination that the Contracts may involve an activity enumerated in Regulation 40.11(a) and Section 5c(C)(5) of the CEA.  AR 148.  In accordance with Regulation 40.11(c)(1), the CFTC requested that Kalshi suspend any listing and trading of the Contracts during the pendency of the review period.  AR 148.  As part of the review, though not required by the CEA or Regulation 40.11, the CFTC sought public comment on specific questions related to Kalshi's self-certification during a 30-day public comment period.  AR 149.  The CFTC's questions covered a variety of topics, including:  whether the Contracts involve gaming or an activity that is unlawful under State or Federal law; whether and how the Contracts might serve a hedging function; whether the Contracts are contrary to the public interest; and whether the Contracts could be used to undermine election integrity including by influencing perception of a political party or candidate or by implicating attempted election manipulation.  AR 150.

On September 22, 2023, at the conclusion of the review period, the Commission issued an Order prohibiting Kalshi from listing the Congressional Control Contracts for trading.  The Commission determined that the Contracts "involve" two enumerated activities – gaming and activities unlawful under state law.  The Commission then determined that the Contracts were contrary to public interest and, as such, prohibited them from listing and trading. AR 1-23.

Noting that "involve" is not defined by statute for purposes of Section 5c(c)(5)(C)(i), the Commission looked to its ordinary meaning in analyzing whether the Congressional Control Contracts "involve" enumerated activities.  AR 5.  The Commission drew the ordinary meaning

---

federal or statewide public office; 2) paid campaign staffers on Congressional campaigns; 3) paid employees of Democratic and Republican Party organizations; 4) paid employees of political action committees ("PACs") and "Super PACs" (independent expenditure only political committees); 5) paid employees of major polling organizations; 6) existing members of Congress; 7) existing paid staffers of members of Congress; 8) household members and immediate family members of any of the above; and 9) "any of the above listed institutions themselves."

from multiple dictionaries and determined that the definitions of "involve" include "to relate to or affect," "to relate closely," to "entail," or to "have an essential feature or consequence." AR 5. The Commission rejected Kalshi's proposed narrower reading that a contract involves an enumerated activity only if that activity is the contract's underlying. AR 6. The Commission noted that Kalshi's reading is inconsistent with the CEA, including Section 5c(c)(5)(C)(i) itself, because when the CEA refers to a contract's underlying, it uses the word "underlying" or states what the contract is "based on" or "based upon." AR 6. The Commission reasoned that, most notably, Section 5c(c)(5)(C)(i) itself uses "based on" to describe event contracts as those "based on an occurrence, extent of an occurrence, or contingency." AR 6. Thus, the Commission reasoned, the only thing Section 5c(c)(5)(C)(i) says about the underlying is that it must be a certain kind of excluded commodity (an event contract) and not that it must be one of the enumerated activities. AR 6-7. On these findings, the Commission reasoned that Congress's choice of the broader term "involve" means that CEA Section 5c(c)(5)(C)(i) broadly captures both contracts whose underlying is one of the enumerated activities and contracts with a different connection to one of the enumerated activities. AR 7.

In finding that the Congressional Control Contracts "involve" the enumerated activity of "gaming" the Commission applied the ordinary meaning of "gaming" to include betting or wagering on elections. AR 8-10. The Commission reasoned that: (1) dictionaries define "gaming" to mean "gambling;" (2) under most state laws "gambling" involves staking something of value upon the outcome of a game, contest, or contingent event; (3) the Unlawful Internet Gambling Enforcement Act ("UIGEA") defines the term "bet or wager" as "the staking or risking by any person of something of value upon the outcome of a contest of others ..., upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome;" and (4) state statutes link the terms "gaming" or "gambling" to betting or wagering on elections. AR 8-9. Accordingly, because taking a position in the Congressional Control

Contracts would be staking something of value (*i.e.* betting or wagering) upon the outcome of a contest of others (*i.e.* the outcome of Congressional elections), the Contracts involve "gaming."  AR 10.

      As to unlawful activity, the Commission found that the Congressional Control Contracts involve an activity that is unlawful under state law because betting or wagering on elections is prohibited by numerous state statutes and because several state court decisions hold that betting or wagering on elections is illegal.  AR 11-12.  The Commission reasoned, and Kalshi does not contest, that taking a position in the Congressional Control Contracts would be staking something of value (or betting) upon the outcome of contests between electoral candidates, which is illegal in a number of states.  AR 12-13.  The Commission also explained that to permit nationwide election gambling would directly undermine important state interests in controlling election gambling.  AR 13 n.28.

      Having found the Contracts "involved" two enumerated activities, the Commission next evaluated whether the Contracts are contrary to the public interest. AR 12.  The Commission found that the Congressional Control Contracts are contrary to public interest because of their negligible hedging and price-basing utility, AR 15-19, because of their potential negative impact on election integrity or the perception of election integrity, AR 19-22, and because permitting trading in the Contracts could require the Commission to assume a role in overseeing the electoral process, AR 22-23.  The Commission also explained that to permit nationwide election gambling would directly undermine important state interests in controlling election gambling.  AR 13 n.28.

      In assessing the hedging and price-basing utility, the Commission applied a form of the "economic purpose test" supported by the legislative history of CEA Section 5c(c)(5)(C)(i), as well as the Congressional finding in CEA Section 3 of a national public interest in well-regulated markets for hedging and price basing.  AR 15.  This entailed determining whether the Contracts could be reasonably expected to be used for hedging and/or price basing on "more than an occasional basis"

or could reasonably be expected to be used predominantly by market participants having a commercial or hedging interest.  AR 19.  The Commission examined the Contracts' salient features, considered the relevant comments, and applied its expertise to make a series of findings.  AR 15-18.  The Commission found that control of a chamber of Congress does not, in and of itself, have sufficiently direct, predictable, or quantifiable economic consequences for the Congressional Control Contracts to serve an effective hedging function.  AR 17.  The Commission acknowledged that control of a chamber of Congress may ultimately have economic effects but that those eventual effects are diffuse and unpredictable, considering the many intervening events and variables that exist between control of a chamber of Congress and the actual implementation of policy, such that the Contracts could be useful for specific, identifiable hedging purposes.  AR 17.  The Commission noted the specifications for the contract, including the binary nature of the payout and the settlement only once every two years, further limited the hedging capabilities of the contract.  AR 17-18.  For these same reasons, the Commission explained that the Contracts could not predictably be used for price basing.  AR 18-19.

As to election integrity, the Commission found that the Contracts could potentially adversely affect election integrity or the perception of election integrity by creating monetary incentives to vote (including as an organized collective) for particular candidates or by incentivizing the spread of misinformation in order to influence the markets and that the market could be used to influence perceptions about elections.  The Commission cited, among other things, comment letters from six United States Senators expressing serious concerns along those lines.  AR 19-20.

The Commission noted the difficulty of guarding against misinformation and manipulative activity because the Contracts have no underlying cash market and instead the price forming information is driven largely by opaque and unregulated sources such as polling and voter surveys.  AR 20-21.  This differs from the reliable informational sources, such as information in government

crop forecasts, that are used to price the vast majority of commodities underlying Commission-regulated derivatives contracts.  AR 21.

The Commission found that the Contracts' proposed trading prohibitions provided insufficient protections against manipulative activities because they do not exclude all persons who could have a motivation to manipulate the markets, nor do they prevent the prohibited individuals and entities from engaging in activity other than trading that could artificially move the market in the Congressional Control Contracts.  AR 22.

Finally, the Commission found that as a regulator of the Congressional Control Contracts markets, the CFTC could find itself in the position of investigating suspected manipulation of the markets, which could, by extension involve investigating election-related activities.  AR 22-23.  The Commission observed that several commenters, including members of the House of Representatives, noted that the Commission is not equipped or well suited for this role, which falls well outside its mandate as established by Congress.  AR 22-23.

In light of these findings, the Commission determined that the Congressional Control Contracts involve gaming and activity that is unlawful under State law, and are contrary to the public interest.  Accordingly, the Commission ordered that pursuant to CEA Section 5c(c)(5)(C)(ii) and Regulation 40.11(a)(1), the Congressional Control Contracts are prohibited and shall not be listed for clearing or trading on or through Kalshi.  AR 23.

## SUMMARY OF ARGUMENT

Kalshi's arguments are based overwhelmingly on unreasonable interpretations of the CEA, mischaracterizations of the Commission's Order, straw men, faulty logic, and mistaken reliance on evidentiary standards that apply to rulemakings and not individual adjudications like this one.  The CFTC is entitled to judgment as a matter of law for the following reasons:

*First*, the CFTC correctly applied the ordinary and broad meaning of "involve," in determining whether the Congressional Control Contracts and transactions therein involve an enumerated activity under CEA Section 5c(c)(5)(C)(i).  The Commission's application of the broad meaning of "involve" to include "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence," is supported by dictionary definitions, the usage of other terms in the CEA, and the legislative history of the statutory language of Section 5c(c)(5)(C)(i), and is reinforced by multiple tools of construction.  Kalshi asserts that a contract can only "involve" an enumerated activity "when the underlying event constitutes or relates to that activity."  This argument disregards the plain meaning of "involve" and is not consistent with terms in the CEA.  Kalshi further accuses the Commission of using "shifting" definitions of "involve," but the accusation is baseless. The definition is not "shifting;" it is just broad, which the Commission explained in its Order in a passage Kalshi simply ignores.

*Second*, the Commission correctly determined that the Contracts involve "gaming."  In so doing, the Commission applied the ordinary meaning of "gaming" to cover "betting or wagering on elections" including "staking something of value on the outcome of contests of others."  This application is supported by the use of the terms "gaming" and "gambling" in both state and federal statutes, the purpose of the CEA Section 5c(c)(5)(C)(i), and the legislative history of CEA Section 5c(c)(5)(C)(i).  The Commission then correctly concluded that the Contracts involve gaming pursuant to Section 5c(c)(5)(C)(i), because taking a position in the Contracts would be staking something of value on the outcome of the contest of others, where the Contracts are premised on the outcome of Congressional elections.  Kalshi argues that "gaming" does not cover betting on elections, and only narrowly covers activities that involve a game, such as playing cards or betting on a football match.  This narrow reading contradicts Kalshi's own view that a contract only "involves"

gaming if the underlying is "gam*ing*" (as opposed to a "game" like football) and is, in any event, not supported by the other statutes Kalshi cites, or Section 5c(c)(5)(C)(i) or its legislative history.

