**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KALSHIEX, LLC, | |
|     Plaintiff, | |
|     v. | Civil Action No. 1:23-cv-03257 (JMC) |
| COMMODITY FUTURES TRADING COMMISSION. | |
|     Defendant. | |

**BRIEF OF BETTER MARKETS, INC., AS AMICUS CURIAE**
**IN SUPPORT OF DEFENDANT COMMODITY FUTURES TRADING COMMISSION**
**AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Stephen W. Hall
D.C. Bar No. 366892
Better Markets, Inc.
2000 Pennsylvania Avenue, NW
Suite 4008
Washington, DC  20006
202-549-3382
shall@bettermarkets.org

*Counsel for Better Markets, Inc.*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. 1

STATEMENT REGARDING AUTHORSHIP AND FUNDING ................................... 1

IDENTITY AND INTEREST OF THE AMICUS ......................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 2

ARGUMENT .................................................................................................................... 4

I.    THE COMMISSION CORRECTLY FOUND THAT EGCS FALL INTO TWO SEPARATE CATEGORIES OF PROHIBITED EVENT CONTRACTS. .................................. 4

     *A. EGCs Involve Gaming.* ............................................................................... 5

     *B. EGCs Involve Activity That Is Unambiguously Illegal Under Many State Laws* ........ 8

II.    THE COMMISSION CORRECTLY FOUND THAT EGCs ARE CONTRARY TO THE PUBLIC INTEREST ........................................................................... 10

     *A. EGCs Do Not Provide Reliable Hedging or Price Discovery Tools* .......................... 10

     *B. EGCs Would Threaten Election Integrity* ................................................... 12

     *C. EGCs Would Be Ripe Targets for Market Manipulation* ........................................... 16

     *D. EGCs Would Also Serve As Vehicles for Other Forms of Investor Victimization* ...... 19

III.  THE COMMISSION'S ORDER DESERVES DEFERENCE ............................................. 20

CONCLUSION ................................................................................................................ 24

**<u>TABLE OF AUTHORITIES</u>**

<u>CASES</u>

*Ad Hoc Telecom. Users Committee v. FCC*, 572 F.3d 903 (D.C. Cir. 2009) ................................ 20

*Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) ............................. 22

*Ball v. Gilbert*, 53 Mass. 397 (1847) ................................................................................. 14

*Bettis v. Reynolds*, 34 N.C. 344 (1851) ............................................................................. 14

*CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir. 2002) .............................................. 7

*Clarke v. CFTC,* No. 1:22-cv-909 (W.D. Tex.) ...................................................................... 23

*Commonwealth v. Crass*, 203 S.W. 708 (Ky. 1918) ............................................................. 15

*David v. Ransom*, 1 Greene 383 (Iowa 1848) ..................................................................... 14

*Leverett v. Stegal*, 23 Ga. 259 (1857) ................................................................................ 15

*McLennan v. Whidon*, 48 S.E. 201, 120 Ga. 666 (1904) ...................................................... 15

*Merchants' Savings, Loan & Trust Co. v. Goodrich*, 75 Ill. 554 (1874) ................................... 15

*Nichols v. Mudgett*, 32 Vt. 546 (1860) .............................................................................. 16

*Quarles v. State*, 24 Tenn. 561 (1845) ............................................................................... 16

*R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) ......................................... 6

*Shumate v. Commonwealth*, 56 Va. 653 (1860) ................................................................... 15

*Stoddard v. Martin*, 1 R.I. 1 (1828) ................................................................................... 15

*Wroth v. Johnson*, 4 H. & McH. 284 (Md. Gen. Ct. 1799) ................................................... 13

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................................................. 9

<u>STATUTES</u>

7 U.S.C. § 5 ............................................................................................................... 11

7 U.S.C. § 7 ......................................................................................................... 6, 8, 21

7 U.S.C. § 9 ............................................................................................................... 18

7 U.S.C. § 13 ............................................................................................................ 18

31 U.S.C. § 5362 ....................................................................................................... 10

<u>OTHER AUTHORITIES</u>

Alex Altman, *Political Betting Market Raises Questions About Insider Trading*, TIME (Oct. 6 2015) ........................................................................................................................ 16

Alex Klein, *InTrade And Jon Hunstman: Why the Media's Faith in the Internet Betting Ring Is Foolish*, THE NEW REPUBLIC (Jun. 21, 2011) ..................................................................... 17

Better Markets, *Comment Letter to CFTC re KalshiEx, LLC's Proposed Political Event Contract* (Sept. 25, 2024) .......................................................................................................... 2

Better Markets, *Standing up to the Lawless Crypto Industry* (Feb. 15, 2024) ........................... 19

Brad Plumer, *How to Swing the Prediction Markets and Boost Mitt Romney's Fortunes*, THE WASHINGTON POST (Oct. 23, 2012) ................................................................................. 17

Cambridge English Dictionary ......................................................................................... 6

Cary Deck, Shengle Lin, & David Porter, *Affecting Policy by Manipulating Prediction Markets: Experimental Evidence*, 85 J. ECON. BEHAV. & ORG. 48 (2013) ............................................. 12

CFTC No-Action Letter, No. 93-66 (June 18, 1993) ...................................................... 23

CFTC Order ................................................................................................................ passim

COMMODITIES FUTURES TRADING COMMISSION, *The Economic Purpose of Futures Markets and
How They Work* ......................................................................................................11

Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV GAMING L. J. 53
(2021) ..................................................................................................................... 23

Dennis M. Kelleher, Jason Grimes, and Andres Chovil, *Securities—Democratizing Equity
Markets With And Without Exploitation: Robinhood, Gamestop, Hedge Funds, Gamification,
High Frequency Trading, And More*, 44 W. NEW ENG. L. REV. 51 (2022) .............................. 20

Jeffrey Steven Gordon, *Silence for Sale*, 71 ALA. L. REV. 1109 (2020) ................................ 13, 14

Kalshi Brief ................................................................................................ 7, 8, 18, 20

Katherine Sayre, *A Psychiatrist Tried to Quit Gambling. Betting Apps Kept Her Hooked*, WALL
ST. J. (Feb. 18, 2024) ................................................................................................. 20

