## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KALSHIEX LLC,

         Plaintiff,

    v.

COMMODITY FUTURES TRADING
COMMISSION,

         Defendant.

Civil Action No. 1:23-cv-03257 (JMC)

---

### Defendant Commodity Futures Trading Commission's Reply
### in Support of its Cross-Motion for Summary Judgment

       Defendant Commodity Futures Trading Commission submits this Reply in Support of its

Cross-Motion for Summary Judgment, Dkt. No. 30.  A memorandum of points and authorities is

attached.

Dated: April 10, 2024

Respectfully submitted,

*/s/ Raagnee Beri*
Raagnee Beri
  *Senior Assistant General Counsel*

Robert A. Schwartz
  *General Counsel*
Anne W. Stukes
  *Deputy General Counsel*
Margaret Aisenbrey
  *Senior Assistant General Counsel*
Conor Daly
  *Counsel*
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, D.C. 20581-0001
Phone: (202) 834-9752
rberi@cftc.gov

# TABLE OF CONENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ........................................................................................................................2

I.   The Commission articulated the correct meaning of involve. ......................................2

    A.   Kalshi's argument that "involve" refers to a contract's "underlying" ignores the plain language of Section 5c(c)(5)(C)(i), and is not supported by statutory context. ..................2

    B.   The Commission's interpretation of "involve" reflects the broad authority provided by Congress in Section 5c(c)(5)(C) ...........................................................................................6

II.  The Commission correctly determined that the Contracts involved gaming and activity unlawful under state law. .....................................................................................................8

    A.   The Commission correctly determined that the Congressional Control Contracts involve gaming. ..........................................................................................................................8

    B.   The contracts or transactions involve activity that is unlawful under State law. .............13

III. The Commission's public interest determination was not arbitrary or capricious. ...................16

    A.   The Commission's determination under the economic purpose test was not arbitrary and capricious. ................................................................................................................16

    B.   The CEA has no specific factor the Commission must consider. ....................................20

    C.   The Commission's determination on election integrity provided a reasoned analysis and the Commission did not refuse to consider evidence. ...........................................................20

CONCLUSION ..................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Chao,*
    409 F.3d 377 (D.C. Cir. 2005) ................................................................................................. 17

*\*Ali v. Fed. Bureau of Prisons,*
    552 U.S. 214 (2008) ...................................................................................................... 7, 14

*Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n,*
    796 F.3d 18 (D.C. Cir. 2015) ................................................................................................. 11

*Bankamerica Corp. v. United States,*
    462 U.S. 122 (1983) ............................................................................................................. 4

*Barnhart v. Sigmon Coal Co.,*
    534 U.S. 438 (2002) ............................................................................................................. 3

*Bd. of Cty. Comm'rs v. U.S. Dep't of Transp.,*
    955 F.3d 96 (D.C. Cir. 2020) ................................................................................................. 18

*\*Bostock v. Clayton Cty.,*
    590 U.S. 644 (2020) ...................................................................................................... 13, 14

*Butte Cty. v. Hogan,*
    613 F.3d 190 (D.C. Cir. 2010) ............................................................................................... 16

*Chamber of Commerce of U.S. v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) ............................................................................................... 22

*Chevron U.S.A. v. Nat. Res. Def. Counsel,*
    467 U.S. 837 (1984) ............................................................................................................. 11

*Citadel Secs. LLC v. SEC,*
    45 F.4th 27 (D.C. Cir. 2022) ................................................................................................. 18

*Clark Cty. v. FAA,*
    522 F.3d 437 (D.C. Cir. 2008) ............................................................................................... 16

*Clark v. Martinez,*
    543 U.S. 371 (2005) ............................................................................................................. 4

*Cooper Distrib. Co. v. Amana Refrig. Inc.,*
    63 F.3d 262 (3d Cir. 1995) ................................................................................................... 10

*Fort Stewart Schs. v. FLRA,*
    495 U.S. 641 (1990) ............................................................................................................. 7

*Getty v. Fed. Sav. & Loan Ins. Corp.,*
　805 F.2d 1050 (D.C. Cir. 1986) ..................................................................20

*In re Betcorp Ltd.,*
　400 B.R. 266 (Bankr. D. Nev. 2009) ...........................................................9

*Indep. U.S. Tanker Owners Comm. v. Lewis,*
　690 F.2d 908 (D.C. Cir. 1982) ....................................................................19

*Inv. Co. Inst. v. CFTC,*
　720 F.3d 370 (D.C. Cir. 2013) ....................................................................17

*Kawashima v. Holder,*
　565 U.S. 478 (2012) ..................................................................................6, 7

*Leist v. Simplot,*
　638 F.2d 283 (2d Cir. 1980) ......................................................................15

*Lindeen v. SEC,*
　825 F.3d 646 (D.C. Cir. 2016) ....................................................................11

*Mercy Hosp., Inc. v. Azar,*
　891 F.3d 1062 (D.C. Cir. 2018) ..................................................................12

*Michigan v. Bay Mills Indian Cmty.,*
　572 U.S. 782 (2014) ......................................................................................9

*Nasdaq Stock Mkt. LLC v. SEC,*
　38 F.4th 1126 (D.C. Cir. 2022) ..............................................................16, 21

*Nat'l Bank of Commerce v. Estate of Ripley,*
　161 Mo. 126 (1901) .......................................................................................7

*Nat'l Cable & Telecomms. Ass'n v. FCC,*
　567 F.3d 659 (D.C. Cir. 2009) ....................................................................11

*\*Phoenix Herpetological Society v. U.S. Fish and Wildlife Serv.,*
　998 F.3d 999 (D.C. Cir. 2021) ................................................................19, 21

*Pulsifer v. United States,*
　144 S. Ct. 718 (2024) ....................................................................................4

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
　566 U.S. 639 (2012) ....................................................................................11

*Reno v. Bossier Par. Sch. Bd.,*
　528 U.S. 320 (2000) ......................................................................................4

*Roschen v. Ward,*
  279 U.S. 337 (1929) ..............................................................................................................3

*Rural Cellular Ass'n v. FCC,*
  588 F.3d 1095 (D.C. Cir. 2009) .........................................................................................20

*State Farm Mut. Auto. Ins. Co.,*
  463 U.S 29 (1983) ...............................................................................................................16

*Stilwell v. Office of Thrift Supervision,*
  569 F.3d 514 (D.C. Cir. 2009) ...........................................................................................21

*Sw. Airlines Co. v. Transp. Sec. Admin.,*
  650 F.3d 752 (D.C. Cir. 2011) ...........................................................................................17

*Thrifty Oil v. Bank of Am. Nat'l Trust and Sav. Ass'n,*
  322 F.3d 1039 (9th Cir. 2003) ............................................................................................13

