1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2

3    KALSHIEX LLC,
                                            Civil Action
4              Plaintiff,                   No.  1:23-cv-03257-JMC

5         vs.                               May 30, 2024
                                            1:00 p.m.
6    COMMODITY FUTURES TRADING
     COMMISSION,
7
               Defendant.                   Washington, D.C.
8    _____

9                    TRANSCRIPT OF THE MOTION HEARING
                     BEFORE THE HONORABLE JIA M. COBB
10                      UNITED STATES DISTRICT JUDGE
     APPEARANCES:
11

12   For the Plaintiff

13             JACOB M. ROTH, ESQ.
               AMANDA KELLY RICE, ESQ.
               JOHN HENRY THOMPSON, ESQ.
14             JOSHUA BROOKS STERLING, ESQ.
               SAMUEL V. LIOI, ESQ.
15             Jones Day
               51 Louisiana Avenue, NW
16             Washington, D.C. 20001

17   For the Defendant

18             ANNE WHITFORD STUKES, ESQ.
               CONOR BARRY DALY, ESQ.
19             RAAGNEE BERI, ESQ.
               MARGARET P. AISENBREY, ESQ.
20             Commodity Futures Trading Commission
               Office of the General Counsel
21             1155 21st Street, N.W.
               Washington, D.C. 20581
22

23

24   Court Reporter:  Stacy Johns, RPR
                       Official Court Reporter
25
        Proceedings recorded by mechanical stenography, transcript
               produced by computer-aided transcription

```
 1                     P R O C E E D I N G S

 2            MR. ROTH:  Good afternoon, Your Honor.  Jacob Roth

 3     from Jones Day on behalf of Kalshi.  And with me at counsel

 4     table is Amanda Rice, Josh Sterling, John Henry Thompson and

 5     Sam Lioi.

 6            THE COURT:  Good afternoon.

 7            MS. STUKES:  Good afternoon, Your Honor.  My name is

 8     Anne Stukes for the Commodity Futures Trading Commission.  And

 9     with me at counsel table is Raagnee Beri, Margaret Aisenbrey,

10     and Conor Daly.

11            THE COURT:  Good afternoon, everyone.  So we are here

12     on the parties' cross motions for summary judgment.  I don't

13     typically have oral argument, although I thought this was a

14     case where argument would be helpful to me in resolving the

15     motions.

16            I don't know who's arguing for plaintiff.  Is there a

17     time sensitivity in this case?  I know there's not a PI that's

18     been filed, but I'm just trying to understand.

19            MR. ROTH:  It was actually the first thing I was going

20     to say was thank you for hearing argument on motions.  We

21     haven't asked for a preliminary injunction but there is time

22     some time sensitivity because the contracts are tied to the

23     November elections.  So what we would like, ideally, is a

24     resolution that would allow, if needed, for appellate

25     intervention so that the contracts can be listed prior to that
```

```
1    election.

2              THE COURT:  That was my preliminary question.

3         All right, I will start with plaintiff.  I may

4    interrupt with some questions, but otherwise will try to

5    restrain myself to listen to your presentation.

6              MR. ROTH:  Great.  Thank you so much, Your Honor.

7         So as Your Honor knows we filed this case because the

8    Commission blocked Kalshi from listing its event contracts that

9    turn on partisan control of the House and the Senate.  And the

10   question for the Court is whether that agency action complies

11   with the Commodity Exchange Act and the APA.  And we've

12   reproduced on a slide here the text of the key statutory

13   provision from the Commodity Exchange Act.  And as you'll see,

14   it authorizes the Commission to block, prohibit the listing of

15   event contract if two elements are satisfied.

16        First, the contract has to involve one of the six

17   enumerated categories of activities, and then if it does, the

18   Commission may determine that the contract is contrary to the

19   public interest, in which case it's prohibited.  So far, I

20   don't think that's a point of dispute.  That's just what the

21   statute says.

22        Following that framework, our challenge here has two

23   basic components.  First, we do dispute that Kalshi's contracts

24   fall within the scope of those six -- any of those six

25   enumerated categories.  And that's really just a matter of
```

```
 1    statutory interpretation.
 2            Then the second piece is that we argue that even
 3    assuming the contracts did fall within one of those categories
 4    that Commission's public interest analysis was arbitrary or
 5    capricious.
 6            THE COURT:  I know I said I was going to restrain
 7    myself, but can I ask just a preliminary question?  I
 8    understand your argument to be because of this two-step
 9    framework that the statute sets forth, that if it's not in --
10    and I'll say enumerated, although the last one is a catchall --
11    but in not one of these categories then you don't even get to
12    public interest.
13            I noticed in your brief you had outlined some of the
14    safeguards that you client has put in into place with respect
15    to this contract in particular.  For example, paid members of
16    congressional staff aren't permitted to trade, other
17    safeguards.  I'm assuming that your client thought those were
18    important to maintain integrity of the process.
19            MR. ROTH:  Correct.
20            THE COURT:  But under your argument, because elections
21    don't fall, according to you in these categories, there's no
22    occasion for CFTC to even reach those safeguards.  So
23    presumably someone could post an event contract similarly to
24    what your client does, another DCM could do this without any of
25    those safeguards, and it's my understanding that under your
```

1    framework, CFTC would not have any interest in that.

2           MR. ROTH:  I agree that it wouldn't be relevant to

3    whether it falls within one of these statutory categories and,

4    therefore, this provision would not capture it.  What I'm not

5    sure about and what I can ask is whether there are other

6    regulations or provisions that may --

7           THE COURT:  Come into play.

8           MR. ROTH:  Yeah, that may speak to issues like that,

9    like who's allowed to trade on it, are there certain

10   restrictions beyond this, sort of, in-or-out provision.  Which

11   is just it's either allowed or it's not allowed.

12          THE COURT:  On a similar vein, I understood one of

13   your positions to be, look, this is a contract involving

14   control of the House; it's not talking about a discrete

15   election between two candidates, there are so many intervening

16   factors that have to occur before -- not even intervening

17   factors but it's not often dispositive of one election, who

18   controls the chamber.  Under your framework, though, would a

19   DCM be able to post an event contract for a presidential

20   election?

21          MR. ROTH:  Yes.

22          THE COURT:  Okay.  So that piece is responsive or

23   relevant to what?  Your point about this being a House, about

24   control of the House and that it's not, you know, a two-party

25   or two-candidate election, there's a lot of moving parts, what

```
 1   is that relevant to?
 2              MR. ROTH:  Let me try to answer it this way.
 3              THE COURT:  Okay.
 4              MR. ROTH:  If you imagine that there was a category on
 5   this list that said elections --
 6              THE COURT:  Okay.
 7              MR. ROTH:  -- then I think one could still say that
 8   these contracts involve elections even though it's one step
 9   removed from the election itself.
10              THE COURT:  Okay.
11              MR. ROTH:  Which goes to an issue that was sort of
12   debated in the briefs, which is does it have been to be
13   literally the underlying event or does it have to -- does this
14   underlying event just have to relate to the category.
15              We agree it's enough that it relates to the category.
16   So if you had the category that said "elections," even though
17   this was a couple steps removed, I think you could say it would
18   relate to elections and, therefore, fall within the scope.  Our
19   main argument, though, is it doesn't say elections.
20              THE COURT:  All right.  Continue please.
21              MR. ROTH:  Okay.  What I was going to say before
22   moving on was I'm going to be speaking to the statutory
23   interpretation piece of the argument, and my colleague, Amanda
24   Rice, is going to be speaking to the arbitrary and capricious
25   piece when I'm done.
```

```
1              Looking to the enumerated categories, we can sort of
2       simplify by taking four of them off the list right off the bat.
3       The last one, as Your Honor noted, is a catchall.  The
4       Commission is essentially allowed to add categories by rule if
5       they're similar to the listed five.  The Commission hasn't done
6       that, so we can sort of cross that one off the list for now.
7              And then, obviously, the Commission does not argue
8       that these contracts involve terrorism, assassination or war.
9       They do think "involve" is very broad, but not broad enough to
10      get them quite that far.  So we can strike two, three and four
11      from the list as well.
12             And that leaves the two enumerated categories that the
13      Commission focuses on, which are, number 1, unlawful activity
14      and then number five, gaming.  And I'd like to take them in
15      that order, which is the order they appear in the statute.
16             THE COURT:  Okay.
17             MR. ROTH:  So starting with the unlawful activity, the
18      way we understand that is that it refers to contracts where the
19      underlying event relates to some unlawful act.  Okay?  So for
20      example, if you had a contract on whether the D.C. murder rate
21      in 2024 is going exceed a certain level, if you had a contract
22      on whether a particular piece of art in the National Gallery is
23      going to be stolen within a period of time, those are unlawful
24      acts.  If you had a contract on those events, it would fall
25      within the scope of number one.
```

1          I think it fits the text and I think it fits the

2     context of the statute, and that's sort of an important point.

3     It aligns it with the terrorism, assassination and war

4     provisions that immediately follow it.  If you think about

5     terrorism, assassination and war, the common denominator is

6     they're bad.  Those are things we don't -- they're bad things.

7     Congress is concerned about people profiting from bad things

8     and about incentives to do bad things.  Right?

9          Using my hypothetical of the D.C. murder rate, you

10    don't want somebody to go hire a hit man to get the rate above

11    a level so you can make money.  Bad incentives.  It also just

12    feels offensive to have people profiting from, you know, there

13    was a terrorist attack, I'm going to make a lot of money from

14    that.  That's sort of the gist of 2, 3 and 4.

15         If you read 1 the way we read 1, it lines up perfectly

16    with that.  We don't want to incentivize crime, we don't want

17    to have people profiting from crime, so it's all parallel.

18         And, of course, that interpretation doesn't sweep in

19    Kalshi's contracts.  Elections are not unlawful.  They don't

20    even relate to unlawful activity.  So now let's consider the

21    Commission's interpretation.

22         As I understand it on this prong, what they're saying

23    is some states prohibit betting on elections, either as part of

24    their gambling statutes or in stand-alone provisions.  And the

25    Commission admits that those state laws don't directly apply in

1    the sense that they can't prohibit trading on a regulated
2    exchange because of preemption principles.  But the way I
3    understand what they're arguing is that they say, well, buying
4    and selling those contracts sort of amounts to a betting on an
5    election because you're staking something of value on the
6    electoral outcome.  If you did that outside the context of a
7    regulated exchange, then it would violate these state laws and
8    therefore the trading of the contract relates to unlawful
9    activity.

10          So a couple problems with that.  Number one, unlike
11   our interpretation, it doesn't align with the three that follow
12   it, because the key move that they're making there is instead
13   of looking at the underlying event and whether it is related to
14   the enumerated activity, they're looking at the trading of the
15   contract and whether it's related to the underlying activity.
16   That is a, sort of just a different focus of the analysis, and
17   it makes 1 sort of stand out relative to 2, 3 and 4.

18          THE COURT:  Can I ask you about that, because I think
19   that this defendant made this point -- the government made this
20   point.  Where it says "agreements, contracts or transactions
21   involved," what work do you argue "transactions" is doing in
22   the statute as it relates to involve?

23          MR. ROTH:  As I understand it, the agreement, contract
24   or transaction sort of triplet, it appears throughout the
25   statute.  It's just the way they refer to these types of

1    instruments when they define it.  So I don't think that they

2    have independent significance.  I think they're just capturing

3    any different way you might structure the arraignment.

4            THE COURT:  So you're not reading transactions to

5    refer to the act of trading the thing, it's another way to say

6    contract agreement; it is the contract, itself.

7            MR. ROTH:  It's the instrument, and I think that

8    follows from the fact that this is how it's used throughout the

9    statute, the three together.

10           And just to be clear, we're not saying that you

11   couldn't have a statute that said transaction involving X,

12   where what it meant was the act of contracting, it involves

13   that activity.  It's not that that's semantically impossible.

14   It's grammatically appropriate, it makes sense; it's just that

15   it doesn't line up with the way the statute works for 2, 3 and

16   4, and so it makes it just an unusual, sort of strange way of

17   speaking.

18           The hypothetical I was thinking about as I was

19   preparing, you could say, my lunch generally involves a

20   sandwich, a salad, a pastry or robust conversation with my work

21   colleagues.  You could say that, and yes, it could involve

22   those things, but putting them together in that way is weird.

23   It's not the way people normally speak.

24           But I actually don't think that's the most problematic

25   aspect of the Commission's reading of the unlawful category.  I

1    think the most serious problem with it and the one that really

2    is, I think, fatal is that it proves way too much, because as

3    the Commission observes elsewhere in the briefing, there are a

4    whole lot of states that prohibit betting on any contingent

5    event.

6            If we go to the second slide -- we've collected

7    them -- there's at least 29 that we've found that prohibit

8    staking something of value on an uncertain event or

9    contingency, and of course, that defines an event contract.  It

10   would mean that every event contract falls within the scope of

11   Roman I and would involve unlawful activity, and that just

12   can't be right because it makes the other five enumerated

13   activities superfluous.  And it defeats the whole purpose of

14   having enumerated activities in the first place because it

15   would allow the Commission to subject every event contract to

16   public interest scrutiny.

17           So every kind of interpretation tells us that's wrong,

18   and so does the statutory history, because sort of notably,

19   prior to 2000, that is how the statute worked.  If we go to the

20   next slide, we have that language.  They actually have to make

21   this public interest determination for every contract.  That

22   was repealed in 2000, and then in 2010 Congress enacted this

23   more limit provision that singles out the categories.  So I

24   think anything that covers the waterfront is necessarily an

25   erroneous interpretation.  I think the Commission actually

```
 1    admits that.  They say on page 11 of their final reply brief
 2    that, sure, you can't read any of these to cover everything,
 3    that would not be tenable.
 4         And so they try to explain why their interpretation
 5    doesn't do that.  And just to be candid, I don't really
 6    understand what they're trying to do there.  To me, if Kalshi's
 7    contracts involve unlawful activity because some states
 8    prohibit betting on elections, then all event contracts involve
 9    unlawful activity because some states ban betting on contingent
10    events.  So I think the bottom line on number 1 is our
11    interpretation is the only one that sort of makes sense in
12    context that gives this provision real work to do without
13    swallowing everything else.
14         THE COURT:  Can you respond -- and apologies if it's
15    in your reply, the Commission gave an example of a circumstance
16    in which they would say a contract involved war without the
17    underlying event actually being about war.  And I think the
18    example they gave is whether the Ukrainian military will
19    acquire certain munitions in 2024.  Can you speak to that
20    example?  They're saying, well, that would be, under their
21    broader reading, involve something that relates to war, but the
22    underlying event in the contract is not, itself, an act of war.
23         MR. ROTH:  That may have been our example.  I'm not
24    sure, because I think we agree with that.  It may have been
25    theirs.
```

1          THE COURT:  Maybe it was your example, sorry.

2          MR. ROTH:  I'm not sure it's a point where the parties

3     disagree.  I think it goes to the difference between "involve"

4     and "based on."

5          THE COURT:  I think that was your example.

6          MR. ROTH:  So "based on" would speak literally about

7     the underlying event.  That's too narrow for this, this says

8     involve, so there's this broader scope.  Our point is that the

9     broader scope is tethered around the event.

10         THE COURT:  Okay.

11         MR. ROTH:  So you're still looking at the event and

12    saying does the event relate to unlawful activity, does it

13    relate to war, does it relate to terrorism.  So you can sort of

14    game it by circumventing -- by sort of making it technically

15    something that's just a proxy, it would capture this.

16         THE COURT:  I just wanted you to flesh that out.

17    Okay.

18         MR. ROTH:  Okay.

19         THE COURT:  So when they say that you're reading or

20    using the word involved too narrowly, you would dispute that.

21    You're not disputing that involve means relate to -- all those

22    other dictionary definitions of involve.  It's just relates to

23    the underlying event in the contract.

24         MR. ROTH:  It's what has to involve.  We don't

25    actually disagree on what involve means; we disagree on what

1    has to involve what.  Right?  It's a subtle but important

2    point.

3         Okay, that takes us through Roman I.  Unless Your

4    Honor has further questions about unlawful activity, I'll move

5    to gaming, which is the second one that they argue.  Again, the

6    fight is about what does gaming mean in this statutory context.

7         Our core point is really simple:  Gaming requires a

8    game.  So if there's no underlying game, there's no gaming.

9    And so for example, if you have a contract on who's going to

10   win the Kentucky Derby, that's a game.  It's a horse race, it's

11   a game.  If you have an event contract on who's going to win

12   the Super Bowl or the point spread in the Super Bowl, it

13   involves a game.  There's an underlying game.  Same thing with

14   the lottery.  They have an underlying game that forms the basis

15   for the contract.  And if you read it and you understand it

16   that way, I think there are a number of benefits to that.

17        Number one, going back to what we were talking about

18   earlier, it lines it up with the others in the sense that there

19   is this connection back to the underlying event rather than

20   just talking about the act of trading in isolation.

21        Number two, I think is most consistent with the text.

22   The root word of gaming is game.  I think it aligns with the

23   legislative history, the famous colloquy that gets a lot of

24   discussion in the briefing between Senators Feinstein and

25   Lincoln -- which by the way, if Your Honor wants to watch it on

1    C-SPAN, you won't be able to find it.  I think it was inserted
2    in writing after the fact.
3           It wasn't literally a colloquy, but you can see it in
4    the congressional record, and they give three examples of
5    gaming contracts:  Football, horseracing and golf.  They're all
6    games.  I don't think that's an accident.  I think that
7    interpretation makes sense too, because what is a game?  It's
8    something that has no inherent economic significance.  It's
9    something that is done for amusement.  It may be done for
10   sport.  It may be done purely to facilitate the betting itself,
11   right, for its own sake.
12          So I think it makes sense for Congress to have thought
13   about that category.  Contracts that involve games are probably
14   not the type of contracts that we want to be listed on an
15   exchange, because they don't have any real economic value to
16   them.  But again, what's tying that together is the existence
17   of the game because the game is the thing that doesn't have
18   intrinsic economic significance.
19          Now, of course, elections are not games.  They're not
20   done for amusement; they're not done for sport; they're not
21   done to facilitate betting.  Elections matter.  They determine
22   our government; they determine our governance.  Nobody would
23   really call them games.  So in our view a contract relating to
24   an election is not gaming.
25          THE COURT:  I have never before this case considered

```
 1    the difference between gaming and gambling, but I'd love to
 2    hear more about your position on that, because I did look at
 3    the various dictionary definitions just to understand what
 4    these words mean that I have used many times.  And there are
 5    some definitions that you would say "cross reference" and they
 6    say "define as" gambling.
 7            So I understand your position to be, sure, gaming is
 8    part of gambling, but gambling is not gaming -- or gaming is a
 9    subset of gambling; gambling is not synonymous with gaming.
10            MR. ROTH:  I do think that's the better understanding
11    of the way the terms relate.  I think gaming has this more
12    close tie to the game, whereas gambling can have a broader
13    meaning.
14            I will say when I went through the dictionary
15    definitions closely, what I found was -- I think this is
16    important.  Even if you look at the definition of gambling,
17    there's generally two different definitions that are offered in
18    the dictionaries.  There's a narrower one and there's a broader
19    one.
20            So for example, the Merriam-Webster, the first
21    definition of gamble is "to play a game for money or property."
22            The second definition is "to stake something on a
23    contingency or take a chance."  Okay?
24            So you've got one definition that is tied to a game
25    and then one definition that is not tied to a game.  And the
```

same is true of the Concise Oxford English Dictionary -- which I think is also cited in the briefs -- two definitions of gamble.  Number one:  Play games of chance for money.

Number two:  Take risky action in the hope of a desired result.

I think that's sort of fair, there are two different ways of understanding gambling.  One is tied to the existence of a game, and one is just colloquially sort of broader, right, a betting.  I think what's important here is that the broader definition does not work for the same reasons we talked about earlier.  If you sort of adopted and imported the broader definition of gambling and treated any contract that involves staking something of value on a contingency or an uncertain outcome, then you've covered the waterfront of event contracts.  And so that can't be the right interpretation of gaming in the statute.  And I think that leaves us with the narrower interpretation in the dictionary, which incorporates the concept of a game.

Now the CFTC, they recognized this problem with the broader definition and actually not -- I didn't fully understand this from the order, but from the briefing it became clear.  They're sort of disclaiming the broader definition, because they understand that that doesn't work in context.  And so instead they're sort of offering a intermediate approach where they say, well, it does require betting on a game or a

1   contest, and then they say an election is a contest.  So voila,
2   there we go.  It fits.
3        In the brief we walk through each step of that logic.
4   What I'd like to here is offer a few higher-level observations
5   on that argument, because when you take a step back,
6   especially, I think it's just too clever by half.  It's sort of
7   this lawyerly attempt to parse it and get it in.  It's not
8   really a serious attempt at statutory interpretation.  I'll
9   just offer a few reasons for that.
10        Number 1, if Congress was really trying to get at
11   election contracts, the easy way to do that would have been to
12   have a Roman VI or VII that said "elections."  Very easy.  One
13   word.
14        To say that they were trying to do it by saying
15   gaming, which some definitions cross reference gambling, which
16   you could say involves a game or contest, it's the most
17   attenuated way of getting at this.  So strained that I don't
18   think it's very credible.
19        Second point is there's no support for this in the
20   legislative history.  The colloquy, again, it's all games,
21   nothing about politics.
22        Third, if you look at where they're getting the word
23   contest from, it's really instructive because they pull it from
24   a few state statutes.  And if we pull up -- we've got the text
25   of a couple of the samples of those.  But it's very clear when

1   you look at them that they're talking about contests that are

2   like games.

3         So for example, this is the Delaware -- their version

4   which is also materially identical to Florida -- and they talk

5   about betting or wagering on the result of any trial or

6   contests wherever conducted of skill, speed or power, of

7   endurance or human or beast.

8         I suppose there are some candidates for office who may

9   be described as beasts, but it's really not -- I just don't

10  think anyone would say in this context of the statute contest

11  means election, just like you wouldn't say in the context of

12  the statute that trial means a trial in this courtroom.  That's

13  not what this is about.

14        Same thing if you look at the next -- this is the

15  Louisiana version, talks about conducting as a business any

16  game, contest, lottery or contrivance.  When you put game and

17  lottery next to contest it, I think, implies a certain meaning,

18  and treating that as including elections is really a stretch.

19  I think we wouldn't -- we don't dispute that you can refer to

20  an election as a contest, just like you can refer to a

21  corporate board fight as a contest.  You could refer to a

22  lawsuit as a contest.  But in the context of these gambling

23  statutes, that's not what they are talking about.

24        And then the final point on this is I think it just

25  leads to some really arbitrary results, because if you focus on

```
1    gaming as involving a game, then there's a certain sense to it,
2    right?  As I said earlier, like games don't have any external
3    economic significance, generally speaking, so as a category it
4    makes sense for Congress the carve that out.
5          If you treat it as games plus elections, it's very
6    strange because it means you could have event contracts on the
7    weather, on whether somebody's going to be nominated for a
8    cabinet role, on what color dress Taylor Swift is going to wear
9    next week.  Any of those are fine, but elections would be swept
10   up by the gaming category.  It's just weird because even if you
11   think, look, elections are different and should be treated
12   differently.  And I know my colleague is going to try to
13   explain why that's misguided, but even if you accepted that, it
14   has nothing to do with the word "gaming."
15         So I think the, sort of, takeaway is the Commission is
16   latching onto this word as sort of a convenient way to squeeze
17   its desired policy outcome into the statute, but it's not a
18   serious attempt to really understand what Congress meant by
19   this term in this context.
20         THE COURT:  When you're saying, and I would agree,
21   that a game doesn't have any external economic significance,
22   how does that -- how is that relevant for the specific argument
23   you're making?  What exactly do you mean by that?
24         MR. ROTH:  What I mean is if we're trying to think of
25   what was Congress trying to get at with gaming --
```

1          THE COURT:  Okay.

2          MR. ROTH:  If we understand gaming to mean a contract

3    that involves an underlying game, then there's a certain policy

4    sense to treating that category differently, because Congress

5    could have been thinking about it and saying well -- there is

6    some of this in the legislative history, the colloquy, if you

7    look at it -- well, games don't matter in the real word;

8    they're games.  So we don't want people essentially gambling,

9    right, on something that doesn't matter in a CFTC-regulated

10   exchange.  So it gives some sense to the categorization that

11   Congress laid out.  And the problem I have with the alternative

12   interpretations is they don't have that, sort of, unifying

13   policy rationale behind them.  Right?

14          Again, the really broad version sweeps up everything;

15   that doesn't work.  And then games plus elections, what is

16   tying those things together?  It's not, it doesn't seem to me,

17   a line that you could really seriously draw from this word.  So

18   that's what I'm trying to get at.

19          THE COURT:  Okay.

20          MR. ROTH:  Okay.  So that takes care of Roman V, and

21   so our position is that is then the end of the analysis and

22   there's no need to go any further, but I will turn it over to

23   my colleague, if Your Honor has no further questions on this

24   piece, to address the arbitrary and capricious issue.

25          THE COURT:  There are a lot of references by the

1    Commission about kind of representations on your client's

2    website about what it does.  Do you want to respond to that?

3             MR. ROTH:  I think it's a page that just pulls press

4    articles.

5             THE COURT:  Okay.

6             MR. ROTH:  So it's just like a collection of links to

7    articles that have mentioned Kalshi.  It's not like a

8    representation by the client about what --

9             THE COURT:  What its business is.

10            MR. ROTH:  It's like here, people are talking about

11   us.  Here's a list of stories.

12            THE COURT:  Okay.

13            MR. ROTH:  Thank you, Your Honor.

14            MS. RICE:  Good morning, Your Honor.  My name is

15   Amanda Rice, and I'm here to talk briefly about the

16   Commission's public interest analysis.  As my colleague

17   explained, we think the statutory issue is dispositive, so you

18   don't have to go this far, so I'll try to keep it pretty quick.

19   But even if you disagree with us on the statutory argument,

20   they are still required here because the Agency's public policy

21   analysis was arbitrary and capricious.

22            I'll start with just a brief note on the standard of

23   review.  There was some back-and-forth on this issue in the

24   brief, but as I think the Commission acknowledges in the end,

25   the arbitrary and capricious standard applies to all final

```
1    agency actions regardless of their form.  That's a deferential
2    standard for sure, but it has some real teeth.  It means
3    agencies have to engage in reasoned decision making, and agency
4    actions are arbitrary and capricious if they apply the wrong
5    standard or ignore relevant considerations or they don't
6    explain themselves reasonably.
7              Those are the kinds of arguments we're making here.
8    And they go to both sides of the public interest analysis, the
9    sort of benefits on the one hand and the alleged harms on the
10   other.  So I'll take those two points in turn starting with the
11   benefits.
12             (Court reporter clarification.)
13        MS. RICE:  I was trying to be quick but don't want to
14   speak too quick.
15             THE COURT:  Take your time.
16        MS. RICE:  So the economic benefits all follow, I
17   think, from one simple proposition, which is that partisan
18   control of Congress has economic implications.  I think that's
19   pretty commonsensical, but there's a ton of evidence in the
20   record to support that point.  I've just got a couple of points
21   highlighted on the slides here.  The first one is from Harvard
22   professor, Jason Furman who's a former chairman of President
23   Obama's Council of Economic Advisors.  He explains that
24   Congressional control impacts legislation, policy and the
25   business environment in ways that have direct economic
```

consequences to businesses and workers.  He says this risk is
conceptually identical to climate risk, business interruption
risk and other risks that can be managed using financial
markets.