*Third*, the Commission correctly determined that the Contracts involve activity that is "unlawful under any … State law." The Commission found that the Congressional Control Contracts involve betting or wagering on elections, an activity the Commission observed is unlawful under numerous state laws, because staking something of value on the outcome of contests between electoral candidates is an essential feature or consequence of transacting in the Contracts. Kalshi does not challenge these findings, but instead argues that the Commission's analysis threatens to undermine its own exclusive jurisdiction and regulatory authority over derivatives markets by permitting states to dictate trading prohibitions by simply outlawing activity. This argument is without merit because contracts that involve enumerated activities are subject to prohibition only if the Commission, in its discretion, determines they are contrary to public interest.

*Fourth*, the Commission rationally considered the contracts' hedging and price-basing utility in determining whether the Congressional Control Contracts are contrary to public interest. The Commission's use of an economic purpose test is supported by the text of the CEA and the relevant legislative history.

*Fifth*, the Commission reasonably determined that the Congressional Control Contracts could not reasonably be expected to be used for hedging or price basing "on more than an occasional basis." This determination was based on the Commission's analysis of the relevant facts and application of its expertise. Kalshi wastes pages of its brief disputing a conclusion the Commission did not reach—that the Contracts could *never* be used by *anyone* to hedge a risk. But nothing that Kalshi cites undermines the Commission's judgment that, even considering Kalshi's assertions of certain narrow hedging uses, the Contracts cannot reasonably be expected to be used for hedging or price basing on more than an occasional basis.

*Sixth*, the Commission reasonably determined the Contracts may be vulnerable to manipulative efforts, and such events or efforts could undermine perception of the integrity of elections, the integrity of those elections, and put the Commission in a role that is misaligned with the Commission's mission.  The specifications of the contract, the lack of an underlying cash market, and the record, including the opinions of economists that Kalshi cites, all point to a contract that could be manipulated, especially in short bursts.  Kalshi argues that the Commission did not consider Kalshi's proposed public interest of socially valuable data, but that is not true—the Commission acknowledged that claim, but reasonably chose to weigh that interest against other factors, including the potential for manipulative events which could affect confidence in, or the even the outcome of, elections, and the possibility that the Commission would be drawn into investigations of manipulative events in elections.  The Commission made a predictive, policy decision, and while Kalshi has a difference in view, that disagreement is no reason for this Court to disturb the decision.

## STANDARD OF REVIEW

In cases challenging a final agency action under the Administrative Procedure Act ("APA"), the Rule 56 summary judgment standard does not govern the court's review.  *Truitt v. Kendall*, 554 F. Supp. 3d 167, 174 (D.D.C. 2021).  Instead, the court "sits as an appellate tribunal," *Concert Inv., LLC v. Small Bus. Admin.*, 616 F. Supp. 3d 25, 29 (D.D.C. 2022) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)), and applies the APA's standards for judicial review, *Citizens for Resp. & Ethics in Washington v. FEC*, 316 F. Supp. 3d 349, 366 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020).  Under those standards, the court determines, as a matter of law, "whether the agency's decision was arbitrary, capricious, an abuse of discretion, or unlawful," *Medica Ins. Co. v. Becerra*, No. 1:22-CV-1440-RCL, 2023 WL 6314571, at *5 (D.D.C. Sept. 28, 2023) (citing *Truitt*, 554 F. Supp. 3d at 174 and 5 U.S.C. § 706).

The arbitrary-and-capricious standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Judicial review "is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.* Rather, the court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*

Kalshi's criticisms of the Commission's analysis are flawed due to a basic legal error: They rely on the wrong procedural requirements under the APA for adjudicating a product certification. Kalshi mistakenly relies on *rulemaking* cases in arguing about the Commission's analysis of the record. However, the Order at issue is an "informal adjudication," and not a rulemaking. This is because the Commission issued a case-specific decision and was not statutorily required to engage in a notice and comment process or hold proceedings on the record. *See* 7 U.S.C. § 7a-2(c)(5)(C); *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017).[16] This means that while under the APA the agency must "examine the relevant data and articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983), it need not include "an exhaustive analysis of the record" or "cite or explain its reasoning as to every piece of evidence that could be read to run contrary to its determination," *Concert Inv., LLC*, 616 F. Supp. 3d at 33. Rather, the agency need only "engage with as much evidence as necessary such that its logic can reasonably be discerned." *Id.* (citing *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). And, "even if not explicitly backed by information in the record," "common

---

[16] Rulemakings carry out broad applications of more general principles that resemble legislation, rather than case-specific individual determinations. *Neustar*, 857 F.3d at 893. The fact that an order rendered in an adjudication "may affect agency policy and have general prospective application," does not make it a rulemaking. *Conf. Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013). Seeking public comment also does not affect whether an agency action is a rulemaking or an informal adjudication. *Neustar*, 857 F.3d at 895.

sense and predictive judgments" may be attributed to the agency's expertise.  *Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999, 1005-06 (D.C. Cir. 2021).

Because Kalshi is challenging the Commission's statutory interpretations, the two step-analysis applies—at least as of this writing—as set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  In the first step, the court examines the statute de novo and employs traditional tools of statutory construction to determine if the intent of Congress is clear. N*at'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).  In determining whether Congress's intent is clear, the court reviews the statute's text, structure, purpose, and legislative history.  *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir.), *on reh'g en banc*, 671 F. App'x 822 (D.C. Cir. 2016), *and on reh'g en banc in part*, 671 F. App'x 824 (D.C. Cir. 2016).  If the intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 842-43).

If a statute is ambiguous, the analysis proceeds to step two, and the court will defer to the agency's interpretation as long as it is "based on a permissible construction of the statute."  *Pub. Citizen, Inc. v. U.S. HHS*, 332 F.3d 654, 659 (D.C. Cir. 2003).[17]  In this case, the Court should find that even if there were no deference due to the agency, the Commission's construction of the statute is the most reasonable interpretation.

Finally, where Congress charges an agency with determining whether something is contrary "to the public interest," courts recognize broad authority on the part of the agency.  *See, e.g., Chamber*

---

[17] An agency interpretation that is enunciated through an action that lacks the force of law, such as a policy statement, is subject to *Skidmore* deference, in which the court will accept agency interpretations of ambiguous statutes if they are persuasive. *Pub. Citizen, Inc.*, 332 F.3d at 660, 662 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The Commission's Order is an adjudication subject to the more deferential *Chevron* standard of review because it was an action authorized by Congress that carries the force of law.  *Menkes v. U.S. DHS*, 637 F.3d 319, 330-31 (D.C. Cir. 2011).

*of Commerce v. SEC*, 412 F.3d 133, 139 (D.C. Cir. 2005); *FCC v. Nat'l Citizens Comm. for Broad.*, 436

U.S. 775, 795 (1978); *see also Sw. Airlines Co. v. Transp. Sec. Admin*, 650 F.3d 752, 756 (D.C. Cir. 2011)

(Kavanaugh, J.) (noting the "distinction between the objective existence of certain conditions and

the [agency]'s determination that such conditions are present, stressing that a statute phrased in the

latter terms fairly exudes deference to the [agency]." ) (quoting *AFL-CIO v. Chao*, 409 F.3d 377, 393

(D.C. Cir. 2005)) (Roberts, J., concurring in part and dissenting in part).   Under *State Farm*, 463 U.S.

at 52, when the Commission makes a policy determination as to whether something is contrary to

the public interest, it need only demonstrate "a rational connection between the facts found and the

choice made."  *See, e.g., Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126, 1135 (D.C. Cir. 2022)

(quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 52); *see also Verizon v. FCC*, 740 F.3d 623, 649

(D.C. Cir. 2014) (same).  And a court may not scrutinize an agency's decision for perfect clarity:  It is

sufficient that the agency's path may "reasonably be discerned."  *CBOE Futures Exch. v. SEC*, 77

F.4th 971, 977 (D.C. Cir. 2023) (quotations omitted).

## ARGUMENT

**I.  The Commission correctly concluded that the Congressional Control Contracts involve both gaming and activity that is unlawful under state law.**

### A.  The Commission did not err in applying the ordinary meaning of "involve."

The Commission correctly rejected Kalshi's made-up definition of "involve" as a reference

to a contract's "underlying."  As the Order explained, because the statute does not define "involve,"

the plain meaning applies, and it is broad enough to cover *both* contracts whose underlying is an

enumerated activity, and contracts with a different connection to that activity.  AR 7.  As stated

above, the Special Rule provides that the Commission "may determine" that certain "agreements,

contracts, transactions, or swaps in excluded commodities that are *based upon* the occurrence, extent

of an occurrence, or contingency," *i.e.* event contracts, "are contrary to the public interest" "if the

agreements, contracts, or transactions *involve*—(I) activity that is unlawful under any Federal or State

law; . . . (IV) gaming . . ." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added).

Kalshi argues that Congress did not mean to capture in Section 5c(c)(5)(C)(i) all contracts or

transactions that "involve" an enumerated activity as that word is commonly understood—only

those whose "underlying" is one of the activities or "relates to" one of the activities.[18]  Kalshi

Motion at 15.  But Kalshi's asserted definition of "involve" is not consistent with other terms in the

statute, and multiple tools of construction reinforce that the ordinary and broad meaning of

"involve" applies here.