Letter from Vincent McGonagle, Dir., Div. of Mkt. Oversight, to Neil Quigley, Deputy Vice-
Chancellor, Research, Victoria Univ. of Wellington, (Oct. 29, 2014) ..................................... 23

Lynn A. Stout, *Derivatives and the Legal Origin of the 2008 Credit Crisis*, 1 HARV. BUS. L. REV.
1 (2011) ...................................................................................................................11

MICH. COMP. LAWS § 750.301 ................................................................................ 6

Miriam A. Cherry & Robert L. Rogers, *Prediction Markets and the First Amendment*, 2008 U.
ILL. L. REV. 833 (2008) ...............................................................................................11

National Conference of State Legislatures, *Wagering on Elections? Not a Smart Bet* (Sept. 17,
2014) ...................................................................................................................... 17

Paul W. Rhode & Koleman S. Strumpf, *Historical Presidential Betting Markets*, 18 J. OF ECON.
PERSP. 127 (2004) ...................................................................................................... 8

Paul W. Rhode & Koleman S. Strumpf, *Manipulating Political Stock Markets: A Field
Experiment and a Century of Observational Data* (Jan. 2007) ............................................ 17

Timothy E. Lynch, *Derivatives: A Twenty-First Century Understanding*, 43 LOY. U. CHI. L. J. 1
(2011) .....................................................................................................................11

U.S. COMMODITIES FUTURES COMMISSION, *Order Prohibiting the Listing or Trading of Political
Event Contracts* (Apr. 2, 2012) ............................................................................. 22, 23

## RULES

Federal Rule of Appellate Procedure 26 ..................................................................... 1

Local Civil Rule 7 .................................................................................................... 1

## REGULATIONS

17 C.F.R. § 40.11 ................................................................................................ 5, 21

Commodity Futures Trading Commission, *Concept Release on the Appropriate Regulatory
Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008) ..................................... 18, 21

<u>**CORPORATE DISCLOSURE STATEMENT**</u>

Pursuant to Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure ("FRAP") 26.1, Better Markets, Inc. ("Better Markets") states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

<u>**STATEMENT REGARDING AUTHORSHIP AND FUNDING**</u>

Pursuant to Local Civil Rule 7(o)(5) and FRAP 29(4)(E), Better Markets states that no counsel for any party authored this brief in whole or in part, and that no party, party's counsel, or any other person—other than Better Markets—contributed money that was intended to fund the preparation or submission of this brief.

<u>**IDENTITY AND INTEREST OF THE AMICUS**</u>

Better Markets is a nonprofit, nonpartisan organization that promotes the public interest in the financial markets through comment letters on proposed rules, independent research, amicus curiae briefs, public advocacy, and Congressional testimony.  It advocates for reforms that stabilize our financial system, prevent financial crises, and protect investors from fraud and abuse.  Better Markets has filed hundreds of comment letters with the federal financial regulators, including the Commodity Futures Trading Commission ("Commission" or "CFTC"), and dozens of amicus briefs in the federal courts supporting strong financial regulation.  Much of Better Markets' advocacy has focused specifically on the derivatives markets, including the importance of measures to prevent market manipulation and excessive speculation. *See generally* www.bettermarkets.org. Better Markets filed an extensive comment letter urging the Commission to prohibit the listing of the plaintiff's ("Kalshi's") event contract at issue in this case (referred to

herein as the "Election Gambling Contract" or "EGC"). *See* Better Markets, Comment Letter to CFTC on Kalshi's Proposed Political Event Contract (Sept. 25, 2022).[1]

Better Markets has a strong interest in this case because a decision from this Court vacating the Commission's Order and allowing the EGC to be listed for exchange trading would undermine a number of the important goals that Better Markets seeks to advance through its advocacy. As explained in detail below, EGCs, if given the Commission's imprimatur, would not only undermine the integrity of our federal elections but also foster market manipulation and victimize countless investors through predatory behavior by bad actors—all magnified by the rising use of digital engagement practices that are so effective at manipulating and attracting investors. In addition, approval of the EGCs would unduly narrow the CFTC's authority, hamper its ability to protect the public, and open the door to a wave of equally harmful variants, as the financial industry races to capitalize on the next financially engineered tool for extracting wealth from everyday American investors. EGCs would unleash all of these harms without providing either of the tools for which the derivatives markets were established: the hedging of price risk and price discovery. Better Markets is therefore seeking to defend the public interest against the threats posed by the EGCs.

## SUMMARY OF ARGUMENT

Better Markets advances three arguments in this brief. First, the Commission was on firm legal ground in finding that EGCs fall into two separate categories of contracts that may be prohibited from listing and trading under Section 5c of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 7a-2. They "involve *gambling*," based on the mainstream definition of that phrase as

---

[1] Better Markets, *Comment Letter to CFTC re KalshiEx, LLC's Proposed Political Event Contract* (Sept. 25, 2024), https://bettermarkets.org/wp-content/uploads/2022/09/Better_Markets_Comment_Letter_KalshiEX.pdf.

well as state and federal laws that reflect its meaning.  Any doubts on the issue should be resolved in favor of a broad construction, since the CEA is unquestionably a remedial statute.  It is equally clear that EGCs involve activity that is *unlawful under state law*; in fact, many states clearly prohibit gambling on elections. Contrary to Kalshi's claim, this interpretation of Section 5c creates no conflict between federal and state law or any form of intrusion of state law into a federal realm. Far from preempting those state laws, Congress deliberately and expressly chose to incorporate them into the CEA as one measure for the Commission to use in determining which derivatives contracts are "contrary to the public interest" and unacceptable on policy grounds.

Second, the Commission was entirely correct in finding that EGCs are contrary to the public interest; if anything, it understated the case.  On the one hand, they cannot perform either of the two core functions that the derivatives markets were established to supply for the benefit of commercial enterprises: hedging against the risk of fluctuations in commodity prices and establishing benchmark prices for a wide range of commercial transactions.  The derivatives markets were never intended to serve primarily as casinos or arenas for sheer speculation.  At the same time, if approved, EGCs would undermine the integrity of our elections, which serve as the cornerstone of our democracy.  The election process in this country is already under assault, and a financial product that invites election manipulation and interference will further compromise the electoral process and further erode the public's already fragile confidence in our nation's most important democratic institution.  The EGC marketplace would also invite market manipulation, which would be widespread and difficult to police.  Finally, EGCs would victimize countless investors through predatory behavior.  That harm would inevitably be magnified through the use of novel technologies and tactics increasingly being deployed in the financial markets.  They

include artificial intelligence, predictive data analytics, and gamification strategies that will manipulate investors and lure them to this new form of gambling.