*United States v. Gonzales,*
  520 U.S. 1 (1997) ................................................................................................................14

*United States v. Gould,*
  30 F.4th 538 (6th Cir. 2022) .................................................................................................6

*United States v. King,*
  325 F.3d 110 (2d Cir. 2003) .................................................................................................6

*United States v. Mead,*
  533 U.S. 218 (2001) ...........................................................................................................11

*United States v. Philip Morris USA Inc.,*
  566 F.3d 1095 (D.C. Cir. 2009) .........................................................................................10

*United States v. Scheels,*
  846 F.3d 1341 (11th Cir. 2017) ...........................................................................................5

*Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.,*
  505 U.S. 214 (1992) ..............................................................................................................4

**Statutes, Rules and Regulations**

17 C.F.R. pt. 32 ..........................................................................................................................5

17 C.F.R. pt. 33 ..........................................................................................................................5

25 C.F.R. § 502.4 ......................................................................................................................10

26 U.S.C. § 7201 ...............................................................................................................7

28 U.S.C. § 2703 ...............................................................................................................9

57 Fed. Reg. 12382-01 (Apr. 9, 1992) ...........................................................................10

7 U.S.C. § 2(a)(1) .............................................................................................................15

7 U.S.C. § 5 .......................................................................................................................19

7 U.S.C. § 5c(c)(5)(C) ...............................................................................................passim

7 U.S.C. §5c(c)(5)(C)(i) ............................................................................................ 2, 3, 5

7 U.S.C. § 6c(b) .................................................................................................................5

7 U.S.C. 7a-2(c) .................................................................................................................6

7 U.S.C. § 7a-2(c)(5)(C) ............................................................................................ 2, 13

7 U.S.C. § 13a-2 ...............................................................................................................15

Del. Code Ann. tit. 11, § 1403(1) ...................................................................................12

Fla. Stat. § 849.14 ...........................................................................................................12

N.J. Stat. § 19:34-24 ........................................................................................................14

Nev. Rev. Stat. § 293.830; ..............................................................................................14

**Other Authorities**

156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010) ............................... 9, 11

2A C. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 47.17 (7th ed. 2023) ........................7

CFTC, *CFTC Issues Order Prohibiting North American Derivatives Exchange's Political Event Derivatives Contracts* (Apr. 2, 2012), https://www.cftc.gov/PressRoom/PressReleases/6224-12 .....................17

*Contest*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/contest (last visited Apr. 10, 2024) ...............................................................................................11

*Contest*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/contest#dictionary-entry-2 (last visited Apr. 10, 2024) .....................................................................12

*Contest*, THE BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/contest (last visited Apr. 10, 2024) ...............................................................................................11

*Gaming*, BLACK'S LAW DICTIONARY (2nd ed.), https://thelawdictionary.org/gaming/ ........................9

*Gaming*, DICTIONARY.COM, https://www.dictionary.com/browse/gaming ...................................9

*Gaming*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/gaming .......8

Illinois Gaming Board, https://www.igb.illinois.gov/ (last visited Apr. 10, 2024) .................9

Nevada Gaming Commission and Nevada Gaming Control Board, https://gaming.nv.gov/ (last visited Apr. 10, 2024) ...............................................................................................9

New York State Gaming Commission, https://www.gaming.ny.gov/ (last visited Apr. 10, 2024)......9

*Press*, Kalshi, https://kalshi.com/blog/press (last visited Apr. 10, 2024) ................................................1

## INTRODUCTION

The Commodity Exchange Act ("CEA") grants the Commodity Futures Trading Commission ("Commission") broad discretionary authority to determine whether certain agreements, contracts, or transactions that "involve" activities enumerated in Section 5c(c)(5)(C) are contrary to the public interest.  Applying the statute's plain meaning, the Commission found that the Congressional Control Contracts ("Contracts") were agreements, contracts, or transactions that involve two enumerated categories, "activity that is unlawful under … State law" and "gaming."

After the Commission determined the Contracts involved "activity that is unlawful under … State law" and "gaming," the Commission considered whether the Contracts were contrary to the public interest.  In so doing, the Commission considered the Contracts' economic purpose and, based on the evidence before it and using its expertise, determined the Contracts would not be used for hedging on more than an occasional basis.  The Commission further found that, while Kalshi and some commenters argued the Contracts would serve as a check on misinformation, research indicated that election markets may nonetheless incentivize "fake" or unreliable information, and thus impact either election integrity or the public perception of election integrity.  The Commission considered that this, in turn, would require the Commission to investigate election-related activities, including potentially the outcome of an election itself, and noted the "very serious concerns" expressed by members of Congress that "assuming the role of an 'election cop'" may not align with the CFTC's historic mission and mandate.  The Commission therefore reasonably determined the Contracts were contrary to the public interest.

Kalshi now asks this Court to overturn the Commission's reasoned decision and order that these "election betting" contracts[1] be listed on a federally regulated futures exchange, based on a

---

[1] *Press*, Kalshi, https://kalshi.com/blog/press (last visited Apr. 10, 2024).

plainly mistaken interpretation of Section 5c(c)(5)(C), artificial and narrow definitions of "involve" and "gaming," and a flawed understanding of "activity that is unlawful under state law."  None of Kalshi's arguments demonstrates that the Commission was arbitrary and capricious or exceeded its authority in any way.  Rather, the Commission employed the ordinary meaning of the broad terms of the statute to determine that the Contracts were precisely the sort of event contracts that Congress empowered the Commission to prohibit.

Kalshi's attacks on the Commission's reasoned judgment in determining that the Contracts were contrary to the public interest further fall flat.  Despite the broad discretion Section 5c(c)(5)(C) affords the Commission in making a public interest determination, and the deference due to an agency's expertise, Kalshi protests the Commission's weighing of the public interest considerations. However, as reflected in the Order, the Commission engaged in a reasoned analysis using its expertise and discretion, considered the evidence before it, and evaluated the appropriate factors to arrive at a sound determination that Kalshi's Contracts were contrary to public interest.  This Court should, accordingly, affirm the Commission's Order.

**ARGUMENT**

## I.  The Commission articulated the correct meaning of involve.

### A.  Kalshi's argument that "involve" refers to a contract's "underlying" ignores the plain language of Section 5c(c)(5)(C)(i), and is not supported by statutory context.