On the next slide we've got managing director of
JPMorgan, so coming from a different perspective, who explains
that election risk is one of the largest risks that their
clients face, that the frequently engage proactively on how to
minimize it or to hedge it.  Hedging is a word, as I understand
it, for minimizing risk.

Mr. Lisboa gives the example of specifically the coal
industry, but there are a lot of other examples in the record
that stand out on different sides.  So there's a software
company serving green energy businesses.  It's at page 1597 of
the record.  There's a recycling robotics firm.  That's at 1533
of the record.  These are just sort of common sense examples of
businesses that have direct control of partisan control of
Congress.

And then take it from Sam Altman who's the CEO of
OpenAI.  He explains here the different risks that biotech
companies face.  Those are direct and they're predictable.  He
explains they involve everything from the FDA and different
approvals to research, funding and legislation.  So it's not
just legislation, there's all kinds of other things that
Congress is doing here.

1          Because these risks are so significant, financial

2     institutions already offer projections on the economic impacts

3     of elections, and there's instruments for hedging against those

4     risks.  You've already seen it from JPMorgan.  There's more

5     examples of that on pages 42 to 44 of the record, if that's

6     helpful.

7          And then there are the noneconomic benefits.

8     Researchers, policymakers, the public, everyone benefits from

9     market-based data about elections.  These markets already

10    exist.  I know Your Honor is familiar with in nonprofit forms

11    because this information is so valuable.  So these are just a

12    few examples from the record.  But that's really just tip of

13    the iceberg.  I thought pages 40 and 41 of our opening brief

14    and 68 to 70 of the record really tell this story of the

15    noneconomic benefits.

16         So the agency doesn't have much to say about either of

17    those two points, so they respond mostly by trying to move the

18    goal post.  They make what I understand to be two primary

19    arguments.  The first one is about direct effects.  They say

20    that the economic effects of elections, sure, that they exist

21    but they're not direct enough.  I think Your Honor is using the

22    language of too many intervening events to make a difference.

23         We explained in our brief that the record says

24    otherwise.  You've already seen some examples today.  I think

25    more important and more fundamental is the idea that the whole

point of having hedging with event contracts is to account for
diffused risks.  This is not a one-to-one kind of hedging
product like the way insurance works.  If there's a hurricane,
for example.  That example helps me because you can see both
the direct and indirect effects of a hurricane, right?  It
might destroy property, but it does other stuff too.  It deters
tourists.  You can't always predict exactly what those effects
might be, but it's a feature, not a bug of these contracts.
They allow you to capture anything that might follow from an
event like this.

        THE COURT:  If I can just stop you right there.  So
what I understood the argument on the other side to be is
certainly if a hurricane hit, the extent of the damage or
effect on tourism or property, that might not be able to be
predicted in advance.  So whatever your worst fear might not
materialize, but whatever effect there is will be direct.
Meaning to the extent that there is property damage, you can
trace that directly to the hurricane.  So maybe the result
doesn't materialize in the way that it was predicted, but there
is a direct effect.

        And my understanding is that, at least they would
argue, with elections, particularly in this context where we're
talking about control of a chamber of Congress by a party that,
sure, whatever thought about what might happen may not
materialize, but to the extent there is an effect, you may not

```
 1    be able to trace it directly to who controls a party at a given
 2    time or a chamber of Congress at a different time because there
 3    are so many variables:  Who's in office as president, kind of
 4    what the split is, if it's a more even split, kind of what the
 5    priorities are of Congress.  Despite control, legislation
 6    doesn't always get passed or become a priority.
 7              So what would you respond to their point about this
 8    not being the kind of direct economic effect that some of the
 9    other trading contracts have?
10              MS. RICE:  I think you're right about what their
11    argument is, but I think both pieces of it are wrong.  And
12    starting with the hurricane example, I think hurricanes do have
13    very similar indirect effects, so you're talking about property
14    damage.  But that's not it.  There might also be decreases in
15    tourism that might also have to do with other features of the
16    weather, did an amusement park get built nearby.  Things like
17    that might also affect tourism.  It's not going to be
18    one-to-one.  There's actually a pretty helpful chart on pages
19    53 to 55 of the record that identifies some other event
20    contracts and tries to explain exactly that point:  Here are
21    the ways in which the economic impacts are not direct; they're
22    indirect.  And that's true of temperature fluctuations.  So is
23    it going to be hot in California this month, that might have
24    some direct effects and then some indirect effects.  That's the
25    first piece of it the way other contracts work.
```

1          The way Congress works, there's also a lot of evidence

2     in the record that there are direct effects here.  That just

3     the election, a change of control in Congress affects stock

4     prices immediately, affects the valuations of entities

5     immediately without any legislation passing; that legislation

6     passing is, of course, a piece of this, but these economic

7     impacts happen even if no legislation passes.

8          So I thought the discussion at 40 to 46 of the record

9     is pretty helpful on that.  It has some examples.  I'll point

10    to 1397, which shows that the green energy sector surged as a

11    result of the democratic party senate takeover.  Again, before

12    anything happened, it's just control of Congress that has these

13    direct effects.

14         So to circle back to your question, I think direct

15    effects is a strange question to be asking for these contracts

16    but not others when all event contracts have these sort of

17    indirect economic effects.  But even if that were the question,

18    I think it's pretty clear that there are direct effects here,

19    if that answers your question.

20         THE COURT:  Maybe you're about to get to this.  I

21    don't want to distract you from your presentation, but can you

22    speak to the manipulation and integrity piece, because I do

23    think -- and obviously I'm going to look very closely at the

24    statute and follow what it says, but I do think there is kind

25    of a -- just to be honest, a gut reaction that people might

1    have that, wow, betting on elections doesn't seem like a good

2    idea.  It seems like there's a lot of room for manipulation,

3    for kind of unsavory things happening.

4          Can you speak to that directly and what your position

5    is as it relates to the public interest concern?  Because I

6    understand a significant part of the Commission's view that

7    this is against public interest has to do with some of those

8    concerns.

9          MS. RICE:  Absolutely.  I'll skip right there.  I

10   think you're right that that's what the Commission said, that

11   it sort of feels icky or that there's a risk of election

12   manipulation in some form.  And I think starting with the risk

13   of manipulation, which I think is the more serious public

14   interest analysis, the icky feeling I think is misguided, but I

15   think it stems from the misunderstanding that these contracts

16   could influence elections in some way or people will be buying

17   votes or things like that.

18        So I guess I'd start by pointing out that political

19   event markets have existed forever, in unregulated forms but

20   also in other democracies.  And I don't think there's a feeling

21   in those places that somehow the existence of these markets

22   affects the integrity of elections.  Then there's good research

23   in the records showing that this kind of manipulation is not

24   remotely plausible.

25        I found the comment from the Center for Effective

1   Altruism particularly helpful at this point.  That's at pages

2   1427 to 1436 of the record.  Kind of take each aspect of the

3   election manipulation arguments and unpack them one at a time

4   and explain why they're wrong.

5          At that time most basic level I think the key point is

6   that people try to influence elections because they matter.

7   They matter for our lives, they matter for their economic

8   effects, but for lots of other reasons.  And so there's lots of

9   money and effort spent on influencing elections.  That's what

10  campaign finance fights are all about.

11         And there's a way in which you might think that some

12  of that's icky, or you have the same reaction that spending

13  money to try to get elections is icky, but I think it's

14  important here to point out how much money and how many

15  incentives there are in these elections because it makes

16  manipulation seem pretty darn unlikely, particularly as Your

17  Honor pointed out at the beginning, that this is a contract

18  about control of Congress.  I think this is another place where

19  that point is relevant.  So it's not particularly relevant to

20  the statutory analysis, but on the public interest piece, if

21  you're asking what's the public interest here, we're looking at

22  this specific contract and asking whether there's a serious

23  public interest harm on the other side, if there's some

24  possibility that having a regulated event contract market as

25  opposed to the unregulated ones that already exist could result

1    in manipulation of control of Congress.

2            It's just pretty hard to imagine -- I think if there

3    were a way to manipulate control of Congress, someone would

4    have tried.  It's hard to imagine that the event contract

5    market could change all of the profound incentives that already

6    exist.  It sort of circles back to the initial point that

7    elections matter, they have real life consequences and that's

8    why people try to impact elections.  I think the record is

9    pretty clear that the possibility of manipulation is just pure

10   speculation; that there's not evidence supporting that sort of

11   intuition that you came up with at the beginning that there's

12   something that feels a little bit strange about that.

13           One last point, I think the Commission suggested, too,

14   it would have to police elections if it approved these

15   contracts.  My response to that is just the Agency regulates

16   contracts that have underlying events of all kinds.  So an

17   event contract on power plant emissions doesn't mean the CFTC

18   has to become the EPA all of a sudden and regulate power plant

19   emissions.  In the same way that an event contract that has to

20   do with stock prices doesn't turn it into the SCC, all the

21   Agency does is the same thing it does in any other context, it

22   just regulates the market, not the underlying activity.  So

23   insomuch as that's the other aspect of this, that there's a

24   concern about manipulation and there's a concern about the

25   Agency and what it would have to do as a result, I think

1   there's no real reason to worry that its role would be any

2   different here than it is in any other context.

3           THE COURT:  Do you have anything to add to what your

4   colleague was saying when I asked the question about the

5   particular safeguards that your client has put into place and

6   obviously deemed important?  For example, the one that sticks

7   out is, well, if you're a paid member of a congressional staff

8   then you obviously cannot trade these contracts.  And there are

9   other safeguards that were put into place, but as I understand

10  your position, the Commission wouldn't reach that because it's

11  not enumerated in the statute so there would be no public

12  interest inquiry, and so those kind of conditions or safeguards

13  would not be required, nor is the fact that this is an election

14  contract involving control of the House particularly relevant.

15  A DCM could have this event contract for the upcoming

16  presidential election, right?  So those things that you point

17  to as evidence of, well, there are safeguards in place and this

18  is about control of Congress, that's not really relevant to the

19  statutory question, correct?

20          MS. RICE:  You're right that it's not part of the

21  statutory question.  It is relevant to the public interest

22  analysis, if you get that far.  If you assume that we lose on

23  the statutory analysis, which we don't think is the right

24  answer here, but if you get to public interest so this is a

25  gaming contract or unlawful activity contract, then you're

1    looking at the public interest and it is relevant the kinds of

2    safeguards we have in place and the fact that this is a

3    contract involving --

4         THE COURT:  I guess that's my point, if under your

5    reading you wouldn't get to the public interest, so that's my

6    point, the Commission would have no ability or interest in

7    considering the fact that a contract didn't have such a

8    safeguard.

9         MR. ROTH:  I didn't want to cut you off, but I had to

10   ask my colleague who actually knows the statutory framework

11   better.

12        THE COURT:  Okay.

13        MR. ROTH:  What he clarified for me was that there are

14   separate antifraud provisions, anti-manipulation provisions and

15   what they call the core principles that you have to comply

16   with.  And so that's where some of these other safeguards come

17   from.  It's just not from this particular statute.

18        Sorry, I didn't mean to --

19        MS. RICE:  No, no, no.

20        THE COURT:  Let me just make sure I understand.

21   You're saying it's not implicated by this statutory provision

22   that's at issue in the lawsuit, but as part of this scheme,

23   generally, there's other safeguards.  And these are statutory

24   from the Commission, meaning that you have to comply with these

25   provisions?

1          MR. ROTH:  Right.  That's right.

2          THE COURT:  Okay.

3          MS. RICE:  That's all consistent with my

4    understanding, and there's some stuff in the record on this,

5    too.  Pages 80 to 88 of the JA and 99 to 100, we talk about the

6    core principles and the kind of background rules in place just

7    to be a regulated market that this CFTC regulates, you have to

8    have these protections.  You listed out the specific people

9    that aren't allowed to trade, and all of that is exactly right,

10   but there is separately and for all contracts a prohibition on

11   any insider with any non-public information trading on these

12   contracts.  So that's in addition to the

13   specifically-enumerated categories.

14         THE COURT:  That makes sense.  And that applies to any

15   of these event contracts?

16         MS. RICE:  Exactly.  To everything.  So where there is

17   insider trading or manipulation, the Agency has the tools to go

18   out and investigate those things.  They're just not relevant to

19   the statutory analysis in the first instance, if that makes

20   sense.

21         Unless you have anything further, Your Honor, I'll

22   just wrap up by reiterating that I don't think you need to get

23   to public interest, but if you do, you still should vacate the

24   order as arbitrary and capricious.

25         THE COURT:  I do have another question.  I don't know

1 | whose, so I will let whoever answer this.  There is something

2 | in the Commission's brief that I thought was -- it's this

3 | point:  Unlike many hedging and risk management contracts, the

4 | payout on the contract at issue here is not in any way tied to

5 | actual or estimated losses incurred elsewhere and a loss on the

6 | contracts is not offset by a gain elsewhere.  I just thought

7 | that was interesting and wanted your response to that.

8 |      MS. RICE:  I don't think that's as unusual as the

9 | Commission makes out.  The example that comes to mind

10 | immediately is the temperature-related contracts.  I think that

11 | works in the same way, that that's not a gain or a loss

12 | necessarily.  It's not clear even which way that cuts.  There

13 | may well be other examples, but my immediate reaction to that

14 | is I don't think that's particularly unusual in this context.

15 |      THE COURT:  I'm learning more about this market

16 | through this case, but this whole futures market, it seems to

17 | me it's grown beyond the days in which only those who are

18 | interested in the commodity or directly affected are

19 | participating.  I mean, that's the case for all these

20 | contracts, right?

21 |      MS. RICE:  That's true of all the contracts.  In fact,

22 | I think as the Commission's order, I think, acknowledges, some

23 | amount of speculation or people who are investing in these

24 | instruments to make money is actually necessary for the markets

25 | to be liquid, because if it was just hedgers, if it was

```
 1    100 percent hedgers, you don't actually get someone willing to
 2    balance out the price and sell you or buy from you at the other
 3    side.
 4         So there are people in all of these market who don't
 5    have a direct hedging interest, but the hedging piece of it is
 6    certainly meaningful, and potentially more meaningful in this
 7    context than many of the others.
 8         THE COURT:  Is there anything else you want to say
 9    about their economic purpose test?  I'm trying to see what the
10    daylight between the two parties is with respect to that test
11    and how it's applied.
12         MS. RICE:  So I think we agree that the Commission has
13    discretion to consider the economic impacts of these contracts,
14    that this statue and these instruments are about economic
15    benefits.  I think where we diverge is the Commissions focus
16    on, sort of, two things.  One is direct effects as opposed to
17    indirect effect, we talked about.
18         And the other is this predominately hedging or more
19    than occasional hedging.
20         THE COURT:  That's what I meant.
21         MS. RICE:  The language shifts in the order, and I
22    think the difference probably matters.  Occasional sounds to me
23    like something less than predominant.  I'm not entirely clear
24    which one the Commission is advocating for.  So I think part of
25    the problem with that standard is that it's not clear what it
```

means, whether it means a certain number of uses, how many dollars are going to be spent in a hedging way, is it a proportion of uses, is it some combination of the two and how much is occasional.  I don't know that you need to get into that, Your Honor, because I think by any metric, the record shows there will be more than occasional uses here.  But I think those are the two points on which we really disagree, not on whether economic benefits are relevant.

THE COURT:  The same question.  I don't really understand there to be a dispute about my standard of review here and what the applicable review framework is.

MS. RICE:  I agree with that, Your Honor.  There was some back and forth about rule-making cases versus adjudication cases.  Ultimately the standard is arbitrary and capricious for both.  There are more rule-making cases, and this proceeding is a bit unusual in that there were formal comments accepted and considered, which doesn't turn it into a formal rule-making.  That's never been our argument.  But it looks a little bit more formal than informal adjudication does, but you're right that the standard is the same.

THE COURT:  All right.  Thank you.

MS. STUKES:  Good afternoon, Your Honor.  To reintroduce myself, I'm Ann Stukes on behalf of the Commodity Futures Trading Commission.  As we did in our briefs, I'm going to refer to my agency today as the CFTC, or the Commission.

1    And I'll refer to the plaintiff simply as Kalshi.

2         I have about an hour's worth of remarks for Your Honor

3    today, if that is okay with you.

4         THE COURT:  We may take just a court reporter break at

5    some point, so I'll let you get started.

6         MS. STUKES:  Thank you.  Any time you want me to jump

7    to an issue, please just let me know.

8         THE COURT:  Could I just ask you something I'm curious

9    about to start?

10        MS. STUKES:  Absolutely.  Sure.

11        THE COURT:  With respect to this catchall category,

12   the Commission specifically didn't make an argument that this

13   contract falls within the catchall, and I was just curious as

14   to -- I'm not saying it does, I'm just curious as to why that

15   wasn't the position of the Commission.

16        MS. STUKES:  In considering the case that was before

17   it, the Commission examined these contracts and determined that

18   two categories applied, enough to bring it within the statute

19   and therefore didn't reach any further categories.

20        THE COURT:  Okay.

21        MS. STUKES:  So as the Court is aware, the CFTC's

22   order that's at issue in this case determined under CEA section

23   5CC5C -- I call it 5CC5C, I'm talking about the same statutory

24   language that's codified at 7 U.S.C. 78-2.  The CEA is, like

25   many statutes, sort of odd where sometimes our statutory

1    sections don't line up with the codification.

2           In any event, the order at issue here determined under

3    CEA 5CC5C, that Kalshi's proposed Congressional control

4    contracts should not be offered on Kalshi's platform because

5    the Commission determined that those contracts were contrary to

6    the public interest.  And we submit that this Court should

7    conclude that the Commission's decision was not arbitrary or

8    capricious.

9           The Commission's decision addressed four principle

10   issues that the parties have briefed and I will discuss today.

11   First, how does the word "involve" apply to activities

12   enumerated in the statute.

13          Second, do these proposed contracts involve the

14   enumerated activity of gaming.

15          Third, do the contracts involve the enumerated

16   activity of activity unlawful under state or federal law.

17          And four, are the contracts contrary to public

18   interest.

19          Before I get into the substance of each of these

20   issues, I want to emphasize that the Commission's order is an

21   informal adjudication, and Your Honor just asked about the

22   standard of review.  This is not a rule-making and it's not

23   even a formal adjudication, and that means in practical terms

24   that the Commission was deciding just one issue, whether these

25   particular proposed contracts should be listed on Kalshi's

1    event contracts platform.  And the Commission didn't purport to

2    address any other question larger than that.  So for instance,

3    the order doesn't establish the full metes and bounds of how

4    the statute might apply to any other event contract other than

5    the ones that were before it.

6            THE COURT:  And just for my own information, is it

7    typical for the Commission to solicit comment in a circumstance

8    like this?

9            MS. STUKES:  It's not required.  It did so, I think,

10   in an abundance of caution.

11           THE COURT:  Is that an unusual event or not unusual?

12           MS. STUKES:  I don't want to say something misleading,

13   especially without talking to my colleagues about how

14   frequently have we done this.  I wish I had a better answer for

15   Your Honor.

16           THE COURT:  It's more out of my curiosity.

17           MS. STUKES:  I can see why.  I think the Commission

18   did it really in an abundance of caution because of public

19   interest associated with this topic generally.

20           THE COURT:  Okay.

21           MS. STUKES:  I'm emphasizing that this is an informal

22   adjudication, because when Your Honor considers the question

23   before you, which is rather the Commission ran afoul of what's

24   required under the Administrative Procedures Act, the standard

25   of review is a lenient one.

```
1          The law requires only that the Agency acted within a
2   zone of reasonableness.  Here the CFTC reasonably considered
3   the relevant issues and reasonably explained its position and
4   no more was required under the APA.  The APA gives the Agency
5   deference on its predictive judgments and on its public
6   interest determination.
7          Now, there are questions of statutory interpretation
8   in this case.  And Your Honor finds herself maybe in the
9   unenviable position of having each party in this case tell you
10  the statute is unambiguous, that the plain meaning advocated by
11  each side supports each side.
12         I submit that the Commission has the better of the
13  argument on what the statute means and how it applies on
14  involve, gaming and unlawful under state law, that the Court's
15  review on the statutory interpretation questions is de novo.
16         I'll get into now the first of the four issues that
17  are before the Court that are briefed in the party's papers,
18  and that is the Commission's reading of the word "involve" to
19  have its ordinary meaning to relate to or affect, to relate
20  closely, to entail or to have as an essential feature a
21  consequence.
22         These are the ordinary dictionary definitions of the
23  term, and that is the definition that applies because the term
24  involved is the -- the term involve is not defined in the
25  statute.  And so case law has held for a long time that when
```

1    there's -- when the statute doesn't define the term, its

2    ordinary meaning applies and that means the ordinary meaning in

3    dictionaries.

4         So what that means for the statute here is that the

5    plain meaning of "involve" when we're talking about the

6    categories enumerated in the statute that would render an event

7    contract eligible for public interest review, the word

8    "involve" is broad enough by its plain meaning to cover event

9    contracts whose underlying, meaning the event on which the

10   contract is premised, here the outcome of congressional

11   elections.  The statute is broad enough to cover contracts

12   where whose underlying involved the enumerated activity, as

13   well as contracts that relate closely, entail or have as their

14   essentially feature or consequence the enumerated activity.

15        THE COURT:  I don't understand the plaintiff to

16   necessarily disagree with the definition that you've set

17   forward, but I think when you say that closely relates to or

18   entails, they're saying yes, to the subject matter or

19   underlying activity of the contract.

20        So can you just speak to that?  Because I had thought

21   initially that there was some difference with how you were

22   defining involve.  And now having heard from plaintiff and

23   going back and reading their brief, reviewing those portions of

24   the brief, I now see more clearly what they were saying, that

25   those definitions have to relate to the activity at issue

1    underlying the contract.

2            So if you could just speak directly to that.

3            MS. STUKES:  That is generally my understanding of the

4    dispute between the parties here.  And that is, as I understand

5    the plaintiff's -- and not to mischaracterize, but as I

6    understand the plaintiff's position, they're saying involve, if

7    it means anything, it has to mean that the underlying event

8    involves an enumerated activity and it can't be a broader

9    relationship involving the contract itself.

10           So when we look at the statutory language and whether

11   a contract is in the scope of the -- pardon me, of the statute

12   at all, it's a two-step inquiry.  So the first step in the

13   statutory language is, does the agreement, contract,

14   transaction, or swap in an excluded commodity that is based

15   upon, based upon -- that means the underlying, based upon the

16   extent of an occurrence or contingency.

17           So step one in other words asks, is the contract based

18   on, does it -- is it based on -- is the underlying an event.

19   Because this -- pardon me -- this statute applies only to event

20   contracts.  So step one under the plain language of the statute

21   which uses "based upon," meaning "underlying,"  in the same

22   sentence that it uses "involve."

23           Step one is is this an event contract at all, is the

24   underlying an event.  If so, we're in the statute, at least

25   this far.

1          Step two is whether the agreements, contracts or

2   transactions involve the enumerated activity.  And that's a

3   broader question than whether just the underlying event

4   involves the enumerated activities.

5          "Based on," as used in the statute, unambiguously

6   refers to the underlying event.  It must be an event, that's

7   all.

8          "Involve" is broader.  Any aspect of the contract,

9   transaction or agreement, if it involves an enumerated

10  activity, we submit that by the plain meaning of the word

11  involve it's in the statute.  At least it gets you so far as to

12  be eligible -- that's the relationship between the contract and

13  the enumerated activities.  If the contract, transaction or

14  agreement involves the enumerated activity, we're in the

15  statute.  Underlying, what the contract is based upon, what the

16  actual event is can be, can -- the underlying can involve the

17  enumerated activities.  They're fairly easy to think of

18  examples.

19          If the event contract is based upon whether a war will

20  break out, it's in an enumerated activity.

21          THE COURT:  Is there an example of a contract that

22  under this broader definition that you're advocating for would

23  involve war where the underlying activity in the contract

24  doesn't speak to war, itself.

25          MS. STUKES:  The examples are -- the examples of how a

1    contract could involve war but not involve an act of war have

2    to do, and I think both parties cite this kind of example,

3    will -- I hate to give these real world examples, will a

4    foreign body be able to use U.S. weapons on its enemy's soil,

5    something like that.  That involves -- oh gosh, I don't want to

6    get too in the weeds -- will funding be allocated to a country

7    that's at war, that involves war.

8             THE COURT:  I think they would say yes --

9             MS. STUKES:  I actually don't think we're too off base

10    on that.  I think the real dispute between the parties is what

11    are you looking at, what has to involve the enumerated

12    activities, and the real rub here is that the Commission

13    interprets the plain language of this statute to say if

14    transacting in the contracts, if the feature or purpose of

15    these contracts is one of the enumerated activities, gambling

16    is the one -- gaming, pardon me, is the one that comes to mind.

17    Is transacting in the contract, is that essential feature

18    gaming.  And the Commission here said yes for gaming and for

19    unlawful under state law.

20             THE COURT:  So what is your best argument for their

21    response that there are a lot of states, and they listed them

22    for me, that make any type of betting stakes on any contingent

23    event unlawful under state law such that that's what these

24    event contracts are?  So every event contract should

25    theoretically -- if the transaction of the contract in and of

1    itself is what involve means and not the underlying activity at

2    issue in the contract, than just the mere transacting event

3    contracts would violate state law; how do you respond to that?

4         MS. STUKES:  I want to say two things about that, and

5    I can jump to the discussion of how we analyzed unlawful under

6    state law.  The Commission is not saying that involve in every

7    instance means anything other than its plain meaning.  Let me

8    say that in a little more -- with a little better articulation.

9         Involve is a broad term.  It's broad enough to cover

10   event contracts whose underlying is one of the enumerated

11   activities, and it's broad enough to cover an event contract

12   whose essential feature is one of the enumerated activities,

13   and here an essential feature of these contracts is betting or

14   wagering on elections.

15        THE COURT:  But an essential feature of some other

16   contract could be betting or wagering on, fill in the blank.

17        MS. STUKES:  Right.  So your Honor's concern, I think,

18   is the plaintiff's argument:  What do we do with this, what I

19   interpret as an extrapolation from what the Commission actually

20   said, to say, well, that would be absurd in another context

21   because other state laws say it's unlawful -- there are state

22   laws that say it's unlawful to wager on any contingent event.

23   And that would sweep in every event contract to a public

24   interest review.