"[C]ourts must presume that a legislature says in a statute what it means and means in a

statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  As explained

above, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the

agency, must give effect to the unambiguously expressed intent of Congress."  *City of Arlington*, 569

---

[18] Kalshi never raised the "relates to" argument before the Commission (or even in its Complaint),
and it is accordingly waived.  *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004);
*Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012).  Until now, Kalshi argued that for purposes of
Section 5c(c)(5)(C)(i), "involve" is interpreted narrowly to mean that the enumerated activity *is* the
contract's underlying event, and that this is "the only way to make sense of" the statute.  *See* Compl.,
Dkt. No. 1 at ¶ 10; *see also* AR 6, 111, 115, 119-22, 130-132.  Kalshi's concession likely reflects a
recognition that the unsupported narrow definition would create absurd results—*i.e.*, a statute that
applies to nothing, or close enough that it makes no difference.  And the argument that the statute
applies to contracts and transactions where the underlying "relates to" an enumerated activity is *the
Commission's* argument.  For example, the Congressional Control Contracts "involve" gaming
because an election "relates to" gaming – *if you gamble on it* – which is what Kalshi's Contracts are for.
Collin Sherwin, *Where can you bet on the 2024 US presidential election?*, DraftKings.com (July 22, 2022),
https://dknetwork.draftkings.com/2022/7/14/23216300/us-presidential-election-where-is-betting-
legal-2024-odds-joe-biden-donald-trump (describing the contracts that have received no-action
Letters from the CFTC as accepting "election bets" and noting that "[w]hile there is no federal
prohibition on election betting as of yet, no state or jurisdiction in the United States has allowed it").
Kalshi offers that possibly Congress chose the term to prevent circumvention of the statute through
contracts based on technically distinct events.  The Commission agrees.  As discussed below in the
discussion of the legislative history, it appears Congress was attempting to prevent the use of these
contracts to "enable gambling."  *See infra* at 33.

U.S. at 296 (quotation marks omitted).  As relevant here, Section 5c(c)(5)(C)(i) unambiguously captures far more than contracts whose underlying *is* an enumerated activity.

The CEA does not define "involve," so its ordinary meaning applies.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  As several courts have observed, the word has "expansive connotations."  *See, e.g.*, *United States v. Alexander*, 331 F.3d 116, 131 (D.C. Cir. 2003) (citation omitted); *United States v. Williams*, 931 F.3d 570, 575 (7th Cir. 2019); *United States v. McKenney*, 450 F.3d 39, 42-43 (1st Cir. 2006) (rejecting a "'narrow' definition of 'involve'"); *United States v. King*, 325 F.3d 110, 113 (2d Cir. 2003).  It means "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence."[19]  The Contracts here "relate closely" to gaming;[20] it is their essential feature; and—notwithstanding Kalshi's assertion that "Election Gambling" (per Kalshi's own website) is a "hedging" tool, *see infra* at 30—gaming is what these transactions "entail." AR 10.  And the Contracts likewise "relate closely" to and would "affect"—by utterly undermining—state laws that prohibit gambling on elections.  AR 11-13.  Accordingly, the Contracts "involve" gaming and activity that is illegal under state law, and Section 5c(c)(5)(C)(i) is satisfied.

The statute's plain meaning is bolstered here by the "meaningful-variation canon."  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022).  Where Congress uses "one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea."  *Id.* at 458.  In the CEA, where Congress refers only to a contract's underlying, it generally

---

[19] *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/involve (last visited Feb. 23, 2024); Random House College Dictionary 703 (Revised ed. 1979); Riverside University Dictionary 645 (1983); *see also* Roget's International Thesaurus 1040 (7th ed. 2010) (giving as synonyms "entail" and "relate to").

[20] As explained, *infra*, in Section I.B. "gaming" and "gambling" can be understood to mean the same thing.

uses the word "underlying," *e.g.*, 7 U.S.C. §§ 6c(d)(2)(A)(i), 20(e), 25(a)(1)(D)(ii), or, where syntax requires, refers to what the contract is "based on" or "based upon," 7 U.S.C. §§ 2(a)(1)(C)(i)(I), 2(a)(1)(C)(ii), 2(a)(1)(C)(iv), 6a(a)(4)(A).[21]   Nowhere does the statute define "involve" as limited to a contract's underlying.[22]   If Congress intended Section 5c(c)(5)(C)(i)(V) to apply only where an enumerated activity like gaming is the underlying, it would have said so. *See Bldg. Owners & Managers Ass'n Int'l v. FCC*, 254 F.3d 89, 95 (D.C. Cir. 2001).

The "meaningful-variation" canon is especially powerful here because Section 5c(c)(5)(C)(i) uses the terms "based upon" and "involve" *in the same sentence* and differentiates between the two. First, Section 5c(c)(5)(C)(i) states that the provision applies to "agreements, contracts, transactions, or swaps in excluded commodities that are *based upon* the occurrence, extent of an occurrence, or contingency." 7 U.S.C. § 7a-2(c)(5)(C) (emphasis added).   In other words, the contract's underlying must be an event.   Then, just a few words later, Section 5c(c)(5)(C)(i) states that "such agreements, contracts, or transactions" must "involve" an enumerated activity.   In context, "based upon" and "involve" must have different meanings, with "based upon" referring to the underlying and requiring only that it be an event, and "involve" retaining its broader ordinary meaning and referring not just to the underlying, but to "such agreements, contracts, or transactions" as a whole.   AR 6-7.

---

[21] Kalshi too does this throughout its Complaint. *See, e.g.*, Compl. ¶ 22 ("underlying"); ¶ 23 (same); ¶ 27 (same); ¶ 65 (same); ¶ 64 ("underlie" and "underlying"); ¶ 2 ("based on"); ¶ 3 (same); ¶ 4 (same); ¶ 29 (same); ¶ 81 (same).

[22] Kalshi argues that certain CEA provisions using "involve" to refer to an "underlying" mean the Commission was incorrect when it observed that when Congress uses "underlying," "based on," or "based upon" to refer narrowly to a contract's underlying.   Kalshi Motion at 21.   This mischaracterizes the Order.   The Commission acknowledged that the ordinary meaning of "involve" *can* include, for purposes of Section 5c(c)(5)(C)(i)(V), contracts where an enumerated activity is the contract's underlying.   It rejected Kalshi' contention that this was the *only* meaning of "involve."   So, the fact that certain CEA provisions use "involve" in a context where it refers to a contract's underlying does not help Kalshi to prove that is the *only* thing to which "involve" can refer here.

The legislative history of Section 5c(c)(5)(C)(i) further supports that Congress meant to include contracts like Kalshi's that, as a whole, relate to or entail an enumerated activity. Senator Blanche Lincoln, then-Chair of the Senate Agriculture Committee, the CFTC's oversight committee, stated in colloquy that CEA Section 5c(c)(5)(C) is intended to "prevent gambling through futures markets" and to restrict exchanges from, for example, "construct[ing] an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament."[23] If Kalshi were right, and a contract "involves" gaming only if the underlying *is* gaming, none of those events would be covered—football, horseracing, and golf are "games," not "gaming." *Betting on them* is "gaming"—just like betting on elections is gaming, because it is staking something of value on a contest of others. As the Commission observed, under Kalshi's definition, "it is difficult to conceive of a contract whose underlying is 'gaming'."[24] AR 7 n.18. But courts must presume that Congress does not "include words that have no effect." *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018). Here, the legislative history confirms that Congress intended 5c(c)(5)(C) to cover bets on contests of others and contracts that relate closely to illegal activity, which describes Kalshi's contracts here.

---

[23] *See* 156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln).

[24] For the first time, in its brief, Kalshi suggests two possibilities: A contract whose underlying is whether someone wins the Powerball by a certain date, or one whose underlying is the World Series of Poker. Kalshi Motion 22. The first of these possibilities is a rather peculiar example that would represent an inconsequential share of potential event contracts, and nothing in the text of the CEA or its legislative history (or common sense) indicates that Congress's concerns were so picayune. Rather, the evidence is that Congress was concerned more broadly with "gambling." 156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010). The second example, a contract tied to the winner of the World Series of Poker, would fall under the Commission's construction of "involve," as such a contract would both relate to or entail "gaming." By Kalshi's logic (at least in this part of its brief), this would only be a contract based on gaming if the players were themselves betting, regardless of the fact that traders would be placing their own best on the game. The position that Congress intended for that contract be considered "gaming" only where the subjects participating in the "game" are themselves betting is absurd.

Rather than engage with any of this, Kalshi contends that a contract can "involve" an enumerated activity only "when the underlying event constitutes or [now] relates to that activity" because "this is the only reading of 'involve' that works across all categories of enumerated activities." Kalshi Motion at 15. Kalshi wastes an enormous amount of space in its brief arguing that the Commission's definition is "inconsistent" and "shape-shifting," but that is simply a false description of the Order. The Commission explained that the term is broad enough to capture the underlying *and* other features:

> Congress's choice of the broader term "involve" means that CEA section 5c(c)(5)(C)(i) can capture both contracts whose underlying is one of the enumerated activities, and contracts with a different connection to one of the enumerated activities because, for example, they "relate closely" to, "entail," or "have as an essential feature or consequence" one of the enumerated activities.

AR 7.[25]  Thus, the Commission clearly explained that one definition captures all five enumerated activities. Kalshi simply ignores this part of the Order.

For its part, Kalshi cites nothing to support its definition of "involve" as "the underlying," and there is no such definition. "[I]nvolve" is unambiguously broader than "underlying," so that is "the end of the matter," *City of Arlington*, 569 U.S. at 296, and Section 5c(c)(5)(C)(i) applies squarely to Kalshi's contracts. The Commission's application of this broad meaning of "involve" was therefore the most reasonable interpretation of the statute, and should not be disturbed.

Nevertheless, Kalshi argues that when applied, the Commission's definition of "involve" "when combined with its interpretation of 'gaming'" "affords the CFTC a roving mandate to review—and potentially to ban—any event contract." Kalshi Motion at 19. But, as discussed below, this argument relies on Kalshi's mischaracterization of the Commission's Order as defining

---

[25] If anything, Kalshi is now pushing "shape-shifting" definitions. Kalshi argues that a contract can "involve" an activity only if the underling "is" the activity Kalshi Motion at 15, or—for the first time, here in court—when the underlying "relates to" gaming. This is puzzling because, as the Commission correctly determined, the Contracts relate to gaming.