Third and finally, the Commission's Order deserves deference in the judicial review process. It reflects the application of the Commission's long-standing expertise on highly technical issues surrounding financial market regulation, acquired over decades, and consistently applied through the rulemaking process and in multiple no-action letters. In short, if the Commission's Order is vacated, the end result will be the worst of all possible worlds. Instead of ushering in a truly innovative financial product with meaningful economic benefits, the EGC will spawn a meaningless new financial market craze that inflicts widespread harm on investors and our democracy.

<u>**ARGUMENT**</u>

## I.     <u>THE COMMISSION CORRECTLY FOUND THAT EGCS FALL INTO TWO SEPARATE CATEGORIES OF PROHIBITED EVENT CONTRACTS.</u>

The Commission's Order prohibiting the EGCs was well-founded on two independent grounds. Section 5c(c)(S)(C) of the CEA explicitly provides that the Commission may prohibit certain types of event contracts deemed to be contrary to the public interest, including contracts that involve *gaming* and those that involve *activity prohibited under state law*. 7 U.S.C. § 7a-2(c)(5)(C). These provisions reflect Congress's heightened concern that event contracts unrelated to commodities can pose exceptionally serious threats to the markets, investors, and other societal values. Congress vested broad discretion in the Commission to determine whether such contracts are contrary to the public interest and to prohibit their trading if it makes that finding. In this case, the Commission appropriately exercised that discretion, finding that EGCs involve gaming as well as activity that is illegal under state law. In its effort to overturn the Order, Kalshi first

attacks the Commission's threshold findings that the EGCs "involve gaming" as well as "activity that is unlawful under Federal or State law." None of their arguments are persuasive.

## A.    <u>EGCs Involve Gaming.</u>

Kalshi initially challenges the Commission's interpretation of the term "involve." However, contrary to Kalshi's argument, the term "involve" is on its face a broad term. Furthermore, as the Commission persuasively demonstrated, based on the ordinary meaning of the word along with the wording, structure, and legislative history of the CEA, it is not limited to the narrow class of contracts whose "underlying" is one of the enumerated activities. Order at 5-7. Rather, the term captures a broader range of relationships, including contracts that "relate closely to," "entail," or "have as an essential feature or consequence" one of the enumerated activities. Order at 7. It therefore encompasses situations where the underlying is one of the enumerated activities as well as other contexts where, as here, the contract relates closely to or entails the enumerated activity. The Commission made this broader meaning explicit in Rule 40.11, which more fully captures the breadth of the statutory term "involve" with the phrase "involves, relates to, or references." 17 C.F.R. § 40.11(a)(1).

EGCs clearly involve gaming because entering into an EGC means engaging in the activity of "gaming." The Commission's analysis on this issue was not only reasonable but unassailably logical. The widely accepted meaning of "gaming" is "gambling," and gambling in turn is understood to encompass staking something of value on the outcome of a wide variety of "contests" and other contingent events, including elections. Order at 8-10. And while the CEA does not define the term "contest," the dictionary definition of the term encompasses any "competition to do better than other people, especially to win a prize or *achieve a position of*

*leadership or power*." Cambridge English Dictionary, *Contest* (emphasis added).[2]  In fact, the illustrative example in the dictionary actually cites to an election: "In the last election, he survived a close contest against a political newcomer." *Id.*  Here, of course, EGCs "are premised on the outcome of Congressional election 'contests.'"  Order at 10.

This interpretation is confirmed by numerous state statutes that broadly define "gambling" to include not only games but other contests, races, or "the happening of any event not known by the parties to be certain." *See, e.g.*, MICH. COMP. LAWS § 750.301 (2023); *see also* multiple state statutes cited in Order at 8 n.22. Federal law reflects a similar approach. The Unlawful Internet Gambling Enforcement Act defines "bet or wager" as staking something of value "upon the outcome of a contest of others." *See* 31 U.S.C. § 5362(1)(A).[3] A number of states actually link the terms "gaming" or "gambling" specifically to betting on elections.  *See* Order at 9 & n.24. Thus, the term "gaming" as it appears in Section 5c encompasses contests, which in turn encompass betting on elections.   EGCs, which involve wagering on electoral contests, clearly fall under Section 5c.

Even if this Court were to consider the interpretation of "gaming" in Section 5c a close call, it should nevertheless uphold the Order, based on the canon that remedial statutes should be construed broadly to effectuate their remedial purposes.  *See R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000) ("Remedial statutes are to be construed liberally, and in an era of increasing individual participation in commodities markets, the need for such protection has not

---

[2]  CAMBRIDGE DICTIONARY, *Contest*,  https://dictionary.cambridge.org/us/dictionary/english/contest.

[3] *See also* Christine Hurt, *Regulating Public Morals and Private Markets: Online Securities Trading, Internet Gambling and the Speculation Paradox*, 86 B.U. L. REV. 371 (2006); Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV GAMING L. J. 53, 67–86 (2021) (discussing the CEA's application to event contracts).

lessened."); *see also CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002) ("[W]e are guided by the principle that the CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived."). That principle carries special force in this context, where the statute's "Findings" clause makes expressly clear that the CEA is a thoroughly remedial statute animated by the need to serve the public interest: "The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a *national public interest* by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). The section goes further and delineates the specific remedial purposes that underlie the law, including protecting investors, combatting manipulation, ensuring the integrity of the markets, and even promoting "responsible" innovation. 7 U.S.C. § 5(b). These are the very public interests that are threatened by approval of the EGCs: As explained below, those contracts will inflict huge investor losses, create an exceptionally hospitable environment for manipulation, undermine the traditional role of the derivatives markets, and give "responsible innovation" a bad name. Therefore, the meaning of technical terms such as "gaming" found in the CEA should be interpreted broadly, precisely so that the public interest goals articulated in the statute can be protected from the threats posed by EGCs.