Section 5c(c)(5)(C)(i) authorizes the Commission to determine whether an event contract is contrary to public interest and therefore prohibited from listing, trading, and clearing in Commission-regulated markets if the "agreements, contracts, or transactions *involve*" certain enumerated activities, including "gaming" or "activity that is unlawful under … State law."  7 U.S.C. § 7a-2(c)(5)(C) (emphasis added).  Despite this plain language, Kalshi insists that the statute applies only where "a contract's *event*" "involves" the activities enumerated in the statute.  Kalshi Reply at 4

(arguing that "involve" "refer[s] to the [contract's] underlying event"); *see also* Kalshi Reply at 6 n.2. Thus, statutory text aside, Kalshi contends that the Commission should not have asked whether the "agreement, contracts, or transactions involve" an enumerated activity, but only whether elections (the Contracts' underlying event) involve an enumerated activity. Building on its argument that "involve" is "event-based," Kalshi contends that it is insufficient "for trading a contract to relate to an enumerated activity." Kalshi Reply at 6.

Kalshi's problem is that Section 5c(c)(5)(C)(i) says it *is* sufficient. It applies where "the agreements, contracts, *or transactions* involve" an enumerated activity. Thus, the Commission correctly invoked Section 5c(c)(5)(C)(i) here because "taking a position in the Congressional Control Contracts," *i.e.*, trading or transacting in them, amounts to gaming and to activity that is unlawful under State law. AR 10. The analysis is similar if the focus is on the "contracts" themselves rather than "transactions" in them. Because it is the "contracts" (and not just the underlying) that may "involve" the enumerated activity, the Commission properly examined the Contracts "as a whole." AR 7. As the Commission correctly explained, the Contracts "involve" gaming because that is what they are for—gaming is an "essential feature or consequence" of them. AR 13 n.28. Either way, Kalshi's interpretation violates the statutory text.

Kalshi's reliance on the "consistent-meaning canon" is misguided. As a threshold matter, canons of statutory interpretation cannot be used to overcome a statute's plain meaning. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461 (2002) ("Our role is to interpret the language of the statute enacted by Congress. This statute does not contain conflicting provisions or ambiguous language."); *see generally Roschen v. Ward*, 279 U.S. 337, 339 (1929) (Holmes, J.) ("[T]here is no canon against using common sense in construing laws as saying what they obviously mean."). But in any event, nothing about the "consistent-meaning canon" justifies Kalshi's insistence that "involve" refers narrowly to a contract's "underlying," rather than the "agreement, contract, or transaction" as a whole, which is

what the statute says.  Kalshi Reply at 4, 6-7.  The presumption of consistent usage means that "[i]n a given statute, the same term usually has the same meaning."  *Pulsifer v. United States*, 144 S. Ct. 718, 735 (2024).  It operates so as to prevent "attribut[ing] different meanings to the same phrase in the same sentence depending on which object it is modifying."  *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 329 (2000); *Bankamerica Corp. v. United States*, 462 U.S. 122, 129 (1983).[2]  Here, the meaning of "involve" does not change depending on the activity—the activities are different from one another, and agreements, contracts, and transactions take different forms.  It is unsurprising that the nexus between the contract and activity can manifest in different ways.  Kalshi's argument suggests that the Court must narrow the meaning of "involve" so that only one type of connection qualifies; but the presumption requires only that language in the same statute be accorded a consistent meaning, *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 225 (1992), not the narrowest common denominator.  If Congress intended to apply Section 5c(c)(5)(C)(i) only where "the underlying event involves" an activity, rather than more broadly when the "agreements, contracts, or transactions involve" the activity, it would have said so.

---

[2] Kalshi does attempt to use precedent for its argument that a term must apply "without differentiation" to a set of defined categories.  The cited cases, however, are easily distinguished when, as here, the Commission is simply using the same broad definition across all categories.  *Clark v. Martinez*, 543 U.S. 371, 378 (2005) (holding the government could not detain an individual indefinitely if they were deemed inadmissible and removable under one subsection when they could only detain an individual for a limited time for purposes of removal under another subsection); *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 329 (2000) (stating that under Section 5 of the Voting Rights Act "abridging the right to vote on account of race or color" means retrogression, and therefore Section 5 does not extend to a proposed change that did not have a purpose of retrogression, even if it had a purpose of discrimination); *Bankamerica Corp v. US*, 462 U.S. 122, 129 (1983) (holding that the Clayton Act's prohibition on corporations with interlocking boards prevented persons to be on two or more boards of corporations "other than banks … or common carriers" must mean none of which is a bank given the government conceded it meant none of which is a common carrier).

The Commission's Order accords "involve" consistent meaning within Section 5c(c)(5)(C)(i) and across the CEA.[3]  The Commission determined that for purposes of Section 5c(c)(5)(C)(i), the broad ordinary meaning of "involve" applies so as to "capture both contracts whose underlying is one of the enumerated activities, and contracts with a different connection to one of the enumerated activities because, for example, they 'relate closely' to, 'entail,' or 'have as an essential feature or consequence' one of the enumerated activities."  AR 7.  The Commission did not, as Kalshi contends, "assign two meanings" by "conced[ing]" that "involve" "refers to a contract's underlying event for most of [Section 5c(c)(5)(C)(i)]'s enumerated activities" but finding that involve refers to "the act of trading for the 'gaming' and 'unlawful activity' categories."  Kalshi Reply at 4 and 6.

The Commission's application of the ordinary broad meaning of "involve" was appropriate and does not amount to inconsistent usage.  Courts have confirmed that "involve" has an expansive connotation when used in federal statutes.  *See United States v. Scheels*, 846 F.3d 1341, 1342 (11th Cir. 2017) (recognizing that 'the ordinary meaning of 'involve' when used as a verb is 'to have as a necessary feature or consequence; entail' … or 'to have within or as part of itself'"); *United States v.*

---

[3] Kalshi suggests the Commission has conceded that "involve" means the contract's "underlying" in other provisions of the CEA, but that mischaracterizes the Commission's position.  The Commission has not taken the position that "involve" in other sections of the CEA is interpreted to mean *only* the underlying.  Rather, the Commission noted that "involve" is used throughout the CEA to *include* the underlying but is not *limited* to the underlying.  For instance, CEA Section 4c(b), 7 U.S.C. § 6c(b) grants the Commission jurisdiction over both options on commodities (where the relevant commodity would be the underlying) and options on commodity futures (where the relevant futures contract would be the underlying, and the commodity itself would have a different relationship to the transaction).  *See* 17 C.F.R. pt. 32 (Regulation of Commodity Options Transactions), pt. 33 (Regulation of Commodity Option Transactions that are Options on Contracts of Sale of a Commodity for Future Delivery).  Thus, the provision that refers to "any transaction involving any commodity" is referring both to transactions where the commodity is the underlying *and* to transactions where the *future* (and not the commodity), is the underlying.  Thus, as in Section 5c(c)(5)(C)(i), "involve" *includes* the underlying, but is not limited to solely the underlying.  That is to say, even if one can find an example where the context restricts "involve" to the underlying, that has no bearing on some other context where by the ordinary meaning of the word it can refer to multiple aspects of the contract.