25        THE COURT:  Right.

1          MS. STUKES:  So I'm just getting to my notes where I
2     have this.
3          THE COURT:  Sure.  Take your time.
4          MS. STUKES:  The Commission had before it the question
5     of whether these contracts, which involve wagering on
6     elections, involve activity under state law.  Here we have
7     numerous state laws that forbid wagering on elections, and that
8     was sufficient for the Commission to say state law forbids
9     wagering on elections.  That's the essential feature of these
10    contracts, and we can stop there.
11         What the Commission didn't do is say state law forbids
12    or makes unlawful wagering on any contingent event.  That was
13    not the basis of the Commission's reasoning, and even if you
14    can say if A is to B then C is to D, like some logical
15    extrapolation, that's not what the Commission did here.  It
16    just said we see under state law that wagering on elections is
17    unlawful.  And that's the essential feature of these contracts,
18    and that's enough.  That's enough that we're in the zone of the
19    statute.
20         THE COURT:  Right, but --
21         MS. STUKES:  And it's not unreasonable -- I'm sorry,
22    I've interrupted Your Honor.
23         THE COURT:  I just wanted to -- because right now I
24    think we're talking about what the meaning of the terms in the
25    statute are, and their argument, as I understand it, is that

1    the Commission's reading doesn't make sense; this is otherwise

2    unambiguous and they're applying this word in a way that kind

3    of means one thing in one subsection and another in another

4    subsection.

5         And what they're saying is elections is not on this

6    enumerated list and that's full stop, end of case.  And you're

7    saying, well, no, it fits under the first category because

8    betting on or wagering on elections violates many state laws.

9         And their response is wagering on any contingent event

10   violates many state laws.  And if that were the reading, if

11   that's how the statute was read, that would mean that every

12   event contract would be subject to this two-step review, which

13   was not the intent when the statute was amended to streamline

14   this process and not make the DCM have to make an initial

15   showing that the contract was in the public interest.

16        So I'm just speaking more about the unlawful under

17   state law.  What does that mean?  Does that mean that the act

18   of trading the contract is unlawful under state law, in which

19   case that would -- might relate to many contracts or all event

20   contracts, or does the underlying activity -- for example, I

21   think plaintiff gave an example whether or not some crime was

22   going to occur, whatever it is, some specific criminal

23   activity, where the subject of the contract relates to,

24   involves something that is unlawful.

25        So I just want to understand the difference -- your

1   response to that, that your reading would put every event

2   contract under this inquiry.

3          MS. STUKES:  Respectfully, I don't believe that what

4   the Commission held in this order would subject every event

5   contract because what the Commission said is only that

6   examining these contracts, whose essential feature is to bet on

7   elections, that involves activity that many state laws

8   prohibit.

9          What the Commission did not say is these contracts

10  involve wagering on a contingent event and many state laws make

11  wagering on a contingent event unlawful.  Therefore, it is.

12         THE COURT:  Hypothetically, let's say I'm a plaintiff,

13  I'm a DCM, I want to post my event contract about whether or

14  not a hurricane will hit in Florida.  And the Commission came

15  back and said this is against public interest and it also falls

16  under -- I'm doing this out of order.  It falls under category

17  one because in Florida and elsewhere the state law prohibits

18  people from posting or making bets or wagering on contingent

19  events, and a hurricane is a contingent event and this contract

20  involves a wager on a contingent event, so we're not going to

21  allow it.  Would that be allowed under this statute?  Would

22  that work?

23         MS. STUKES:  I think it would be an unusual reading of

24  the statute.

25         THE COURT:  And why?

1          MS. STUKES:  And it's because this statute sets forth

2     in broad terms the categories that are the subject of public

3     interest review, and none of those categories on their face

4     suggest that Congress intended to capture all event contracts.

5     And it --

6          THE COURT:  Right, that's their point.  I think that's

7     exactly what they're saying.

8          MS. STUKES:  I think, actually, the parties agree.  I

9     think where we're off is the Commission doesn't agree that

10    that's what it concluded in this case.  It concluded that state

11    laws forbid wagering on elections, and that's an important

12    state interest that Kalshi is asking the Commission to

13    undermine by allowing these contracts to trade on a

14    federally-registered exchange -- a federally-regulated

15    exchange.

16         To be clear, the Commission's order didn't find

17    that -- like if these contracts were allowed, it didn't find

18    that purchasing one of Kalshi's congressional control contracts

19    would be illegal in jurisdictions that prohibit betting on

20    elections by statute or common law.

21         Kalshi argues that the Commission was arbitrary and

22    capricious or fell afoul of the law because it can't be illegal

23    under state law to offer the contracts on a market regulated by

24    the CFTC because Fransha (ph.).  But that, as the Commission

25    held in its order, misses the point.

1          The CEA is a federal statutory regime for the

2     regulation of commodities derivatives markets, and it does

3     preempt state laws that prohibit the trading of commodities

4     contracts.  No state law can ban a contract that's lawfully

5     listed on a CFTC-regulated market.  But what Kalshi asks the

6     Commission to do here and what Kalshi is asking the Court to do

7     is to order the CFTC to permit these contracts, when Kalshi's

8     own website cites news articles that characterize them

9     repeatedly as election gambling, betting on elections, when

10    under state law it's illegal to gamble on elections.

11         And this, by the way, is the reason we're here.  If

12    Kalshi could lawfully offer election-betting contracts on CFTC

13    markets, it could ignore any state law that disallows election

14    gambling.  Even states that allow gambling prohibit betting on

15    elections.  And that indicates that the concern is not so much

16    gambling but election integrity.  You can't place a bet on an

17    election in Las Vegas or Atlantic City.

18         For the CFTC to allow the contracts, it would have had

19    to undermine these important state interests.  And so when the

20    Commission concluded in its order that, in considering whether

21    a contract involves activity under state law, it considered

22    whether the activity is unlawful under state laws that are not

23    otherwise preempted by the CFTC, laws that go to state interest

24    that are not overlapping with the CEA's regulatory authority.

25    And when the Commission considers that it can consider whether

the CFTC's exclusive jurisdiction over federal commodities

markets, federal commodities derivatives markets, should be

used to subvert important state interests.

So this question of -- well, it's frustrating to me --

well, I'm an advocate, I should be frustrated by my opponent's

arguments.  But what's frustrating to me about that is this

concept that the Commission's interpretation of the statute

doesn't make sense because some state laws make it illegal to

place a wager on any contingent event, it's a distraction.

It's not what the Commission held here.

The Commission went as far as it needed to go because

this is an informal adjudication.  It's one case.  Under a

different set of facts and a different proposed contract, it

might look to that language.  It would be an unusual reading of

the statute to say because many state laws prohibit wagering on

any contingent event, that all event contracts are unlawful, it

would be an usual reading of a statute that sets forth only

enumerated categories.

THE COURT:  I think they would agree with that.

MS. STUKES:  Right.  I think we agree on that.

THE COURT:  Well, I don't think you want to agree

on -- if you do want to agree on that, I think you want to

distinguish that from the election.

MS. STUKES:  No.  What I am saying is the Commission

didn't base its decision on the existence of state laws that

1    make wagering on any contingent event unlawful.  The Commission

2    based its decision on the existence of state laws that make

3    election wagering unlawful.  It didn't consider in its decision

4    and it didn't base its decision on the existence of these other

5    broader state laws.

6         And so it doesn't even factor in to the review here.

7    Whether they exist or not, it wasn't the basis for the

8    Commission's decision.  And even if you can extrapolate what

9    the Commission was not doing here -- the Commission wasn't

10   ruling here.  It went only as far as it needed to go to decide

11   the issue before it.  I hope that that is coming through to

12   Your Honor.

13        So here, because these contracts have as their

14   essential feature not that they're wagering on any contingent

15   event but they are wagering on the outcome of elections, and

16   wagering on elections is unlawful under numerous state laws,

17   the Commission was reasonable in its determination that these

18   contracts fit within that category of unlawful under state law

19   to render them at least in the statute in subsection I.

20        I can move on to talk about gaming, unless you want to

21   talk about --

22        THE COURT:  Let's talk about gaming.

23        MS. STUKES:  Okay.  Again, with the term "gaming," the

24   Commission applied the ordinary meaning of the term "gaming" to

25   conclude that these contracts would fall within that enumerated

1  category.  Again, "gaming" is not a defined term in the

2  statute.

3       And so what the Commission did reasonably is look to

4  its ordinary meaning as defined in dictionaries and in ordinary

5  meanings as defined in state law and federal law -- well, I'll

6  talk about that in a second.  And concluded that it falls

7  within the ordinary -- that those proposed contracts, which

8  wager on the outcome of congressional elections, fall within

9  the meaning of "gaming."

10       First, the Commission looked at that the ordinary

11  dictionary definition of gaming and found that gaming in its

12  ordinary dictionary meaning is synonymous or interchangeable

13  with gambling.  And that's actually supported in the

14  congressional record when we see that colloquy between Senators

15  Feinstein and Lincoln, where the first thing, I think, that

16  Senator Lincoln's comment says is this section of the CEA,

17  5CC5C, is intended to prevent gambling, using the futures

18  markets for gambling.

19       THE COURT:  How do you define "gambling"?

20       MS. STUKES:  Let me come back to the definition.  So

21  "gaming" in ordinary dictionary definitions is synonymous with

22  "gambling."  There's actually a Supreme Court case that we

23  cite. in our brief, also, for that proposition.  They're

24  interchangeable terms.

25       THE COURT:  Okay.

1          MS. STUKES:  So what's gambling?  The Commission

2     looked at various definitions under state law of how "gambling"

3     is defined.  And a common thread in many state law definitions

4     of "gambling" is to stake something of value on a contest of

5     others.  It's within a common thread, a frequently used

6     phrasing included in the definition of "gambling," staking

7     something of value on a contest of others.  A number of states

8     linked the terms "gaming" or "gambling" to betting or wagering

9     on elections.

10          The Commission also looked at this Unlawful Internet

11     Gambling Enforcement Act, which has the definition of "to bet"

12     or "wager."  Betting or wagering is a common definition of

13     "gambling."  And in that statute wagering on a contest --

14     staking something of value on a contest of others is included

15     in the definition.

16          THE COURT:  Can I ask you a question.

17          MS. STUKES:  Yeah, absolutely.

18          THE COURT:  Besides elections, in your view, is there

19     a contest of others that doesn't involve a game as plaintiff

20     would define what game means?

21          MS. STUKES:  I actually thought the horse race wasn't

22     a game.  But there are contests, Academy Awards, award types of

23     things that doesn't seem like a game, just seems like a

24     contest.  So --

25          THE COURT:  Okay.  So an event contract on something

1    about one of these awards would fall under the gaming or

2    gambling prong?

3          MS. STUKES:  First of all, I don't want to get ahead

4    of my Commission which -- the Commission didn't define it --

5    didn't define -- didn't talk about whether the -- in this order

6    didn't get into other examples because it was sufficient to

7    determine that elections fall within this ordinary definition

8    of staking something of value on a contest of others.

9          THE COURT:  Right.  I'm trying to make sure that I

10   understand what the terms mean in the statute.  So it's

11   certainly relevant for me to understand how this would apply

12   even beyond this case, while I know I'm only looking at the

13   order in this case.

14         So based on what you said, an event contract about any

15   kind of contest, like an award show, Academy Award, Grammy's --

16         MS. STUKES:  It's not a game.  It seems like a

17   contest.

18         THE COURT:  That would fall under the gaming prong.

19         MS. STUKES:  Wagering on it, it sounds look it might,

20   yeah.

21         THE COURT:  Keep going.

22         MS. STUKES:  So one of the criticisms that Kalshi

23   levies at the Commission's decision here is they say that the

24   definition is gerrymandered because it includes only wagering

25   something or staking something of value on a contest of others.

1    And gaming can be so much more than that.  Gaming can be games,

2    gaming can be so much more than that.

3           What the Commission did, however, is it looked at what

4    are these contracts.  These contracts are staking something of

5    value on the outcome of elections.  Does that fit in an

6    ordinary definition of gaming?  We submit yes.  Because gaming

7    is interchangeable with gambling and ordinary meaning of

8    gambling is to stake something of value on a contest of others,

9    and an election is a contest by its plain meaning.

10          Dictionary definitions define "contest" to include

11    elections.  The examples that we cite in our brief talk about

12    the presidential election as a contest, the presidential

13    contest, meaning an election.

14          So "gaming" reasonably and plainly includes by its

15    plain meaning staking something of value on the outcome of the

16    contest of others.  This might not be to the exclusion of other

17    types of gaming and gambling that were not at issue in this

18    particular matter.  But these contracts are designed to wager

19    on the outcome of congressional elections.

20          THE COURT:  But the definitions don't change based on

21    the contract at issue, right?  The statute says what it says.

22          MS. STUKES:  The statute says what it says.

23          THE COURT:  And it's your role to determine whether --

24    if you undertake this type of review under the statute, then

25    you decide or make a decision as to whether or not the contract

```
 1    fits the definition.  So the definition doesn't change; it's
 2    whether the contract fits the definition.
 3         So it can't be -- I'm not going to find gambling means
 4    contest here and then in another case be given a different
 5    definition from the Commission about what gambling might mean
 6    based on the contract at issue there.  That's not what you're
 7    suggesting.
 8         MS. STUKES:  What I am suggesting is that because this
 9    is not a rule making, that the Commission's determination of
10    whether these contracts fit within the ordinary meaning of
11    "gaming" did not require the Commission to define "gaming's"
12    entire universe for it to determine that these contracts fit
13    within an ordinary meaning of "gaming."
14         THE COURT:  I guess that's what I'm having difficulty
15    with because what I'm hearing you say is that there could be
16    many definitions and we pick the one applicable here.  If there
17    are many definitions -- I hope no one is asking me to find this
18    is an ambiguous statute.  This is not the time to deal with
19    ambiguities in statutory interpretation.
20         So I guess -- I mean, I hope that the Commission is
21    taking the position that "gaming" means X and that this
22    contract fits X because of whatever argument.  You're not
23    saying that you're adding a contest here, but in other
24    circumstance you'd use another dictionary definition.  There
25    should be a definition that applies that's unambiguous.
```

1      MS. STUKES:  What the Commission found here is an

2  ordinary definition of "gaming" includes wagering on a contest

3  of others, because -- and that's not, as Kalshi puts it,

4  gerrymandering.

5      THE COURT:  I can accept that.

6      MS. STUKES:  That's deciding what's before it.

7      THE COURT:  I can accept that in the dictionary there

8  may be one, two, three, and if it fits any of those prongs.  I

9  just want to know the extent of what the definition of

10  "gambling" is under the Commission's view.  So what you're

11  saying is it includes this contest of others.  And so because

12  an election, in your view, is a contest of others, then betting

13  or wagering on that violates that provision of the statute.

14      MS. STUKES:  Or at least brings it into that

15  enumerated category of the statute, yes.

16      THE COURT:  Okay.  But if there are other definitions

17  of gambling -- and I'm losing track of whether I saw it myself

18  or whether it's in the papers, but that would just say, for

19  example, you might have said it earlier, betting or wagering on

20  a contingent event.

21      MS. STUKES:  On any contingent event.

22      THE COURT:  On any contingent event.  Would that mean

23  that every event contract involves gambling and, thus, gaming?

24      MS. STUKES:  That's not what the Commission held here

25  and it's unlikely to be what the Commission would hold in

1   another context if it came up.  But that wasn't the question

2   presented here.

3          So what was presented here was:  Do these contracts,

4   which are routinely characterized as election-betting

5   contracts, fall within the ordinary meaning -- an ordinary

6   meaning of "gaming," where gaming is synonymous with gambling

7   and gambling includes wagering on a contest of others and a

8   contest of others includes elections.  And that was enough --

9          THE COURT:  Okay.

10         MS. STUKES:  -- to be a reasonable interpretation of

11  the plain meaning of the statute.

12         We've talked about gaming and unlawful under state law

13  and involve, and unless Your Honor wants to talk further about

14  any of those subissues, I can move on to the public interest.

15         THE COURT:  Sure.  Yes, please.

16         MS. STUKES:  Okay.  So having determined that Kalshi's

17  proposed contracts involve two enumerated activities under the

18  statute, the Commission proceeded to determine that the

19  contracts are contrary to public interest and, therefore, are

20  prohibited from trading.  And in making this determination, the

21  Commission considered the contract's economic purpose as well

22  as other factors.  So I'll start with the economic purpose

23  evaluation.

24         So the parties point this out in our briefs, but our

25  statute here, the CEA, codifies two public interests in

1    commodities markets, hedging and price discovery.  So hedging,

2    in general, means to use the commodity derivatives markets to

3    manage risk of price fluctuations in commodities.  For example,

4    we put in our brief an example of an airline.  They have to buy

5    jet fuel to operate their business and they have a price

6    sensitivity to movements in the price of jet fuel.

7          So a market participant who wants to hedge their risk

8    of price fluctuations, and they're worried that the price of a

9    commodity will go up, will hedge that risk by entering into a

10   commodity derivatives contract whose value will go up if the

11   price of that commodity increases.  So in other words, hedging

12   means you can enter into a derivatives contract in a

13   CFTC-regulated market that will move in your financial interest

14   if the commodity that you're sensitive to moves against your

15   financial interest.  That's hedging.

16         Price discovery, which is the other enumerated public

17   interest in the CEA and in commodity derivatives markets

18   generally, means to determine a price level for a commodity

19   based upon its pricing in a CFTC-regulated market.  So for

20   instance, futures contracts on, like, agricultural commodities

21   can be used -- the trading on futures contracts can be used to

22   discover the price of the actual commodity in the cash market.

23         As noted in the order, the Commission considered the

24   public interest of Kalshi's proposed contracts and considered

25   their economic purpose.  So this statute, 5CC5C, doesn't define

1    what it means to consider the public interest but because the

2    CEA itself codifies economic interests, in the years before

3    2000, when the CFTC examined every derivatives contract for

4    public interest, it looked at an economic purpose test that

5    asked whether a contract can be reasonably expected to be or

6    has been used for hedging or price basing on more than an

7    occasional basis.  That was the test.

8         And the CFTC looked at that test in considering

9    whether these proposed contracts have an economic purpose, and

10   the CFTC also mentioned this colloquy between Senators

11   Feinstein and Lincoln in which Senator Feinstein asked if the

12   Commission would have the power to determine that a contract is

13   a gaming contract if the predominate use of the contract is

14   speculative as opposed to hedging or economic use.

15        So the Commission cited both of these formulations of

16   considering the economic purpose of the contracts in evaluating

17   these proposed contracts.

18        And it considered comments that Kalshi highlighted for

19   Your Honor that congressional control has economic effects.

20   And it considered comments from commenters that said they would

21   use these contracts to hedge.

22        But, as the Commission found, the economic effects of

23   one chamber of Congress or another are -- the word the

24   Commission used is diffuse and unpredictable.  The price of

25   these contracts is not correlated to the price of any

```
1    commodity, and so the price of the contracts couldn't

2    reasonably or predictably be used to establish commercial

3    transaction prices for hedging or discovery.

4          THE COURT:  Can I get a clarification?  Is the test --

5    is it the more than occasional language or is it the

6    predominantly for commercial purpose?

7          MS. STUKES:  The test -- the Commission evaluated

8    both.  It looked at both and found that even considering the

9    comments that suggested -- pardon me, that these contracts

10   would be used for hedging purposes, most of the comments

11   suggested that the hedging uses were not really related to the

12   control of a single chamber of Congress, but rather the

13   ultimate changes in law or policy that could be affected many

14   steps down the line from control of a single chamber of

15   Congress.

16         So even taking all the commenters together who stated

17   an intent to hedge economic risk by trading these contracts, it

18   didn't establish that the contracts would be used for hedging

19   on more than an occasional basis.

20         But even if there were robust economic purposes for

21   these contracts, the economic purpose of the contracts was just

22   one aspect of the evaluation here, because a contract with

23   economic purpose, an event contract, even if it has an economic

24   purpose, it doesn't make it per se in the public interest.

25         There's an example actually in the colloquy of the
```

1    congressional record.  You can have a contract on whether a

2    terrorist event will occur and it could be used for hedging,

3    even.  If you're going to suffer an economic consequence from

4    that, it doesn't make it in the public interest.  It doesn't

5    make it a good idea.

6            So the Commission here considered the alleged economic

7    purposes of these contracts and it found that these contracts

8    could not -- because control of a single chamber of Congress,

9    the impact for economic hedging is so diffuse, there are so

10   many steps that are involved between the election and actual

11   enactment of legislation, that the economic purpose of these

12   contracts did not weigh in favor of their public interest, but

13   it considered other aspects too.

14           I want to address one thing, that Kalshi argues that

15   the Commission imposed an arbitrary and capricious

16   direct-effects test.  Stating that these contracts don't have a

17   direct economic effect, simply because a single chamber of

18   Congress doesn't itself have the power to enact law, is not an

19   arbitrary test.  It's a description of the limited hedging

20   utility that these contracts would have.

21           But again, even if these contracts had a robust

22   economic purpose, other factors play in to the public interest

23   determination, and they did here.  So I'll talk about election

24   integrity, unless Your Honor would like to talk about the

25   economic purpose --

1      THE COURT:  I guess the only question is plaintiff

2   made an argument in their briefs, and I talked to them a little

3   today, about even putting aside any legislation that's passed,

4   just the mere fact of elections that dictate who is in control

5   of what chamber has maybe impact on the stock market or other

6   direct economic consequences that are real and tangible and

7   that can be observed in the aftermath of elections, and I

8   wanted to know what your response was to that.

9      MS. STUKES:  My response is maybe something you've

10  already said, which is even if there are economic benefits to

11  trading these contracts, the Commission determined in its

12  discretion that those were not outweighed by the very serious

13  public interest --

14     THE COURT:  So you don't dispute that?

15     MS. STUKES:  I find that even if it's true, it doesn't

16  make a difference because the Commission was reasonable and not

17  arbitrary and capricious in its determination that the concerns

18  about election integrity here overwhelmingly are reasonable and

19  not arbitrary or capricious.

20     THE COURT:  Okay.  Let's go to the election integrity.

21     MS. STUKES:  So factors including specific concerns

22  about election integrity supported the Commission's

23  determination that the contracts were contrary to public

24  interest, and the principal concerns that the Commission

25  identified included that these contracts could create monetary

1    incentives for individuals or organized groups to vote for

2    particular candidates for financial gain, to win a bet, not --

3    regardless --

4              THE COURT:  And before you said to win a bet, I was

5    thinking you're describing what I think happens now in real

6    life in terms of the financial incentives of people putting

7    money behind elections and what motivates people to vote for

8    certain candidates is often financial in nature, right?  But

9    you're saying specifically to collect on these event contracts.

10             MS. STUKES:  These event contracts, their very

11   existence would establish -- could establish a financial

12   incentive to vote in a particular way that doesn't presently

13   exist because these contracts are not traded anywhere.  You

14   can't gamble on elections.  So they can incentivize voting in

15   particular ways that could influence how people vote.

16             THE COURT:  How would we ever measure that?

17             MS. STUKES:  Well, the --

18             THE COURT:  The reason I'm asking is because I think

19   the plaintiff's argument is that concern is so unlikely to

20   happen it's -- and I thought that they made a good argument

21   today that there are already so many incentives, financial and

22   otherwise, behind elections that motivate people to do certain

23   things -- I mean, the point being that if there were some way

24   to get control over a -- if someone could figure out a way to

25   ensure control of a chamber of Congress, that probably would

1    have happened by now, right?  So what is your response to that?

2         MS. STUKES:  My response is the existence of a

3    federally-regulated derivatives contract on the outcome of

4    elections could incentivize people to manipulate either that

5    contract or the election itself for financial gain.

6         I'll give you some examples to talk about the kind of

7    thing we're concerned about.  And I'm skipping ahead to the --

8    the order I was going to talk with you about these things.

9         The Commission is not just a regulatory agency.  We're

10   also a law enforcement agency.  And we're tasked under the CEA

11   with antifraud authority.  And we're tasked under the CEA to

12   ensure integrity in the markets that we oversee.  And because

13   of that, the Commission could be drawn in to investigating

14   manipulative conduct in these markets in a way that doesn't --

15   is outside of its ordinary mission.

16        So here's an example.  A political activist with a big

17   social media following, they float a rumor on social media

18   damaging to a candidate who is important to one party's control

19   of the Senate.  In a couple of weeks, this rumor spins up and

20   spins out and it turns out maybe it's untrue.  It turns out to

21   be false.

22        But during the weeks that the rumor was circulating,

23   the congressional control contract on the other party goes up

24   and many people make a lot of money by selling that contract

25   when the market is high.  And then the CFTC gets a tip and

1    says, well, that person put that rumor on social media in order

2    to manipulate the congressional control contract.

3          There's a couple of implications here.  The very

4    availability of that contract has added one more reason, and

5    maybe a big reason for some people, to disseminate false

6    information about elections.  And that's certainly relevant to

7    the public interest.

8          Another thing that the Commission considered here is

9    that it would draw the Commission into investigating these

10   kinds of activities, and that's not farfetched.

11         THE COURT:  Is that something that the Commission is

12   tasked with doing now?  I'm assuming there are other

13   contract -- I probably could come up with an example of any

14   contract that could be subject to some manipulation where

15   there's money involved.  Is that the kind of thing that the

16   Commission would typically investigate if there was an issue

17   with -- okay.

18         MS. STUKES:  Absolutely, Your Honor.  As a federal

19   regulator of commodities markets, the CFTC, as I said, is in

20   charge of ensuring price integrity on our federally-regulated

21   exchanges.  In the ordinary course, there's many ways to

22   manipulate markets.

23         Now, I say this in the same breath that I say I think

24   the markets regulated by the CFTC are among the safest in the

25   rule, but the limit of manipulation is really just the limit of

1    human ingenuity.  Manipulation is attempted, and the CFTC, as a

2    law enforcement agency, routinely investigates allegations of

3    fraud and manipulation in the markets that it oversees.

4         THE COURT:  I asked that because when I read your

5    brief it sounded like one of the arguments you were making was

6    that if you had to do that in this circumstance it would put

7    you in a position that the CFTC is not equipped to do.  But it

8    sound like, if it's part of your regular mission, it wouldn't

9    put you in a position that you're not already required or

10   routinely do.

11        MS. STUKES:  My answer to that, Your Honor, is that

12   there are two important differences because this is not a

13   minimal concern.  It's not simple enough to say, oh, but you

14   investigate manipulation in markets that you're not an expert

15   in all the time.  And it's true, we have a division of

16   enforcement that investigates alleged manipulation in a lot of

17   markets on a lot of commodities.

18        The difference here, there are two important

19   differences.  First and most important, any government

20   investigation and enforcement activity involving the political

21   process is inherently sensitive.  There's a difference in the

22   CFTC investigating economic activity related to commodity

23   derivatives markets and the CFTC investigating acts that may be

24   political speech or other conduct central to the political

25   process.

1          Second, as we briefed and as the Commission found in

2    its order, most of the markets regulated by the CFTC have

3    objective economic data that may not totally decide a case but

4    at a minimum it provides some objective grounding through the

5    CFTC's investigations of whether manipulation has occurred.

6          The vast potential of these contracts to incentivize

7    misinformation could absolutely draw the Commission into

8    investigations of a vast array of possible manipulation.  The

9    pricing of these congressional control contracts would be

10   impacted by such a broad array of information.  Anything that

11   could influence the election could influence the price of these

12   contracts.  So polls, rumors, news, announcements, faked

13   information, advertisement, I can't even think of it all.  And

14   this would be for every congressional race in the country.