"gaming" to include all event contracts. *See infra* at 27-28. Because the Commission did not define gaming in this way, the argument is without merit.

Finally, Kalshi challenges the Commission's application of "involve" as "making a hash of" the unlawful activity provision as it relates to both federal law and state law. This argument is also a mischaracterization of the Commission's Order—specifically, Kalshi argues as though the Commission were defining "involve" with regard to unlawful activity as meaning that the *act of trading* the contract itself must be unlawful. On that false premise, Kalshi goes on to argue that under this definition the Commission's authority to engage in a public interest review is meaningless because "Congress had no need to authorize public-interest review of contracts whose trading is already illegal under federal law" and any state law banning trading would be preempted by the CEA. Kalshi Motion at 20. But, again, that is not what the Commission said. The Commission did not define "involve" for purposes of unlawful activity to mean that the trading itself must be unlawful. As noted, the Commission applied the ordinary meaning of "involve" to mean "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence," and under this definition, the Commission could review event contracts that have other connections to unlawful activities. For example, the Commission could review a contract that "involves" the unlawful activity of narcotics trafficking in the sense that the contract's payout depends on whether a certain amount of cocaine is seized by federal or state authorities in a given month. Accordingly, Kalshi's argument that the Commission rendered its own authority meaningless, is without merit.

## B. The Commission correctly determined that the Congressional Control Contracts involve gaming.

The Commission's determination that the Congressional Control Contract involve "gaming" for purposes of CEA Section 5c(c)(5)(C) was properly based on the application of the ordinary meaning of "gaming" to "include[] betting or wagering on elections." In explaining its decision, the Commission "note[d] that a common thread throughout the large majority of definitions of 'gaming'

and 'gambling' is the act of staking something of value on the outcome of a contest of others," a subject on which "futures contracts traditionally have not been premised."  AR 10 n.25.  Kalshi does not dispute that taking a position in the Congressional Control Contracts is betting or wagering on elections because Kalshi does not contest that the Congressional Control Contracts involve staking something of value upon the outcome of a contest of others.  AR 8-10.  Instead, Kalshi argues without basis that this does not amount to "gaming" because elections are not a "game" (which is different from "gaming" anyway) nor a "contest" in the sense Congress intended.  Kalshi further argues "gaming" and "gambling" have different meanings, that gaming cannot include wagers based on contests, and that if gaming includes wagers based on contests the contests must be staged purely for entertainment.  None of that has any basis in the statute, and this Court should reject Kalshi's arguments.

### 1. The Commission did not construe "gaming" to mean the staking of money on any contingent event.

Kalshi overstates its case by suggesting the Order defined "gaming" "to include staking money on *any* contingent event beyond the parties' control" such that every event contract would be subject to a public interest review, rendering the remaining enumerated activities in CEA Section 5c(c)(5)(C) superfluous.  Kalshi Motion at 19, 27.  This is a straw man.  The Commission found that the Contracts involve "gaming" because taking a position in the Contracts would be "staking something of value *upon the outcome of a contest of others*," AR 10 (emphasis added), not just any contingent event beyond the parties' control.[26]  This reasoning would not subject all event contracts to public interest review.

---

[26] Indeed, the Commission acknowledged that some state law definitions of "gaming" would have broader application that arguably capture all contingent events, AR 8, but the Commission did not adopt the broad definition, AR 10.  Kalshi fixates on a footnote that says a contract "involves" gaming if trading it "amounts to" gaming, and repeats the term *ad nauseam*, as though it were the

The difference may best be illustrated by example:  Under the Commission's construction of "gaming," an event contract based on who will win the Super Bowl could be categorized as "gaming" because it involves staking something of value on a contest of two teams; on the other hand, an event contract based on the how much rain the Des Moines Airport will get in a specified month would not fall within the Commission's interpretation because, while it involves staking money on a contingent event (here rainfall), that event is not a contest of others.

      2.  **The Commission's interpretation of "gaming" to include betting or wagering on a contest of others is consistent with the ordinary meaning of "gaming."**

The Commission arrived at its interpretation of "gaming" by looking to ordinary, dictionary definitions of "gaming" to mean "gambling,"[27] and referring to both state laws and federal laws that define gambling or betting as the staking something of value upon the outcome of, among other things, a contest of others.  Thus, the Commission found that staking something of value on elections amounts to "gaming" or "gambling" because it is staking something of value on the outcome of a contest of electoral candidates.  AR 10.

Kalshi argues that "gaming" is more limited than "gambling," and means "playing games of chance for money," "casino gambling,"[28] and "betting on other games."  Kalshi Motion at 24.

---

reason the Commission ruled against Kalshi's Contract.  The Commission's statement in the footnote is correct, but again, it is not the test the Commission applied to the Congressional Control Contracts—the Congressional Control Contracts involve gaming because they "relate to or affect," "relate closely," to "entail," or to "have as an essential feature or consequence" the staking of value on a contest of others. AR 7.

[27] *See, e.g., Gaming,* MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/gaming (defining the noun "gaming" as "the practice or activity of playing games for stakes: gambling") (last visited Feb. 23, 2024); *Gaming,* BLACK'S LAW DICTIONARY, https://thelawdictionary.org/gaming/ (last visited Feb. 23, 2024) ("In general, the words 'gaming' and 'gambling,' in statutes, are similar in meaning.").

[28] Notably, multiple international gambling websites, including one operated by the casino giant MGM, do offer election betting.  *See* BetMGM, https://sports.on.betmgm.ca/en/sports/politics-61 (last visited Feb. 23, 2024); FanDuel,

Kalshi concludes an activity must involve a *game*, such as playing cards or betting on a football match, to fall under the "gaming" category.  But Kalshi's narrow interpretation is unsupportable under the plain meaning of "gaming."  For instance, Kalshi cites a dictionary definition of "gaming" that includes playing "games" for stakes, but Kalshi fails to note that the very same definition cross-references "gambling."[29]  *See Gaming*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/gaming.  Notably, the Supreme Court has recognized synonymity of "gaming" and "gambling" in the context of wagering or betting, and has held that the term "gaming activities" under the Indian Gaming Regulatory Act refers to the act of "gambling." *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014) ("The 'gaming activit[y]' is (once again) the gambling."); *see also In re Betcorp Ltd.*, 400 B.R. 266, 271 n.3 (Bankr. D. Nev. 2009) ("'Gaming' is generally regarded as a mild euphemism for gambling.").  Kalshi's argument that Congress's use of "gaming" instead of "gambling" limits the application of Section 5c(c)(5)(C) to wagers on "games" is thus without merit.  *All Party Parliamentary Grp. on Extraordinary Rendition v. U.S. Dep't of Def.*, 754 F.3d 1047, 1051 (D.C. Cir. 2014) ("Where, as here, two words share at least one common meaning, we read nothing into Congress's use of one rather than the other.").  The Commission correctly applied the accepted meaning, which includes staking something of value on a contest of others.

### 3. The Commission's interpretation of "gaming" is consistent with state and federal gambling statutes.

The Commission's construction of "gaming" is also consistent with state gambling statutes. As the Commission's Order notes, several state statutes define "gambling" to encompass wagering or betting on the outcome of "contests of others," and election event contracts fit squarely within

---

https://canada.sportsbook.fanduel.com/en/sports/navigation/32473.25/32492.25 (last visited Feb. 23, 2024); BetOnline, https://www.betonline.ag/sportsbook/futures-and-props/congress-specials (last visited Feb. 23, 2024).

[29] Kalshi also argues the definition is limited to contests that are staged "purely for entertainment." But this definition is without support in any definition or statute.

this definition.  Other state statutes cited in the Order define the term to include bets upon the "result" of a "game or contest."  *See, e.g.*, Ga. Code Ann. § 16-12-21(a)(1).  Though Kalshi asserts that elections are not *games*, elections in which candidates are vying to win a seat in the House of Representatives or Senate are undoubtedly *contests*.  *See, e.g., Contest*, THE BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/contest (last visited Feb. 23, 2024) (providing the definition, "a struggle or effort to win or get something," and an example, "the presidential contest").[30]  Indeed, the Commission's Order cites several state statutes that *expressly* define wagering on elections as a form of gambling.  *See, e.g.*, 720 ILL. COMP. STAT. ANN. 5/28-1 ("A person commits gambling when he . . . [m]akes a wager upon the result of any game, contest, or any political nomination, appointment or election.").

Kalshi argues that other state statutes and a federal statute support its position that "gaming" means "betting on *games*" and does not, as the Commission properly explained, include, "contests of others."  Kalshi Motion at 25.  However, the state statutes Kalshi cites are broadly worded and do not exclude wagering on elections.  Rather, they define "gaming" to mean engaging in "a game for any sum" or "any game for pay," Kalshi Motion at 25 (citing Iowa Code § 725.7(1); Mass. Gen. Laws ch. 23K, § 2), which for a person placing bets on an "Election Gambling" site, it is.  Similarly, the state statutes that use the term "contest of chance" and that ban wagering on trials or contests "of skill, speed or power of endurance" do not limit "gaming" to wagering on games.[31]  Kalshi cites

---

[30] The Order noted that it is common parlance to refer to elections as "contests." AR 10 n.25 (citing *Frozen Needle in GOP Contest*, THE WASHINGTON POST, Sept. 3, 2023; *Biden: Dems revitalizing manufacturing*, HOUSTON CHRONICLE, Sept. 10, 2022).

[31] For example, Kalshi cites a state statute, Ala. Code § 13A-12-20, that prohibits staking "something of value upon the outcome of a contest of chance," which Kalshi claims obviously references only traditional gambling activities.  However, Kalshi fails to note that the statute also prohibits wagers on "*a future contingent event not under his control or influence*," which would plainly cover betting on elections (though the basis given in the Commission's Order is narrower than that).  Ala. Code § 13A-12-20(4) (emphasis added).

other statutes that define "gambling" to include wagering on "games," but those definitions also include wagering on "contests" and not just "contests of chance."  Kalshi Motion at 29 (citing La. Stat. § 14:90(A)(1)(a); Ky. Rev. Stat. § 528.010(6)(a); Utah Code Ann. § 76-10-1101(a)).