Kalshi disregards this principle of broad construction and urges the Court to adopt a narrow interpretation of "gaming," lamenting the public interest scrutiny that comes with the more natural and mainstream reading of the term. *See* Kalshi Br. at 19 (decrying the Commission's supposed "across-the-board public-interest test"); *id.* at 28 (arguing that defining "gaming" broadly "would subject *every* event contract to heightened public-interest review") (emphasis in original).

However, Kalshi's position is not a matter of sound legal analysis but rather a tacit recognition that EGCs pose serious threats that cannot withstand scrutiny under a Section 5c public interest analysis. Its reading of the law starkly conflicts with the remedial purposes of the statute and should be rejected.

**B.** **EGCs Involve Activity That Is Unambiguously Illegal Under Many State Laws.**

Even more clear-cut is the Commission's additional finding that EGCs involve activity that is "unlawful under state law." The fact is that in many states, betting or wagering on elections is expressly prohibited by statute or the common law. Order at 11 & n.26 (cataloguing 22 state laws that criminalize making any bet or wager on the result of an election); *id.* at 12 n.27 (cataloguing 17 state court decisions, spanning over 150 years, that declare wagering on elections as against public policy). For ages, states have long asserted their right to protect the integrity of elections by prohibiting the placement of wagers on the outcome of an election.[4] Because EGCs clearly involve wagering on the outcome of elections—in this case, congressional elections—they violate many state laws and therefore fall squarely under Section 5c.

One of Kalshi's principal attacks on this finding rests on a misguided application of the preemption doctrine. Kalshi suggests that the Commission's reading of Section 5c as to contracts involving unlawful activity under state law statute would, in effect, allow state law to preempt the Commission's exclusive jurisdiction under the CEA. In their view, the Order's reasoning on this issue "would upend the CEA's regulatory scheme by empowering state legislatures to dictate the regulation of event contracts." Kalshi Br. at 32; *see also id.* at 20, 31.

---

[4] *See generally* Paul W. Rhode & Koleman S. Strumpf, *Historical Presidential Betting Markets*, 18 J. OF ECON. PERSP. 127 (2004) (outlining the history of election wagering in America).

However, contrary to Kalshi's claim, Congress's deliberate decision to incorporate state law into the CEA as a test for contracts that may pose unacceptable threats to the public interest in no way conflicts with the Commission's exclusive jurisdiction over the derivatives markets. In the first instance, nothing in Section 5c allows state law to dictate anything. It merely provides that if a proposed event contract involves activity that is unlawful under state law, then the Commission "may determine" that it is contrary to the public interest and prohibit its trading on a designated contract market. The Commission has full discretion in the matter and is not compelled to make that finding under the statute. While the Commission decided to make that finding more generally applicable in the form of Rule 40.11, it has the authority to revisit that decision and amend the rule—assuming, of course, that a credible case could be made that such contracts pose no threats to the public interest.

Even more to the point, however, here Congress deliberately chose to designate state law in Section 5c as one metric for contracts that may conflict with the public interest and therefore prove especially harmful if publicly traded. Therefore, it cannot represent any state law overriding or effecting a "reverse" preemption of federal law. This is especially true since Congress incorporated the state law test in Section 5c via the Dodd-Frank Act of 2010, with full knowledge of the states' many prohibitions on various forms of gambling, including gambling on elections. Where Congress is aware of the operation of state law, acquiesces in it, and tolerates whatever legal "tension" results, the "case for preemption of state law is particularly weak." *See Wyeth v. Levine*, 555 U.S. 555, 575 (2009). That principle applies here with even greater force, as Congress not only tolerated state law but chose to rely upon it in Section 5c. Thus, the influence of state law on the Commission's review of event contracts cannot possibly be considered an impermissible intrusion of state law into federal regulation. On the contrary, Kalshi's position that state laws in

this context have no force and effect would result in a de facto preemption of state law in contravention of Congress's clear intent.

## II.  THE COMMISSION CORRECTLY FOUND THAT EGCs ARE CONTRARY TO THE PUBLIC INTEREST.

Having found that EGCs involve gaming as well as activity in violation of state law, the Commission undertook a public interest analysis under Section 5c.  It reasonably and correctly concluded that these EGCs are in fact contrary to the public interest in multiple ways.  First, they cannot consistently or reliably serve either of the core public interest functions of the derivatives markets, namely hedging against price risk and enabling price discovery (or price basing).  Second, the Commission found that the contracts threaten affirmative harm to the public interest by undermining the integrity of congressional elections, fostering market manipulation, and inappropriately casting the Commission in the role of election regulator.  The Commission's findings on these issues were reasonable and supported by the record.

The case against EGCs on public interest grounds actually goes much further, since they also pose especially dangerous threats to investors. They would undoubtedly lure countless investors into this highly speculative market through the modern-day technologies and marketing practices that, as explained below, are becoming increasingly prevalent and harmful in finance. They include artificial intelligence, gamification, and other digital engagement practices.  The resulting investor losses would be cumulatively enormous.

### A.  EGCs Do Not Provide Reliable Hedging or Price Discovery Tools.

The Order first examines whether EGCs could *serve* the public interest by performing the core functions for which the derivatives markets were established over a century ago—hedging by commercial enterprises against the risk of prices fluctuations in the cost of goods used or products sold, and price-basing or price discovery.  This focus was appropriate since the fundamental

purpose of the derivatives market is to provide these price stabilizing and price benchmarking tools, not to promote or facilitate large-scale speculative gambling among retail traders.[5]

The Commission correctly found that a political party's control of the chambers of Congress simply does not have sufficiently "direct, predictable, or quantifiable economic consequences" for the EGCs "to serve as an effective hedging mechanism." Order at 15. As the Commission emphasized, control of a chamber of Congress may ultimately have economic effects, but those eventual impacts are "both diffuse and unpredictable." Order at 16. Too many events and variables intervene between a political party's control of Congress and the implementation of a given policy with economic repercussions. *Id.* The Commission's findings were based upon a thorough review of the record, including competing claims and studies offered by Kalshi and various commenters, which collectively failed to establish a bona fide hedging role for EGCs. Order at 16.