*Gould*, 30 F.4th 538, 545 (6th Cir. 2022) (noting that "[c]ircuit courts have repeatedly held … that the term 'involve' is expansive") (collecting cases).  Courts also recognize that "involve" can capture the terms that it modifies in more than one way.  *See United States v. King*, 325 F.3d 110, 113 (2d Cir. 2003) (finding sentencing enhancement for "serious drug offense" "*involving* manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" applied to attempted drug offenses because "involvement" extends inquiry beyond precise crimes); *Kawashima v. Holder*, 565 U.S. 478, 483-84 (2012) (rejecting petitioners' challenge to deportation for commission of crimes that "involved fraud or deceit" on grounds that respective crimes did not include formal elements of fraud or deceit, because "involve" broadly captured "offenses with elements that necessarily entail fraudulent or deceitful conduct.").  By contrast, Kalshi does not cite a single case that says that when "involve" modifies a set of statutory terms, it can only mean one kind of connection to those terms.

**B. The Commission's interpretation of "involve" reflects the broad authority provided by Congress in Section 5c(c)(5)(C).**

Kalshi protests that the Commission's interpretation "reduce[s] multiple statutory terms to surplusage," claiming that the "basic principles of statutory construction confirm that 'involve' here must refer to the underlying event, lest every event contract be subjected to public-interest scrutiny even after Congress specifically repealed that regime and curtailed the Commission's review authority."  However, it is not surprising that a broadly worded statute enacted by Congress naturally features overlap between the enumerated categories, especially given the deference provided to the Commission to scrutinize event contracts potentially contrary to the public interest.

Moreover, Kalshi's overly-restrictive "is" or "closely relates to" definition of "involve" suffers the same supposed problem because, under this definition, the first enumerated category "(I) activity that is unlawful under any Federal or State law;" would swallow at least two other categories: "(II) terrorism;" and "(III) assassination."  7 U.S.C. 7a-2(c).  However, Congress placed

"activity that is unlawful under any Federal of State law"—a very broadly worded category—*first*. Only after this broad formulation did Congress enumerate (II) terrorism, (III) assassination, (IV) war, and (V) gaming, and finally, (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest. Even if the general words in the statute are rendered partially redundant, this fits the natural construction and accords with the doctrine of *ejusdem generis*. *See* 2A C. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 47.17 (7th ed. 2023) *(ejusdem generis)* ("If, on the other hand, the series of specific words is given its full and natural meaning, the general words are partially redundant. The rule 'accomplishes the purpose of giving effect to both the particular and the general words, by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words.'") (quoting *Nat'l Bank of Commerce v. Estate of Ripley*, 161 Mo. 126, 131 (1901)). Moreover, Congress may have included the enumerated categories, even if technically unnecessary, "to remove any doubt" these categories were included. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227-28 (2008) ("In any event, we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase."); *see Fort Stewart Schs. v. FLRA*, 495 U.S. 641, 646 (1990) (noting that "technically unnecessary" examples may have been "inserted out of an abundance of caution"); *Kawashima*, 565 U.S. at 487 ("We disagree with the Kawashimas' contention that the specific mention of one type of tax crime in Clause (ii) impliedly limits the scope of Clause (i)'s plain language, which extends to any offense that "involves fraud or deceit." We think it more likely that Congress specifically included tax evasion offenses under 26 U.S.C. § 7201 in Clause (ii) to remove any doubt that tax evasion qualifies as an aggravated felony.").

**II.  The Commission correctly determined that the Contracts involved gaming and activity unlawful under state law.**

**A.  The Commission correctly determined that the Congressional Control Contracts involve gaming.**

Kalshi's Reply fails to show that the Commission unreasonably determined that the Congressional Control Contracts involve "gaming" for purposes of CEA Section 5c(c)(5)(C) by applying the ordinary meaning of "gaming" to "include[] betting or wagering on elections."  Kalshi does not contest that wagering or betting on the outcomes of elections is "gambling," or that taking a position in their Contracts means betting on the outcomes of elections.  Indeed, they tout their proposed market as "Election Gambling", "Political Betting," "election betting," and an "Election-Betting Market."[4]  Instead, Kalshi attempts to distinguish "gambling" from "gaming," and then argues that the Contracts do not involve "gaming" under its definition because elections are not games.  Kalshi's argument defies common usage of the term "gaming," and ignores dictionary definitions and congressional intent, all of which demonstrate that the terms are interchangeable generally, and for purposes of Section 5c(c)(5)(C).

**1.  "Gaming" and "gambling" are interchangeable terms.**

Kalshi first repeats its argument that "gaming" and "gambling" are not interchangeable terms and that, therefore, the Commission incorrectly referred to definitions of "gambling" in interpreting "gaming" as including "staking something of value upon the outcome of a contest of others."  Kalshi Reply at 14.  Specifically, Kalshi claims, without support from any authority, that "gaming" is a subset of "gambling," the latter of which includes more than just "gaming."  Kalshi also insists, again without support, that the terms ordinarily have different meanings.  By contrast,

---

[4] *Press*, Kalshi, https://kalshi.com/blog/press (last visited Apr. 10, 2024).

the Commission set forth in support of its application of "gaming" both dictionary definitions[5] and caselaw[6] that show that the terms are interchangeable and carry the same meaning (CFTC Motion at 28-29; Order at 8 n.21).  The Commission also cited the statute's legislative history, in which Senators Feinstein and Lincoln confirmed in a colloquy that the "gaming" provision is intended "*to prevent . . . gambling* through futures markets" and "derivatives contracts" that "exist predominately to enable gambling."  156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010) (emphasis added).  Notably, many state agencies that regulate gambling are known as "gaming" commissions.  *See, e.g.*, Nevada Gaming Commission and Nevada Gaming Control Board, https://gaming.nv.gov/ (last visited Apr. 10, 2024); New York State Gaming Commission, https://www.gaming.ny.gov/ (last visited Apr. 10, 2024); Illinois Gaming Board, https://www.igb.illinois.gov/ (last visited Apr. 10, 2024).  Kalshi simply ignores all of this.

Kalshi next insists that "gaming" has a specific meaning that limits it to "games," including "playing games of chance for money" or "betting on games, including sporting events."  But this narrow interpretation lacks any significant support, and Kalshi fails to provide any dictionary definition that interprets "gaming" in this limited way, and to the exclusion of "gambling."[7]

Kalshi relies only on the definitions of the three classes of gaming under the Indian Gaming Regulatory Act ("IGRA") in 28 U.S.C. § 2703 to support its interpretation.  Acknowledging that the

---

[5] *See Gaming*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/gaming (defining the noun "gaming" as "the practice or activity of playing games for stakes: gambling"); *Gaming*, DICTIONARY.COM, https://www.dictionary.com/browse/gaming (defining "gaming" as "gambling"); *Gaming*, BLACK'S LAW DICTIONARY (2nd ed.), https://thelawdictionary.org/gaming/ (defining gaming as "gambling" and "an agreement between two or more to risk money on a contest or chance of any kind").