15         Kalshi doesn't have jurisdiction to investigate any

16   alleged manipulation on these contracts.  It would fall to the

17   CFTC.  In its everyday operation, the CFTC receives tips of

18   possible market manipulation and it would be drawn into

19   investigating whether information disseminated about

20   congressional elections illegally manipulated the market in

21   these contracts, and that is not a role for which the

22   Commission is equipped and it would greatly expand the

23   jurisdiction of the CFTC.

24         Assuming the role of an election cop raises very

25   serious concerns about not only the misalignment of that role

1    with the Commission's mission and its history but with election

2    integrity.  And it was reasonable for the CFTC to have

3    considered this.

4          As another example, it's not farfetched.  It's not a

5    de minimus concern.  Kalshi says, oh, it's not a big deal.  You

6    do that anyway.  Or it's not likely to happen.

7          The Commission's predicted judgment based upon its

8    existence as a law enforcement agency that routinely

9    investigates manipulation and as a regulatory agency that is

10   entrusted with ensuring the integrity of its markets, it was a

11   reasonable predictive judgment to say that that would draw the

12   CFTC into investigating conduct that relates to elections.

13         There's another example.  There's another example I

14   wanted to talk with Your Honor about, and that would be you

15   asked Kalshi's counsel about the limits that it proposed to put

16   on who could trade these contracts.  As far as I read that

17   list, it wouldn't prohibit people who count the votes from

18   trading in these contracts.

19         So imagine a scenario -- and the position limits,

20   meaning how much can be traded on these contracts, the position

21   limits proposed would allow trading of up to $5 million if

22   you're a company or entity.  So imagine a group of poll

23   workers -- and I don't mean people that are involved in

24   surveys.  I mean people that count the votes.  They form a

25   company of some kind and they're accused of putting their money

1  together and putting a $5 million position on these

2  congressional-control contracts.  These are the people counting

3  the votes.

4  Someone refers this to the CFTC because they think the

5  vote counting has been manipulated to make a profit in the

6  event contract.  So here would be the CFTC being drawn into

7  whether the vote count is accurate.

8  THE COURT:  Or whether there was fraud in connection

9  with the event contract, right?

10  MS. STUKES:  Correct.  Because it would ask the

11  question of whether there was fraud in the event contract.

12  Because that would be manipulating -- manipulative or

13  fraudulent conduct that unduly influenced the event contract.

14  And that's an example of the CFTC's concern.  Because

15  these contracts could -- their very existence could incentivize

16  conduct designed to artificially affect the electoral process

17  for the purpose of manipulating the price of the contract for

18  financial gain or they could incentivize the manipulation of

19  the market for the purpose of artificially affecting the

20  election or perceptions of the election.

21  I want to mention one thing that Kalshi talks about

22  and that is -- oh, actually, before I get there, research in

23  the record -- one comment submitted in the record involved the

24  actual manipulation of a political event contract by false

25  information.  There was -- it's a bizarre fact pattern.  The

1   pop singer Kid Rock was shown to be ahead in the polls in a

2   match-up against a sitting senator before he had ever -- he had

3   not even declared a candidacy for the Senate, but he was shown

4   in a poll to be ahead of a sitting senator, and that caused the

5   price of a corresponding event contract to drop and it caused

6   trading volume to surge, and users were later, on social media,

7   bragging about how that poll trolled the news media and

8   influenced the election event contract.

9         Researchers have theorized that that kind of fake

10  information could be used to generate market movement in other

11  election event contracts.  So it's not farfetched to say that

12  this is a serious concern.  Over 600 comment letters were

13  received by the agency, including from Senators and members of

14  the House of Representatives, expressing significant concerns

15  about election integrity and the improper commodification of

16  our elections.

17        And I don't say commodification just as rhetorical

18  flourish.  When you have an event contract trading on a

19  CFTC-regulated market and the underlying event of that contract

20  is an election, the election is a commodity under the Commodity

21  Exchange Act.

22        Where a large number of states have specifically

23  disallowed gambling on elections by either statute or common

24  law, and that reflects the view of a large number of states

25  that this kind of wagering is against the public interest, the

1  Commission grants significant weight to any threat to election
2  integrity, as well as the threat to the perception of election
3  integrity.
4          And this is especially important at a point in time
5  where so many people question the validity of elections.  The
6  Commission is not required to let threats to election integrity
7  happen before recognizing election integrity as a public
8  interest concern with respect to these contracts.
9          There's one other value that Kalshi argues -- that
10  Kalshi and Amici and commenters argue that these contracts
11  have, and that is that they could provide beneficial
12  market-based predictive data.  And that that's societally
13  valuable information.  The Commission considered that but it
14  didn't find that generation of such data outweighed the very
15  real and grave concerns about the threat to election integrity
16  that these contracts would pose.
17          The CFTC's predictive judgment about possible negative
18  consequences that could arise from these proposed contracts are
19  entitled to deference under APA law.  The Commission didn't
20  ignore evidence.  It didn't refuse to engage with contrary
21  positions.  It found that any economic utility of the contracts
22  didn't outweigh the very serious risks that the contracts could
23  be manipulated and could incentivize the spread of
24  misinformation or be used to undermine election integrity or
25  the perception of election integrity.

```
1              So for all of these reasons, the CFTC submits that

2     Your Honor should deny Kalshi's motion for summary judgment and

3     grant judgment to the CFTC.

4              THE COURT:  Okay.  Thank you.

5              Any brief rebuttal?

6              MR. ROTH:  Very brief.  Very, very brief.

7              THE COURT:  Yes.

8              MR. ROTH:  I appreciate the Court's time.  I will be

9     very, very brief.  Three quick points.  First Your Honor asked

10    about the catchall category, why they didn't rely on the

11    catchall.

12             THE COURT:  Yes.

13             MR. ROTH:  The catchall requires a rule making.  It's

14    by rule or regulation.  They haven't done a rule making.  And

15    so that's -- they couldn't rely on the catchall.

16             THE COURT:  They could not rely on the catchall.

17             MR. ROTH:  Yes.  So they would first have to do a rule

18    making to determine some activity is similar to the others.

19    They have not done that.  So that's the answer to that.

20             THE COURT:  Thank you.  I appreciate that.

21             MR. ROTH:  On unlawful, I still did not really hear a

22    theory as to why their reading doesn't sweep in everything.

23    What I heard was, you don't have to worry about that because

24    that's not this case.  That's not how statutory interpretation

25    works.  We need to understand what the statute means.  Counsel
```

1   admitted that's a de novo question for this Court to consider.

2   And, of course, in considering what the statute means, the

3   Court is going to look at how it would apply in other contexts.

4           That doesn't mean you need to figure out the answer to

5   every other hypothetical case that might exist.  But the

6   Supreme Court, whenever it's considering a question of

7   statutory interpretation, looks at how it's going to apply

8   elsewhere, and if it's going to be absurd in a wide variety of

9   other cases that means it's a bad interpretation.  That, I

10  think, covers unlawful.

11          The only thing I'll say about gaming, to add to

12  earlier, Your Honor asked if their interpretation of contests

13  would sweep in anything that isn't a game other than elections.

14  And counsel's response was potentially awards shows, like who's

15  going to win the Emmy or the Oscar, which I thought was a

16  fascinating example because Kalshi offers those and has offered

17  those for a long time, and they have never subjected those to

18  the review process.

19          And I think that really underscores the sort of

20  outcome-driven aspect of this.  It's not a good-faith statutory

21  interpretation.  It's an attempt to get it in without a real

22  coherent theory of what the statute means.

23          That's all I have, Your Honor, unless you have further

24  questions.

25          THE COURT:  No.  Thank you.  I appreciate the briefs

1    were very good and helpful and I appreciate your time.

2          Before we leave, I'm going to embarrass Ms. Franklin

3    because -- this is my courtroom deputy, Ms. Franklin, and this

4    is her last in-person hearing.  She's going to be retiring

5    after over 30 years on the court.

6          (Applause)

7          So I did not know there were going to be this many

8    people here.  I brought cupcakes for the parties and for us.  I

9    am sorry to the people in the audience.  I do not know if I can

10   accommodate everyone.  There's more coming.

11         I'm sad but happy for Ms. Franklin.  After 32 years on

12   the court, she certainly deserves to retire but we're going to

13   miss her.  And so I just wanted to recognize her for this last

14   hearing of hers in this courtroom.  So thanks everyone.

15         (Applause)

16         We're waiting for more cake.

17         There's not a song that we can sing.  I don't know if

18   people blow out candles for retirement.  We just wanted to say

19   thank you so much.  We're going to miss you.  Please don't

20   leave us too in the wind, and I hope you come back.

21      (Off-the-record discussion.)

22         THE COURT:  I'll take this matter under advisement.

23   Thank you, everyone.

24      (Proceedings concluded at 3:03 PM)

25

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.


/s/ Stacy Johns               Date: June 3, 2024

Stacy Johns, RPR
Official Court Reporter

**MR. ROTH: [37]** 2/2
2/19 3/6 4/19 5/2 5/8
5/21 6/2 6/4 6/7 6/11
6/21 7/17 9/23 10/7
12/23 13/2 13/6 13/11
13/18 13/24 16/10
20/24 21/2 21/20 22/3
22/6 22/10 22/13 33/9
33/13 34/1 75/6 75/8
75/13 75/17 75/21
**MS. RICE: [14]** 22/14
23/13 23/16 27/10 29/9
32/20 33/19 34/3 34/16
35/8 35/21 36/12 36/21
37/12
**MS. STUKES: [52]** 2/7
37/22 38/6 38/10 38/16
38/21 40/9 40/12 40/17
40/21 43/3 44/25 45/9
46/4 46/17 47/1 47/4
47/21 49/3 49/23 50/1
50/8 52/20 52/24 53/23
54/20 55/1 55/17 55/21
56/3 56/16 56/19 56/22
57/22 58/8 59/1 59/6
59/14 59/21 59/24
60/10 60/16 63/7 65/9
65/15 65/21 66/10
66/17 67/2 68/18 69/11
72/10
**THE COURT: [101]**

**$**

**$5 [2]** 71/21 72/1
**$5 million [2]** 71/21
72/1

**/**

**/s [1]** 78/8

**1**

**100 [1]** 34/5
**100 percent [1]** 36/1
**11 [1]** 12/1
**1155 [1]** 1/21
**1397 [1]** 28/10
**1427 [1]** 30/2
**1436 [1]** 30/2
**1533 [1]** 24/15
**1597 [1]** 24/14
**1:00 [1]** 1/5
**1:23-cv-03257-JMC [1]**
1/4

**2**

**2000 [3]** 11/19 11/22
62/3
**20001 [1]** 1/16
**2010 [1]** 11/22
**2024 [4]** 1/5 7/21 12/19
78/8
**20581 [1]** 1/21
**21st [1]** 1/21
**29 [1]** 11/7

**3**

**30 [1]** 1/5
**30 years [1]** 77/5
**32 years [1]** 77/11
**3:03 [1]** 77/24

**4**

**40 [2]** 25/13 28/8
**41 [1]** 25/13
**42 [1]** 25/5
**44 [1]** 25/5
**46 [1]** 28/8

**5**

**51 [1]** 1/15
**53 [1]** 27/19
**55 [1]** 27/19
**5CC5C [5]** 38/23 38/23
39/3 54/17 61/25

**6**

**600 [1]** 73/12
**68 [1]** 25/14

**7**

**70 [1]** 25/14
**78-2 [1]** 38/24

**8**

**80 [1]** 34/5
**88 [1]** 34/5

**9**

**99 [1]** 34/5

**A**

**ability [1]** 33/6
**able [5]** 5/19 15/1
26/14 27/1 45/4
**about [96]**
**above [2]** 8/10 78/5
**above-entitled [1]** 78/5
**absolutely [5]** 29/9
38/10 55/17 68/18 70/7
**absurd [2]** 46/20 76/8
**abundance [2]** 40/10
40/18
**Academy [2]** 55/22
56/15
**accept [2]** 59/5 59/7
**accepted [2]** 20/13
37/16
**accident [1]** 15/6
**accommodate [1]**
77/10
**according [1]** 4/21
**account [1]** 26/1
**accurate [2]** 72/7 78/4
**accused [1]** 71/25
**acknowledges [2]**
22/24 35/22
**acquire [1]** 12/19
**act [12]** 3/11 3/13 7/19
10/5 10/12 12/22 14/20
40/24 45/1 48/17 55/11
73/21
**acted [1]** 41/1
**action [3]** 1/3 3/10 17/4

**actions [2]** 23/1 29/4
**activist [1]** 67/16
**activities [13]** 3/17
11/13 11/14 39/11 44/4
44/13 44/17 45/12
45/15 46/11 46/12
60/17 68/10
**activity [37]** 7/13 7/17
8/20 9/9 9/14 9/15
10/13 11/11 12/7 12/9
13/12 14/4 31/22 32/25
39/14 39/16 39/16
42/12 42/14 42/19
42/25 43/8 44/2 44/10
44/14 44/20 44/23 46/1
47/6 48/20 48/23 49/7
51/21 51/22 69/20
69/22 75/18
**acts [2]** 7/24 69/23
**actual [5]** 35/5 44/16
61/22 64/10 72/24
**actually [19]** 2/19
10/24 11/20 11/25
12/17 13/25 17/20
27/18 33/10 35/24 36/1
45/9 46/19 50/8 54/13
54/22 55/21 63/25
72/22
**add [3]** 7/4 32/3 76/11
**added [1]** 68/4
**adding [1]** 58/23
**addition [1]** 34/12
**address [3]** 21/24 40/2
64/14
**addressed [1]** 39/9
**adjudication [6]** 37/13
37/19 39/21 39/23
40/22 52/12
**Administrative [1]**
40/24
**admits [2]** 8/25 12/1
**admitted [1]** 76/1
**adopted [1]** 17/11
**advance [1]** 26/15
**advertisement [1]**
70/13
**advisement [1]** 77/22
**Advisors [1]** 23/23
**advocate [1]** 52/5
**advocated [1]** 41/10
**advocating [2]** 36/24
44/22
**affect [3]** 27/17 41/19
72/16
**affected [2]** 35/18
63/13
**affecting [1]** 72/19
**affects [3]** 28/3 28/4
29/22
**afoul [2]** 40/23 50/22
**after [3]** 15/2 77/5
77/11
**aftermath [1]** 65/7
**afternoon [5]** 2/2 2/6
2/7 2/11 37/22
**again [8]** 14/5 15/16
18/20 21/14 28/11
53/23 54/1 64/21

**against [6]** 35/3 29/7
49/15 61/14 73/2 73/25
**agencies [1]** 23/3
**agency [17]** 3/10 23/1
23/3 25/16 31/15 31/21
31/25 34/17 37/25 41/1
41/4 67/9 67/10 69/2
71/8 71/9 73/13
**Agency's [1]** 22/20
**agree [12]** 5/2 6/15
12/24 20/20 36/12
37/12 50/8 50/9 52/19
52/20 52/21 52/22
**agreement [5]** 9/23
10/6 43/13 44/9 44/14
**agreements [2]** 9/20
44/1
**agricultural [1]** 61/20
**ahead [4]** 56/3 67/7
73/1 73/4
**aided [1]** 1/25
**airline [1]** 61/4
**AISENBREY [2]** 1/19
2/9
**align [1]** 9/11
**aligns [2]** 8/13 14/22
**all [35]** 3/3 6/20 8/17
12/8 13/21 15/5 18/20
22/25 23/16 24/24
28/16 30/10 31/5 31/16
31/18 31/20 34/3 34/9
34/10 35/19 35/21 36/4
37/21 43/12 43/23 44/7
48/19 50/4 52/16 56/3
63/16 69/15 70/13 75/1
76/23
**allegations [1]** 69/2
**alleged [4]** 23/9 64/6
69/16 70/16
**allocated [1]** 45/6
**allow [7]** 2/24 11/15
26/9 49/21 51/14 51/18
71/21
**allowed [7]** 5/9 5/11
5/11 7/4 34/9 49/21
50/17
**allowing [1]** 50/13
**alone [1]** 8/24
**already [9]** 25/2 25/4
25/9 25/24 30/25 31/5
65/10 66/21 69/9
**also [13]** 8/11 17/2
19/4 27/14 27/15 27/17
28/1 29/20 49/15 54/23
55/10 62/10 67/10
**alternative [1]** 21/11
**although [2]** 2/13 4/10
**Altman [1]** 24/19
**Altruism [1]** 30/1
**always [2]** 26/7 27/6
**am [3]** 52/24 58/8 77/9
**AMANDA [4]** 1/13 2/4
6/23 22/15
**ambiguities [1]** 58/19
**ambiguous [1]** 58/18
**amended [1]** 48/13
**Amici [1]** 74/10
**among [1]** 68/24

**amount [1]** 35/23
**amounts [1]** 9/4
**amusement [3]** 15/9
15/20 27/16
**analysis [11]** 4/4 9/16
21/21 22/16 22/21 23/8
29/14 30/20 32/22
32/23 34/19
**analyzed [1]** 46/5
**Ann [1]** 37/23
**ANNE [2]** 1/18 2/8
**announcements [1]**
70/12
**another [15]** 4/24 10/5
30/18 34/25 46/20 48/3
48/3 58/4 58/24 60/1
62/23 68/8 71/4 71/13
71/13
**answer [7]** 6/2 32/24
35/1 40/14 69/11 75/19
76/4
**answers [1]** 28/19
**anti [1]** 33/14
**anti-manipulation [1]**
33/14
**antifraud [2]** 33/14
67/11
**any [52]** 3/24 4/24 5/1
10/3 11/4 12/2 12/15
17/12 19/5 19/15 20/2
20/9 20/21 21/22 28/5
31/21 32/1 32/2 34/11
34/11 34/14 35/4 37/5
38/6 38/19 39/2 40/2
40/4 44/8 45/22 45/22
46/22 47/12 48/9 51/13
52/9 52/16 53/1 53/14
56/14 59/8 59/21 59/22
60/14 62/25 65/3 68/13
69/19 70/15 74/1 74/21
75/5
**anyone [1]** 19/10
**anything [10]** 11/24
26/9 28/12 32/3 34/21
36/8 43/7 46/7 70/10
76/13
**anyway [1]** 71/6
**anywhere [1]** 66/13
**APA [4]** 3/11 41/4 41/4
74/19
**apologies [1]** 12/14
**appear [1]** 7/15
**APPEARANCES [1]**
1/10
**appears [1]** 9/24
**appellate [1]** 2/24
**Applause [2]** 77/6
77/15
**applicable [2]** 37/11
58/16
**applied [3]** 36/11 38/18
53/24
**applies [7]** 22/25 34/14
41/13 41/23 42/2 43/19
58/25
**apply [8]** 8/25 23/4
39/11 40/4 56/11 76/3
76/7

**A**

applying [1] 48/2
appreciate [4] 75/8
75/20 76/25 77/1
approach [1] 17/24
appropriate [1] 10/14
approvals [1] 24/23
approved [1] 31/14
arbitrary [15] 4/4 6/24
19/25 21/24 22/21
22/25 23/4 34/24 37/14
39/7 50/21 64/15 64/19
65/17 65/19
are [95]
aren't [2] 4/16 34/9
argue [6] 4/2 7/7 9/21
14/5 26/22 74/10
argues [3] 50/21 64/14
74/9
arguing [2] 2/16 9/3
argument [22] 2/13
2/14 2/20 4/8 4/20 6/19
6/23 18/5 20/22 22/19
26/12 27/11 37/18
38/12 41/13 45/20
46/18 47/25 58/22 65/2
66/19 66/20
arguments [5] 23/7
25/19 30/3 52/6 69/5
arise [1] 74/18
around [1] 13/9
arraignment [1] 10/3
array [2] 70/8 70/10
art [1] 7/22
articles [3] 22/4 22/7
51/8
articulation [1] 46/8
artificially [2] 72/16
72/19
as [90]
aside [1] 65/3
ask [7] 4/7 5/5 9/18
33/10 38/8 55/16 72/10
asked [9] 2/21 32/4
39/21 62/5 62/11 69/4
71/15 75/9 76/12
asking [7] 28/15 30/21
30/22 50/12 51/6 58/17
66/18
asks [2] 43/17 51/5
aspect [6] 10/25 30/2
31/23 44/8 63/22 76/20
aspects [1] 64/13
assassination [3] 7/8
8/3 8/5
associated [1] 40/19
assume [1] 32/22
assuming [4] 4/3 4/17
68/12 70/24
Atlantic [1] 51/17
attack [1] 8/13
attempt [4] 18/7 18/8
20/16 76/21
attempted [1] 69/1
attenuated [1] 18/17
audience [1] 77/9
authority [2] 51/24
67/11

authorizes [1] 9/14
availability [1] 68/4
Avenue [1] 1/15
award [3] 55/22 56/15
56/15
awards [3] 55/22 56/1
76/14
aware [1] 38/21

**B**

back [11] 14/17 14/19
18/5 22/23 28/14 31/6
37/13 42/23 49/15
54/20 77/20
background [1] 34/6
bad [6] 8/6 8/6 8/7 8/8
8/11 76/9
balance [1] 36/2
ban [2] 12/9 51/4
BARRY [1] 1/18
base [3] 45/9 52/25
53/4
based [19] 13/4 13/6
25/9 43/14 43/15 43/15
43/17 43/18 43/21 44/5
44/15 44/19 53/2 56/14
57/20 58/6 61/19 71/7
74/12
basic [2] 3/23 30/5
basing [1] 62/6
basis [5] 14/14 47/13
53/7 62/7 63/19
bat [1] 7/2
be [110]
beast [1] 19/7
beasts [1] 19/9
became [1] 17/21
because [81]
become [2] 27/6 31/18
been [9] 2/18 6/12
12/23 12/24 18/11 21/5
37/18 62/6 72/5
before [19] 1/9 5/16
6/21 15/25 28/11 38/16
39/19 40/5 40/23 41/17
47/4 53/11 59/6 62/2
66/4 72/22 73/2 74/7
77/2
beginning [2] 30/17
31/11
behalf [2] 2/3 37/23
behind [3] 21/13 66/7
66/22
being [5] 5/23 12/17
27/8 66/23 72/6
believe [1] 49/3
beneficial [1] 74/11
benefits [10] 14/16
23/9 23/11 23/16 25/7
25/8 25/15 36/15 37/8
65/10
BERI [2] 1/19 2/9
Besides [1] 55/18
best [1] 45/20
bet [5] 49/6 51/16
55/11 66/2 66/4
bets [1] 49/18
better [5] 16/10 33/11

betting [24] 8/23 9/4
11/4 12/8 12/9 15/10
15/21 17/9 17/25 19/5
29/1 45/22 46/13 46/16
48/8 50/19 51/9 51/12
51/14 55/8 55/12 59/12
59/19 60/4
between [11] 5/15 13/3
14/24 16/1 36/10 43/4
44/12 45/10 54/14
62/10 64/10
beyond [3] 5/10 35/17
56/12
big [3] 67/16 68/5 71/5
biotech [1] 24/20
bit [3] 31/12 37/16
37/18
bizarre [1] 72/25
blank [1] 46/16
block [1] 3/14
blocked [1] 3/8
blow [1] 77/18
board [1] 19/21
body [1] 45/4
both [8] 23/8 26/4
27/11 37/15 45/2 62/15
63/8 63/8
bottom [1] 12/10
bounds [1] 40/3
Bowl [2] 14/12 14/12
bragging [1] 73/7
break [2] 38/4 44/20
breath [1] 68/23
brief [18] 4/13 12/1
18/3 22/22 22/24 25/13
25/23 35/2 42/23 42/24
54/23 57/11 61/4 69/5
75/5 75/6 75/6 75/9
briefed [3] 39/10 41/17
70/1
briefing [3] 11/3 14/24
17/21
briefly [1] 22/15
briefs [6] 6/12 17/2
37/24 60/24 65/2 76/25
bring [1] 38/18
brings [1] 59/14
broad [10] 7/9 7/9
21/14 42/8 42/11 46/9
46/9 46/11 50/2 70/10
broader [15] 12/21
13/8 13/9 16/12 16/18
17/8 17/9 17/11 17/20
17/22 43/8 44/3 44/8
44/22 53/5
BROOKS [1] 1/14
brought [1] 77/8
bug [1] 26/8
built [1] 27/16
business [5] 19/15
22/9 23/25 24/2 61/5
businesses [3] 24/1
24/14 24/17
buy [2] 36/2 61/4
buying [2] 9/3 29/16

**C**

C-SPAN [1] 15/1
cabinet [1] 20/8
cake [1] 77/16
California [1] 27/23
call [3] 15/23 33/15
38/23
came [3] 31/11 49/14
60/1
campaign [1] 30/10
can [51] 2/25 4/7 5/5
7/1 7/6 7/10 8/11 9/18
12/14 12/19 13/13 15/3
16/12 19/19 19/20 24/3
26/4 26/11 26/17 28/21
29/4 40/17 42/20 44/16
44/16 44/16 46/5 47/10
47/14 51/4 51/25 53/8
53/20 55/16 57/1 57/1
57/2 59/5 59/7 60/14
61/12 61/21 61/21 62/5
63/4 64/1 65/7 66/14
71/20 77/9 77/17
can't [11] 9/1 11/12
12/2 17/15 26/7 43/8
50/22 51/16 58/3 66/14
70/13
candid [1] 12/5
candidacy [1] 5/25
candidate [2] 5/25
67/18
candidates [4] 5/15
19/8 66/2 66/8
candles [1] 77/18
cannot [1] 32/8
capricious [13] 4/5
6/24 21/24 22/21 22/25
23/4 34/24 37/14 39/8
50/22 64/15 65/17
65/19
capture [4] 5/4 13/15
26/9 50/4
capturing [1] 10/2
care [1] 21/20
carve [1] 20/4
case [23] 2/14 2/17 3/7
3/19 15/25 35/16 35/19
38/16 38/22 41/8 41/9
41/25 48/6 48/19 50/10
52/12 54/22 56/12
56/13 58/4 70/3 75/24
76/5
cases [4] 37/13 37/14
37/15 76/9
cash [1] 61/22
catchall [9] 4/10 7/3
38/11 38/13 75/10
75/11 75/13 75/15
75/16
categories [17] 3/17
3/25 4/3 4/11 4/21 5/3
7/1 7/4 7/12 11/23
34/13 38/18 38/19 42/6
50/2 50/3 52/18
categorization [1]
21/10
category [16] 6/4 6/14
6/15 6/16 10/25 15/13