Though elections are plainly considered contests ordinarily, Kalshi further claims that the term "contests" in the state statutes do not include elections because those statutes use the term to reach events that are not games but share similar attributes, such as horseraces.  Kalshi argues that under the canon of *noscitur a sociis*, in which words grouped in a list should be given related meanings, the terms alongside "contest" in these statutes, such as "game" or "gaming scheme," demonstrate that it should be limited to competitions staged purely for entertainment and to facilitate betting. The canon of *noscitur a sociis* "requires some context cues indicating that the statutory text should be limited by its company."  *United States v. Fischer*, 64 F.4th 329, 346 (D.C. Cir. 2023).  Here, the connections between the broadly worded terms accompanying "contest" in the state statutes are "not so tight or so self-evident" to preclude the ordinary meaning of the term and, instead, suggest that the terms should be construed broadly.  *See Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 (2010).  Kalshi fails to provide any other context cues that indicate that the meaning of "contest" should be artificially limited to exclude elections and, thus, this argument fails.

Similarly, Kalshi's argument fails when it cites the Indian Gaming Regulatory Act ("IGRA") to assert that "federal statutes … use 'gaming' to refer to betting on games."  Kalshi Motion at 25. But the language of IGRA undermines this limited view.  IGRA defines three classes of "gaming" that are subject to regulation, including two classes that include "social games" and "bingo and card

games," among other things.[32]  25 U.S.C. § 2703(8).  But there is a the third, catchall, class that is telling.  It captures "all forms of gaming that are not class I gaming or class II gaming," and does not itself define "gaming."  *Id.*  Without a definition of "gaming" in this catchall, the IGRA cannot be read as limiting gaming to betting on games.

**4.  The Commission arrived at the best interpretation of "gaming" given the statutory context.**

The Commission's interpretation of "gaming" makes sense within the context of Section 5c(c)(5)(C).  The Commission's interpretation is proper when reviewed "not only by reference to the language itself" but also "the specific context in which th[e] language is used, and the broader context of the statute as a whole."  *Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 796 F.3d 18, 26 (D.C. Cir. 2015); *see also United States v. Wilson*, 290 F.3d 347, 355 (D.C. Cir. 2002) (noting statutory provisions are construed "to 'make sense' in combination"); *Am. Min. Cong. v. EPA*, 824 F.2d 1177, 1187 (D.C. Cir. 1987) (requiring courts to "read statutes as a whole" rather than "construe phrases in isolation").

A review of Section 5(c)(5)(C), including the complete list of the enumerated activities, confirms Congress's intent to provide broad authority to the Commission to prohibit event contracts that the Commission determines are contrary to the public interest.  As to "gaming" specifically, Congress used broad language that "should be given broad, sweeping application." *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 664 (D.C. Cir. 2009).  Had Congress intended to further narrow the Commission's authority to review event contracts involving sports or games of chance, it could have included more limiting language.  *See Bldg. Owners & Managers Ass'n Int'l*, 254

---

[32] "[C]lass I gaming" is "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations," 25 U.S.C. § 2703(6); "class II gaming" is "bingo" and "card games" but not "banking card games, including . . . blackjack." 25 U.S.C. § 2703(7).

F.3d at 95.  But it chose not to.  Accordingly, the language of Section 5(c)(5)(C) favors the Commission's inclusive interpretation of "gaming" over Kalshi's narrow interpretation.

### 5. Legislative history supports the Commission's interpretation of "gaming."

Finally, the legislative history of Section 5(c)(5)(C) supports the Commission's application of "gaming."  In considering "'the problem Congress sought to solve' in enacting the statute in the first place," *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 782 (D.C. Cir. 2012) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004)), a colloquy between Senators Feinstein and Lincoln regarding Section 5c(c)(5)(C) is instructive.  That colloquy confirms the understanding that "gaming" and "gambling" are interchangeable.  Senator Lincoln remarked that the provision is intended "to assure that the Commission has the power to prevent . . . *gambling* through futures markets" and "derivatives contracts" that "exist predominately to enable *gambling*." 156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010) (emphases added).  When asked by Senator Feinstein about whether the provision would give the Commission "the power to determine that a contract is a *gaming* contract," Senator Lincoln confirmed that the intent was to prevent derivatives contracts that "enable *gambling*." *Id.* (emphasis added).

The colloquy also confirms that the scope of activities covered by "gaming" was not intended to be limited to "games of chance," as Kalshi suggests.  In providing examples of covered event contracts, Senator Lincoln included event contracts constructed "around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament." *Id.* at S5907.  Any wagers on these competitions would clearly constitute "stak[ing] something of value upon the outcome of contests of others" and not "games of chance."

Kalshi argues that the examples offered by Senator Lincoln support its contention that "gaming" includes only betting on contests that are "*games*," but there is no basis to conclude that sports gambling is the *only* gambling Congress meant to cover.  And even if that was Senator

Lincoln's focus, broadly worded statutory prohibitions "often go beyond the principal evil to cover reasonably comparable evils." *United States v. Fischer*, 64 F.4th 329, 347 (D.C. Cir. 2023) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)).  Evidence of a specific rationale for the enactment of a broadly worded statute "does not define the outer limits of the statute's coverage." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) (quoting *New York v. FERC*, 535 U.S. 1, 21 (2002)).  Staking something of value on elections is a reasonably comparable activity to betting on sports or other competitions and falls within the scope of "gaming" under Section 5c(c)(5)(C).

### C. The Commission correctly concluded that the Congressional Control Contracts involve activity that is unlawful under state law.

Drawing on the ordinary meaning of "involve" to include the definition to "have as an essential feature or consequence," the Commission found that the Congressional Control Contracts involve wagering on elections, which is unlawful in a number of states.  As the Commission observed, wagering on elections is unlawful under 22 state statutes and by common law in 18 states. AR 11-12, n.26, 27.  The Commission reasoned that because taking a position in the Congressional Control Contracts means staking something of value on the outcome of contests between electoral candidates, taking a position in the Contracts means wagering on elections.  And, accordingly, the Commission found, the Contracts involve unlawful activity because wagering on elections is "an essential feature or consequence of the contracts."[33]  AR 13 n.28.

Kalshi ignores the Commission's findings and instead argues that the Commission's reasoning enables states to "ban the trading of event contracts on federally regulated exchanges."

---

[33] Kalshi suggests that the Commission relied on the "entail" and "relates closely to" definitions of "involve," and then asks "What does this even mean?" Kalshi Motion at 32. But, as explained, the Order applied the "essential feature or consequence" definition in determining the contracts involve an activity "unlawful under … State law."  *See* AR 13 n.28.

Kalshi Motion at 31.  But that is not what the Commission said.  The Commission expressly recognized its exclusive jurisdiction over event contracts.  The Commission agreed that state laws cannot prohibit trading futures on registered exchanges, and that the CEA preempts state law to the contrary.  There are such state laws on the books, sometimes called "bucket shop" laws, but those are not the laws on which the Commission based its determination.

The Commission explained in detail why Kalshi's argument "misses the point," AR 13 n.28, but Kalshi simply ignores what the Commission said.  As the Commission correctly explained (AR 13 n.28): CEA section 2(a)(1) grants the Commission "exclusive jurisdiction" over futures and swaps traded on a DCM.  7 U.S.C. § 2(a)(1).  This "preempts the application of state law," *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), so transacting these products on a DCM cannot, in and of itself, be an "activity that is unlawful under any … State law."  On the other hand, these products may still "involve … activity" that is unlawful under a state law, in the sense, for example, that transactions in the products may "relate closely" to, "entail," or "have as an essential feature or consequence" an activity that violates state law.  *See* Merriam-Webster, available at https://www.merriam-webster.com/dictionary/involve (last visited Feb. 23, 2024); Random House College Dictionary 703 (Revised ed. 1979); Riverside University Dictionary 645 (1983).  Here, state laws (that are not preempted by the CEA) prohibit wagering on elections.  Taking a position in the Congressional Control Contracts would be staking something of value on the outcome of contests between electoral candidates, such that wagering on elections is "an essential feature or consequence" of the contracts.  Thus, while transactions in the Congressional Control Contracts on a DCM do not violate, for example, state bucket-shop laws, they nevertheless involve an activity that is unlawful in a number of states—wagering on elections.  To permit such transactions on a DCM would undermine important state interests expressed in statutes separate and apart from those applicable to trading on a DCM.  Kalshi does not dispute this.

35

Kalshi nevertheless argues that the Commission's reasoning threatens to "upend the CEA's regulatory scheme by empowering state legislatures to dictate the regulation of event contracts." Kalshi Motion at 31-32.  But under the CEA, event contracts are subject to prohibition only if the Commission initiates a discretionary review and determines that the contracts are contrary to public interest.  7 U.S.C. § 5(c)(5)(C)(i)-(ii).  As Kalshi admits, Section 5c(c)(5)(C)(i) provides that the Commission "may determine" that the contract is contrary to public interest and therefore subject to prohibition, but there is no requirement that the Commission do so, much less an automatic prohibition that kicks in if a state outlaws an activity.  Kalshi Motion at 8 (acknowledging that the Commission "may determine" contracts are contrary to public interest).  Thus, the Commission's reasoning in no way empowers state legislatures to dictate regulation of event contracts.