Kalshi attempts to fortify its case by citing examples of what it contends are the economic consequences of elections, including, for example, changes in stock prices experienced by renewable energy companies, tobacco stocks, and others that appear to have been correlated with election outcomes. Order at 38-39. But such anecdotal evidence, in a realm so fraught with complexity and an abundance of possible causes, is unpersuasive. In addition, for every example

---

[5] *See* Timothy E. Lynch, *Derivatives: A Twenty-First Century Understanding*, 43 LOY. U. CHI. L. J. 1, 38 (2011) ("[E]nabling hedging is the raison d'être for the existence of derivatives, and without this characteristic, it is doubtful that the modern derivatives industry would have developed."); Lynn A. Stout, *Derivatives and the Legal Origin of the 2008 Credit Crisis*, 1 HARV. BUS. L. REV. 1 (2011); Miriam A. Cherry & Robert L. Rogers, *Prediction Markets and the First Amendment*, 2008 U. ILL. L. REV. 833, 838 (2008) (distinguishing the information-aggregating function of prediction markets from the price discovery function of other traditional markets); COMMODITIES FUTURES TRADING COMMISSION, *The Economic Purpose of Futures Markets and How They Work*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/economicpurpose.html.

that Kalshi offers in hindsight to prove the predictability of the economic impact of elections, there are undoubtedly as many or more that belie the theory. But the decisive point is that the Commission reviewed the evidence in the record and made a reasoned judgment that Kalshi's EGCs cannot consistently or reliably perform a hedging function.

In addition to hedging, the legitimate derivatives markets also perform a price discovery or price-basing role by establishing prevailing commodity prices that can be used as benchmarks for a wide variety of commercial transactions. Here too the Commission thoroughly reviewed the record and correctly concluded that EGCs "could not predictably be used to establish commercial transaction prices." This flaw in EGCs also arises principally because the economic ramifications of an election are indirect and unpredictable, and therefore cannot help determine the price of a commodity or financial asset in a predictable manner. Order at 18-19.[6]

## B.     EGCs Would Threaten Election Integrity.

In its public interest analysis, the Commission appropriately evaluated not only the failure of EGCs to provide useful financial tools but also the affirmative harm they would inflict. The fact is that EGCs would open a Pandora's box of threats to the integrity of congressional elections, the country's most important Democratic institution. They would incentivize voting based on the contracts' promise of financial gain rather than the candidates' merits; encourage voter suppression; and perhaps above all, intensify the widespread deployment of misinformation using state of the art AI. Some of these threats have already surfaced as our November elections approach, and if approved for trading, EGCs could be expected to incentivize many more. The

---

[6] *Cf.* Cary Deck, Shengle Lin, & David Porter, *Affecting Policy by Manipulating Prediction Markets: Experimental Evidence*, 85 J. ECON. BEHAV. & ORG. 48, 48 (2013) ("[W]e present evidence from the lab indicating that single-minded, well-funded manipulators can in fact destroy a prediction market's ability to aggregate informative prices and mislead those who are making forecasts based upon market predictions.").

result would be not only corrupted congressional elections but further erosion in the public's already tenuous confidence in the integrity of those elections.

The record is replete with evidence of these dangers. As the Order notes, over 600 commenters voiced these concerns. Among them were a group of United States Senators, who aptly warned that "[e]stablishing a large-scale, for-profit political event betting market in the United States … would profoundly undermine the sanctity and democratic value of elections … There is no doubt that mass commodification of our democratic process would raise widespread concerns about the integrity of our electoral process." Order at 19-20.

The evidence is far more voluminous, indeed overwhelming. For nearly 200 years, state courts have consistently and emphatically warned of the unique societal harm that comes with corruption in the electoral process. These cases confirm the need to protect elections from gambling—and they also confirm the wisdom of Congress's decision to incorporate state law as a measure of contracts that pose unacceptable risks to the public interest. For example, in 1799, Jeremiah Chase wrote for the General Court of Maryland that an election wager "would be 'against sound policy, and ought not to be sanctioned by a court of justice.'" Jeffrey Steven Gordon, *Silence for Sale*, 71 ALA. L. REV. 1109, 1160–61 (2020) (quoting *Wroth v. Johnson*, 4 H. & McH. 284, 286 (Md. Gen. Ct. 1799)). Chase added that election wagers "'have a malignant and evil tendency by making the parties, their connexions and friends, partizans in the election, and creating an interest and views incompatible with the general good and sound policy.'" *Id.* (quoting *Wroth*, 4 H. & McH. at 286-87).

Following that decision, numerous state courts in the 1800s held that election wagers posed grave dangers to the public interest and election integrity. The "principles animating these cases

found their fullest expression in an opinion of the Massachusetts Supreme Judicial Court, speaking through Chief Justice Lemuel Shaw, in 1847." *Id.* at 1163:

> The very theory of such popular institutions is, that the person elected to office is placed there by the free choice of the majority of persons free to inquire and judge, free to will and determine, and free to act with purity and intelligence, uninfluenced and unseduced by interested, sinister, or corrupt motives. If the persons voting act otherwise, they act without regard to the fitness of the candidate, or to their own sense of duty. . . . If one bet can be made on an election, many can be made. If small sums can be staked, large ones can. So that, on a great and exciting popular election, a large amount of money may depend on the result. . . . An election so influenced could not be regarded as the expressed will of an intelligent constituency; it would violate the whole theory, on which the right of suffrage is founded, and destroy the confidence of all judicious persons in that particular power of the people, which has been regarded as the principal security for permanent, regulated, constitutional liberty. If it be true that wagers on elections would have any tendency to create such a pecuniary interest in their result, as we have no doubt they have, we can have no hesitation in saying, that all such wagers are illegal and utterly void.