[6] *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014) ("The 'gaming activit[y]' is (once again) the gambling."); *see also In re Betcorp Ltd.*, 400 B.R. 266, 271 n.3 (Bankr. D. Nev. 2009) ("'Gaming' is generally regarded as a mild euphemism for gambling.").

[7] Kalshi claims in its Reply that "[d]ictionary definitions and common usage alike confirm that gaming—unlike the broader terms 'gambling' or 'wagering'—typically requires a predicate game.

IGRA's "class III gaming" is a catchall category that only defines "gaming" as all gaming activities not listed in classes I or II, Kalshi turns to a regulation to argue that class III gaming is limited to activities such as blackjack, slot machines, and sports betting under the IGRA.  25 C.F.R. § 502.4.  That citation is unpersuasive for two reasons.  First, it is the Department of the Interior's National Indian Gaming Commission's description by regulation of gaming activities, and not Congress's definition of gaming.  *See generally Definitions Under the Indian Gaming Regulatory Act*, 57 Fed. Reg. 12382-01 (Apr. 9, 1992).  The regulation, therefore, does not provide insight into Congress's interpretation of "gaming."  Second, the regulation on its face does not limit "gaming" to "games" because it is non-exhaustive: class III gaming includes "all forms of gaming . . . including *but not limited to*" the listed activities listed.  25 C.F.R. § 502.4 (emphasis added); *see United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1115 (D.C. Cir. 2009) (noting that "the phrase 'including, but not limited to' . . . indicate[s] a non-exhaustive list"); *Cooper Distrib. Co. v. Amana Refrig. Inc.*, 63 F.3d 262, 280 (3d Cir. 1995) (Alito, J.) (discussing the phrase "including, but not limited to").  Therefore, the list of gaming activities provided in the regulation are not exhaustive and does not exclude wagering or betting on the outcomes of elections.

### 2.  The Commission's interpretation of "gaming" is neither too broad nor too narrow.

Kalshi next contends that the ordinary meaning of "gambling" is too broad because it would cover bets on all contingent events.  In this regard, Kalshi critiques the Commission's interpretation of "gaming" as contrived (or, as Kalshi puts it, "gerrymandered") to avoid covering all event contracts.  But the question before the Commission was whether *Kalshi's* proposed Contracts involved gaming, not other contracts.  Because transacting in these Contracts so clearly falls within

---

Kalshi Br. 25–26."  Kalshi Reply at 14.  However, Kalshi fails to provide any of the allegedly supportive dictionary definitions in its Reply or in the portion of its Motion that it cites.

the ordinary meaning of the word "gaming," the Commission's decision was neither too narrow nor too broad. Moreover, the Commission's interpretation is consistent with the basic statutory canon that statutory terms cannot be read in isolation and must also be considered in "the specific context in which th[e] language is used, and the broader context of the statute as a whole." *Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 796 F.3d 18, 26 (D.C. Cir. 2015) (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion)). Thus, the purpose and legislative history of CEA Section 5c(c)(5)(C) also shapes the meaning of the statutory term. *See Lindeen v. SEC*, 825 F.3d 646, 653 (D.C. Cir. 2016). The Commission rightfully did not interpret "gaming" to include bets or wagers on all contingent events; to do so could have rendered the other enumerated categories superfluous. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) ("[E]ffect shall be given to every clause and part of a statute."). This was not "an outcome-driven gerrymander," as Kalshi accuses, but rather, the Commission's interpretation of the term complies with the "broad, sweeping" authority provided by Congress to "prevent gambling through futures markets" without subjecting every event contract to public interest review under the "gaming" category. *See Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 664 (D.C. Cir. 2009); 156 Cong. Rec. S5906; *cf. United States v. Mead*, 533 U.S. 218, 227-28 (2001) (noting "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of the statutory scheme it is entrusted to administer") (quoting *Chevron U.S.A. v. Nat. Res. Def. Counsel*, 467 U.S. 837, 844 (1984)).

### 3. Elections are contests.

Kalshi contends that elections are not "contests" in the context of gambling and, thus, betting on the outcome of an election is not staking something of value upon the outcome of a contest of others. This argument lacks foundation in common sense or parlance. As discussed in the Commission's Cross-Motion but ignored in Kalshi's Reply, elections for seats in either chamber

of Congress undoubtedly fall within the ordinary definition of a contest.  *See, Contest*, THE

BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/contest (last visited Apr. 10,

2024) (providing the definition, "a struggle or effort to win or get something," and an example, "the

presidential contest"); *Contest*, CAMBRIDGE DICTIONARY,

https://dictionary.cambridge.org/us/dictionary/english/contest (last visited Apr. 10, 2024)

(providing the definition, "an attempt, usually against difficulties, to win an election or to get power

or control"); *Contest*, MERRIAM-WEBSTER, https://www.merriam-

webster.com/dictionary/contest#dictionary-entry-2 (last visited Apr. 10, 2024) (providing an

example, "She hopes to win the contest for mayor").  Kalshi claims that no legal authority

characterizes elections as contests in the context of gambling, despite itself citing state gambling laws

that prohibit bets or wagers "upon the result of any . . . contest, wherever conducted, of skill."  Del.

Code Ann. tit. 11, § 1403(1); Fla. Stat. § 849.14.  This requires Kalshi to take the implausible position

that that "[n]o one would classify" an election as a contest of skill.  Kalshi Reply at 17.  Of course

they are – all else equal, the more skilled candidate wins the contest.

Kalshi also contends that the fact that some state statutes separately state that wagering on

elections is gambling while also stating that wagering on contests is gambling demonstrates that

elections are not contests for the purposes of gambling laws.  Kalshi Reply at 17.  However, the fact

that state gambling statutes have overlap and redundancies between different terms and provisions

demonstrates comprehensive regulation, rather than a narrow meaning of terms.  *See Mercy Hosp., Inc.

v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (noting "overlap may very well exist to make 'double

sure' that [statutory provisions] remain above the fray of litigation").

Kalshi adds that Congress could not have considered elections as contests in the context of

Section 5c(c)(5)(C) because an "election is not a game" or "staged for entertainment" and has "vast

extrinsic and economic consequences."  However, there is no indication that the consequences or

significance of the contest is relevant to whether the wager or bet on the contest is categorized as "gaming" or "gambling."  Kalshi cites Senator Lincoln's reference to bets on sporting events, such as the Kentucky Derby, as examples of event contracts that fall within the "gaming" category and argues that bets on sporting contests was Congress's main concern when enacting Section 5c(c)(5)(C).  However, a law's broadly-worded text guides our application of the statute, "rather than the *principal* concerns of our legislators."  *See Bostock v. Clayton Cty.*, 590 U.S. 644, 664 (2020) (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 59 (1998)) (noting that "unexpected applications of broad language reflect only Congress's 'presumed point [to] produce general coverage—not to leave room for courts to recognize ad hoc exceptions'") (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (2012)).  Accordingly, the Commission was not arbitrary and capricious when it determined that taking a position in the Contracts is "gaming."