20/3 20/10 21/4 38/11
48/7 49/16 53/18 54/1
59/15 75/10
caused [2] 73/4 73/5
caution [2] 40/10 40/18
CEA [10] 38/22 38/24
39/3 51/1 54/16 60/25
61/17 62/2 67/10 67/11
CEA's [1] 51/24
Center [1] 29/25
central [1] 69/24
CEO [1] 24/19
certain [9] 5/9 7/21
12/19 19/17 20/1 21/3
37/1 66/8 66/22
certainly [5] 26/13 36/6
56/11 68/6 77/12
certify [1] 78/3
CFTC [37] 4/22 5/1
17/19 21/9 31/17 34/7
37/25 41/2 50/24 51/5
51/7 51/12 51/18 51/23
61/13 61/19 62/3 62/8
62/10 67/25 68/19
68/24 69/1 69/7 69/22
69/23 70/2 70/17 70/17
70/23 71/2 71/12 72/4
72/6 73/19 75/1 75/3
CFTC's [5] 38/21 52/1
70/5 72/14 74/17
CFTC-regulated [5]
21/9 51/5 61/13 61/19
73/19
chairman [1] 23/22
challenge [1] 3/22
chamber [10] 5/18
26/23 27/2 62/23 63/12
63/14 64/8 64/17 65/5
66/25
chance [2] 16/23 17/3
change [4] 28/3 31/5
57/20 58/1
changes [1] 63/13
characterize [1] 51/8
characterized [1] 60/4
charge [1] 68/20
chart [1] 27/18
circle [1] 28/14
circles [1] 31/6
circulating [1] 67/22
circumstance [4]
12/15 40/7 58/24 69/6
circumventing [1]
13/14
cite [3] 45/2 54/23
57/11
cited [2] 17/2 62/15
cites [1] 51/8
City [1] 51/17
Civil [1] 1/3
clarification [2] 23/12
63/4
clarified [1] 33/13
clear [9] 10/10 17/22
18/25 28/18 31/9 35/12
36/23 36/25 50/16
clearly [1] 42/24
clever [1] 18/6

**C**

**client [5]** 4/14 4/17 4/24 22/8 32/5
**client's [1]** 22/1
**clients [1]** 24/8
**climate [1]** 24/2
**close [1]** 16/12
**closely [5]** 16/15 28/23 41/20 42/13 42/17
**coal [1]** 24/11
**COBB [1]** 1/9
**codification [1]** 39/1
**codified [1]** 38/24
**codifies [2]** 60/25 62/2
**coherent [1]** 76/22
**colleague [6]** 6/23 20/12 21/23 22/16 32/4 33/10
**colleagues [2]** 10/21 40/13
**collect [1]** 66/9
**collected [1]** 11/6
**collection [1]** 22/6
**colloquially [1]** 17/8
**colloquy [7]** 14/23 15/3 18/20 21/6 54/14 62/10 63/25
**color [1]** 20/8
**COLUMBIA [1]** 1/1
**combination [1]** 37/3
**come [5]** 5/7 33/16 54/20 68/13 77/20
**comes [2]** 35/9 45/16
**coming [3]** 24/6 53/11 77/10
**comment [5]** 29/25 40/7 54/16 72/23 73/12
**commenters [3]** 62/20 63/16 74/10
**comments [5]** 37/16 62/18 62/20 63/9 63/10
**commercial [2]** 63/2 63/6
**COMMISSION [104]**
**Commission's [22]** 4/4 8/21 10/25 22/16 29/6 35/2 35/22 39/7 39/9 39/20 41/18 47/13 48/1 50/16 52/7 53/8 56/23 58/9 59/10 65/22 71/1 71/7
**Commissions [1]** 36/15
**commodification [2]** 73/15 73/17
**commodities [9]** 51/2 51/3 52/1 52/2 61/1 61/3 61/20 68/19 69/17
**commodity [20]** 1/6 1/20 2/8 3/11 3/13 35/18 37/23 43/14 61/2 61/9 61/10 61/11 61/14 61/17 61/18 61/22 63/1 69/22 73/20 73/20
**common [7]** 8/5 24/16 50/20 55/3 55/5 55/12 73/23
**commonsensical [1]**

**companies [1]** 24/21
**company [3]** 24/14 71/22 71/25
**complies [1]** 3/10
**comply [2]** 33/15 33/24
**components [1]** 3/23
**computer [1]** 1/25
**computer-aided [1]** 1/25
**concept [2]** 17/18 52/7
**conceptually [1]** 24/2
**concern [11]** 29/5 31/24 31/24 46/17 51/15 66/19 69/13 71/5 72/14 73/12 74/8
**concerned [2]** 8/7 67/7
**concerns [7]** 29/8 65/17 65/21 65/24 70/25 73/14 74/15
**Concise [1]** 17/1
**conclude [2]** 39/7 53/25
**concluded [5]** 50/10 50/10 51/20 54/6 77/24
**conditions [1]** 32/12
**conduct [5]** 67/14 69/24 71/12 72/13 72/16
**conducted [1]** 19/6
**conducting [1]** 19/15
**Congress [29]** 8/7 11/22 15/12 18/10 20/4 20/18 20/25 21/4 21/11 23/18 24/18 24/25 26/23 27/2 27/5 28/1 28/3 28/12 30/18 31/1 31/3 32/18 50/4 62/23 63/12 63/15 64/8 64/18 66/25
**congressional [18]** 4/16 15/4 23/24 32/7 39/3 42/10 50/18 54/8 54/15 57/19 62/19 64/1 67/23 68/2 70/9 70/14 70/20 72/2
**congressional-control [1]** 72/2
**connection [2]** 14/19 72/8
**CONOR [2]** 1/18 2/10
**consequence [3]** 41/21 42/14 64/3
**consequences [4]** 24/1 31/7 65/6 74/18
**consider [6]** 8/20 36/13 51/25 53/3 62/1 76/1
**considerations [1]** 23/5
**considered [14]** 15/25 37/17 41/2 51/21 60/21 61/23 61/24 62/18 62/20 64/6 64/13 68/8 71/3 74/13
**considering [8]** 33/7 38/16 51/20 62/8 62/16 63/8 76/2 76/6
**considers [2]** 40/22

**consistent [2]** 14/21 34/3
**contest [33]** 18/1 18/1 18/16 18/23 19/10 19/16 19/17 19/20 19/21 19/22 55/4 55/7 55/13 55/14 55/19 55/24 56/8 56/15 56/17 56/25 57/8 57/9 57/10 57/12 57/13 57/16 58/4 58/23 59/2 59/11 59/12 60/7 60/8
**contests [4]** 19/1 19/6 55/22 76/12
**context [16]** 8/2 9/6 12/12 14/6 17/23 19/10 19/11 19/22 20/19 26/22 31/21 32/2 35/14 36/7 46/20 60/1
**contexts [1]** 76/3
**contingency [4]** 11/9 16/23 17/13 43/16
**contingent [18]** 11/4 12/9 45/22 46/22 47/12 48/9 49/10 49/11 49/18 49/19 49/20 52/9 52/16 53/1 53/14 59/20 59/21 59/22
**Continue [1]** 6/20
**contract [114]**
**contract's [1]** 60/21
**contracting [1]** 10/12
**contracts [131]**
**contrary [6]** 3/18 39/5 39/17 60/19 65/23 74/20
**contrivance [1]** 19/16
**control [30]** 3/9 5/14 5/24 23/18 23/24 24/17 24/17 26/23 27/5 28/3 28/12 30/18 31/1 31/3 32/14 32/18 39/3 50/18 62/19 63/12 63/14 64/8 65/4 66/24 66/25 67/18 67/23 68/2 70/9 72/2
**controls [2]** 5/18 27/1
**convenient [1]** 20/16
**conversation [1]** 10/20
**cop [1]** 70/24
**core [3]** 14/7 33/15 34/6
**corporate [1]** 19/21
**correct [3]** 4/19 32/19 72/10
**correlated [1]** 62/25
**corresponding [1]** 73/5
**could [47]** 4/23 4/24 6/7 6/17 10/19 10/21 10/21 18/16 19/21 20/16 21/5 21/17 29/16 30/25 31/5 32/15 38/8 43/2 45/1 46/16 51/12 51/13 58/15 63/13 64/2 64/8 65/25 66/11 66/15 66/24 67/4 67/13 68/13 68/14 70/7 70/11 70/11

**71/16 72/13 72/18**
**72/18 73/10 74/11**
**74/18 74/22 74/23**
**75/16**
**couldn't [3]** 10/11 63/1 75/15
**Council [1]** 23/23
**counsel [5]** 1/20 2/3 2/9 71/15 75/25
**counsel's [1]** 76/14
**count [3]** 71/17 71/24 72/7
**counting [2]** 72/2 72/5
**country [2]** 45/6 70/14
**couple [6]** 6/17 9/10 18/25 23/20 67/19 68/3
**course [6]** 8/18 11/9 15/19 28/6 68/21 76/2
**court [17]** 1/1 1/23 1/24 3/10 23/12 38/4 38/21 39/6 41/17 51/6 54/22 76/1 76/3 76/6 77/5 77/12 78/9
**Court's [2]** 41/14 75/8
**courtroom [3]** 19/12 77/3 77/14
**cover [5]** 12/2 42/8 42/11 46/9 46/11
**covered [2]** 17/14
**covers [2]** 11/24 76/10
**create [1]** 65/25
**credible [1]** 18/18
**crime [3]** 8/16 8/17 48/21
**criminal [1]** 48/22
**criticisms [1]** 56/22
**cross [4]** 2/12 7/6 16/5 18/15
**cupcakes [1]** 77/8
**curiosity [1]** 40/16
**curious [3]** 38/8 38/13 38/14
**cut [1]** 33/9
**cuts [1]** 35/12
**cv [1]** 1/4

**D**

**D.C [5]** 1/7 1/16 1/21 7/20 8/9
**DALY [2]** 1/18 2/10
**damage [3]** 26/13 26/17 27/14
**damaging [1]** 67/18
**darn [1]** 30/16
**data [4]** 25/9 70/3 74/12 74/14
**Date [1]** 78/8
**Day [2]** 1/15 2/3
**daylight [1]** 36/10
**days [1]** 35/17
**DCM [5]** 4/24 5/19 32/15 48/14 49/13
**de [3]** 41/15 71/5 76/1
**deal [2]** 58/18 71/5
**debated [1]** 6/12
**decide [3]** 53/10 57/25 70/3
**deciding [2]** 39/24 59/6

**decision [10]** 23/3 39/7 39/9 52/25 53/2 53/3 53/4 53/8 56/23 57/25 59/16 60/14
**declared [1]** 73/3
**decreases [1]** 27/14
**deemed [1]** 32/6
**defeats [1]** 11/13
**defendant [3]** 1/7 1/17 9/19
**deference [2]** 41/5 74/19
**deferential [1]** 23/1
**define [10]** 10/1 16/6 42/1 54/19 55/20 56/4 56/5 57/10 58/11 61/25
**defined [5]** 41/24 54/1 54/4 54/5 55/3
**defines [1]** 11/9
**defining [1]** 42/22
**definition [29]** 16/16 16/21 16/22 16/24 16/25 17/10 17/12 17/20 17/22 41/23 42/16 44/22 54/11 54/20 55/6 55/11 55/12 55/15 56/7 56/24 57/6 58/1 58/1 58/2 58/5 58/24 58/25 59/2 59/9
**definitions [17]** 13/22 16/3 16/5 16/15 16/17 17/2 18/15 41/22 42/25 54/21 55/23 57/10 57/20 58/16 58/17 59/16
**Delaware [1]** 19/3
**democracies [1]** 29/20
**democratic [1]** 28/11
**denominator [1]** 8/5
**deny [1]** 75/2
**deputy [1]** 77/3
**Derby [1]** 14/10
**derivatives [9]** 51/2 52/2 61/2 61/10 61/12 61/17 62/3 67/3 69/23
**described [1]** 19/9
**describing [1]** 66/5
**description [1]** 64/19
**deserves [1]** 77/12
**designed [2]** 57/18 72/16
**desired [2]** 17/5 20/17
**Despite [1]** 27/5
**destroy [1]** 26/6
**determination [8]** 11/21 41/6 53/17 58/9 60/20 64/23 65/17 65/23
**determine [10]** 3/18 15/21 15/22 56/7 57/23 58/12 60/18 61/18 62/12 75/18
**determined [6]** 38/17 38/22 39/2 39/5 60/16 65/11
**deters [1]** 26/6
**dictate [1]** 65/4
**dictionaries [3]** 16/18 42/3 54/4

**D**

dictionary [12] 13/22
16/3 16/14 17/1 17/17
41/22 54/11 54/12
54/21 57/10 58/24 59/7
did [16] 4/3 9/6 16/2
27/16 37/24 40/9 40/18
47/15 49/9 54/3 57/3
58/11 64/12 64/23
75/21 77/7
didn't [23] 17/20 33/7
33/9 33/18 38/12 38/19
40/1 47/11 50/16 50/17
52/25 53/3 53/4 56/4
56/5 56/5 56/6 63/18
74/14 74/19 74/20
74/22 75/10
difference [9] 13/3
16/1 25/22 36/22 42/21
48/25 65/16 69/18
69/21
differences [2] 69/12
69/19
different [14] 9/16 10/3
16/17 17/6 20/11 24/6
24/13 24/20 24/22 27/2
32/2 52/13 52/13 58/4
differently [2] 20/12
21/4
difficulty [1] 58/14
diffuse [2] 62/24 64/9
diffused [1] 26/2
direct [20] 23/25 24/17
24/21 25/19 25/21 26/5
26/16 26/20 27/8 27/21
27/24 28/2 28/13 28/14
28/18 36/5 36/16 64/16
64/17 65/6
direct-effects [1] 64/16
directly [6] 8/25 26/18
27/1 29/4 35/18 43/2
director [1] 24/5
disagree [6] 13/3 13/25
13/25 22/19 37/7 42/16
disallowed [1] 73/23
disallows [1] 51/13
disclaiming [1] 17/22
discover [1] 61/22
discovery [3] 61/1
61/16 63/3
discrete [1] 5/14
discretion [2] 36/13
65/12
discuss [1] 39/10
discussion [4] 14/24
28/8 46/5 77/21
dispositive [2] 5/17
22/17
dispute [8] 3/20 3/23
13/20 19/19 37/10 43/4
45/10 65/14
disputing [1] 13/21
disseminate [1] 68/5
disseminated [1] 70/19
distinguish [1] 52/23
distract [1] 28/21
distraction [1] 52/9
DISTRICT [3] 1/1 1/1

7/16
diverge [1] 36/15
division [1] 69/15
do [43] 3/23 4/24 7/9
8/8 9/21 12/5 12/6
12/12 16/10 18/11
18/14 20/14 20/23 22/2
27/12 27/15 28/22
28/24 29/7 31/20 31/25
32/3 34/24 34/25 39/13
39/15 45/2 46/3 46/18
46/18 47/11 51/6 51/6
52/22 54/19 60/3 66/22
69/6 69/7 69/10 71/6
75/17 77/9
does [28] 3/17 4/24
6/12 6/13 6/13 7/7
11/18 13/12 13/12
13/13 14/6 17/10 17/25
20/22 22/2 26/6 31/21
31/21 37/19 38/14
39/11 43/13 43/18
48/17 48/17 48/20 51/2
57/5
doesn't [39] 6/19 8/18
9/11 10/15 12/5 15/17
17/23 20/21 21/9 21/15
21/16 25/16 26/19 27/6
29/1 31/17 31/20 37/17
40/3 42/1 44/24 48/1
50/9 52/8 53/6 55/19
55/23 58/1 61/25 63/24
64/4 64/4 64/18 65/15
66/12 67/14 70/15
75/22 76/4
doing [5] 9/21 24/25
49/16 53/9 68/12
dollars [1] 37/2
don't [54] 2/12 2/16
3/20 4/11 4/21 8/6 8/10
8/16 8/16 8/19 8/25
10/1 10/24 12/5 13/24
15/6 15/15 18/17 19/9
19/19 20/2 21/7 21/8
21/12 22/18 23/5 23/13
28/21 29/20 32/23
34/22 34/25 35/8 35/14
36/1 36/4 37/4 37/9
39/1 40/12 42/15 45/5
45/9 49/3 52/21 56/3
57/20 64/16 65/14
71/23 73/17 75/23
77/17 77/19
done [11] 6/25 7/5 15/9
15/9 15/10 15/20 15/20
15/21 40/14 75/14
75/19
down [1] 63/14
draw [4] 21/17 68/9
70/7 71/11
drawn [3] 67/13 70/18
72/6
dress [1] 20/8
driven [1] 76/20
drop [1] 73/5
during [1] 67/22

**E**

each [6] 18/3 30/2
39/19 41/9 41/11 41/11
earlier [5] 14/18 17/11
20/2 59/19 76/12
easy [3] 18/11 18/12
44/17
economic [47] 15/8
15/15 15/18 20/3 20/21
23/16 23/18 23/23
23/25 25/2 25/20 27/8
27/21 28/6 28/17 30/7
36/9 36/13 36/14 37/8
60/21 60/22 61/25 62/2
62/4 62/9 62/14 62/16
62/19 62/22 63/17
63/20 63/21 63/23
63/23 64/3 64/6 64/9
64/11 64/17 64/22
64/25 65/6 65/10 69/22
70/3 74/21
effect [7] 26/14 26/16
26/20 26/25 27/8 36/17
64/17
Effective [1] 29/25
effects [17] 25/19
25/20 26/5 26/7 27/13
27/24 27/24 28/2 28/13
28/15 28/17 28/18 30/8
36/16 62/19 62/22
64/16
effort [1] 30/9
either [5] 5/11 8/23
25/16 67/4 73/23
election [53] 3/1 5/15
5/17 5/20 5/25 6/9 9/5
15/24 18/1 18/11 19/11
19/20 24/7 28/19 29/11
30/3 32/13 32/16 51/9
51/12 51/13 51/16
51/17 52/23 53/3 57/9
57/12 57/13 59/12 60/4
64/10 64/23 65/18
65/20 65/22 67/5 70/11
70/24 71/1 72/20 72/20
73/8 73/11 73/15 73/20
73/20 74/1 74/2 74/6
74/7 74/15 74/24 74/25
election-betting [2]
51/12 60/4
elections [69] 2/23
4/20 6/5 6/8 6/16 6/18
6/19 8/19 8/23 12/8
15/19 15/21 18/12
19/18 20/5 20/9 20/11
21/15 25/3 25/9 25/20
26/22 29/1 29/16 29/22
30/6 30/9 30/13 30/15
31/7 31/8 31/14 42/11
46/14 47/6 47/7 47/9
47/16 48/5 48/8 49/7
50/11 50/20 51/9 51/10
51/15 53/15 53/16 54/8
55/9 55/18 56/7 57/5
57/11 57/19 60/8 65/4
65/7 66/7 66/14 66/22
67/4 68/6 70/20 71/12
73/16 73/23 74/5 76/13

electoral [2] 9/6 72/16
elements [1] 3/15
eligible [2] 42/7 44/12
else [2] 12/13 36/8
elsewhere [5] 11/3
35/5 35/6 49/17 76/8
embarrass [1] 77/2
emissions [2] 31/17
31/19
Emmy [1] 76/15
emphasize [1] 39/20
emphasizing [1] 40/21
enact [1] 64/18
enacted [1] 11/22
enactment [1] 64/11
end [3] 21/21 22/24
48/6
endurance [1] 19/7
enemy's [1] 45/4
energy [2] 24/14 28/10
enforcement [6] 55/11
67/10 69/2 69/16 69/20
71/8
engage [3] 23/3 24/8
74/20
English [1] 17/1
enough [12] 6/15 7/9
25/21 38/18 42/8 42/11
46/9 46/11 47/18 47/18
60/8 69/13
ensure [2] 66/25 67/12
ensuring [2] 68/20
71/10
entail [2] 41/20 42/13
entails [1] 42/18
enter [1] 61/12
entering [1] 61/9
entire [1] 58/12
entirely [1] 36/23
entities [2] 38/4
entitled [2] 74/19 78/5
entity [1] 71/22
entrusted [1] 71/10
enumerated [34] 3/17
3/25 4/10 7/1 7/12 9/14
11/12 11/14 32/11
34/13 39/12 39/14
39/15 42/6 42/12 42/14
43/8 44/2 44/4 44/9
44/13 44/14 44/17
44/20 45/11 45/15
46/10 46/12 48/6 52/18
53/25 59/15 60/17
61/16
environment [1] 23/25
EPA [1] 31/18
equipped [2] 69/7
70/22
erroneous [1] 11/25
especially [3] 18/6
40/13 74/4
ESQ [9] 1/12 1/13 1/13
1/14 1/14 1/18 1/18
1/19 1/19
essential [9] 41/20
45/17 46/12 46/13
46/15 47/9 47/17 49/6
53/14

essentially [3] 7/4 21/8
42/14
establish [5] 40/3 63/2
63/18 66/11 66/11
estimated [1] 35/5
evaluated [1] 63/7
evaluating [1] 62/16
evaluation [2] 60/23
63/22
even [32] 4/2 4/11 4/22
5/16 6/8 6/16 8/20
16/16 20/10 20/13
22/19 27/4 28/7 28/17
35/12 39/23 47/13
51/14 53/6 53/8 56/12
63/8 63/16 63/20 63/23
64/3 64/21 65/3 65/10
65/15 70/13 73/3
event [98]
events [5] 7/24 12/10
25/22 31/16 49/19
ever [2] 66/16 73/2
every [14] 11/10 11/15
11/17 11/21 45/24 46/6
46/23 48/11 49/1 49/4
59/23 62/3 70/14 76/5
everyday [1] 70/17
everyone [5] 2/11 25/8
77/10 77/14 77/23
everything [6] 12/2
12/13 21/14 24/22
34/16 75/22
evidence [5] 23/19
28/1 31/10 32/17 74/20
exactly [6] 20/23 26/7
27/20 34/9 34/16 50/7
examined [2] 38/17
62/3
examining [1] 49/6
example [32] 4/15 7/20
12/15 12/18 12/20
12/23 13/1 13/5 14/9
16/20 19/3 24/11 26/4
26/4 27/12 32/6 35/9
44/21 45/2 48/20 48/21
59/19 61/3 61/4 63/25
67/16 68/13 71/4 71/13
71/13 72/14 76/16
examples [15] 15/4
24/12 24/16 25/5 25/12
25/24 28/9 35/13 44/18
44/25 44/25 45/3 56/6
57/11 67/6
exceed [1] 7/21
exchange [9] 3/11 3/13
9/2 9/7 15/15 21/10
50/14 50/15 73/23
exchanges [1] 68/21
excluded [1] 43/14
exclusion [1] 57/16
exclusive [1] 52/1
exist [7] 25/10 25/20
30/25 31/6 53/7 66/13
76/5
existed [1] 29/19
existence [10] 15/16
17/7 29/21 52/25 53/2
53/4 66/11 67/2 71/8

**E**

existence... [1] 72/16
expand [1] 70/22
expected [1] 62/5
expert [1] 69/14
explain [5] 12/4 20/13 23/6 27/20 30/4
explained [3] 22/17 25/23 41/3
explains [4] 23/23 24/6 24/20 24/22
expressing [1] 73/14
extent [5] 26/13 26/17 26/25 43/16 59/9
external [2] 20/2 20/21
extrapolate [1] 53/8
extrapolation [2] 46/19 47/15

**F**

face [3] 24/8 24/21 50/3
facilitate [2] 15/10 15/21
fact [8] 10/8 15/2 32/13 33/2 33/7 35/21 65/4 72/25
factor [1] 53/6
factors [5] 5/16 5/17 60/22 64/22 65/21
facts [1] 52/13
fair [1] 17/6
fairly [1] 44/17
faith [1] 76/20
fake [1] 73/9
faked [1] 70/12
fall [12] 3/24 4/3 4/21 6/18 7/24 53/25 54/8 56/1 56/7 56/18 60/5 70/16
falls [6] 5/3 11/10 38/13 49/15 49/16 54/6
false [3] 67/21 68/5 72/24
familiar [1] 25/10
famous [1] 14/23
far [9] 3/19 7/10 22/18 32/22 43/25 44/11 52/11 53/10 71/16
farfetched [3] 68/10 71/4 73/11
fascinating [1] 76/16
fatal [1] 11/2
favor [1] 64/12
FDA [1] 24/22
fear [1] 26/15
feature [12] 26/8 41/20 42/14 45/14 45/17 46/12 46/13 46/15 47/9 47/17 49/6 53/14
features [1] 27/15
federal [6] 39/16 51/1 52/1 52/2 54/5 68/18
federally [4] 50/14 50/14 67/3 68/20
federally-registered [1] 50/14
federally-regulated [3]

feeling [2] 29/14 29/20
feels [3] 8/12 29/11 31/12
Feinstein [4] 14/24 54/15 62/11 62/11
fell [1] 50/22
few [4] 18/4 18/9 18/24 25/12
fight [2] 14/6 19/21
fights [1] 30/10
figure [2] 66/24 76/4
filed [2] 2/18 3/7
fill [1] 46/16
final [3] 12/1 19/24 22/25
finance [1] 30/10
financial [11] 24/3 25/1 61/13 61/15 66/2 66/6 66/8 66/11 66/21 67/5 72/18
find [7] 15/1 50/16 50/17 58/3 58/17 65/15 74/14
finds [1] 41/8
fine [1] 20/9
firm [1] 24/15
first [19] 2/19 3/16 3/23 11/14 16/20 23/21 25/19 27/25 34/19 39/11 41/16 43/12 48/7 54/10 54/15 56/3 69/19 75/9 75/17
fit [4] 53/18 57/5 58/10 58/12
fits [8] 8/1 8/1 18/2 48/7 58/1 58/2 58/22 59/8
five [3] 7/5 7/14 11/12
flesh [1] 13/16
float [1] 67/17
Florida [3] 19/4 49/14 49/17
flourish [1] 73/18
fluctuations [3] 27/22 61/3 61/8
focus [3] 9/16 19/25 36/15
focuses [1] 7/13
follow [5] 8/4 9/11 23/16 26/9 28/24
following [2] 3/22 67/17
follows [1] 10/8
Football [1] 15/5
forbid [2] 47/7 50/11
forbids [2] 47/8 47/11
foregoing [1] 78/3
foreign [1] 45/4
forever [1] 29/19
form [3] 23/1 29/12 71/24
formal [4] 37/16 37/17 37/19 39/23
former [1] 23/22
forms [3] 14/14 25/10 29/19
formulations [1] 62/15

form [5] 4/9 22/23 37/13 50/1 52/17
forward [1] 42/17
found [10] 11/7 16/15 29/25 54/11 59/1 62/22 63/8 64/7 70/1 74/21
four [5] 7/2 7/10 39/9 39/17 41/16
framework [6] 3/22 4/9 5/1 5/18 33/10 37/11
Franklin [3] 77/2 77/3 77/11
Fransha [1] 50/24
fraud [3] 69/3 72/8 72/11
fraudulent [1] 72/13
frequently [3] 24/8 40/14 55/5
frustrated [1] 52/5
frustrating [2] 52/4 52/6
fuel [2] 61/5 61/6
full [2] 40/3 48/6
fully [1] 17/20
fundamental [1] 25/25
funding [2] 24/23 45/6
Furman [1] 23/22
further [7] 14/4 21/22 21/23 34/21 38/9 60/13 76/23
futures [8] 1/6 1/20 2/8 35/16 37/24 54/17 61/20 61/21