## II. The Commission reasonably determined that the Congressional Control Contracts are contrary to public interest.

Section 5c(c)(5)(C)(i) provides that the Commission "may determine" that event contracts involving an enumerated activity are contrary to public interest and therefore prohibited from being listed or made available for clearing or trading pursuant to Section 5c(c)(5)(C)(ii).  During the review of the Contracts, Kalshi conceded the Commission has wide discretion in considering a variety of factors in making the public-interest determination, and Kalshi appears to concede as much in this Court.[34]  Thus, the arguments before this Court are confined to whether the public interest portion

---

[34] Kalshi appears to admit that the "contrary to public interest" standard is broad, stating that "[n]othing in the CEA suggests the CFTC is *limited* to weighing economic considerations." Kalshi Motion at 40.  Further, a comment Letter submitted by counsel for Kalshi in support of Kalshi's 2022 Submission states: "I do note, however, that the Commission is not limited to using an economic purpose test for determining whether a contract is within the public interest. That test is found nowhere in the text of Section 5c(c)(5)(C) or Rule 40.11.  One reference to the economic purpose test between two Senators in a brief discussion of what would become Section 5c(c)(5)(C) is insufficient to bind the Commission to that test."  AR 137, 3747.  Another comment letter of Kalshi's in support of the 2023 Submission states "Congress wanted the Commission to look at the variety of factors that are discussed in the CEA, its purpose, and the core principles."  AR 1811

of the Commission's Order was arbitrary and capricious under the rational-connection standard, *i.e.*, that there was "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The Commission's determination comfortably clears that deferential bar.

In considering whether the Congressional Control Contracts are contrary to the public interest, the Commission considered in detail the proposed contract's specifications and applied its expertise to evaluate how the relevant contract may work in practice. The Commission determined that the contracts did not meet the economic purpose test and could be subject to manipulation and other deceptive practices that may undermine confidence in elections, election integrity, and would thrust the Commission into a role for which, members of the House of Representatives noted in a comment, the Commission is not equipped or well-suited. *See Bd. of Cty. Comm'rs v. U.S. Dep't of Transp.*, 955 F.3d 96, 99 (D.C. Cir. 2020) ("Both the Supreme Court and our court have recognized that agencies should be given a wide berth when making predictive judgments . . . that is so because such predictions are policy-laden, and courts are not well equipped to second-guess agency estimates, especially where those estimates fall within the field of an agency's expertise."); AR 2723-26. The Commission also engaged with the comments supporting and opposing the contracts, considering all important aspects of the problem, as required. *CBOE Futures Exch.*, 77 F.4th at 977. *See, e.g.*, AR 15-16, 19, 20 n.37-38, 21-22 (discussing comments and research).

Kalshi's arguments merely amount to a "difference in view" for how the Commission should have evaluated whether the Congressional Contract Contracts were against the public interest and

---

n.82. Even Kalshi's motion notes that insisting on some economic purpose "is sensible." Kalshi Motion at 35.

By contrast, Amicus Aristotle argues that the CFTC acted in a way that was manifestly contrary to the statute by using the economic purpose test. However, Aristotle cannot expand the scope of this appeal. *See Met Life v. Fin. Stability Oversight Counsel,* 865 F.3d 661, 666 n.4 (D.C. Cir. 2017) ("Nor may amici expand an appeals scope to sweep in issues that a party has waived."). In any event, for the reasons given, the Commission validly applied the economic purpose test as part of its broader public interest analysis.

do not demonstrate that the Commission's Order was arbitrary and capricious. *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020). The arbitrary and capricious standard is narrow; courts refuse to substitute their judgment for the agency's and will accept the decision as long as the agency has provided a reasonable explanation. *Id.* A court's review is especially deferential when, as here, "the decision under review requires expert policy judgment of a technical, complex, and dynamic subject" and involves "matters implicating predictive judgments." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).

### A. Kalshi incorrectly relies on rulemaking cases and mischaracterizes the Commission Order in arguing that the Commission's public interest analysis was arbitrary and capricious.

In challenging the Commission's public interest analysis, and specifically the economic purpose determination, Kalshi relies almost exclusively on rulemaking cases to argue that the Commission engaged in "textbook arbitrary-and-capricious reasoning." Kalshi Motion at 34, 39. Kalshi contends that the Commission did not "meaningfully address comments and evidence," "disregarded evidence" in "assessing the economic utility of Kalshi's contracts," "ignored record evidence of non-economic benefits," "ignor[ed] the contrary record material," and "refused to engage with the commenters' points and evidence'." Kalshi Motion 34, 39. But Kalshi's attempt at legal support is a blunder because the Commission's Order is not a rulemaking. It is an informal adjudication which is a distinct administrative procedure. As explained above, in adjudicating Kalshi's two product submissions, the Commission was not required to include "an exhaustive analysis of the record" or "cite or explain its reasoning as to every piece of evidence that could be read to run contrary to its determination," *Concert Inv., LLC*, 616 F. Supp. 3d at 33. Rather, it was sufficent to do just what the agency did: "engage with as much evidence as necessary such that [its] logic can reasonably be discerned." *Id.* (citing *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419

U.S. 281, 286 (1974)).  Because Kalshi relied on the wrong cases, it makes no argument that the Commission did otherwise.

Kalshi's argument also again mischaracterizes the Commission's Order.  As discussed below, the Commission properly considered the economic effects of Congressional control and the economic utility of the Contracts, and therefore did not "ignore" relevant data.  *See e.g.* AR 15 (noting "the Commission has considered comments from Kalshi and others that state that Congressional control impacts a wide variety of assets and cash flows"); AR 16 (noting that the Commission considered "detailed examples … attempting to predict broad-ranging economic impacts of various political outcomes" and assertions about the Contracts "hedging purpose").

### B.  The Commission's application of the economic purpose test was not arbitrary or capricious.

The Commission's use of the economic purpose test, as well as its consideration of other factors in evaluating whether a Contract is contrary to the public interest, was appropriate under the text of the statute and its legislative history.

As the Commission explained, AR 14, consideration of the public interest in hedging and managing price risks stems from the text of the CEA, 7 U.S.C. § 5, which states that the transactions subject to this Act are "affected with a national public interest by providing a means for managing and assuming price risks, discovery prices, or disseminating pricing information through trading in liquid, fair and financially secure markets."  Thus, as the Commission noted, the Act "recognizes hedging—and, in particular, price hedging (the 'managing [of] price risks')" is the "public interest that transactions subject to the CEA are intended to serve."  AR 14.  Kalshi does not challenge this, and it was entirely reasonable for the Commission to apply an economic purpose test that relies on those factors.

The Commission's decision was also rationally based on the history of the statute.  As discussed above, during the era in which registered exchanges were required to satisfy the economic

purpose test for every new contract before it could be listed for trading, the test asked "whether [a] contract reasonably can be expected to be, or has been, used for hedging and/or price basing on more than an occasional basis."  17 C.F.R. § 5, Appendix A- Guideline No. l (repealed 2001).[35] Critically, the test historically was not whether there was *any* existing or *potential* hedging or price-basing use for a contract.  Rather, it asked if that use was "more than occasional."  *Id.*  Congress repealed that historical test, but then when discussing the Special Rule on Senate floor, Senator Feinstein noted it was "very important to restore CFTC's authority to prevent trading that is contrary to the public interest."  She summarized the history, with the CFTC being required to prevent trading in futures contracts that were "contrary to the public interest" from 1974 to 2000 and how in 2000 Congress took away this authority.  She then stated a hope that Senator Lincoln's intent was "to define 'public interest' broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used predominantly by speculators or participants not having a commercial or hedging interest…" Senator Lincoln responded affirmatively.  *See* 156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010) (emphasis added).  As the Commission explained, this is further evidence that an economic purpose test should apply.  Indeed, Kalshi here admits that insisting on some economic purpose "is sensible."  Kalshi Motion at 35.

Thus, the Commission properly considered the Congressional Control Contracts' hedging and price-basing utility, including whether the contracts were predominantly speculative or would be used for hedging on more than an occasional basis.  AR 19.  That Kalshi or other commenters "might have chosen a different" economic test or factors to consider "is of no moment so long as

---

[35] Appendix A may be found in the various adopting releases, *See, e.g.*, Economic and Public Interest Requirements for Contract Market Designation, 47 Fed. Reg. 49,832, 49,839 (Nov. 3, 1982); Economic and Public Interest Requirements for Contract Market Designation, 64 Fed. Reg. 29,217, 29,222 (June 1, 1999).

the [Commission's] decision was justifiable and clearly articulated," which here, it was.  *In re Polar Bear Endangered Species Act Listing*, 709 F.3d 1, 16 (D.C. Cir. 2013).

> ### C.   The Commission reasonably determined that the Congressional Control Contracts did not have a sufficient economic purpose for purposes of the CEA.

Examining the Contracts' economic purpose, the Commission determined that the Congressional Control Contracts could not reasonably be expected to be used either for hedging or price basing on more than an occasional basis, or predominantly by market participants having a commercial or hedging interest.  AR 19.  This determination is supported by the Commission's findings that: (i) control of a chamber of Congress itself has no sufficiently direct, predictable, or quantifiable economic consequences; (ii) any eventual effects that Kalshi and commenters cited were diffuse and unpredictable; and (iii) the economics and structure of the transactions limit their utility as a vehicle for hedging.  The Commission's explanation was rational and supported by the facts.  The APA and CEA require no more.

Kalshi does not challenge the Commission's factual findings that the features of the Contracts undermine them as hedging and price-basing tools.  As the Commission observed, the Congressional Control Contracts result, upon settlement, in a payout of $1 or $0, per contract, only once every two years (coinciding with the election cycle).  And, unlike many hedging and risk management contracts, the payout on the Contracts is not in any way tied to actual or estimated losses incurred elsewhere, and a loss on the Contracts is not offset by a gain elsewhere.  Thus, the Commission concluded, the binary payout and frequency of settlement of the Contracts limit their utility as a vehicle for hedging eventual economic effects resulting from which party controls Congress.

Kalshi asserts that the Commission's application of the economic purpose test amounted to "arbitrarily heightened standard," alleging that the Commission incorrectly required that Kalshi demonstrate "direct economic effects" of control of a chamber of Congress.  Kalshi Motion at 16-

18.  This is not true.  In considering hedging utility, the Commission examined whether there were *any* economic effects of control of one chamber of Congress, including indirect effects advanced by Kalshi and commenters, that the Contracts might be used to hedge.  At the outset, the Commission made the common sense point that control of one chamber did not, itself, have "sufficiently direct, predictable, or quantifiable economic consequences."  AR 15.  The Commission then turned to eventual (*i.e.* indirect) effects that Kalshi and the commenters cited.  AR 16.  The Commission determined such effects were too "diffuse and unpredictable" to establish a specific identifiable hedging or price-basing purpose for the Contracts, on more than an occasional basis.  AR 15-16.