*Ball v. Gilbert*, 53 Mass. 397, 400-02 (1847); *see also, e.g.*, *Bettis v. Reynolds*, 34 N.C. 344, 346 (1851) ("Ours, both Federal and State, are representative, republican governments, and rest upon elections by the people, as 'the corner stone.' Everything, not merely the proper action, but the very existence, of our institutions, depends on the free and unbiased exercise of the elective franchise; and it is manifest, that whatever has a tendency, in any way, unduly to influence elections, is against public policy. This position we assume, as self-evident. It seems equally clear, that the practice of betting on elections has a direct tendency to cause undue influence."); *David v. Ransom*, 1 Greene 383, 385-86 (Iowa 1848) ("But in a free country, where its very existence, and the majesty of its laws, depend upon an enlightened and unbiased popular will, betting upon elections should especially be restrained. It is clearly repugnant to morality and sound policy, and inconsistent with the prevailing genius of our institutions. Its tendency is to exert an unwholesome and fraudulent influence upon the elective franchise. . . . These wagers, being so injurious to public welfare, so pernicious to popular suffrage which is the very essence of freedom, sound policy and

correct principles forbid that they should in any way receive the sanction of legal decisions."); *Stoddard v. Martin*, 1 R.I. 1, 2 (1828) ("The strong hold of freedom in our country, is in the freedom of our elections. Destroy this, and our freedom is at an end. Whatever tends to this destruction, in the remotest degree, ought to be resisted here, with a determination that admits of no compromise. Wagers on elections, whether by the people or the general assembly, have this tendency directly. . . . It is enough for the decision of this case to show, that a wager on an election has this tendency. Can it be necessary to ask, whether in a free country, a contract which has a tendency to destroy freedom of elections, and produce corruption, is consistent with sound policy?").

These cases also make clear that the dangers of betting on elections go beyond the concerns that animate prohibitions on gambling generally. "If there be any class of gambling contracts which should be frowned upon more than another it is bets on elections. They strike at the foundations of popular institutions, corrupt the ballot box, or, what is tantamount to it, interfere with the freedom and purity of elections." *McLennan v. Whidon*, 48 S.E. 201, 202-03, 120 Ga. 666 (1904) (quoting *Leverett v. Stegal*, 23 Ga. 259 (1857); *see also Merchants' Savings, Loan & Trust Co. v. Goodrich*, 75 Ill. 554, 560-61 (1874) ("All wagers are not void at common law. It is only those that are contrary to public policy; as, on the question of war or peace, *on the event of an election*, etc.") (emphasis in original). For these reasons, the state laws prohibiting betting on elections discussed above must not be undermined. The object of such laws "is to protect the purity of the elective franchise, and to secure perfect freedom and impartiality in the exercise of this inestimable right." *Commonwealth v. Crass*, 203 S.W. 708, 708 (Ky. 1918); *see also Shumate v. Commonwealth*, 56 Va. 653, 661 (1860) ("The object of the law is to preserve the purity of elections; which is always impaired whenever private and personal interests are brought to bear upon them, instead of those high considerations of public duty by which alone the voters ought to

be influenced. One of the worst forms in which private interest is made to operate on elections, is that of betting on the result."); *Quarles v. State*, 24 Tenn. 561, 562 (1845) ("The offence is also within the meaning and object of the statute, which was to preserve the freedom and purity of election, and to exclude from them the operation of motives not founded on, but adverse to, the public good."). As a result, conduct such as betting on elections "should be guarded against with the strictest watchfulness, and pursued with the most prompt condemnation by courts and legislators." *Nichols v. Mudgett*, 32 Vt. 546, 549 (1860). In light of this mountain of evidence warning about the perils of allowing gambling on elections, EGCs can only be seen as starkly contrary to the public interest.

## C.    EGCs Would Be Ripe Targets for Market Manipulation.

These contracts would be especially vulnerable to market manipulation for a variety of reasons. First, they would not be tethered to any underlying cash market. Moreover, political prediction markets operate in an opaque space that would readily lend itself to manipulation and other forms of abusive activity. Order at 21. These markets raise the specter of political insiders privy to non-public information—such as internal polling or campaign finance data—wielding their informational advantage to profit at the expense of others.[7] And the threat goes far beyond insiders. The data that determine the pricing of EGCs would be a hodge podge of unregulated, opaque, and unscientific sources such as polls, voter surveys, rumors, and media reports, all of widely varying degrees of rigor and reliability. Much of this data could be selectively compiled, skewed, and deployed by almost anyone in ways designed to manipulate prices in the EGC market.

---

[7] *See* Alex Altman, *Political Betting Market Raises Questions About Insider Trading*, TIME (Oct. 6 2015), https://time.com/4062628/fantasy-sports-predictit-political-forecasting/.

And this activity would be especially difficult to detect.[8]  In short, this market environment would present irresistible opportunities for manipulation of the EGC contracts through the dissemination of false information coupled with strategic trading patterns in the contracts, and the record includes evidence of manipulation schemes.  Order at 21 n.38.[9]  Investors would certainly suffer, as would confidence in the integrity of the derivatives markets.[10]

This threat of market manipulation has heightened importance in the derivatives markets because of its uniquely destructive impact on the ability of those markets to provide reliable hedging and price discovery tools for commercial enterprises, in addition to the harm it inflicts on investors.  Accordingly, a central focus of the CEA and its predecessor statutes has been on preventing manipulation.  As the Commission explained in its 2008 concept release seeking input on the appropriate treatment of event contracts, the Grain Futures Act of 1922, which was the

---

[8] By virtue of this feature, EGCs would violate core principle number 4 applicable to designated contract markets ("DCMs"), providing that a DCM must have the "capacity and responsibility to prevent manipulation [and] price distortion . . ." 7 U.S.C. § 7(d)(4).

[9] *See generally* Paul W. Rhode & Koleman S. Strumpf, *Manipulating Political Stock Markets: A Field Experiment and a Century of Observational Data* 2 (Jan. 2007) (unpublished manuscript, https://economics.yale.edu/sites/default/files/files/Workshops-Seminars/Economic-History/rhode-051116.pdf) (observing that "parties with an interest in the outcome have an incentive, whenever possible, to move the odds prices in their preferred direction"); *see also* Brad Plumer, *How to Swing the Prediction Markets and Boost Mitt Romney's Fortunes*, THE WASHINGTON POST (Oct. 23, 2012), https://www.washingtonpost.com/news/wonk/wp/2012/10/23/how-to-manipulate-prediction-markets-and-boost-mitt-romneys-fortunes/; Alex Klein, *InTrade And Jon Hunstman: Why the Media's Faith in the Internet Betting Ring Is Foolish*, THE NEW REPUBLIC (Jun. 21, 2011), https://newrepublic.com/article/90371/intrade-and-jon-huntsman-president-odds-republican-nomination; National Conference of State Legislatures, *Wagering on Elections? Not a Smart Bet* (Sept. 17, 2014), https://www.ncsl.org/blog/2014/09/17/wagering-on-elections-not-a-smart-bet.aspx.