## B. The contracts or transactions involve activity that is unlawful under State law.

In enacting Section 5c(c)(5)(C), Congress included a provision that the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the "agreements, contracts, or transactions involve— (I) activity that is unlawful under any Federal or State law."  7 U.S.C. § 7a-2(c)(5)(C).  The Commission determined that the Contracts involved activity that is unlawful under state law because taking a position, or transacting, in the Contracts would be staking something of value, or wagering, upon the outcome of contests between electoral candidates, and many states prohibit wagering on elections.  AR 12-13.  Kalshi raised to the Commission that any state law prohibiting wagering on elections does not and cannot refer to Commission-regulated event contracts, and the Congressional Control Contracts are therefore not unlawful under state law.  The Commission responded that this "misses the point."  AR 13 n.28. The Commission then explained that the relevant state laws here are not the state laws prohibiting

futures trading,[8] which are expressly preempted by the CEA.  Rather, the Commission explained

that the category was concerned with the "important state interests expressed in statutes separate

and apart from those applicable to trading on a DCM."  AR 13 n.28.

Kalshi continues to argue that "any . . . State law" cannot mean *any* state law because some

state laws are subject to federal preemption.  However, in this case, the Commission focused on

state laws that were *not* preempted by the CEA and that expressed a state interest outside the

Commission's regulatory regime.  AR 13 n.28.  Here, that interest was betting on elections.  AR 12-

13.  Even states that allow gambling prohibit betting on elections, because the concern is not

gambling *per se*, but election integrity.  *See, e.g.*, Nev. Rev. Stat. § 293.830; N.J. Stat. § 19:34-24.  There

is no support for the proposition that exclusive federal jurisdiction over exchange-traded futures

means that those state interests must give way to a registered DCM's desire to run an "Election

Gambling" operation on a regulated futures exchange.

Further, when Congress passed the Special Rule, they were aware the CEA would preempt

state law, such as bucket shop laws, but they nonetheless stated that the Commission may perform a

public interest review of an agreement, contract, or transaction that involved activity that was

unlawful under *any* state law.  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("We have

previously noted that '[r]ead naturally, the word "any" has an expansive meaning, that is, "one or

some indiscriminately of whatever kind."'") (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).

Accordingly, the CEA's preemption of certain state laws does not preclude the Commission from

reviewing event contracts that involve activity that violates state laws that express state interests

---

[8] To describe these, the Commission used the term "bucket-shop laws."  AR 13 n.28.  The term
"bucket shop" refers to an illegitimate gambling operation, common at the end of the nineteenth
century, that permitted betting on the market prices of stocks and commodities.  The CEA
preempts these laws.  *See generally Thrifty Oil v. Bank of Am. Nat'l Trust and Sav. Ass'n*, 322 F.3d 1039
(9th Cir. 2003).

separate and apart from those that would be preempted.  *See, e.g., Bostock*, 590 U.S. at 658-59

(determining Title VII's meaning based on the plain meaning of the broad language Congress used

and rejecting narrower interpretations because Congress "could have written the law differently").

Kalshi nevertheless insists that "if the Congressional Control Contracts 'involve' unlawful

activity because some States prohibit wagering on elections, then every event contract equally

'involves' unlawful activity because many States prohibit all wagering on contingencies."  Kalshi

Reply at 20.  But *that* argument overlooks federal preemption.  A state *cannot* prohibit trading all

event contracts because, as the Commission observed, CEA Section 2(a)(1) grants the Commission

"exclusive jurisdiction" over futures and swaps traded on a DCM, and this preempts the application

of state law.  AR 13 n.28 (citing 7 U.S.C. § 2(a)(1) and *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir.

1980)).  So while a state is preempted from outlawing futures trading simply because someone thinks

it resembles gambling, it *can* prohibit gambling on elections with no obstacle from the CEA.  That is

the sense in which Kalshi's proposal "involves" activity that violates state law, without regard to the

CEA's general preemption.  The question for the Commission was whether to *legalize* gambling

activity that is prohibited by *unpreempted* state laws, by allowing Kalshi to establish an Election

Gambling business on a federally registered DCM.  The Commission rationally determined not to.

Kalshi posits that by this reasoning, "but for federal preemption of state law," trading on any

event contract would be unlawful under state laws prohibiting trading on contingencies.  Kalshi

Reply at 20.  However, the Commission's careful application of the CEA's preemptive effect is

consistent with the structure of the statute as a whole.  While Congress has preempted certain state

laws, it has also expressly stated the CEA will not interfere with state investigatory power or general

civil or criminal antifraud laws, while also empowering the states to use the CEA's antifraud

authority.  7 U.S.C. § 13a-2.  Further, the relevant state laws that the Commission focused on in the

Order express interests that are separate and apart from laws applicable to trading on a DCM.  AR

15

13 n.28.  An inference from both Section 6d (7 U.S.C. § 13a-2) and Section 5c(c)(5)(C) is that Congress did not want to wholly annihilate state interests that may otherwise be subsumed by the CEA.  The Commission's construction effectuates the purpose of the section, the Congressional interest in preserving state interests, and the plain meaning, but does not subject all event contracts to the Commission's public interest determination.

The Commission's definitions of "involve," "gaming," and its interpretation of "activity that is unlawful under any . . . State law" were all driven by the plain meaning of the statute.  Therefore, the Commission was able to exercise its discretion to determine whether the Contracts are contrary to public interest.

### III.  The Commission's public interest determination was not arbitrary or capricious.

The Commission engaged in reasoned decision-making and easily met the standard for informal adjudications, even under the cases Kalshi relies on.  *Butte Cty. v. Hogan*, 613 F.3d 190, 195 (D.C. Cir. 2010) (stating an agency must provide a statement of reasoning and cannot refuse to consider evidence bearing on the issue); *Clark Cty. v. FAA*, 522 F.3d 437, 441 (D.C. Cir. 2008) (Kavanaugh, J.) (requiring an explanation when the only evidence in the record supported the opposite conclusion).  The Commission did not refuse to consider evidence, like in *Butte County*, nor was the agency confronted with only evidence that did not support its decision, like in *Clark County*.  Rather, the Commission adequately explained its reasoning, considered the relevant evidence, and demonstrated a "rational connection between the facts found and the choice made."  *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1135 (D.C. Cir. 2022) (quoting *Motor Vehicle Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S 29, 52 (1983)).