**G**

gain [5] 35/6 35/11 66/2 67/5 72/18
Gallery [1] 7/22
gamble [6] 16/21 17/3 51/10 66/14
gambling [43] 8/24 16/1 16/6 16/8 16/8 16/9 16/9 16/12 16/16 17/7 17/12 18/15 19/22 21/8 45/15 51/9 51/14 51/14 51/16 54/13 54/17 54/18 54/19 54/22 55/1 55/2 55/4 55/11 55/15 55/13 56/2 57/7 57/8 57/17 58/3 58/5 59/10 59/17 59/23 60/6 60/7 73/23
game [31] 13/14 14/8 14/8 14/10 14/11 14/13 14/13 14/14 14/22 15/7 15/17 15/17 16/12 16/21 16/24 16/25 17/8 17/18 17/25 18/16 19/16 19/16 20/1 20/21 21/3 55/19 55/20 55/22 55/23 56/16 76/13
games [13] 15/6 15/13 15/19 15/23 17/3 18/20 19/2 20/22 20/5 21/7 21/8 21/15 57/1
gaming [56] 7/14 14/5 14/6 14/7 14/8 14/22 15/5 15/24 16/1 16/7

governance [1] 15/22
government [3] 9/19 15/22 69/19
grammatically [1] 10/14
Grammy's [1] 56/15
grant [1] 75/3
grants [1] 74/1
grave [1] 74/15
Great [1] 3/6
greatly [1] 70/22
green [2] 24/14 28/10
grounding [1] 70/4
group [1] 71/22
groups [1] 66/1
grown [1] 35/17
guess [5] 29/18 33/4 58/14 58/20 65/1
gut [1] 28/25

**H**

had [14] 4/13 6/16 7/20 7/21 7/24 33/9 40/14 42/20 47/4 51/18 64/21 69/6 73/2 73/2
half [1] 18/6
hand [1] 23/9
happen [5] 26/24 28/7 66/20 71/6 74/7
happened [2] 28/12 67/1
happening [1] 29/3
happens [1] 66/5
happy [1] 77/11
hard [2] 31/2 31/4
harm [1] 30/23
harms [1] 23/9
Harvard [1] 23/21
has [33] 3/16 3/22 4/14 13/24 14/1 14/4 15/8 16/11 20/14 21/23 23/2 23/18 28/9 28/12 29/7 31/18 31/19 32/5 34/17 36/12 41/12 41/25 43/7 45/11 55/11 62/6 62/19 63/23 65/5 68/4 70/5 72/5 76/16
hasn't [1] 7/5
hate [1] 45/3
have [99]
haven't [2] 2/21 75/14
having [7] 11/14 26/1 30/24 41/9 42/22 58/14 60/16
he [8] 23/23 24/1 24/20 24/21 33/13 73/2 73/2 73/3
hear [2] 16/2 75/21
heard [2] 25/7 75/23
hearing [5] 1/9 2/20 58/15 77/4 77/14
hedge [5] 24/9 61/7 61/9 62/21 63/17
hedgers [2] 35/25 36/1
hedging [23] 24/9 25/3 26/1 26/2 35/3 36/5 36/5 36/18 36/19 37/2 61/1 61/1 61/11 61/15

**H**

hedging... [9] 62/6
62/14 63/3 63/10 63/11
63/18 64/2 64/9 64/19
held [5] 41/25 49/4
50/25 52/10 59/24
helpful [6] 2/14 25/6
27/18 28/9 30/1 77/1
helps [1] 26/4
HENRY [1] 1/13 2/4
her [3] 77/4 77/13
77/13
here [57] 2/11 3/12
3/22 17/9 18/4 22/10
22/15 22/20 23/7 23/21
24/20 24/25 27/20 28/2
28/18 30/14 30/21 32/2
32/24 35/4 37/6 37/11
39/2 41/2 42/4 42/10
43/4 45/12 45/18 46/13
47/6 47/15 51/6 51/11
52/10 53/6 53/9 53/10
53/13 56/23 58/4 58/16
58/23 59/1 59/24 60/2
60/3 60/25 63/22 64/6
64/23 65/18 68/3 68/8
69/18 72/6 77/8
here's [2] 22/11 67/16
hers [1] 77/14
herself [1] 41/8
high [1] 67/25
higher [1] 18/4
higher-level [1] 18/4
highlighted [2] 23/21
62/18
hire [1] 8/10
history [5] 11/18 14/23
18/20 21/6 71/1
hit [3] 8/10 26/13 49/14
hold [1] 59/25
honest [1] 28/25
Honor [34] 2/2 2/7 3/6
3/7 7/3 14/4 14/25
21/23 22/13 22/14
25/10 25/21 30/17
34/21 37/5 37/12 37/22
38/2 39/21 40/15 40/22
41/8 47/22 53/12 60/13
62/19 64/24 68/18
69/11 71/14 75/2 75/9
76/12 76/23
Honor's [1] 46/17
HONORABLE [1] 1/9
hope [5] 17/4 53/11
58/17 58/20 77/20
horse [2] 14/10 55/21
horseracing [1] 15/5
hot [1] 27/23
hour's [1] 38/2
House [6] 3/9 5/14 5/23
5/24 32/14 73/14
how [29] 10/8 11/19
20/22 20/22 24/8 30/14
30/14 36/11 37/1 37/3
39/11 40/3 40/13 41/13
42/21 44/25 46/3 46/5
48/11 54/19 55/2 56/11
66/15 66/16 71/20 73/7

however [1] 57/3
human [1] 19/7 69/1
hurricane [7] 26/3 26/5
26/13 26/18 27/12
49/14 49/19
hurricanes [1] 27/12
hypothetical [3] 8/9
10/18 76/5
Hypothetically [1]
49/12

**I**

I'd [4] 7/14 16/1 18/4
29/18
I'll [18] 4/10 14/4 18/8
22/18 22/22 23/10 28/9
29/9 34/21 38/1 38/5
41/16 54/5 60/22 64/23
67/6 76/11 77/22
I'm [39] 2/18 4/17 5/4
6/22 6/25 8/13 12/23
13/2 21/18 22/15 28/23
35/15 36/9 36/23 37/23
37/24 38/8 38/14 38/14
38/23 40/21 47/1 47/21
48/16 49/12 49/13
49/16 52/5 56/9 56/12
58/3 58/14 58/15 59/17
66/18 67/7 68/12 77/2
77/11
I've [2] 23/20 47/22
iceberg [1] 25/13
icky [4] 29/11 29/14
30/12 30/13
idea [3] 25/25 29/2
64/5
ideally [1] 2/23
identical [2] 19/4 24/2
identified [1] 65/25
identifies [1] 27/19
ignore [3] 5/23 51/13
74/20
illegal [4] 50/19 50/22
51/10 52/8
illegally [1] 70/20
imagine [5] 6/4 31/2
31/4 71/19 71/22
immediate [1] 35/13
immediately [4] 8/4
28/4 28/5 35/10
impact [2] 31/8 64/9
65/5
impacted [1] 70/10
impacts [5] 23/24 25/2
27/21 28/7 36/13
implicated [1] 33/21
implications [2] 23/18
68/3
implies [1] 19/17
important [16] 4/18 8/2
14/1 16/16 17/9 25/25
30/14 32/6 50/11 51/19
52/3 67/18 69/12 69/18
69/19 74/4
imported [1] 77/11
imposed [1] 64/15
impossible [1] 10/13

improper [1] 73/15
incentive [1] 66/12
incentives [7] 8/8 8/11
30/15 31/5 66/1 66/6
66/21
incentivize [7] 8/16
66/14 67/4 70/6 72/15
72/18 74/23
include [1] 57/10
included [3] 55/6 55/14
65/25
includes [6] 56/24
57/14 59/2 59/11 60/7
60/8
including [3] 19/18
65/21 73/13
incorporates [1] 17/17
increases [1] 61/11
incurred [1] 35/5
independent [1] 10/2
indicates [1] 51/15
indirect [6] 26/5 27/13
27/22 27/24 28/17
36/17
individuals [1] 66/1
industry [1] 24/12
influence [1] 29/16
30/6 66/15 70/11 70/11
influenced [2] 72/13
73/8
influencing [1] 30/9
informal [4] 37/19
39/21 40/21 52/12
information [10] 25/11
34/11 40/6 68/6 70/10
70/13 70/19 72/25
73/10 74/13
ingenuity [1] 69/1
inherent [1] 15/8
inherently [1] 69/21
initial [2] 31/6 48/14
initially [1] 42/21
injunction [1] 2/21
inquiry [3] 32/12 43/12
49/2
inserted [1] 57/7
insider [2] 34/11 34/17
insomuch [1] 31/23
instance [4] 34/19 40/2
46/7 61/20
instead [2] 9/12 17/24
institutions [1] 25/2
instructive [1] 18/23
instrument [1] 10/7
instruments [4] 10/1
25/3 35/24 36/14
insurance [1] 26/3
integrity [20] 4/16
28/22 29/22 51/6
64/24 65/18 65/20
65/22 67/12 68/20 71/2
71/10 73/15 74/2 74/3
74/6 74/7 74/15 74/24
74/25
intended [2] 50/4 54/17
intent [8] 48/13 63/17
interchangeable [3]
54/12 54/24 57/7

interest [50] 3/19 4/7
4/12 5/1 11/16 11/21
22/16 23/8 29/5 29/7
29/14 30/20 30/21
30/23 32/12 32/21
32/24 33/1 33/5 33/6
34/23 36/5 39/6 39/18
40/19 41/6 42/7 46/24
48/15 49/15 50/3 50/12
51/23 60/14 60/19
61/13 61/15 61/17
61/24 62/1 62/4 63/24
64/4 64/12 64/22 65/13
65/24 68/7 73/25 74/8
interested [1] 35/18
interesting [1] 35/7
interests [4] 51/19 52/3
60/25 62/2
intermediate [1] 17/24
Internet [1] 55/10
interpret [1] 46/19
interpretation [23] 4/1
6/23 8/18 8/21 9/11
11/17 11/25 12/4 12/11
15/7 17/15 17/17 18/8
41/7 41/15 52/7 58/19
60/10 75/24 76/7 76/9
76/12 76/21
interpretations [1]
21/12
interprets [1] 45/13
interrupt [1] 3/4
interrupted [1] 47/22
interruption [1] 24/2
intervening [3] 5/15
5/16 25/22
intervention [1] 2/25
intrinsic [1] 15/18
intuition [1] 31/11
investigate [4] 34/18
68/16 69/14 70/15
investigates [3] 69/2
69/16 71/9
investigating [6] 67/13
68/9 69/22 69/23 70/19
71/12
investigation [1] 69/20
investigations [2] 70/5
70/8
investing [1] 35/23
involve [47] 3/16 6/8
7/8 7/9 9/22 10/21
11/11 12/7 12/8 12/21
13/3 13/8 13/21 13/22
13/24 13/25 14/1 15/13
24/22 39/11 39/13
39/15 41/14 41/18
41/24 42/5 42/8 42/22
43/6 43/22 44/2 44/8
44/11 44/16 44/23 45/1
45/1 45/11 46/1 46/6
46/9 47/5 47/6 49/10
55/19 60/13 60/17
involved [9] 9/21 12/16
13/20 41/24 42/12
64/10 68/15 71/23
72/23
involves [17] 10/12

involving [7] 5/13
10/11 20/1 32/14 33/3
43/9 69/20
is [332]
isn't [1] 76/13
isolation [1] 14/20
issue [17] 6/11 21/24
22/17 22/23 33/22 35/4
38/7 38/22 39/2 39/24
42/25 46/2 53/11 57/17
57/21 58/6 68/16
issues [5] 5/8 39/10
39/20 41/3 41/16
it [247]
it's [110]
its [33] 3/8 15/11 20/17
22/9 32/1 41/3 41/5
41/5 41/19 42/1 42/8
45/4 46/7 50/25 51/20
52/25 53/2 53/3 53/4
53/17 54/4 54/11 57/9
57/14 61/19 65/11
65/17 67/15 70/2 70/17
71/1 71/7 71/10
itself [10] 6/9 10/6
12/22 15/10 43/9 44/24
46/1 62/2 64/18 67/5

**J**

JA [1] 34/5
JACOB [2] 1/12 2/2
Jason [1] 23/22
jet [2] 61/5 61/6
JIA [1] 1/9
JMC [1] 1/4
JOHN [2] 1/13 2/4
Johns [4] 1/23 78/3
78/8 78/9
Jones [2] 1/15 2/3
Josh [1] 2/4
JOSHUA [1] 1/14
JPMorgan [2] 24/6
25/4
JUDGE [1] 1/10
judgment [6] 2/12 71/7
71/11 74/17 75/2 75/3
judgments [1] 41/5
jump [2] 38/6 46/5
June [1] 78/8
jurisdiction [3] 52/1
70/15 70/23
jurisdictions [1] 50/19
just [78] 2/18 3/20 3/25
4/7 5/11 6/14 8/11 9/16
9/25 10/2 10/14 10/14
10/16 11/11 12/5 13/15
13/16 13/22 14/20 16/3
17/8 18/6 18/9 19/9
19/11 19/20 19/24 20/3
20/10 22/3 22/6 22/22
23/20 24/16 24/24
25/11 25/12 26/11 28/2
28/12 28/25 31/2 31/9

**J**

just... [36] 31/15 31/22
33/17 33/20 34/6 34/18
34/22 35/6 35/25 38/4
38/7 38/8 38/13 38/14
39/21 39/24 40/6 42/20
43/2 44/3 46/2 47/1
47/16 47/23 48/16
48/25 55/23 59/9 59/18
63/21 65/4 67/9 68/25
73/17 77/13 77/18

**K**

Kalshi [19]  2/3 3/8 22/7
38/1 50/12 50/21 51/5
51/6 51/12 56/22 59/3
62/18 64/14 70/15 71/5
72/21 74/9 74/10 76/16
Kalshi's [12]  3/23 8/19
12/6 39/3 39/4 39/25
50/18 51/7 60/16 61/24
71/15 75/2
KALSHIEX [1]  1/3
keep [2]  22/18 56/21
KELLY [1]  1/13
Kentucky [1]  14/10
key [3]  3/12 9/12 30/5
Kid [1]  73/1
kind [20]  11/17 22/1
26/2 27/3 27/4 27/8
28/24 29/3 29/23 30/2
32/12 34/6 45/2 48/2
56/15 67/6 68/15 71/25
73/9 73/25
kinds [5]  23/7 24/24
31/16 33/1 68/10
know [16]  2/16 2/17
4/6 5/24 8/12 20/12
25/10 34/25 37/4 38/7
56/12 59/9 65/8 77/7
77/9 77/17
knows [2]  3/7 33/10

**L**

laid [1]  21/11
language [10]  11/20
25/22 36/21 38/24
43/10 43/13 43/20
45/13 52/14 63/5
large [2]  73/22 73/24
larger [1]  40/2
largest [1]  24/7
Las [1]  51/17
last [5]  4/10 7/3 31/13
77/4 77/13
latching [1]  20/16
later [1]  73/6
law [35]  39/16 41/1
41/14 41/25 45/19
45/23 46/3 46/6 47/6
47/8 47/11 47/16 48/17
48/18 49/17 50/20
50/22 50/23 51/4 51/10
51/13 51/21 53/18 54/5
54/5 55/2 55/3 60/12
63/13 64/18 67/10 69/2
71/8 73/24 74/19
lawfully [1]  51/4 51/12

laws [19]  8/23 9/7
46/21 46/22 47/7 48/8
48/10 49/7 49/10 50/11
51/3 51/22 51/23 52/8
52/15 52/25 53/2 53/5
53/16
lawsuit [2]  19/22 33/22
lawyerly [1]  18/7
leads [1]  19/25
learning [1]  35/15
least [6]  11/7 26/21
43/24 44/11 53/19
59/14
leave [2]  77/2 77/20
leaves [2]  7/12 17/16
legislation [9]  23/24
24/23 24/24 27/5 28/5
28/5 28/7 64/11 65/3
legislative [3]  14/23
18/20 21/6
lenient [1]  40/25
less [1]  36/23
let [8]  6/2 33/20 35/1
38/5 38/7 46/7 54/20
74/6
let's [4]  8/20 49/12
53/22 65/20
letters [1]  73/12
level [5]  7/21 8/11 18/4
30/5 61/18
levies [1]  56/23
life [2]  31/7 66/6
like [33]  2/23 5/8 5/9
7/14 18/4 19/2 19/11
19/20 20/2 22/6 22/7
22/10 26/3 26/10 27/16
29/1 29/2 29/17 36/23
38/24 40/8 45/5 47/14
50/17 55/23 55/23
56/15 56/16 61/20
64/24 69/5 69/8 76/14
likely [1]  71/6
limit [3]  11/23 68/25
68/25
limited [1]  64/19
limits [3]  71/15 71/19
71/21
Lincoln [1]  14/25 54/15
62/11
Lincoln's [1]  54/16
line [5]  10/15 12/10
21/17 39/1 63/14
lines [2]  8/15 14/18
linked [1]  55/8
links [1]  22/6
LIOI [2]  1/14 2/5
liquid [1]  35/25
Lisboa [1]  24/11
list [7]  6/5 7/2 7/6 7/11
22/11 48/6 71/17
listed [7]  2/25 7/5
15/14 34/8 39/25 45/21
51/5
listen [1]  3/5
listing [2]  3/8 3/14
literally [3]  6/13 13/6
15/3
little [5]  31/12 37/18

lives [1]  30/7
LLC [1]  1/3
logic [1]  18/3
logical [1]  47/14
long [2]  41/25 76/17
look [14]  5/13 16/2
16/16 18/22 19/11 19/14
20/11 21/7 28/23 43/10
52/14 54/3 56/19 76/3
looked [7]  54/10 55/2
55/10 57/3 62/4 62/8
63/8
looking [8]  7/1 9/13
9/14 13/11 30/21 33/1
45/11 56/12
looks [2]  37/18 76/7
lose [1]  32/22
losing [1]  59/17
loss [2]  35/5 35/11
losses [1]  35/5
lot [12]  5/25 8/13 11/4
14/23 21/25 24/12 28/1
29/2 45/21 67/24 69/16
69/17
lots [2]  30/8 30/8
lottery [3]  14/14 19/16
19/17
Louisiana [2]  1/15
19/15
love [1]  16/1
lunch [1]  10/19

**M**

made [4]  9/19 9/19
65/2 66/20
main [1]  6/19
maintain [1]  4/18
make [25]  8/11 8/13
11/20 25/18 25/22
33/20 35/24 38/12
45/22 48/1 48/14 48/14
49/10 52/8 52/8 53/1
53/2 56/9 57/25 63/24
64/4 64/5 65/16 67/24
72/5
makes [13]  9/17 10/14
10/16 11/12 12/11 15/7
15/12 20/4 30/15 34/14
34/19 35/9 47/12
making [9]  9/12 13/14
20/23 23/3 23/7 37/13
37/15 37/17 39/22
49/18 58/9 60/20 69/5
75/13 75/14 75/18
man [1]  8/10
manage [1]  61/3
managed [1]  24/3
management [1]  35/3
managing [1]  24/5
manipulate [4]  31/3
67/4 68/2 68/22
manipulated [3]  70/20
72/5 74/23
manipulating [2]  72/12
72/17
manipulation [25]
28/22 29/2 29/12 29/13

29/23 30/3 30/16 31/9
31/9 31/24 33/14 34/17
68/14 68/25 69/1 69/3
69/14 69/16 70/5 70/8
70/16 70/18 71/9 72/18
72/24
manipulative [2]  67/14
72/12
many [25]  5/15 16/4
25/22 27/3 30/14 35/3
36/7 37/1 38/25 48/8
48/10 48/19 49/7 49/10
52/15 55/3 58/16 58/17
63/13 64/10 66/21
67/24 68/21 74/5 77/7
MARGARET [2]  1/19
2/9
market [22]  25/9 30/24
31/5 31/22 34/7 35/15
35/16 36/4 50/23 51/5
61/7 61/13 61/19 61/22
65/5 67/25 70/18 70/20
72/19 73/10 73/19
74/12
market-based [2]  25/9
74/12
markets [24]  24/4 25/9
29/19 29/21 35/24 51/2
51/13 52/2 52/2 54/18
61/1 61/2 61/17 67/12
67/14 68/19 68/22
68/24 69/3 69/14 69/17
69/23 70/2 71/10
match [1]  73/2
match-up [1]  73/2
materialize [3]  26/16
26/19 26/25
materially [1]  19/4
matter [12]  3/25 15/21
21/7 21/9 30/6 30/7
30/7 31/7 42/18 57/18
77/22 78/5
matters [1]  36/22
may [17]  1/5 3/3 3/18
5/6 5/8 12/23 12/24
15/9 15/10 19/8 26/24
26/25 35/13 38/4 59/8
69/23 70/3
maybe [8]  13/1 26/18
28/20 41/8 65/5 65/9
67/20 68/5
me [24]  2/3 2/9 2/14
6/2 12/6 21/16 26/4
33/13 33/20 35/17
36/22 38/6 38/7 43/11
43/19 45/16 45/22 46/7
52/4 52/6 54/20 56/11
58/17 63/9
mean [21]  11/10 14/6
16/4 20/23 20/24 21/2
31/17 33/18 35/19 43/7
48/11 48/17 48/17
56/10 58/5 58/20 59/22
66/23 71/23 71/24 76/24
meaning [29]  16/13
19/17 26/17 33/24
41/10 41/19 42/2 42/2
42/5 42/8 42/9 43/21

44/10 46/7 47/24 53/24
54/4 54/9 54/12 57/7
57/9 57/13 57/15 58/10
58/13 60/5 60/6 60/11
71/20
meaningful [2]  36/6
36/6
meanings [1]  54/5
means [28]  13/21
13/25 19/11 19/12 20/6
23/2 37/1 37/1 39/23
41/13 42/2 42/4 43/7
43/15 46/1 46/7 48/3
55/20 58/3 58/21 61/2
61/12 61/18 62/1 75/25
76/2 76/9 76/22
meant [3]  10/12 20/18
36/20
measure [1]  66/16
mechanical [1]  1/25
media [5]  67/17 67/17
68/1 73/6 73/7
member [1]  32/7
members [2]  4/15
73/13
mention [1]  72/21
mentioned [2]  22/7
62/10
mere [2]  46/2 65/4
Merriam [1]  16/20
Merriam-Webster [1]
16/20
metes [1]  40/3
metric [1]  37/5
might [21]  10/3 26/6
26/8 26/9 26/14 26/15
26/24 27/14 27/15
27/17 27/23 28/25
30/11 40/4 48/19 52/14
56/19 57/16 58/5 59/19
76/5
military [1]  12/18
million [2]  71/21 72/11
mind [2]  35/9 45/16
minimal [1]  69/13
minimize [1]  24/9
minimizing [1]  24/10
minimum [1]  70/4
minimus [1]  71/5
misalignment [1]
70/25
mischaracterize [1]
43/5
misguided [2]  20/13
29/14
misinformation [2]
70/7 74/24
misleading [1]  40/12
miss [2]  77/13 77/19
misses [1]  50/25
mission [3]  67/15 69/15
71/1
misunderstanding [1]
29/15
monetary [1]  65/25
money [12]  8/11 8/13
16/21 17/3 30/9 30/13
30/14 35/24 66/7 67/24

Case 1:23-cv-03257-JMC   Document 40   Filed 06/04/24   Page 86 of 91

**M**

money... [2] 68/15 71/25
month [1] 27/23
more [27] 11/23 16/2 16/11 25/4 25/25 25/25 27/4 29/13 35/15 36/6 36/18 37/6 37/15 37/18 40/16 41/4 42/24 46/8 48/16 57/1 57/2 62/6 63/5 63/19 68/4 77/10 77/16
morning [1] 22/14
most [8] 10/24 11/1 14/21 18/16 30/5 63/10 69/19 70/2
mostly [1] 25/17
motion [2] 1/9 75/2
motions [3] 2/12 2/15 2/20
motivate [1] 66/22
motivates [1] 66/7
move [6] 9/12 14/4 25/17 53/20 60/14 61/13
movement [1] 73/10
movements [1] 61/6
moves [1] 61/14
moving [2] 5/25 6/22
Mr. [1] 24/11
Mr. Lisboa [1] 24/11
Ms. [3] 77/2 77/3 77/11
Ms. Franklin [3] 77/2 77/3 77/11
much [10] 3/6 11/2 25/16 30/14 37/4 51/15 57/1 57/2 71/20 77/19
munitions [1] 12/19
murder [2] 7/20 8/9
must [1] 44/6
my [32] 2/7 3/2 4/25 6/23 8/9 10/19 10/20 20/12 21/23 22/14 22/16 26/21 31/15 33/4 33/5 33/10 34/3 35/13 37/10 37/25 40/6 40/13 40/16 43/3 47/1 49/13 52/5 56/4 65/9 67/2 69/11 77/3
myself [4] 3/5 4/7 37/23 59/17

**N**

N.W [1] 1/21
name [2] 2/7 22/14
narrow [1] 13/7
narrower [2] 16/18 17/16
narrowly [1] 13/20
National [1] 7/22
nature [1] 66/8
nearby [1] 27/16
necessarily [3] 11/24 35/12 42/16
necessary [1] 35/24
need [5] 21/22 34/22 37/4 75/25 76/4
needed [3] 2/24 52/11

53/16
negative [1] 74/17
never [3] 15/25 37/18 76/17
news [3] 51/8 70/12 73/7
next [5] 11/20 19/14 19/17 20/9 24/5
no [21] 1/4 4/21 14/8 14/8 15/8 18/19 21/22 21/23 28/7 32/1 32/11 33/6 33/19 33/19 33/19 41/4 48/7 51/4 52/24 58/17 76/25
Nobody [1] 15/22
nominated [1] 20/7
non [1] 34/11
non-public [1] 34/11
none [1] 50/3
noneconomic [2] 25/7 25/15
nonprofit [1] 25/10
normally [1] 10/23
not [150]
notably [1] 11/18
note [1] 22/22
noted [2] 7/3 61/23
notes [1] 47/1
nothing [2] 18/21 20/14
noticed [1] 4/13
November [1] 2/23
novo [2] 41/15 76/1
now [13] 7/6 8/20 15/19 17/19 41/7 41/16 42/22 42/24 47/23 66/5 67/1 68/12 68/23
number [15] 7/13 7/14 7/25 9/10 12/10 14/16 14/17 14/21 17/3 17/4 18/10 37/1 55/7 73/22 73/24
number 1 [1] 7/13
numerous [2] 47/7 53/16
NW [1] 1/15