As the Commission observed, the eventual economic effects were related to *potential* legislative policy changes.  The Commission acknowledged that the likelihood of adoption of a given policy may increase or decrease based on control of a single chamber of Congress, but reasonably observed that "many intervening events and variables exist between control of a chamber of Congress and the actual implementation of such a policy."  AR 16.  This is because, as the Commission noted, there are several steps required to enact and implement legislation, the likelihood of which does not depend on control of a chamber of Congress alone.  AR 16-17.  Implementation also depends on, for example, whether a party controls one or both chambers, the size of its majority, the votes by individual party members, and the political affiliation of the president, among other factors.  AR 16 n.34.  Thus, the Commission reasonably concluded, the cited potential economic effects of control of a single chamber of Congress were insufficient to demonstrate that the Contracts had a specific, identifiable hedging purpose or that they could be used to establish commercial transaction prices, as necessary to satisfy the economic purpose test.

Kalshi points to a handful of examples of possible hedging.[36]  As a threshold matter, many of these do not relate to the Congressional Control Contracts at all—they relate to other forms of theoretical political risk.  Kalshi argues that JPMorgan projected that "Democratic victory in the 2020 election would boost the prices of … 'China-exposed stocks' and 'renewables'" and "[s]ure enough, the Democratic Party's Senate takeover did trigger a large rally in the green-energy sector."  Kalshi Motion at 38.  Yet, the JPMorgan projection that Kalshi cites is about the presidential election, as the title of the cited Bloomberg article suggests—JPMorgan Says *Biden* Victory Could Mark a Stock Market Shift.  *See* Kalshi Motion at 38 (citing AR 2991 n.8) (emphasis added)).  It should go without saying that the President's control over the executive branch may involve different issues than the partisan composition of Congress.  But, more fundamentally, nowhere does Kalshi engage with the question of whether that hedging function would be its "predominant use" or whether the identified hedging function could be reasonably expected to be used on "more than an occasional basis," when all indications are, as common-sense and new stories on Kalshi's own website dictate, the proposed markets are simply a form of "Election Gambling."

To resist the obvious, Kalshi points to a hypothetical "consulting firm with deep ties to one party" whose business would be "directly harm[ed]" by "Congressional control by the other party."  Kalshi Motion at 38.  Kalshi argues that the Congressional Control Contracts could be used by the hypothetical firm to hedge this risk and by others to determine the firm's value.  *Id.*  Kalshi neither quantifies these hypothetical effects nor demonstrates how they would support more than occasional hedging or price-basing utility, which on their face they could not.  And Kalshi's own

---

[36] Notably, many of Kalshi's arguments cite "control of Congress" as opposed to control of one chamber of Congress.  For example, Kalshi refers to "partisan control of Congress," Kalshi Motion at 35, "control of Congress," *Id.* at 36, "if Republicans take control of Congress in 2024," *Id.* at 37, "Congressional control," *Id.* at 38.  Other arguments refer to the party affiliation of the president, such as the effect of President Bush's election on the value of tobacco companies, *Id.* at 38-39, and JP Morgan's 2020 projection for green energy with a Biden win, *Id.* at 38 (citing AR 2991).

2022 Submission undermines any assertion of a hypothetical hedging need because, it notes, political consulting firms "are careful to bill themselves as bi-partisan" in light of the importance of political connections to their business.  AR 3001 at n.42.  Nevertheless, even if the consulting firm Kalshi describes were rooted in fact, it would do nothing to undermine the Commission's rational judgment that the Contracts are predominantly for gambling, not hedging.

Kalshi also cites examples of "specific assets whose value is directly linked to partisan control" to argue that Congressional control has predictable effects on equity prices.  But Kalshi's examples are observations of isolated movements in stock prices or firm valuations, not predictable patterns or repeated occurrences of economic effects in any particular asset price.  And as noted above, the Contracts only apply to control of a single chamber of Congress.  Kalshi does not point to *any* particular commercial transaction price that would be based on or include the price of the Congressional Control Contracts to support an argument the Contracts would serve a price-basing function.  Nor does the record support such a finding.  For these reasons, Kalshi has not demonstrated that there is a frequency of movement in any asset that could support more than occasional hedging or price basing, even if some of the price movements Kalshi cites could be tied to an election result.

### D.  The Commission was not arbitrary and capricious in addressing comments.

Finally, Kalshi argues that the Commission was arbitrary and capricious because it "refused to engage" with commenters who provided "probative and compelling evidence of the contracts' hedging purpose."  Kalshi Motion at 39.  But as discussed above, Kalshi's argument in this regard is based on a research mistake:  Kalshi relies almost entirely on cases addressing the APA's requirements for rulemaking, not informal adjudication.  Contrary to Kalshi's suggestion, the Commission was not required to specifically respond to each and every comment that might be

construed as contrary to its position.[37]  *See Concert Inv., LLC*, 616 F. Supp. 3d 25 at 33.  And, in any

event, as the Order indicates, the Commission did consider comments from Kalshi and others about

the eventual economic effects of Congressional control and the purported hedging and price-basing

utility of the Contracts.  *See* AR 15-16.  The comments that Kalshi specifically cites identify potential

policy changes that might affect various industries.[38]  But these comments cannot overcome the

reasonableness of the Commission's conclusion that eventual economic effects of Congressional

control in the form of potential policy changes are simply too diffuse and unpredictable to support a

finding of hedging and price-basing utility sufficient to demonstrate a true economic purpose.

### E. The Commission reasonably determined that the Contracts could potentially be used in ways that would have an adverse effect on election integrity, or the perception of election integrity, and could put the Commission in the position of investigating election-related activities.

The Commission's focus on real and perceived election integrity and the Commission's

potential role in policing election-related activities, including misinformation, was reasonable.  As the

Commission noted, the record included studies regarding the potential for, and examples of, such

manipulation.  AR 22 n.39.  Moreover, the Commission reasonably explained how the lack of an

underlying cash market for the Contracts, and the opaque and unregulated sources of price forming

information of the Contracts, may increase the risk of manipulative activity relating to the Contracts,

while decreasing Kalshi's or the Commission's ability to detect such activity.  AR 21.  Again,

---

[37] Even in notice and comment rulemaking, the agency need only respond to "significant points raised by the public," and "an agency's failure to address a particular comment or category of comments is not an APA violation *per se*."  *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012).

[38] The commenters claim, for example, that they would hedge against:  (1) a change in legal status of cannabinoids (AR 1348, AR 1613); (2) changes to tax policy that could affect business operations (AR1375-76, AR 1391, AR 1533); (3) changes to green energy policies that could affect the valuation of a green energy business and the ability to attract talent or investors in the business (AR 1386, AR 1597); and change to immigration policies that might also affect ability to attract talent to tech businesses (AR 1391, 1533).  Even taken together, the Commission rationally determined that hedging would not take place on more than an occasional basis.

"common-sense determination[s]" such as these "pass[] muster, particularly in an informal adjudication." *Phoenix Herpetological Soc'y*, 998 F.3d at 1005.

      Kalshi's argument that the record did not include data on the potential for manipulation misreads the record.  For instance, the Commission cited a law review article detailing examples of "fake polls" and how they had consequences in corresponding event contracts.  AR 22 n.39.[39]  And even the economists that Kalshi cites admitted that manipulation attempts *can* have a discernible effect on prices "during a short transition phase."  AR 1449-1450; AR 1751 (noting price pump attempts were "short-lived"); AR 1404 ("As Hanson and Opera (2009) correctly argue, manipulation encourages entry to trade against it.  *In the long run*, this improves liquidity and accuracy of prices.  Moreover…past suspected episodes of manipulation have involved *relatively quick* reversion of prices") (emphases added); AR 1434 (discussing the phenomenon of "fake polls" used to manipulate a particular event-contract market, including an example regarding a fake poll affecting a re-election contract for Senator Stabenow, and stating "market motivations may have been secondary to the trolling factor, but the mere fact that the markets can be so easily manipulated is noteworthy" and citing a paper with "many more examples").[40]  The Order further observes that several commenters noted specific examples of manipulation or attempts in election markets and that other commenters "downplayed these incidents."  AR 20 n.38.  In any event, the Commission "need not suffer the flood before building the levee."  *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (Kavanaugh, J.).

---

[39] The Commission received a number of comments on expressing a concern the contracts could be manipulated, including from six Senators, AR 2816-17, Sen. Klobuchar, AR 2818, Representatives Sarbanes and Raskin, AR 2273-76, Undergraduate researchers at Duke University, AR 159-182, Better Markets, AR 1889-1910, the Center for American Progress, AR 2260-61, Campaign for Accountability, AR 2258-59, Public Citizen, AR 222-225.

[40] The Commission also cited the same research, AR 22 n.39, and thus, contrary to Kalshi's contention, the Commission order does provide "real-world examples."  Kalshi Motion at 52.

Kalshi appears to be suggesting that the only appropriate focus is long-term manipulative activity. However, short-term manipulations can be profoundly damaging to market participants. *See, e.g., CFTC v. McAfee*, No. 21-cv-1919 (JGK), 2022 WL 3969757 (S.D.N.Y. July 14, 2022) (consent order) (illegal pump-and-dump scheme of virtual currency). And the effects can occur in more than just the manipulated market. If timed correctly, such manipulative conduct could affect fundraising efforts around the end of a reporting period, or turnout during early voting, among other things. Now, consider a viral "deep fake" video of a partisan leader in Congress made to look like said person was involved in serious crime. Such a video—even though false—could have at least a short-term effect on the price of the contract, and the Commission could find itself investigating its release. Finally, a group of supporters of a political party, or even a foreign power, could organize around a misinformation campaign, and make money off of their campaign by timing their purchase and sale of the Contracts.[41] Short-term manipulations could also have serious effects on the public perception of election integrity. All of the above examples could, as the Commission observed, undermine confidence in the electoral process. *See* AR 19-20 (noting over 600 comments, including from United States Senators, expressing concern about the potential impact of the Contracts on election integrity and the perception of election integrity).