[10] EGCs would also conflict with core principle number 3 stipulating that a DCM may list "only contracts that are not readily susceptible to manipulation." *See* 7 U.S.C. § 7(d)(3).

forerunner of the CEA, was enacted "to promote the financial vitality of futures trading by limiting price manipulation and other disturbances that were prevalent at the time." Commodity Futures Trading Commission, *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008). The Purpose clause in the CEA confirms that preventing manipulation has remained among Congress's top priorities: "To foster these public interests, it is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity." And the CEA further reflects this singular focus in provisions not only outlawing manipulation but criminalizing violations of any cease and desist order that prohibits it. 7 U.S.C. §§ 9, 13b.

Presumably in an effort to address the unusually intense risk of market manipulation, Kalshi points out that EGCs would preclude a long list of institutions and individuals from trading in the contracts, including candidates, staffers, party organizations, PACs, polling organizations, members of Congress, and others. Kalshi Br. at 10. Yet these prohibitions only confirm the threat, especially as these insiders could still engage in other forms of manipulative activity, allowing them to benefit indirectly from manipulation.

In addition, Kalshi suggests that listing the contracts on federally regulated exchanges such as Kalshi's would "ameliorate" manipulation concerns associated with unregulated markets. Kashi Br. at 42. But this is a classic rationalization that would ultimately prove hollow. The same argument is relentlessly advanced in the world of cryptocurrencies, a marketplace that bears striking similarities to EGCs: they offer financial instruments with little or no beneficial utility that foster market manipulation and threaten investor harm on a grand scale. Yet the crypto industry, in concert with their allies on the Hill and even within some regulatory agencies, is desperately striving to secure its own light-touch regulatory framework that would help legitimize

cryptocurrency investments and make them more attractive to investors. *See* Better Markets, *Standing up to the Lawless Crypto Industry* (Feb. 15, 2024) (a compilation of advocacy regarding abuses in the crypto markets).[11] Here, as in the world of cryptocurrencies, a regulatory imprimatur through exchange trading would imbue EGCs with a misleading aura of safety, facilitating access to what is essentially a casino without redeeming social value and vastly increasing the pool of investor victims.

> **D.** **EGCs Would Also Serve As Vehicles for Other Forms of Investor Victimization.**

Finally, the threats posed by EGCs go beyond those identified in the Commission's Order, as investors would be likely to suffer huge losses on these contracts if they were made easily accessible via sanctioned exchange trading. The losses would inevitably be intensified through the rapidly expanding use of "gamification" and "retailization" in the financial markets. Through these tactics and technologies, everyday consumers and investors are lured into new financial products and services, often against their best interest. These strategies pair advanced technologies, including AI, with high-profile advertising campaigns and game-like features such as points, rewards, leaderboards, push notifications, and other methods to encourage users to engage in constant trading activities. And they are deployed through online trading platforms, robo advisers, and mobile apps.

This pattern was starkly revealed in the "gamification practices" deployed by the broker-dealer Robinhood that fueled the meme stock frenzy. *See generally* Dennis M. Kelleher, Jason Grimes, and Andres Chovil, *Securities—Democratizing Equity Markets With And Without*

---

[11] Better Markets, *Standing Up to the Lawless Crypto Industry* (Feb. 15, 2024), https://bettermarkets.org/analysis/setting-the-record-straight-on-crypto-ftx-sam-bankman-fried-jamie-dimon-the-sec-and-cftc-and-the-revolving-door/.

*Exploitation: Robinhood, Gamestop, Hedge Funds, Gamification, High Frequency Trading, And More*, 44 W. NEW ENG. L. REV. 51 (2022). They also appear in the market for cryptocurrencies. The explosion in the online gambling industry highlights the financially ruinous consequences that these business models can inflict. Katherine Sayre, *A Psychiatrist Tried to Quit Gambling. Betting Apps Kept Her Hooked*, WALL ST. J. (Feb. 18, 2024).

EGCs and the many variants that will appear if the Order is vacated are bound to follow this same pattern. The signs are unmistakable. Promoters relying on these methods for enticing clients and encouraging trading activity often proclaim that the offerings represent beneficial "democratization" and "innovation" in finance. *See* Kelleher *et al.*, *supra.* Kalshi is invoking these very themes. It asserts that "corporate customers and wealthy individuals" have access to "bespoke" derivatives to hedge against the risks arising from political events, while many businesses and individuals lack such access. Kalshi Br. at 6. It goes on to claim that political event contracts "help level the playing field." *Id.* Elsewhere, Kalshi proclaims that it "seeks to democratize investing opportunities once restricted to large corporations and the super-rich." Kalshi Br. at 9. But more likely, as with gamified brokerage apps, cryptocurrencies, and online gambling, the result will be massive wealth accumulation for Kalshi and its cadre of sponsors but massive losses suffered by the majority of investors.

## III.   THE COMMISSION'S ORDER DESERVES DEFERENCE.

Agencies deserves judicial deference for their judgments on issues requiring special expertise regarding the legal and policy considerations surrounding the industries they regulate. *See Ad Hoc Telecom. Users Committee v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009) (stating that matters "which implicate competing policy choices, technical expertise, and predictive market judgments" warrant "particular deference"). That rule surely applies in this case. Well-functioning

derivatives markets are vitally important to our economy, yet they are also complex and arcane. The Commission has been overseeing these markets for nearly 50 years, interpreting and applying the CEA to innumerable futures, options, and swaps contracts; overseeing a wide range of market participants; combatting fraud and manipulation; and of particular relevance here, determining which derivatives products should be listed and traded on publicly accessible exchanges.