### A.  The Commission's determination under the economic purpose test was not arbitrary and capricious.

Kalshi's opening brief incorrectly characterized the Commission's Order as requiring "direct economic effects." Kalshi now attacks the Commission's brief for not engaging with their straw-

16

man argument.  Apparently, Kalshi views the Commission's role in determining whether the Contracts are in the public interest as deciding if there is *any hedging purpose at all*, and if so, Kalshi seems to argue the Commission must permit them.[9]  But, that is not the statute's structure.  The statute gives the Commission discretion to determine whether the Contracts are contrary to the public interest, and because the statute is phrased in such terms, it "fairly exudes deference to the [agency]."  *Sw. Airlines Co. v. Transp. Sec. Admin.*, 650 F.3d 752, 756 (D.C. Cir. 2011) (Kavanaugh, J.) (quoting *AFL-CIO v. Chao*, 409 F.3d 377, 393 (D.C. Cir. 2005) (Roberts, J., concurring in part and dissenting in part)).  The agency found (i) control of a chamber of Congress itself has no sufficiently direct, predictable, or quantifiable economic consequences; (ii) any eventual effects that Kalshi and commenters cited were diffuse and unpredictable; and (iii) the economics and structure of the transactions limit their utility as a vehicle for hedging.  Based on these findings, the agency determined the Contracts could not reasonably be expected to be used for hedging and/or price basing on more than an occasional basis and/or that the Contracts could not reasonably be expected to be used predominantly by market participants having a commercial or hedging interest.[10]  AR 19. It need go no farther.

---

[9] It indisputable that the Commission has the discretion to prevent a contract with *some* hedging purpose from trading.  War and terrorism, for example, may have effects on economic interests that are more predictable than an election's, and for which someone could articulate a mechanism for hedging with on-exchange derivatives, but the Commission may still determine it is contrary to the public interest.  As noted in the Order, the Senate colloquy even discussed that the provision would allow the Commission to prevent trading in contracts "that may serve a limited commercial function but threaten the public good."  AR 14 n.31.

[10] Kalshi also attacks the Commission's use of the test here, stating that the Commission did not apply the economic purpose test in its decision on the NADEX contracts.  CFTC, *CFTC Issues Order Prohibiting North American Derivatives Exchange's Political Event Derivatives Contracts* (Apr. 2, 2012), https://www.cftc.gov/PressRoom/PressReleases/6224-12.  The NADEX order, a 4-page order, is not at issue here, but nonetheless that order *did* reference the pre-CFMA economic purpose test, though the order did not fully articulate it.  Regardless, in the NADEX order, as here, the CFTC found NADEX had not met the economic purpose test, and the contracts were contrary to the public interest.  Thus, the agency has not changed course.  However, even if it had, it would only need to explain its reasons—and the agency's reasons for its use of the economic purpose test are

Kalshi also posits that because *some* commenters said they would use the contract for hedging—despite hundreds of comments opposing the contracts, many of which equated the contracts to gambling—the Commission *could not* find the expected hedging and/or price basing use is insufficient under the economic purpose test.[11]  In addition, and notably, throughout Kalshi's briefs, the record citations often focus on their own unsubstantiated views or those of Aristotle, which serves as a clearing house for trades on the PredictIt Market.  *Clarke et al. v. CFTC*, 1:24-cv-00167-JMC, ECF No. 55 at ¶ 38 (D.D.C.).  The CFTC cannot rely to the exclusion of others on the "self-serving views of the regulated entity."  *CBOE Futures Exch. v. SEC*, 77 F.4th 971, 979 (D.C. Cir. 2023) (quoting *Susquehanna Int'l Grp v. SEC*, 886 F.3d 442, 447 (D.C. Cir. 2017)) (requiring a "critical review" of the submissions of a securities exchange).  Regardless of whether these few comments are sufficient to establish a hedging use at all, the comments do not establish a hedging use that would be more than occasional or that the contracts would not be predominantly used by speculators.

The common sense, predictive judgment that the contracts in the "Election Gambling" market could not be reasonably expected to be used for hedging or price-basing on more than occasional basis is *precisely* the type of determination that is based on "highly complex and technical matters" and is therefore "entitled to great deference."  *Citadel Secs. LLC v. SEC*, 45 F.4th 27, 32 (D.C. Cir. 2022); *see also Bd. of Cty. Comm'rs v. U.S. Dep't of Transp.*, 955 F.3d 96, 99 (D.C. Cir. 2020) (noting that courts should give agencies "a wide berth when making predictive judgments").  Indeed, due to the nature of the informal adjudication, the Commission's common sense and predictive

---

adequately articulated here.  *See, e.g.*, *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 376 (D.C. Cir. 2013) (describing the requirements for a change in agency position as "a low bar").

[11] Kalshi cites one commenter arguing for a hedging purpose that compares the prediction markets to sports betting and casino gambling and stating he uses the prediction markets for income.  AR 1539-40.

judgment "*need not be explicitly backed by information in the record*,"[12] and this posture is exactly where the difference between a formal and informal adjudication "should not be underestimated."[13]  *Phoenix Herpetological Society v. U.S. Fish and Wildlife Serv.*, 998 F.3d 999, 1006 (D.C. Cir. 2021) (noting that in informal adjudications common sense and predictive judgments need not be explicitly backed by information in the record, whereas in formal adjudications, they do).

---

[12] Nevertheless, the Commission cited plenty of evidence for its judgment, including the economics and structure of the transaction, the evidence of the diffuse and unpredictable effects of partisan control of a chamber of Congress—including the very nature of the process for enacting legislation, and the many variables that affect the actual implementation of public policy, etc.  AR 15-17.

[13] Kalshi argues that the Commission placed on it an "unclear burden to sufficiently prove the extent of its contracts' economic utility," which "flips Congress's framework on its head" because "a contract is presumptively legal unless the Commission determines that the contract is 'contrary to the public interest.'"  Kalshi Reply at 29.  The nature of Kalshi's precise objection is not apparent, but it is certainly not true that the Commission applied a presumption against allowing the Contracts to trade.  The Commission did not base its decision on some unmet burden as to the Contracts' economic purpose.  It examined that purpose as something that could have weighed in favor of permitting the Contracts, and in so doing, Commission conducted its own analysis of the Contracts' economic utility evident from the structure, mechanics, and economics of the Contracts; reviewed public comments and Kalshi's own submissions regarding economic utility; and relied on its own expertise.  The Commission concluded that "it has not been demonstrated that the Congressional Control Contracts could reasonably be expected to be used for hedging and/or price basing on more than an occasional basis or that the Congressional Control Contracts could reasonably be expected to be used predominantly by market participants having a commercial or hedging interest."  AR 19.  This does not suggest that the Commission imposed an unclear burden.  Kalshi was undoubtedly aware that the Commission would consider economic utility because transactions subject to the CEA "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities."  7 U.S.C. § 5.  In this regard, Kalshi included with the 2023 Contract Submission, Appendix C "Risk Mitigation and Price Basing Utilities," AR 36-60, and later responded to the Commission's questions for public comment, including those about the Contracts' potential hedging and price-basing utility.  AR 1786-1841; 2669-2757.  The Commission owed Kalshi nothing more.  *See Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 926 (D.C. Cir. 1982) ("An agency is not obliged to publish a tentative opinion for comment.").  And, importantly, the Commission did not disapprove the Contracts simply because they lacked a meaningful economic purpose – it disapproved them in light of that fact and because numerous public-interest factors cut the other way.