**O**

Obama's [1] 23/23
objective [2] 70/3 70/4
observations [1] 18/4
observed [1] 65/7
observes [1] 11/3
obviously [4] 7/7 28/23 32/6 32/8
occasion [1] 4/22
occasional [7] 36/19 36/22 37/4 37/6 62/7 63/5 63/19
occur [3] 5/16 48/22 64/2
occurred [1] 70/5
occurrence [1] 43/16
odd [1] 38/25
off [7] 7/2 7/2 7/6 33/9 45/9 50/9 77/21
offensive [1] 8/12
offer [5] 18/4 18/9 25/2

offered [3] 16/17 39/4 76/16
offering [1] 17/24
offers [1] 76/16
office [3] 1/20 19/8 27/3
Official [2] 1/24 78/9
offset [1] 35/6
often [2] 5/17 66/8
oh [4] 45/5 69/13 71/5 72/22
okay [31] 5/22 6/3 6/6 6/10 6/21 7/16 7/19 13/10 13/17 13/18 14/3 16/23 21/1 21/19 21/20 22/5 22/12 33/12 34/2 38/3 38/20 40/20 53/23 54/25 55/25 59/16 60/9 60/16 65/20 68/17 75/4 one [68] 3/16 4/3 4/10 4/11 5/3 5/12 5/17 6/7 6/8 7/3 7/6 7/25 9/10 11/1 12/11 14/5 14/17 16/18 16/19 16/24 16/25 17/3 17/7 17/8 18/12 23/9 23/17 23/21 24/7 25/19 26/2 26/2 27/18 27/18 30/3 31/13 32/6 36/16 36/24 39/24 40/25 43/17 43/20 43/23 45/15 45/16 45/16 46/10 46/12 48/3 48/3 49/17 50/18 52/12 56/1 56/22 58/16 58/17 59/8 62/23 63/22 64/14 67/18 68/4 69/5 72/21 72/23 74/9
ones [2] 30/25 40/5
only [12] 12/11 35/17 41/1 43/19 49/5 52/17 53/10 56/12 56/24 65/1 70/25 76/11
OpenAI [1] 24/20
opening [1] 25/13
operate [1] 61/5
operation [1] 70/17
opponent's [1] 52/5
opposed [3] 30/25 36/16 62/14
oral [1] 2/13
order [22] 7/15 7/15 17/21 34/24 35/22 36/21 38/22 39/2 39/20 40/3 49/4 49/16 50/16 50/25 51/7 51/20 56/5 56/13 61/23 67/8 68/1 70/2
ordinary [21] 41/19 41/22 42/2 42/2 53/24 54/4 54/4 54/7 54/10 54/12 54/21 56/7 57/6 57/7 58/10 58/13 59/2 60/5 60/5 67/15 68/21
organized [1] 66/1
Oscar [1] 76/15
other [53] 4/16 5/5 11/12 13/22 23/10 24/3

50/23 51/12
24/12 24/24 26/6 26/6 27/9 27/15 27/19 27/25 29/20 30/8 30/23 31/21 31/23 32/2 32/9 33/16 33/23 35/13 36/2 36/18 40/2 40/4 40/4 43/17 46/7 46/15 46/21 53/4 56/6 57/16 58/23 59/16 60/22 61/11 61/16 64/13 64/22 65/5 67/23 68/12 69/24 73/10 74/9 76/3 76/5 76/9 76/13
others [17] 14/18 28/16 36/7 55/5 55/7 55/14 55/19 56/8 56/25 57/8 57/16 59/3 59/11 59/12 60/7 60/8 75/18
otherwise [5] 3/4 25/24 48/1 51/23 66/22
our [24] 3/22 6/18 9/11 12/10 12/23 13/8 14/7 15/22 15/22 15/23 21/21 25/13 25/23 30/7 37/18 37/24 38/25 54/23 57/11 60/24 60/24 61/4 68/20 73/16
out [25] 5/10 9/17 11/23 13/16 20/4 21/11 24/13 29/18 30/14 30/17 32/7 34/8 34/18 35/9 36/2 40/16 44/20 49/16 60/24 66/24 67/20 67/20 67/20 76/4 77/18
outcome [11] 9/6 17/14 20/17 42/10 53/15 54/8 57/5 57/15 57/19 67/3 76/20
outcome-driven [1] 76/20
outlined [1] 4/13
outside [2] 9/6 67/15
outweigh [1] 74/22
outweighed [2] 65/12 74/14
over [5] 21/22 52/1 66/24 73/12 77/5
overlapping [1] 51/24
oversee [1] 67/12
oversees [1] 69/3
overwhelmingly [1] 65/18
own [3] 15/11 40/6 51/8
Oxford [1] 17/1

**P**

p.m [1] 1/5
page [2] 12/1 22/3 24/14
page 11 [1] 12/1
page 1597 [1] 24/14
pages [5] 25/5 25/13 27/18 30/1 34/5
paid [2] 4/15 32/7
papers [2] 41/17 59/18
parallel [1] 8/17
pardon [4] 43/11 43/19

45/16 63/9
park [1] 27/16
parse [1] 18/7
part [7] 8/23 16/8 29/6 32/20 33/22 36/24 69/8
participant [1] 61/7
participating [1] 35/19
particular [9] 4/15 7/22 32/5 33/17 39/25 57/18 66/2 66/12 66/15
particularly [6] 26/22 30/1 30/16 30/19 32/14 35/14
parties [9] 13/2 36/10 39/10 43/4 45/2 45/10 50/8 60/24 77/8
parties' [2] 2/12
partisan [3] 3/9 23/17 24/17
parts [1] 5/25
party [6] 5/24 26/23 27/1 28/11 41/9 67/23
party's [2] 41/17 67/18
passed [2] 27/6 65/3
passes [1] 28/7
passing [2] 28/5 28/6
pastry [1] 10/20
pattern [1] 72/25
payout [1] 35/4
people [29] 8/7 8/12 8/17 10/23 21/8 22/10 28/25 29/16 30/6 31/8 34/8 35/23 36/4 49/18 66/6 66/7 66/15 66/22 67/4 67/24 68/5 71/17 71/23 71/24 72/2 74/5 77/8 77/9 77/18
per [1] 63/24
percent [1] 36/1
perception [2] 74/2 74/25
perceptions [1] 72/20
perfectly [1] 8/15
period [1] 7/23
permit [1] 51/7
permitted [1] 4/16
person [2] 68/1 77/4
perspective [1] 24/6
ph [1] 50/24
phrasing [1] 55/6
PI [1] 2/17
pick [1] 58/16
piece [11] 4/2 5/22 6/23 6/25 7/22 22/24 27/25 28/6 28/22 30/20 36/5
pieces [1] 27/11
place [10] 4/14 11/14 30/18 32/5 32/9 32/17 33/2 34/6 51/16 52/9
places [1] 29/21
plain [10] 41/10 42/5 42/8 43/20 44/10 45/13 46/7 57/9 57/15 60/11
plainly [1] 57/14
plaintiff [1] 1/4 1/11 2/16 3/3 38/1 42/15 42/22 48/21 49/12

**P**

plaintiff... [2] 55/19 65/1
plaintiff's [4] 43/5 43/6 46/18 66/19
plant [2] 31/17 31/18
platform [2] 39/4 40/1
plausible [1] 29/24
play [4] 5/7 16/21 17/3 64/22
please [4] 6/20 38/7 60/15 77/19
plus [2] 20/5 21/15
PM [1] 77/24
point [33] 3/20 5/23 8/2 9/19 9/20 13/2 13/8 14/2 14/7 14/12 18/19 19/24 23/20 26/1 27/7 27/20 28/9 30/1 30/5 30/14 30/19 31/6 31/13 32/16 33/4 33/6 35/3 38/5 50/6 50/25 60/24 66/23 74/4
pointed [1] 30/17
pointing [1] 29/18
points [5] 23/10 23/20 25/17 37/7 75/9
police [1] 31/14
policy [6] 20/17 21/3 21/13 22/20 23/24 63/13
policymakers [1] 25/8
political [6] 29/18 67/16 69/20 69/24 69/24 72/24
politics [1] 18/21
poll [3] 71/22 73/4 73/7
polls [2] 70/12 73/1
pop [1] 73/1
portions [1] 42/23
pose [1] 74/16
position [15] 16/2 16/7 21/21 29/4 32/10 38/15 41/3 41/9 43/6 58/21 69/7 69/9 71/19 71/20 72/1
positions [2] 5/13 74/21
possibility [2] 30/24 31/9
possible [3] 70/8 70/18 74/17
post [4] 4/23 5/19 25/18 49/13
posting [1] 49/18
potential [1] 70/6
potentially [2] 36/6 76/14
power [5] 19/6 31/17 31/18 62/12 64/18
practical [1] 39/23
predict [1] 26/7
predictable [1] 24/21
predictably [1] 63/2
predicted [3] 26/15 26/19 71/7
predictive [4] 41/5 71/11 74/12 74/17

predominant [1] 36/23
predominantly [1] 63/6
predominate [1] 62/13
predominately [1] 36/18
preempt [1] 51/3
preempted [1] 51/23
preemption [1] 9/2
preliminary [3] 2/21 3/2 4/7
premised [1] 42/10
preparing [1] 10/19
presentation [2] 3/5 28/21
presented [2] 60/2 60/3
presently [1] 66/12
president [2] 23/22 27/3
presidential [4] 5/19 32/16 57/12 57/12
press [1] 22/3
presumably [1] 4/23
pretty [8] 22/18 23/19 27/18 28/9 28/18 30/16 31/2 31/9
prevent [1] 54/17
price [19] 36/2 61/1 61/3 61/5 61/6 61/8 61/8 61/11 61/16 61/18 61/22 62/6 62/24 62/25 63/1 68/20 70/11 72/17 73/5
prices [3] 28/4 31/20 63/3
pricing [2] 61/19 70/9
primary [1] 25/18
principal [1] 65/24
principle [1] 39/9
principles [3] 9/2 33/15 34/6
prior [2] 2/25 11/19
priorities [1] 27/5
priority [1] 27/6
proactively [1] 24/8
probably [4] 15/13 36/22 66/25 68/13
problem [4] 11/1 17/19 21/11 36/25
problematic [1] 10/24
problems [1] 9/10
Procedures [1] 40/24
proceeded [1] 60/18
proceeding [1] 37/15
proceedings [1] 1/25 77/24 78/4
process [6] 4/18 48/14 69/21 69/25 72/16 76/18
produced [1] 1/25
product [1] 26/3
professor [1] 23/22
profit [1] 72/5
profiting [3] 8/7 8/12 8/17
profound [1] 31/5
prohibit [12] 3/14 8/23 9/1 11/4 11/7 12/8 49/8

50/15 51/9 51/14 52/15 71/17
prohibited [2] 3/19 60/20
prohibition [1] 34/10
prohibits [1] 49/17
projections [1] 25/2
prong [3] 8/22 56/2 56/18
prongs [1] 59/8
property [5] 16/21 26/6 26/14 26/17 27/13
proportion [1] 37/3
proposed [12] 39/3 39/13 39/25 52/13 54/7 60/17 61/24 62/9 62/17 71/15 71/21 74/18
proposition [2] 23/17 54/23
protections [1] 34/8
proves [1] 11/2
provide [1] 74/11
provides [1] 70/4
provision [7] 3/13 5/4 5/10 11/23 12/12 33/21 59/13
provisions [6] 5/6 8/4 8/24 33/14 33/14 33/25
proxy [1] 13/15
public [47] 3/19 4/4 4/12 11/16 11/21 22/16 22/20 23/8 25/8 29/5 29/7 29/13 30/20 30/21 30/23 32/11 32/21 32/24 33/1 33/5 34/11 34/23 39/6 39/17 40/18 41/5 42/7 46/23 48/15 49/15 50/2 60/14 60/19 60/25 61/16 61/24 62/1 62/4 63/24 64/4 64/12 64/22 65/13 65/23 68/7 73/25 74/7
pull [2] 18/23 18/24
pulls [1] 22/3
purchasing [1] 50/18
pure [1] 31/9
purely [1] 15/10
purport [1] 40/1
purpose [18] 11/13 36/9 45/14 60/21 60/22 61/25 62/4 62/9 62/16 63/6 63/21 63/23 63/24 64/11 64/22 64/25 72/17 72/19
purposes [3] 63/10 63/20 64/7
put [10] 4/14 19/16 32/5 32/9 49/1 61/4 68/1 69/6 69/9 71/15
puts [1] 59/3
putting [5] 10/22 65/3 66/6 71/25 72/1

**Q**

question [24] 3/2 3/10 4/7 28/14 28/15 28/17 28/19 32/4 32/19 32/21 34/25 37/9 40/2 40/22

44/3 47/4 52/4 52/4 55/16 60/1 65/1 72/11 74/5 76/1 76/6
questions [6] 3/4 14/4 21/23 41/7 41/15 76/24
quick [2] 22/18 23/13 23/14 75/9
quite [1] 7/10

**R**

RAAGNEE [2] 1/19 2/9
race [3] 14/10 55/21 70/14
raises [1] 70/24
ran [1] 40/23
rate [3] 7/20 8/9 8/10
rather [3] 14/19 40/23 63/12
rationale [1] 21/13
reach [3] 4/22 32/10 38/19
reaction [1] 28/25 30/12 35/13
read [7] 8/15 8/15 12/2 14/15 48/11 69/4 71/16
reading [14] 10/4 10/25 12/21 13/19 33/5 41/18 42/23 48/1 48/10 49/1 49/23 52/14 52/17 75/22
real [13] 12/12 15/15 21/7 23/2 31/7 32/1 45/3 45/10 45/12 65/6 66/5 74/15 76/21
really [24] 3/25 11/1 12/5 14/7 15/23 18/8 18/10 18/23 19/9 19/18 19/25 20/18 21/14 21/17 25/12 25/14 32/18 37/7 37/9 40/18 63/11 68/25 75/21 76/19
reason [5] 32/1 51/11 66/18 68/4 68/5
reasonable [6] 53/17 60/10 65/16 65/18 71/2 71/11
reasonableness [1] 41/2
reasonably [7] 23/6 41/2 41/3 54/3 57/14 62/5 63/2
reasoned [1] 23/3
reasoning [1] 47/13
reasons [4] 17/10 18/9 30/8 75/1
rebuttal [1] 75/5
received [1] 73/13
receives [1] 70/17
recognize [1] 77/13
recognized [1] 17/19
recognizing [1] 74/7
record [21] 15/4 23/20 24/12 24/15 24/16 25/5 25/12 25/14 25/23 27/19 28/2 28/8 30/2 31/8 34/4 37/5 54/14 64/1 72/23 72/23 77/21

recorded [1] 1/25
records [1] 29/23
recycling [1] 24/15
refer [7] 9/25 10/5 19/19 19/20 19/21 37/25 38/1
reference [2] 16/5 18/15
references [1] 21/25
refers [3] 7/18 44/6 72/4
reflects [1] 73/24
refuse [1] 74/20
regardless [2] 23/1 66/3
regime [1] 51/1
registered [1] 50/14
regular [1] 69/8
regulate [1] 31/18
regulated [15] 9/1 9/7 21/9 30/24 34/7 50/14 50/23 51/5 61/13 61/19 67/3 68/20 68/24 70/2 73/19
regulates [3] 31/15 31/22 34/7
regulation [1] 51/2 75/14
regulations [1] 5/6
regulator [1] 68/19
regulatory [3] 51/24 67/9 71/9
reintroduce [1] 37/23
reiterating [1] 34/22
relate [13] 6/14 6/18 8/20 13/12 13/13 13/13 13/21 16/11 41/19 41/19 42/13 42/25 48/19
related [5] 9/13 9/15 35/10 63/11 69/22
relates [10] 6/15 7/19 9/8 9/22 12/21 13/22 29/5 42/17 48/23 71/12
relating [1] 15/23
relationship [2] 43/9 44/12
relative [1] 9/17
relevant [16] 5/2 5/23 6/1 20/22 23/5 30/19 30/19 32/14 32/18 32/21 33/1 34/18 37/8 41/3 56/11 68/6
rely [3] 75/10 75/15 75/16
remarks [1] 38/2
remotely [1] 29/24
removed [2] 6/9 6/17
render [2] 42/6 53/19
repealed [1] 11/22
repeatedly [1] 51/9
reply [2] 12/1 12/15
reporter [5] 1/23 1/24 23/12 38/4 78/9
representation [1] 22/8
representations [1] 22/1
Representatives [1]

**R**

**Representatives...** [1]
73/14
**reproduced** [1] 3/12
**require** [2] 17/25 58/11
**required** [7] 22/20
32/13 40/9 40/24 41/4
69/9 74/6
**requires** [3] 14/7 41/1
75/13
**research** [3] 24/23
29/22 72/22
**Researchers** [2] 25/8
73/9
**resolution** [1] 2/24
**resolving** [1] 2/14
**respect** [4] 4/14 36/10
38/11 74/8
**Respectfully** [1] 49/3
**respond** [5] 12/14 22/2
25/17 27/7 46/3
**response** [10] 31/15
35/7 45/21 48/9 49/1
65/8 65/9 67/1 67/2
76/14
**responsive** [1] 5/22
**restrain** [2] 3/5 4/6
**restrictions** [1] 5/10
**result** [6] 17/5 19/5
26/18 28/11 30/25
31/25
**results** [1] 19/25
**retire** [1] 77/12
**retirement** [1] 77/18
**retiring** [1] 77/4
**review** [13] 22/23
37/10 37/11 39/22
40/25 41/15 42/7 46/24
48/12 50/3 53/6 57/24
76/18
**reviewing** [1] 42/23
**rhetorical** [1] 73/17
**RICE** [4] 1/13 2/4 6/24
22/15
**right** [37] 3/3 6/20 7/2
8/8 11/12 14/1 15/11
17/8 17/15 20/2 21/9
21/13 26/5 26/11 27/10
29/9 29/10 32/16 32/20
32/23 34/1 34/1 34/9
35/20 37/19 37/21
46/17 46/25 47/20
47/23 50/6 52/20 56/9
57/21 66/8 67/1 72/9
**risk** [12] 24/1 24/2 24/3
24/7 24/10 29/11 29/12
35/3 61/3 61/7 61/9
63/17
**risks** [7] 24/3 24/7
24/20 25/1 25/4 26/2
74/22
**risky** [1] 17/4
**robotics** [1] 24/15
**robust** [3] 10/20 63/20
64/21
**Rock** [1] 73/1
**role** [6] 20/8 32/1 57/23
70/21 70/24 70/25

**Roman** [4] 1/11 14/3
18/12 21/20
**room** [1] 29/2
**root** [1] 14/22
**ROTH** [2] 1/12 2/2
**routinely** [4] 60/4 69/2
69/10 71/8
**RPR** [2] 1/23 78/9
**rub** [1] 45/12
**rule** [11] 7/4 37/13
37/15 37/17 39/22 58/9
68/25 75/13 75/14
75/14 75/17
**rule-making** [4] 37/13
37/15 37/17 39/22
**rules** [1] 34/6
**ruling** [1] 53/10
**rumor** [4] 67/17 67/19
67/22 68/1
**rumors** [1] 70/12

**S**

**sad** [1] 77/11
**safeguard** [1] 33/8
**safeguards** [11] 4/14
4/17 4/22 4/25 32/5
32/9 32/12 32/17 33/2
33/16 33/23
**safest** [1] 68/24
**said** [18] 4/6 6/5 6/16
10/11 18/12 20/2 20/19
45/18 46/20 47/16 49/5
49/15 56/14 59/19
62/20 65/10 66/4 68/19
**sake** [1] 15/11
**salad** [1] 10/20
**Sam** [2] 2/5 24/19
**same** [13] 14/13 17/1
17/10 19/14 30/12
31/19 31/21 35/11 37/9
37/20 38/23 43/21
68/23
**samples** [1] 18/25
**SAMUEL** [1] 1/14
**sandwich** [1] 10/20
**satisfied** [1] 3/15
**saw** [1] 59/17
**say** [51] 2/20 4/10 6/7
6/17 6/19 6/21 9/3 10/5
10/19 10/21 12/1 12/16
13/19 16/5 16/6 16/14
17/25 18/1 18/14 18/16
19/10 19/11 25/16
25/19 36/8 40/12 42/17
45/8 45/13 46/4 46/8
46/20 46/21 46/22 47/8
47/11 47/14 49/9 49/12
52/15 56/23 58/15
59/18 68/23 68/23
69/13 71/11 73/11
73/17 76/11 77/18
**saying** [21] 8/22 10/10
12/20 13/12 18/14
20/20 21/5 32/4 33/21
38/14 42/18 42/24 43/6
46/6 48/5 48/7 50/7
52/24 58/23 59/11 66/9
**says** [13] 3/21 9/20

**137** 24/1 25/23 30/24
54/16 57/21 57/21
57/22 57/22 68/1 71/5
**SCC** [1] 31/20
**scenario** [1] 71/19
**scheme** [1] 33/22
**scope** [7] 3/24 6/18
7/25 11/10 13/8 13/9
43/11
**scrutiny** [1] 11/16
**se** [1] 63/24
**second** [4] 4/2 11/6
14/5 16/22 18/19 39/13
54/6 70/1
**section** [2] 38/22 54/16
**sections** [1] 39/1
**sector** [1] 28/10
**see** [8] 3/13 15/3 26/4
36/9 40/17 42/24 47/16
54/14
**seem** [4] 21/16 29/1
30/16 55/23
**seems** [4] 29/2 35/16
55/23 56/16
**seen** [2] 25/4 25/24
**sell** [1] 36/2
**selling** [2] 9/4 67/24
**semantically** [1] 10/13
**senate** [4] 3/9 28/11
67/19 73/3
**senator** [4] 54/16 62/11
73/2 73/4
**Senators** [4] 14/24
54/14 62/10 73/13
**sense** [15] 9/1 10/14
12/11 14/18 15/7 15/12
20/1 20/4 21/4 21/10
24/16 34/14 34/20 48/1
52/8
**sensitive** [2] 61/14
69/21
**sensitivity** [3] 2/17
2/22 61/6
**sentence** [1] 43/22
**separate** [1] 33/14
**separately** [1] 34/10
**serious** [9] 11/1 18/8
20/18 29/13 30/22
65/12 70/25 73/12
74/22
**seriously** [1] 21/17
**serving** [1] 24/14
**set** [2] 42/16 52/13
**sets** [3] 4/9 50/1 52/17
**she** [1] 77/12
**She's** [1] 77/4
**shifts** [1] 36/21
**should** [10] 20/11
34/23 39/4 39/6 39/25
45/24 52/2 52/5 58/25
75/2
**show** [1] 56/15
**showing** [2] 29/23
48/15
**shown** [2] 73/1 73/3
**shows** [3] 28/10 37/6
76/14
**side** [5] 26/12 30/23

**30/3** 41/1 41/9 41/11
**sides** [2] 23/8 24/13
**significance** [5] 10/2
15/8 15/18 20/3 20/21
**significant** [4] 25/1
29/6 73/14 74/1
**similar** [4] 5/12 7/5
27/13 75/18
**similarly** [1] 4/23
**simple** [3] 14/7 23/17
69/13
**simplify** [1] 7/2
**simply** [2] 38/1 64/17
**sing** [1] 77/17
**singer** [1] 73/1
**single** [4] 63/12 63/14
64/8 64/17
**singles** [1] 11/23
**sitting** [2] 73/2 73/4
**six** [3] 3/16 3/24 3/24
**skill** [1] 19/6
**skip** [1] 29/9
**skipping** [1] 67/7
**slide** [4] 3/12 11/6
11/20 24/5
**slides** [1] 23/21
**so** [168]
**social** [4] 67/17 67/17
68/1 73/6
**societally** [1] 74/12
**software** [1] 24/13
**soil** [1] 45/4
**solicit** [1] 40/7
**some** [45] 2/22 3/4
4/13 7/19 8/23 12/7
12/9 16/5 18/15 19/8
19/25 21/6 21/10 22/23
23/2 25/24 27/8 27/19
27/24 27/24 28/9 29/7
29/12 29/16 30/11
30/23 33/16 34/4 35/22
37/3 37/13 38/5 42/21
46/15 47/14 48/21
48/22 52/8 66/23 67/6
68/5 68/14 70/4 71/25
75/18
**somebody** [1] 8/10
**somebody's** [1] 20/7
**somehow** [1] 29/21
**someone** [5] 4/23 31/3
36/1 66/24 72/4
**something** [28] 9/5
11/8 12/21 13/15 15/8
15/9 16/22 17/13 21/9
31/12 35/1 36/23 38/8
40/12 45/5 48/24 55/4
55/7 55/14 55/25 56/8
56/25 56/25 57/4 57/8
57/15 65/9 68/11
**sometimes** [1] 38/25
**song** [1] 77/17
**sorry** [4] 13/1 33/18
47/21 77/9
**sort** [33] 5/10 6/11 7/1
7/6 8/2 8/14 9/4 9/16
9/17 9/24 10/16 11/18
12/11 13/13 13/14 17/6
17/8 17/11 17/22 17/24

**18/6** 20/15 20/16 21/12
23/9 24/16 28/16 29/11
31/6 31/10 36/16 38/25
76/19
**sound** [1] 69/8
**sounded** [1] 69/5
**sounds** [2] 36/22 56/19
**SPAN** [1] 15/1
**speak** [10] 5/8 10/23
12/19 13/6 23/14 28/22
29/4 42/20 43/2 44/24
**speaking** [5] 6/22 6/24
10/17 20/3 48/16
**specific** [5] 20/22
30/22 34/8 48/22 65/21
**specifically** [5] 24/11
34/13 38/12 66/9 73/22
**specifically-enumerate
d** [1] 34/13
**speculation** [2] 31/10
35/23
**speculative** [1] 62/14
**speech** [1] 69/24
**speed** [1] 19/6
**spending** [1] 30/12
**spent** [2] 30/9 37/2
**spins** [2] 67/19 67/20
**split** [2] 27/4 27/4
**sport** [2] 15/10 15/20
**spread** [2] 14/12 74/23
**squeeze** [1] 20/16
**Stacy** [4] 1/23 78/3
78/8 78/9
**staff** [2] 4/16 32/7
**stake** [3] 16/22 55/4
57/8
**stakes** [1] 45/22
**staking** [9] 9/5 11/8
17/13 55/6 55/14 56/8
56/25 57/4 57/15
**stand** [3] 8/24 9/17
24/13
**stand-alone** [1] 8/24
**standard** [10] 22/22
22/25 23/2 23/5 36/25
37/10 37/14 37/20
39/22 40/24
**start** [5] 3/3 22/22
29/18 38/9 60/22
**started** [1] 38/5
**starting** [4] 7/17 23/10
27/12 29/12
**state** [46] 8/25 9/7
18/24 39/16 41/14
45/19 45/23 46/3 46/6
46/21 46/21 47/6 47/7
47/8 47/11 47/16 48/8
48/10 48/17 48/18 49/7
49/10 49/17 50/10
50/12 50/23 51/3 51/4
51/10 51/13 51/19
51/21 51/22 51/23 52/3
52/8 52/15 52/25 53/2
53/5 53/16 53/18 54/5
55/2 55/3 60/12
**stated** [1] 63/16
**states** [11] 1/1 1/10
8/23 11/4 12/7 12/9