Contrary to Kalshi's argument, the Commission's consideration that the Contracts may create monetary incentives to vote for particular candidates was not "outside the bounds of reasoned decision making." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). The contracts on their face create monetary incentives related to the election—up to as much as

---

[41] Kalshi has not proposed prohibiting foreign entities or members of the media from trading. AR 22, 33-34. The Commission noted that groups of individuals who were not prohibited from trading but may have an incentive to create a false impression included, for example, Congressional campaign volunteers, consultants to Congressional campaigns, or donors or other supporters of political parties or individual Congressional candidates. AR 22 n.40.

$100,000,000.  AR. 32-33.  Plenty of eligible voters do not cast ballots in each election, and not everyone who does feels equally strongly about their candidate of choice—there is nothing unreasonable in the common-sense determination that monetary incentives may have an impact on at least some voters, acting individually or, more disturbingly, as part of an organized group.[42]

*Phoenix Herpetological Society*, 998 F.3d at 1006.

To prop up the argument that their contracts would not easily be manipulated, Kalshi argues that "listing contracts on federally regulated exchanges like Kalshi's would *ameliorate* manipulation concerns."  Kalshi Motion at 42; *see also* Aristotle Amicus brief at 15 (calling attempts to manipulate the market "profit opportunities"); Grundfest Amicus brief at 17 (arguing price "pump" attempts are short-lived and "disciplined by the market's self-correcting mechanisms"[43]).  This argument is based on the idea that the market will correct itself over a period of time, but that does not change the possibility that the market could still be subject to short-term manipulative activity, which could affect at least the perception of election integrity.  Further, it also appears that Kalshi is arguing that for these contracts, it is better for "the house" to be regulated by the CFTC than a gaming commission.[44]  But that argument goes to the heart of the Commission's concern about its role in

---

[42] Kalshi argues the Commission's determination on this is not "credible" and "utterly implausible," but the Commission cited Tyler Yeargain, *Fake Polls, Real Consequences: The Rise of Fake Polls and the Case for Criminal Liability*, 85 MISSOURI L. REV. 129 (2020).  AR 22 n.39.  That article details events that occurred on a market with a trading limit of $850 per contract, a limit that is well below Kalshi's proposed limits. The incentive for wrongdoing in connection with Kalshi's Contracts is orders of magnitude greater.

[43] Professor Grundfest's brief does not consider that a wrong-doer may profit by short-term price manipulation events, regardless of whether the market eventually self-corrects.  *See, e.g., In re JPMorgan Chase & Co.*, CFTC No. 20-69, 2020 WL 5876730 (Sep. 29, 2020) (manipulation and spoofing in the precious metals futures market and the U.S. Treasury futures market).

[44] Kalshi also inexplicably seems to analogize CFTC-regulated derivatives markets to overseas gambling markets, in arguing that creating a financial instrument, regulated by a derivatives regulator, would not affect the legitimacy of the elections.  Specifically, Kalshi argues that no one questions the legitimacy of the election of Margaret Thatcher or Tony Blair, notwithstanding the existence of the UK gambling markets.  First of all, even if true, Prime Ministers Thatcher and Blair last stood for

investigating elections.  If Congressional Control Contracts are traded on a Commission-regulated DCM, the concerns about manipulations will belong to the Commission—and without underlying cash markets that allow the Commission to verify real-time prices are behaving as expected, but instead with opaque, unregulated sources of pricing information for the contracts which may not follow scientifically reliable methodologies.  AR 21.  Thus, to determine manipulation the Commission might have to investigate aspects of the electioneering process itself.

Kalshi argues that the Commission "ignored" evidence that the Contracts could give societally valuable data.[45]  However, the Commission stated in its Order that it considered the argument the Contracts could provide "a check on misinformation and inaccurate polling," but also noted the research suggesting that election markets "may incentivize the creation of 'fake' unreliable information in the interest of moving the market" and that, for example, certain individuals and entities who would not, by the terms of the Contracts be permitted to trade them, such as paid employees of political campaigns could nonetheless engage in other activity "intended to create the impression of likely electoral success or failure on the part of a particular political candidate or candidates – that could artificially move the market in the Congressional Control Contracts."  AR

_____

election in 1987 and 2005, respectively.  By contrast, conspiracy theories abound concerning the 2016 Brexit vote.  And, importantly, the UK derivatives markets are overseen by the Financial Conduct Authority or Prudential Regulation Authority, and those authorities will prosecute manipulation in those markets, but betting on prime ministers is separate.  Those markets are regulated by the UK Gambling Commission, which does not have any requirement that a betting line be a vehicle of price discovery.  *See, e.g.* U.K. Gambling Commission, *License Conditions and Code of Practice* (Jan. 31, 2024), https://www.gamblingcommission.gov.uk/licensees-and-businesses/lccp/print.  In fact, two different licensees could offer different odds on the same event, without raising any concern at all.  Thus, if a gambling market were to inaccurately predict the outcome of an election, such as Brexit—which the betting markets predicted would be a "remain" vote—the effect on the electorate's confidence should logically be minimal.

[45] Kalshi also argues, wrongly, that "most commenters attested to the economic informational value of political event contracts generally and the Congressional Control Contracts specifically."  Kalshi Motion at 11.  However, more than 600 of the commenters, including members of Congress, researchers, non-profits, institutions, and ordinary citizens expressed opposition to the contracts. AR 19.

21-22.  The Commission's conclusion that election integrity concerns (including public perception of election integrity) outweighed the potential for valuable data is reasonable and within the Commission's discretion.  Because "the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion," the Commission need only show a "rational connection between the facts found and the choice made." *Verizon v. FCC*, 740 F.3d 623, 649 (D.C. Cir. 2014) (quoting *Motor Vehicle Mfrs. Ass'n of US v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)); *compare CBOE Futures Exch.*, 77 F.4th at 980 (requiring the SEC to provide a statement of reasoning rather than a mere conclusion), *with Crooks v. Mabus*, 845 F.3d 412, 424 (D.C. Cir. 2016) (stating agency did not need to "explain away every point raised").  Here, it did so.

Moreover, the potential for short term manipulations of these contracts undercuts Kalshi's argument that the contracts are valuable based on their ability to produce "up-to-the-minute assessments."  AR 1495, AR 1550 (discussing a market that can react immediately); AR 1404 (use of event markets in tracking news events).  Kalshi cannot have it both ways: If the data is valuable *because* of the short-term, immediate information, its likelihood to succumb to short-term manipulations—which cannot be independently assessed as either manipulation or legitimate price movements by reference to an underlying market—devalues the reliability of that data.

Finally, Kalshi advances an argument that the Commission would not be required to police election-related activity because other agencies "already shoulder the critical responsibility of ensuring that our elections are free and secure."  Kalshi Motion at 54.  This misses the point.  The Commission has the responsibility to address fraud and manipulation in markets for derivatives contracts that trade on Commission regulated exchanges that other government bodies lack.  7 U.S.C. § 9(c).  Further, the fact that another federal regulator may have jurisdiction over an underlying product does not alter the Commission's obligation to ensure integrity in its markets.

Sophisticated commenters, such as the Chicago Mercantile Exchange (a large DCM) and members of Congress underlined this very concern.  AR 1912-13 (noting that were the Contracts designated, the Commission would be required to police for fraud in a political election underlying a contract and asking "Do any of us really believe that Congress intended for the CFTC to play this role in the electoral process?"); AR 2273-75 (outlining "serious concerns about the misalignment of [an election cop] role with the CFTC's historic mission and mandate as established by Congress).  And while commodities outside the Commission's direct remit do underlie derivatives without giving rise to significant problems, elections obviously play a special role in our society such that it was rational for the Commission to determine that the public interest favors keeping the CFTC out of any oversight role.  Indeed, the examples Kalshi cites of products based on underlying commodities outside of the Commission's jurisdiction are each economic in nature.

The Commission adequately explained that it had considered the non-economic reasons for approving the Congressional Control Contracts asserted by Kalshi and public commenters but that they did not outweigh the substantial risks presented by the Contracts.  Accordingly, the Commission met its obligation to provide "a statement of reasons [] sufficient to permit a court to discern its rationale" for determining the Congressional Control Contracts were contrary to public interest. *Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

Kalshi asks the Court to declare that the Commission was arbitrary and capricious in its refusal to legalize—nationally—election gambling via the derivatives markets governed by the CEA. The Commission's mission includes to "deter and prevent price manipulation or any other disruptions to market integrity."  7 U.S.C. § 5(b).  Kalshi's concession that its proposed markets could be affected by short-term spasms of manipulation—thereby damaging ordinary market participants—shows how reasonable the Commission indeed was in considering the potential for

manipulation.  With the potential for manipulation, even in short bursts, to have effects outside the

contract market, the Commission's concern for election integrity and the perception of election

integrity was rational and provided a reasoned foundation for the Commission's concern about its

own role in policing election-related activity.

## CONCLUSION

For the foregoing reasons, the CFTC respectfully requests that this Court grant the

Commission's motion for summary judgment, deny Kalshi's motion for summary judgment, enter

judgment in favor of the CFTC and against Kalshi on all claims, and order any other relief that this

Court determines is appropriate.


Dated: February 26, 2024                              Respectfully submitted,

                                                      */s/ Raagnee Beri*
                                                      Raagnee Beri
                                                         *Senior Assistant General Counsel*

                                                      Robert A. Schwartz
                                                         *General Counsel*
                                                      Anne W. Stukes
                                                         *Deputy General Counsel*
                                                      Margaret P. Aisenbrey
                                                         *Senior Assistant General Counsel*
                                                      Conor B. Daly
                                                         *Counsel*
                                                      Commodity Futures Trading Commission
                                                      1155 21st Street, NW
                                                      Washington, D.C. 20581-0001
                                                      Phone: (202) 418-5986
                                                      rberi@cftc.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2024, I served the foregoing on counsel of record using this Court's CM/ECF system.

/s/ Raagnee Beri
Raagnee Beri
 Senior Assistant General Counsel
Commodity Futures Trading Commission