With respect to the specific issues raised in this case, the Commission has been addressing the appropriate regulatory treatment of event contracts since at least 1993. Following an increase in requests for guidance on these contracts, it issued a concept release in 2008 as part of "a comprehensive review of the Act's applicability to event contracts and markets." Concept Release on the Appropriate Treatment of Event Contracts, 73 Fed. Reg. 25669, 25670 (May 7, 2008). It sought expertise from a wide range of sources, including market participants, legal practitioners, state and federal regulatory authorities, and academicians "with respect to the practical and regulatory issues relevant to regulating event contracts and markets." *Id.*

In 2011, it promulgated Rule 40.11. Final Rule, Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011), codified at 17 C.F.R. § 40.11(a). Its purpose was to flatly "prohibit the listing of certain contracts involving terrorism, assassination, war, gaming, or activities that are unlawful under any State or Federal law." *Id.* at 44785. In the final rule release, the Commission explained that the term "gaming" presented definitional challenges but further explained that it had determined to prohibit such contracts and address any nuances presented by specific contracts on a case-by-case basis. *Id.* It added that its prohibition of certain gaming contracts—including those involving gaming and activity unlawful under state law—was "consistent with Congress's intent 'to prevent gambling through the futures markets' and to 'protect the public interest from gaming and other event contracts.' " *Id.* at 44786.

Beyond the concept release and the rulemaking, the Commission has repeatedly been called upon to apply its considerable knowledge and expertise to the very type of political event contract at issue in this case. And its treatment has been thoroughly consistent with the principles set forth in the Order. *See Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461, 487 (2004) ("We normally accord particular deference to an agency interpretation of longstanding duration, recognizing that well-reasoned views of an expert administrator rest on a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (internal quotation marks and citations omitted))." For example, in December 2011, the North American Derivatives Exchange ("NADEX") submitted a proposal to the Commission seeking approval of five political event contracts relating to the political control of the United States Congress and the Presidency. On April 2, 2012, the Commission issued an order prohibiting NADEX from listing its proposed political event contracts.[12] In its order, the Commission found that the contracts, which would have paid out based upon the outcome of U.S. federal elections, "involved[] gaming" and were contrary to the public interest under CEA Section 5c(c)(5)(C)(i). In its analysis, which parallels the Order in many respects, the Commission determined, among other things, that the contracts could not reasonably be expected to be used for hedging purposes; could not form the basis for the pricing of a commercial transaction involving a physical commodity, financial asset or service; and could be used in ways that would have an adverse effect on the integrity of elections,

---

[12] U.S. COMMODITIES FUTURES COMMISSION, *Order Prohibiting the Listing or Trading of Political Event Contracts* (Apr. 2, 2012), https://www.cftc.gov/sites/default/files/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf.

"for example by creating monetary incentives to vote for particular candidates even when such a vote may be contrary to the voter's political views of such candidates."[13]

On two other occasions, the Commission has determined *not* to prohibit the trading of political event contracts that were fundamentally distinguishable from the contracts advanced by NADEX and Kalshi. It chose instead to strictly limit their purpose, operations, and scope under no-action letters. In 1993, Commission staff issued a no-action letter to the Iowa Electronic Markets ("IEM"), an academic prediction market run by the University of Iowa's Tippie College of Business in conjunction with several other universities.[14] Among the event contracts available for trading on the IEM are political event contracts regarding partisan control of the United States Congress. On another occasion, in 2014, the CFTC issued a no-action letter to PredictIt, operated by researchers at the Victoria University of Wellington, allowing its political event contracts to operate in the United States.[15] Common to both no-action letters were stipulations providing that the platforms could only operate as non-profits, for educational or academic research purposes, and on a small scale.[16] Neither letter was predicted on any finding that those event contracts could serve as meaningful hedging or price discovery tools. In stark contrast with these two platforms, Kalshi has no intention of operating on a non-profit basis, exclusively for research purposes, or on a limited scale.

---

[13] *Id.*; *see also* Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV GAMING L. J. 53, 75–76 (2021) (discussing Commission's treatment of the NADEX contracts).

[14] CFTC No-Action Letter, CFTCLTR No. 93-66, 1993 WL 595741 (June 18, 1993), https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

[15] Letter from Vincent McGonagle, Dir., Div. of Mkt. Oversight, to Neil Quigley, Deputy Vice-Chancellor, Research, Victoria Univ. of Wellington, (Oct. 29, 2014), https://www.cftc.gov/csl/14-130/download.

[16] In August 2022, the CFTC rescinded that no-action letter, a decision challenged in court by PredictIt. *See Clarke v. CFTC,* No. 1:22-cv-909 (W.D. Tex.) (transferred to the U.S. District Court for the District of Columbia, No. 1:24-cv-167, as of Jan. 19, 2024).

In this case, the Commission has concluded that Kalshi's Election Gambling Contracts cannot perform the hedging and price discovery roles that are fundamental to the derivatives markets. It has also concluded that they pose serious threats to investors and the integrity of our federal elections. The Commission made these findings after applying its extensive knowledge and experience on the issues presented, acquired over 30 years and consistently applied. Its Order and the findings on which it rests deserve deference and should be sustained.

<div align="center"><u>**CONCLUSION**</u></div>

For all of the foregoing reasons, and those set forth in the Commission's principal brief filed on February 26, 2024, Better Markets respectfully urges the Court to rule in favor of the Commission on all of the issues presented and uphold the Order.

Dated:  March 4, 2024

Respectfully Submitted,

Better Markets, Inc.

By:     /s/ Stephen W. Hall
        Stephen W. Hall
        D.C. Bar No. 366892
        Better Markets, Inc.
        2000 Pennsylvania Avenue, NW
        Suite 4008
        Washington, DC  20006
        202-549-3382
        shall@bettermarkets.org

        *Counsel for Amicus Curiae Better Markets, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2024, I caused the foregoing brief to be served on all counsel of record using this Court's CM/ECF system.

<div style="margin-left:50%">

/s/ Stephen W. Hall
Stephen W. Hall
D.C. Bar No 366892

*Counsel for Amicus Curiae Better Markets, Inc.*

</div>