**B.  The CEA has no specific factor the Commission must consider.**

Kalshi's argument that the Commission did not "meaningfully engage" with its asserted "extensive informational benefits" crumbles upon examination of the case it cites.  Kalshi Reply at 28.  In *Getty v. Federal Savings & Loan Insurance Corp.*, the agency was required *statutorily* to consider a specific factor, and the DC Circuit noted: "[w]hen a statute requires agencies to consider particular factors, it imposes upon agencies duties that are essentially procedural . . . .  The only role for a court is to ensure that the agency has considered the factor."  805 F.2d 1050, 1055 (D.C. Cir. 1986).  Section 5c(c)(5)(C) requires the Commission to consider no specific factor in its public interest analysis.  The Commission noted that Kalshi and other commenters stated the Contracts would serve as a check on misinformation, but there was also research that such markets may incentivize the creation of unreliable information.  AR 21-22.  The Commission's decision weighed the competing interests and risks, including the risk of incentivizing misinformation.  This is another example of how the Commission had to make a common sense, predictive judgment, based on uncertain future events.  *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments and interim regulations.").

**C.  The Commission's determination on election integrity provided a reasoned analysis and the Commission did not refuse to consider evidence.**

Kalshi now admits the Commission would be required to investigate manipulative events, and, realizing that its own economists had conceded short-term manipulations would happen, argues that what matters is long-term manipulative events.  The Commission's order focused on manipulations, and the CEA does not distinguish between a short and a long-term manipulation.

The Commission's brief only pointed out that the risk of short-term manipulative events, as admitted by Kalshi's own economists, *alone* supports the Commission's order.[14]

The Commission does not, and did not, agree there would be no long-term manipulative effects, and the Commission expressed concern about election integrity and perceptions of election integrity.  As the Order states, the Contracts create monetary incentives to vote (including as an organized collective) for particular candidates, AR 20, up to $100,000,000, AR 32-33.  Moreover, as the Order stated, the Contracts could incentivize the spread of misinformation[15]—and the public interest in guarding against such information is all the more pressing in context of federal election outcomes.  AR 20.  The Commission "need not suffer the flood before building the levee."  *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (Kavanaugh, J.).  Further, contrary to Kalshi's implication, short-term manipulations could have long-term effects by impacting fundraising, voter turnout efforts, and news stories covering candidates.  *See* AR 20, 22.  In short, the Commission found itself in the type of situation where it needed to forecast uncertain, future events.  In such moments, agencies are allowed to conduct a general analysis based on informed

[14] Kalshi completely misses the point by arguing "that kind of short-term risk exists in *any* derivative," Kalshi Reply at 30, overlooking one of the bases for the Commission's Order.  The Commission's Order discussed how the Contracts differ from vast majority of commodities underlying Commission-regulated derivatives—those have informational sources such as weather forecasts, federal government economic data, market-derived supply and demand metrics for commodities, market-based interest rate curves, etc.  Contrast those sources to what would underly the Contracts here—not a cash market with bona fide economic transactions—instead, the pricing information would be driven by unregulated informational sources that do not follow scientifically reliable methodologies.  AR 21.  The Commission noted this difference in price forming information "may increase the risk of manipulative activity relating to the trading and pricing of the contracts, while decreasing Kalshi's and the Commission's ability to detect such activity."  AR 21.  Again, this is precisely the type of determination, based on informed conjecture, the agency is entitled to conduct.  *See Nasdaq Stock Mkt. v. SEC*, 38 F.4th 1126, 1142 (D.C. Cir. 2022); *Phoenix Herpetological Soc'y v. U.S. Fish and Wildlife Serv.*, 998 F.3d 999, 1006 (D.C. Cir. 2021).

[15] Further, as the Commission noted, the Contracts do not exclude all individuals or entities who could have a motivation to create the impression of likely electoral success or failure on the part of a political candidate or candidates.  AR 22.  Kalshi does not, for instance, exclude agents of foreign powers.

predictions—and it did so here, reasonably. *Nasdaq Stock Mkt. v. SEC*, 38 F.4th 1126, 1142 (D.C. Cir. 2022) ("But an agency 'need not—indeed cannot—base its every action upon empirical data' and may, 'depending on the nature of the problem, . . . be "entitled to conduct . . . a general analysis based on informed conjecture."'") (quoting *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005)).

Thus, all that is required here is that, even under Kalshi's own case law, cited above, the agency provides a statement of reasoning, not refuse to consider evidence with bearing on the issue, and provide a fulsome explanation if the only evidence in the record supports the opposite conclusion. Here, the agency explained its reasoning, engaged with the relevant evidence, and was not confronted with a one-sided record. The Commission considered the Contracts' proposed economic utility properly using a critical review, the proposed non-economic benefits, and the concerns about election integrity and the perceptions on election integrity, as well as the Commission's role in policing it, and came to a reasoned judgment. The public interest determination is therefore sound.

## CONCLUSION

For the foregoing reasons and those stated in the CFTC's Cross-Motion for Summary Judgment, the CFTC respectfully requests that this Court grant the Commission's motion for summary judgment, deny Kalshi's motion for summary judgment, enter judgment in favor of the CFTC and against Kalshi on all claims, and order any other relief that this Court determines is appropriate.

Dated: April 10, 2024                                  Respectfully submitted,

                                                       */s/ Raagnee Beri*
                                                       Raagnee Beri
                                                         *Senior Assistant General Counsel*

                                                       Robert A. Schwartz
                                                         *General Counsel*
                                                       Anne W. Stukes
                                                         *Deputy General Counsel*
                                                       Margaret Aisenbrey
                                                         *Senior Assistant General Counsel*
                                                       Conor Daly
                                                         *Counsel*
                                                       Commodity Futures Trading Commission
                                                       1155 21st Street, NW
                                                       Washington, D.C. 20581-0001
                                                       Phone: (202) 834-9752
                                                       rberi@cftc.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2024, I served the foregoing on counsel of record using this Court's CM/ECF system.

*/s/ Raagnee Beri*