**S**

**states... [5]** 45/21 51/14 55/7 73/22 73/24
**Stating [1]** 64/16
**statue [1]** 36/14
**statute [64]** 3/21 4/9 7/15 8/2 9/22 9/25 10/9 10/11 10/15 11/19 17/16 19/10 19/12 20/17 28/24 32/11 33/17 38/18 39/12 40/4 41/10 41/13 41/25 42/1 42/4 42/6 42/11 43/11 43/19 43/20 43/24 44/5 44/11 44/15 45/13 47/19 47/25 48/11 48/13 49/21 49/24 50/1 50/20 52/7 52/15 52/17 53/19 54/2 55/13 56/10 57/21 57/22 57/24 58/18 59/13 59/15 60/11 60/18 60/25 61/25 73/23 75/25 76/2 76/22
**statutes [4]** 8/24 18/24 19/23 38/25
**statutory [28]** 3/12 4/1 5/3 6/22 11/18 14/6 18/8 22/17 22/19 30/20 32/19 32/21 32/23 33/10 33/21 33/23 34/19 38/23 38/25 41/7 41/15 43/10 43/13 51/1 58/19 75/24 76/7 76/20
**stems [1]** 29/15
**stenography [1]** 1/25
**step [11]** 4/8 6/8 18/3 18/5 43/12 43/12 43/17 43/20 43/23 44/1 48/12
**steps [6]** 6/17 63/14 64/10
**STERLING [2]** 1/14 2/4
**sticks [1]** 32/6
**still [5]** 6/7 13/11 22/20 34/23 75/21
**stock [3]** 28/3 31/20 65/5
**stolen [1]** 7/23
**stop [3]** 26/11 47/10 48/6
**stories [1]** 22/11
**story [1]** 25/14
**strained [1]** 18/17
**strange [4]** 10/16 20/6 28/15 31/12
**streamline [1]** 48/13
**Street [1]** 1/21
**stretch [1]** 19/18
**strike [1]** 7/10
**structure [1]** 10/3
**stuff [2]** 26/6 34/4
**STUKES [3]** 1/18 2/8 37/23
**subissues [1]** 10/14
**subject [7]** 11/15 42/18 48/12 48/23 49/4 50/2 68/14
**subjected [1]** 76/17

**submit [4]** 39/6 41/12 44/10 57/6
**submits [1]** 75/1
**submitted [1]** 72/23
**subsection [3]** 48/3 48/4 53/19
**subset [1]** 16/9
**substance [1]** 39/19
**subtle [1]** 14/1
**subvert [1]** 52/3
**such [4]** 33/7 45/23 70/10 74/14
**sudden [1]** 31/18
**suffer [1]** 64/3
**sufficient [2]** 47/8 56/6
**suggest [1]** 50/4
**suggested [3]** 31/13 63/9 63/11
**suggesting [2]** 58/7 58/8
**summary [2]** 2/12 75/2
**Super [2]** 14/12 14/12
**superfluous [1]** 11/13
**support [2]** 18/19 23/20
**supported [2]** 54/13 65/22
**supporting [1]** 31/10
**supports [1]** 41/11
**suppose [1]** 19/8
**Supreme [2]** 54/22 76/6
**sure [13]** 5/5 12/2 12/24 13/2 16/7 23/2 25/20 26/24 33/20 38/10 47/3 56/9 60/15
**surge [1]** 73/6
**surged [1]** 28/10
**surveys [1]** 71/24
**swallowing [1]** 12/13
**swap [1]** 43/14
**sweep [4]** 8/18 46/23 75/22 76/13
**sweeps [1]** 21/14
**swept [1]** 20/9
**Swift [1]** 20/8
**synonymous [4]** 16/9 54/12 54/21 60/6

**T**

**table [2]** 2/4 2/9
**take [11]** 7/14 16/23 17/4 18/5 23/10 23/15 24/19 30/2 38/4 47/3 77/22
**takeaway [1]** 20/15
**takeover [1]** 28/11
**takes [2]** 14/3 21/20
**taking [3]** 7/2 58/21 63/16
**talk [15]** 19/4 22/15 34/5 53/20 53/21 53/22 54/6 56/5 57/11 60/13 64/23 64/24 67/6 67/8 71/14
**talked [4]** 17/10 36/17 60/12 65/2
**talking [12]** 5/14 14/17

**talks [2]** 19/15 72/21
**tangible [1]** 65/6
**tasked [2]** 67/10 67/11 68/12
**Taylor [1]** 20/8
**technically [1]** 13/14
**teeth [1]** 23/2
**tell [2]** 25/14 41/9
**tells [1]** 11/17
**temperature [2]** 27/22 35/10
**temperature-related [1]** 35/10
**tenable [1]** 12/3
**term [9]** 20/19 41/23 41/23 41/24 42/1 46/9 53/23 53/24 54/1
**terms [8]** 16/11 39/23 47/24 50/2 54/24 55/8 56/10 66/6
**terrorism [4]** 7/8 8/3 8/5 13/13
**terrorist [2]** 8/13 64/2
**test [9]** 36/9 36/10 62/4 62/7 62/8 63/4 63/7 64/16 64/19
**tethered [1]** 13/9
**text [4]** 3/12 8/1 14/21 18/24
**than [18]** 14/19 32/2 36/7 36/19 36/23 37/6 37/19 40/2 40/4 44/3 46/2 46/7 57/1 57/2 62/6 63/5 63/19 76/13
**thank [10]** 2/20 3/6 22/13 37/21 38/6 75/4 75/20 76/25 77/19 77/23
**thanks [1]** 77/14
**that [564]**
**that's [86]**
**their [29]** 8/24 12/1 12/4 12/20 19/3 23/1 24/7 27/7 27/10 30/7 36/9 42/13 42/23 45/20 47/25 48/9 50/3 50/6 53/13 61/5 61/7 61/25 64/12 65/2 66/10 71/25 72/15 75/22 76/12
**theirs [1]** 12/25
**them [14]** 7/2 7/10 7/14 10/22 11/7 15/16 15/23 19/1 21/13 30/3 45/21 51/8 53/19 65/2
**themselves [1]** 23/6
**then [28]** 3/17 4/2 4/11 6/7 7/7 7/14 9/7 11/22 12/8 16/25 17/14 18/1 19/24 20/1 21/3 21/15 21/21 24/19 25/7 27/24 29/22 32/8 32/25 47/14 57/24 58/4 59/12 67/25
**theoretically [1]** 45/25
**theorized [1]** 73/9
**theory [2]** 75/22 76/22

**there [77]** 2/16 2/21 5/5 5/9 5/15 6/4 8/12 9/12 11/3 12/6 14/16 14/18 16/4 17/6 18/2 19/8 21/5 21/25 22/23 24/12 25/7 26/11 26/16 26/17 26/19 26/25 27/2 27/14 28/2 28/18 28/24 29/9 30/15 31/2 32/8 32/11 32/17 33/13 34/10 34/16 35/1 35/12 36/4 36/8 37/6 37/10 37/12 37/15 37/16 41/7 42/21 44/21 45/21 46/21 47/10 55/18 55/22 58/6 58/15 58/16 58/24 59/7 59/16 63/20 64/9 65/10 66/21 66/23 68/12 68/16 69/12 69/18 72/8 72/11 72/22 72/25 77/7 74/14 74/15 74/9 77/10 77/17
**there's [51]** 2/17 4/21 5/25 11/7 13/8 14/8 14/8 14/13 16/17 16/18 16/18 18/19 20/1 21/3 21/22 23/19 24/13 24/15 24/24 25/3 25/4 26/3 27/18 28/1 29/2 29/11 29/20 29/22 30/8 30/11 30/22 30/23 31/10 31/11 31/23 31/24 32/1 33/23 34/4 42/1 54/22 63/25 68/3 68/15 68/21 69/21 71/13 71/13 74/9 77/10 77/17
**therefore [6]** 5/4 6/18 9/8 38/19 49/11 60/19
**these [102]**
**they [71]** 7/9 7/15 8/19 9/1 9/3 9/25 10/1 10/1 11/20 12/1 12/4 12/16 12/18 13/19 14/5 14/14 15/4 15/15 15/21 15/22 16/5 17/19 17/23 17/25 18/1 18/14 18/23 19/4 19/23 21/12 22/20 23/4 23/5 23/8 24/22 25/17 25/18 25/19 25/20 26/9 26/21 30/6 30/7 30/7 31/7 33/15 42/24 45/8 45/21 52/19 53/7 53/15 56/23 61/4 61/5 62/20 64/23 66/14 66/20 67/17 71/24 72/4 72/18 74/11 75/10 75/14 75/15 75/16 75/17 75/19 76/17
**they're [34]** 7/5 8/6 8/6 8/22 9/3 9/12 9/14 10/2 12/6 12/20 15/5 15/19 15/20 15/20 17/22 17/24 18/22 19/1 21/8 24/21 25/21 27/21 30/4 34/18 42/18 43/6 44/17 48/2 48/5 50/7 53/14 54/23 61/8 71/25
**thing [14]** 2/19 10/5 14/13 15/17 19/14

**this [31]** 1/21 48/3 54/15 64/14 67/7 68/8 68/15 72/21 76/11
**things [17]** 8/6 8/6 8/7 8/8 10/22 21/16 24/24 27/16 29/3 29/17 32/16 34/18 36/16 46/4 55/23 66/23 67/8
**think [112]**
**thinking [1]** 10/18 21/5 66/5
**Third [2]** 18/22 39/15
**this [162]**
**THOMPSON [2]** 1/13 2/4
**those [40]** 3/24 3/24 4/3 4/17 4/22 4/25 7/23 7/24 8/6 8/25 9/4 10/22 13/21 18/25 20/9 21/16 23/7 23/10 24/21 25/3 25/17 26/7 29/7 29/21 32/12 32/16 34/18 35/17 37/7 39/5 42/23 42/25 50/3 54/7 59/8 60/14 65/12 76/16 76/17 76/17
**though [4]** 5/18 6/8 6/16 6/19
**thought [12]** 2/13 4/17 15/12 25/13 26/24 28/8 35/2 35/6 42/20 55/21 66/20 76/15
**thread [2]** 55/3 55/5
**threat [3]** 74/1 74/2 74/15
**threats [1]** 74/4
**three [6]** 7/10 9/11 10/9 15/4 59/8 75/9
**through [6]** 14/3 16/14 18/3 35/16 53/11 70/4
**throughout [2]** 9/24 10/8
**thus [1]** 59/23
**tie [1]** 16/12
**tied [5]** 2/22 16/24 16/25 17/7 35/4
**time [18]** 2/17 2/21 2/22 7/23 23/15 27/2 27/2 30/3 30/5 38/6 41/25 47/3 58/18 69/15 74/4 75/8 76/17 77/1
**times [1]** 16/4
**tip [2]** 25/12 67/25
**tips [1]** 70/17
**today [6]** 25/24 37/25 38/3 39/10 65/3 66/21
**together [6]** 10/9 10/22 15/16 21/16 63/16 72/1
**ton [1]** 23/19
**too [14]** 11/2 13/7 13/20 15/7 18/6 23/14 25/22 26/6 31/13 34/5 45/6 45/9 64/13 77/20
**tools [1]** 34/17
**topic [1]** 40/19
**totally [1]** 70/3
**tourism [3]** 26/14 27/15 27/17

**T**

**tourists** [1]  26/7
**trace** [2]  26/18 27/1
**track** [1]  59/17
**trade** [6]  4/16 5/9 32/8
34/9 50/13 71/16
**traded** [2]  66/13 71/20
**trading** [22]  1/6 1/20
2/8 9/1 9/8 9/14 10/5
14/20 27/9 34/11 34/17
37/24 48/18 51/3 60/20
61/21 63/17 65/11
71/18 71/21 73/6 73/18
**transacting** [3]  45/14
45/17 46/2
**transaction** [7]  9/24
10/11 43/14 44/9 44/13
45/25 63/3
**transactions** [4]  9/20
9/21 10/4 44/2
**transcript** [2]  1/9 1/25
**transcription** [2]  1/25
78/4
**treat** [1]  20/5
**treated** [2]  17/12 20/11
**treating** [2]  19/18 21/4
**trial** [3]  19/5 19/12
19/12
**tried** [1]  31/4
**tries** [1]  27/20
**triplet** [1]  9/24
**trolled** [1]  73/7
**true** [5]  17/1 27/22
35/21 65/15 69/15
**try** [8]  3/4 6/2 12/4
20/12 22/18 30/6 30/13
31/8
**trying** [11]  2/18 12/6
18/10 18/14 20/24
20/25 21/18 23/13
25/17 36/9 56/9
**turn** [5]  3/9 21/22 23/10
31/20 37/17
**turns** [2]  67/20 67/20
**two** [30]  3/15 3/22 4/8
5/15 5/24 5/25 7/10
7/12 14/21 16/17 17/2
17/4 17/6 23/10 25/17
25/18 36/10 36/16 37/3
37/7 38/18 43/12 44/1
46/4 48/12 59/8 60/17
60/25 69/12 69/18
**two-candidate** [1]  5/25
**two-party** [1]  5/24
**two-step** [3]  4/8 43/12
48/12
**tying** [2]  15/16 21/16
**type** [3]  15/14 45/22
57/24
**types** [3]  9/25 55/22
57/17
**typical** [1]  40/7
**typically** [2]  2/13 68/16

**U**

**U.S** [1]  45/4
**U.S.C** [1]  38/24
**Ukrainian** [1]  12/18

**ultimate** [1]  63/13
**Ultimately** [1]  37/14
**unambiguous** [3]
41/10 48/2 58/25
**unambiguously** [1]
44/5
**uncertain** [2]  11/8
17/13
**under** [44]  4/20 4/25
5/18 12/20 33/4 38/22
39/2 39/16 40/24 41/4
41/14 43/20 44/22
45/19 45/23 46/5 47/6
47/16 48/7 48/16 48/18
49/2 49/16 49/16 49/21
50/23 51/10 51/21
51/22 52/12 53/16
53/18 55/2 56/1 56/18
57/24 59/10 60/12
60/17 67/10 67/11
73/20 74/19 77/22
**underlying** [34]  6/13
6/14 7/19 9/13 9/15
12/17 12/22 13/7 13/23
14/8 14/13 14/14 14/19
21/3 31/16 31/22 42/9
42/12 42/19 43/1 43/7
43/15 43/18 43/21
43/24 44/3 44/6 44/15
44/16 44/23 46/1 46/10
48/20 73/19
**undermine** [3]  50/13
51/19 74/24
**underscores** [1]  76/19
**understand** [28]  2/18
4/8 7/18 8/22 9/3 9/23
12/6 14/15 16/3 16/7
17/21 17/23 20/18 21/2
24/9 25/18 29/6 32/9
33/20 37/10 42/15 43/4
43/6 47/25 48/25 56/10
56/11 75/25
**understanding** [6]  4/25
16/10 17/7 26/21 34/4
43/3
**understood** [2]  5/12
26/12
**undertake** [1]  57/24
**unduly** [1]  72/13
**unenviable** [1]  41/9
**unifying** [1]  21/12
**UNITED** [1]  1/1 1/10
**universe** [1]  58/12
**unlawful** [37]  7/13 7/17
7/19 7/23 8/19 8/20 9/8
10/25 11/11 12/17 12/9
13/12 14/4 32/25 39/16
41/14 45/19 45/23 46/5
46/21 46/22 47/12
47/17 48/16 48/18
48/24 49/11 51/22
52/16 53/1 53/3 53/16
53/18 55/10 60/12
75/21 76/10
**unless** [6]  14/3 34/21
53/20 60/13 64/24
76/23
**unlike** [2]  9/10 35/3

**unlikely** [3]  36/16
59/25 66/19
**unpack** [1]  30/3
**unpredictable** [1]
62/24
**unreasonable** [1]
47/21
**unregulated** [2]  29/19
30/25
**unsavory** [1]  29/3
**untrue** [1]  67/20
**unusual** [8]  10/16 35/8
35/14 37/16 40/11
40/11 49/23 52/14
**up** [17]  8/15 10/15
14/18 18/24 20/10
21/14 31/11 34/22 39/1
60/1 61/9 61/10 67/19
67/23 68/13 71/21 73/2
73/20 74/19 77/22
**upcoming** [1]  32/15
**upon** [8]  43/15 43/15
43/15 43/21 44/15
44/19 61/19 71/7
**us** [7]  11/17 14/3 17/16
22/11 22/19 77/8 77/20
**use** [6]  45/4 58/24 61/2
62/13 62/14 62/21
**used** [15]  10/8 16/4
44/5 52/3 55/5 61/21
61/21 62/6 62/24 63/2
63/10 63/18 64/2 73/10
74/24
**users** [1]  73/6
**uses** [6]  37/1 37/3 37/6
43/21 43/22 63/11
**using** [5]  8/9 13/20
24/3 25/21 54/17
**usual** [1]  52/17
**utility** [2]  64/20 74/21

**V**

**vacate** [1]  34/23
**validity** [1]  74/5
**valuable** [2]  25/11
74/13
**valuations** [1]  28/4
**value** [14]  9/5 11/8
15/15 17/13 55/4 55/7
55/14 56/8 56/25 57/5
57/8 57/15 61/10 74/9
**variables** [1]  27/3
**variety** [1]  76/8
**various** [6]  16/3 55/2
**vast** [2]  70/6 70/8
**Vegas** [1]  51/17
**vein** [1]  5/12
**version** [3]  19/3 19/15
21/14
**versus** [1]  37/13
**very** [20]  7/9 18/12
18/18 18/25 20/5 27/13
28/23 65/12 66/10 68/3
70/24 72/15 74/14
74/22 75/6 75/6 75/6
75/9 75/9 77/1
**VI** [1]  18/12
**view** [6]  15/23 29/6
55/18 59/10 59/12

**VII** [1]  18/12
**violate** [2]  9/7 46/3
**violates** [3]  48/8 48/10
59/13
**voila** [1]  18/1
**volume** [1]  73/6
**vote** [6]  66/1 66/7
66/12 66/15 72/5 72/7
**votes** [4]  29/17 71/17
71/24 72/3
**voting** [1]  66/14
**vs** [1]  1/5

**W**

**wager** [6]  46/22 49/20
52/9 54/8 55/12 57/18
**wagering** [30]  19/5
46/14 46/16 47/5 47/7
47/9 47/12 47/16 48/8
48/9 49/10 49/11 49/18
50/11 52/15 53/1 53/3
53/14 53/15 53/16 55/8
55/12 55/13 56/19
56/24 59/2 59/13 59/19
60/7 73/25
**waiting** [1]  77/16
**walk** [1]  18/3
**want** [25]  8/10 8/16
8/16 15/14 21/8 22/2
23/13 28/21 33/9 36/8
38/6 39/20 40/12 45/5
46/4 48/25 49/13 52/21
52/22 52/22 53/20 56/3
59/9 64/14 72/21
**wanted** [7]  13/16 35/7
47/23 65/8 71/14 77/13
77/18
**wants** [3]  14/25 60/13
61/7
**war** [15]  7/8 8/3 8/5
12/16 12/17 12/21
12/22 13/13 44/19
44/23 44/24 45/1 45/1
45/7 45/7
**was** [73]  2/13 2/19 2/19
2/20 3/2 4/4 4/6 6/4
6/11 6/17 6/21 6/22
8/13 10/12 10/18 10/18
11/22 13/1 13/5 15/1
16/15 18/10 20/25
22/21 22/23 23/13
26/19 32/4 33/13 35/2
35/7 35/25 35/25 37/12
38/13 38/16 39/7 39/24
41/4 42/21 47/8 47/12
48/11 48/13 48/13
48/15 48/21 50/21 53/9
53/17 56/6 60/8 60/3
60/8 62/7 63/21 65/8
65/16 66/4 67/8 67/22
68/16 69/5 71/2 71/10
72/8 72/11 72/25 73/1
73/3 75/23 76/14 76/15
**Washington** [3]  1/7
1/16 1/21
**wasn't** [6]  15/3 38/15
53/7 53/9 55/21 60/1

**watch** [1]  14/25
**waterfront** [2]  11/24
17/14
**way** [36]  6/2 7/18 8/15
9/2 9/25 10/3 10/5
10/15 10/16 10/22
10/23 11/2 14/16 14/25
16/11 18/11 18/17
20/16 26/3 26/19 27/25
28/1 29/16 30/11 31/3
31/19 35/4 35/11 35/12
37/2 48/2 51/11 66/12
66/23 66/24 67/14
**ways** [5]  17/7 23/25
27/21 66/15 68/21
**we** [67]  2/11 2/20 2/23
3/7 3/23 4/2 6/15 7/1
7/6 7/10 7/18 8/6 8/15
8/16 8/16 11/6 11/9
11/20 12/24 13/24
13/25 14/17 15/14
17/10 18/2 18/3 18/24
19/19 19/19 21/2 21/8
22/17 25/23 32/22
32/23 33/2 34/5 36/12
36/15 36/17 37/7 37/24
38/4 39/6 40/14 43/10
44/10 46/5 46/18 47/6
47/10 47/16 47/16 52/20
54/14 54/22 57/6 57/11
58/16 61/4 66/16 67/12
69/15 70/1 75/25 77/2
77/17 77/18
**we're** [21]  10/10 20/24
23/7 26/22 30/21 42/5
43/24 44/14 45/9 47/18
47/24 49/20 50/9 51/11
67/7 67/9 67/10 67/11
77/12 77/16 77/19
**we've** [6]  3/11 11/6
11/7 18/24 24/5 60/12
**weapons** [1]  45/4
**wear** [1]  20/8
**weather** [2]  20/7 27/16
**website** [2]  22/2 51/8
**Webster** [1]  16/20
**weeds** [1]  45/6
**week** [1]  20/9
**weeks** [2]  67/19 67/22
**weigh** [1]  64/12
**weight** [1]  74/1
**weird** [2]  10/22 20/10
**well** [20]  7/11 9/3 12/20
17/25 21/5 27/17 32/7
32/17 35/13 42/13
46/20 48/7 52/4 52/5
52/21 54/5 60/21 66/17
68/1 74/2
**went** [3]  16/14 52/11
53/10
**were** [24]  4/17 14/17
18/14 28/17 31/3 32/9
37/16 39/5 40/5 42/21
42/24 48/10 50/17
57/17 63/11 63/20
65/12 65/23 66/23 69/5
73/6 73/12 77/1 77/7
**what** [112]

**We** [1]  18/12

**W**

**what's [7]** 15/16 17/9 30/21 40/23 52/6 55/1 59/6

**whatever [5]** 26/15 26/16 26/24 48/22 58/22

**when [26]** 6/25 10/1 13/19 16/14 18/5 18/25 19/16 20/20 28/16 32/4 40/22 41/25 42/1 42/5 42/17 43/10 48/13 51/7 51/9 51/19 51/25 54/14 62/3 67/25 69/4 73/18

**whenever [1]** 76/6

**where [23]** 2/14 7/18 9/20 10/12 13/2 17/25 18/22 26/22 30/18 33/16 34/16 36/15 38/25 42/12 44/23 47/1 48/23 50/9 54/15 60/6 68/14 73/22 74/5

**whereas [1]** 16/12

**wherever [1]** 19/6

**whether [39]** 3/10 5/3 5/5 7/20 7/22 9/13 9/15 12/18 20/7 30/22 37/1 37/8 39/24 43/10 44/1 44/3 44/19 47/5 48/21 49/13 51/20 51/22 51/25 53/7 56/5 57/23 57/25 58/2 58/10 59/17 59/18 62/5 62/9 64/1 70/5 70/19 72/7 72/8 72/11

**which [40]** 3/19 5/10 6/11 6/12 7/13 7/15 12/16 14/5 14/25 17/1 17/17 18/15 18/15 19/4 23/17 27/21 28/10 29/13 30/11 32/23 35/12 35/17 36/24 37/7 37/17 40/23 42/9 43/21 47/5 48/12 48/18 54/7 55/11 56/4 60/4 61/16 62/11 65/10 70/21 76/15

**while [1]** 56/12

**WHITFORD [1]** 1/18

**who [14]** 5/17 19/8 24/6 27/1 33/10 35/17 35/23 36/4 61/7 63/16 65/4 67/18 71/16 71/17

**who's [8]** 2/16 5/9 14/9 14/11 23/22 24/19 27/3 76/14

**whoever [1]** 35/1

**whole [4]** 11/4 11/13 25/25 35/16

**whose [7]** 35/1 42/9 42/12 46/10 46/12 49/6 61/10

**why [9]** 12/4 20/13 30/4 31/8 38/14 40/17 49/25 75/10 75/22

**wide [1]** 76/8

**will [21]** 3/3 3/4 12/18 16/14 21/22 26/16

29/18 35/13 37/6 39/10 44/19 45/3 45/3 45/6 49/14 61/9 61/9 61/10 61/13 64/2 75/8

**willing [1]** 36/1

**win [5]** 14/10 14/11 66/2 66/4 76/15

**wind [1]** 77/20

**wish [1]** 40/14

**within [19]** 3/24 4/3 5/3 6/18 7/23 7/25 11/10 38/13 38/18 41/1 53/18 53/25 54/7 54/8 55/5 56/7 58/10 58/13 60/5

**without [6]** 4/24 12/12 12/16 28/5 40/13 76/21

**won't [1]** 15/1

**word [15]** 13/20 14/22 18/13 18/22 20/14 20/16 21/7 21/17 24/9 39/11 41/18 42/7 44/10 48/2 62/23

**words [3]** 16/4 43/17 61/11

**work [8]** 9/21 10/20 12/12 17/10 17/23 21/15 27/25 49/22

**worked [1]** 11/19

**workers [2]** 24/1 71/23

**works [5]** 10/15 26/3 28/1 35/11 75/25

**world [1]** 45/3

**worried [1]** 61/8

**worry [2]** 32/1 75/23

**worst [1]** 26/15

**worth [1]** 38/2

**would [87]**

**wouldn't [7]** 5/2 19/11 19/19 32/10 33/5 69/8 71/17

**wow [1]** 29/1

**wrap [1]** 34/22

**writing [1]** 15/2

**wrong [4]** 11/17 23/4 27/11 30/4

**Y**

**yeah [3]** 5/8 55/17 56/20

**years [3]** 62/2 77/5 77/11

**yes [11]** 5/21 10/21 42/18 45/8 45/18 57/6 59/15 60/15 75/7 75/12 75/17

**you [150]**

**you'd [1]** 58/24

**you'll [1]** 3/13

**you're [30]** 9/5 10/4 13/11 13/19 13/21 20/20 20/23 27/10 27/13 28/20 29/10 30/21 32/7 32/20 32/25 33/21 37/19 44/22 48/6 58/6 58/22 58/23 59/10 61/14 64/3 66/5 66/9 69/9 69/14 71/22

**you've [6]** 16/24 17/14

25/4 25/24 42/16 65/9

**your [76]** 2/2 2/7 3/5 3/6 3/7 4/8 4/13 4/17 4/20 4/24 4/25 5/13 5/18 5/23 7/3 12/15 13/1 13/5 14/3 14/25 16/2 16/7 21/23 22/1 22/13 22/14 23/15 25/10 25/21 26/15 28/14 28/19 28/21 29/4 30/16 32/3 32/5 32/10 33/4 34/21 35/7 37/5 37/12 37/22 38/2 39/21 40/15 40/22 41/8 45/20 46/17 47/3 47/22 48/25 49/1 53/12 55/18 57/23 59/12 60/13 61/13 61/14 62/19 64/24 65/8 67/1 68/18 69/4 69/8 69/11 71/14 75/2 75/9 76/12 76/23 77/1

**Z**

**zone [2]** 41/2 47/18