IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KALSHIEX LLC,<br><br>       Plaintiff,<br><br>    v.<br><br>COMMODITY FUTURES TRADING COMMISSION,<br><br>       Defendant. | Civil Action No. 1:23-cv-03257 (JMC) |

**Defendant Commodity Futures Trading Commission's Supplemental Memorandum Responding to New Issues Raised at Hearing on Cross-Motions for Summary Judgment**

      Defendant Commodity Futures Trading Commission ("CFTC" or "Commission") submits this supplemental memorandum in support of its cross-motion for summary judgment in order to respond to new arguments raised for the first time by plaintiff KalshiEx, LLC ("Kalshi") at the May 30, 2024 hearing on the cross-motions for summary judgment, including during Kalshi's rebuttal: (1) that the terms "agreements, contracts, or transactions" in CEA Section 5c(c)(5)(C) are not three separate terms as written, but a "sort of triplet" referring to the "instrument" that "appears throughout the statute" without giving "independent significance" to any of the three terms; and (2) that because the Commission has not prohibited Kalshi from offering certain *other* event contracts that involve wagering on "contests of others" (as the election-betting contracts do here), the Commission is arbitrarily classifying Kalshi's election-betting contracts as transactions involving "gaming." Neither argument has merit.

1

I.     **Background**

For context, these issues both relate to the two-step inquiry for determining whether an agreement, contract, or transaction is subject to public interest review under Section 5c(c)(5)(C):

1. **First, the Commission must determine if the "<u>agreements</u>" or "<u>contracts</u>" or "<u>transactions</u>" are "<u>based upon</u>" an "occurrence, extent of an occurrence, or contingency."?**[1]  In other words, are these agreements, contracts, or transactions whose <u>underlying</u> is an event?

2. ***Separately*, the Commission must determine if "*such* agreements, contracts, or transactions [*i.e.*, whose underlying is an event] <u>involve</u>" a category listed in the statute?** That is, once the Commission has determined if the underlying is an event, the next step is to determine if the agreements or contracts or transactions—in any respect and without any stated limitation—"involve" an enumerated activity such as, here, gaming or activity unlawful under state law.[2]

Kalshi's first new argument pertains to both steps, while its second new argument pertains to the second step.[3]

II.    **Kalshi's New Arguments**

1. Kalshi incorrectly asserted, for the first time at the hearing, that Section 5c(c)(5)(C)'s disjunctive language "agreements, contracts, *or* transactions" should be disregarded and interpreted to refer only to "the instrument" and that the words "agreements" and "transactions" have no independent significance.

---

[1] 7 U.S.C. § 7a-2(c)(5)(C)(i) (stating the provision applies to "agreements, contracts, transactions, or swaps in excluded commodities that *are based upon*" an event (emphasis added)).

[2]  *Id.* (stating that the provision applies where "such agreements, contracts, or transactions … involve" an enumerated activity).

[3] Kalshi collapses these two elements into one, as though the statute said the contracts must be "based upon gaming," which it does not.  Tr. 13.  Despite extensive opportunity to do so, Kalshi has never explained why the Court should ignore the fact that the statutory text contains separate clauses for (1) the underlying; and (2) what the contracts or transactions must "involve."

2

At argument, the Court questioned Kalshi on the meaning of the text in Section 5c(c)(5)(C) that states "the Commission may determine that such agreements, contracts, *or transactions* are contrary to the public interest if the agreements, contracts, *or transactions* involve" an enumerated activity. 7 U.S.C. § 7a-2(c)(5)(C) (emphases added). The Court asked: "[W]hat work do you argue 'transactions' is doing in the statute as it relates to involve?" Kalshi admitted that reading "transactions" as something other than "contracts" might be "grammatically appropriate," which it is. But Kalshi argued that it would not make sense to read the statute as written, because that would "make[] it just an unusual, sort of strange way of speaking." Tr. 9-10.

Finding the plain language "strange," Kalshi asserted the novel argument that "agreements, contracts, or transactions" are a "sort of triplet" so that the individual terms have no "independent significance." Kalshi then asserted that this "triplet" "appears throughout the [CEA]," and is "used throughout the statute" to refer to "the instrument" (in other words, the contract). Thus, notwithstanding the text and other evidence of Congressional intent to prevent gambling through futures markets, CFTC Br. at 24, CFTC Reply Br. at 9, Kalshi argues that the Commission erred in considering whether election-betting transactions involve gaming, because the word "transaction" is meaningless. This contention has no basis whatsoever.

First, as usual, the Court must look to the text itself. At issue are the words "contracts," "transactions," and "or." None of these terms are defined, so all retain their ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Thus, in Section 5c(c)(5)(C), as in ordinary legal usage, a "contract" is "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law," *Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019), and a "transaction" is "the formation, performance, or discharge of a contract," *Transaction*, BLACK'S LAW DICTIONARY (11th ed. 2019). Congress used the word "or" to connect these terms, the use of which "is almost always disjunctive, that is, the phrases it connects

3

are to 'be given separate meanings.'" *Pinson v. United States Dep't of Just.*, 964 F.3d 65, 69 (D.C. Cir. 2020) (*quoting United States v. Woods*, 571 U.S. 31, 45 (2013)) (cleaned up); *see also United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) (articulating the "interpretive principle that every clause and word of a statute should have meaning" (internal quotation marks omitted)). Nothing in the statute suggests that the Court should apply anything but the plain meaning of "contract" or "transaction" or "or." Accordingly, the statute authorizes the Commission to consider both Kalshi's contracts, and "transactions" in those contracts.

Second, at the hearing, Kalshi offered no support for its assertion that "agreement, contract, or transaction" is a unitary "triplet" lumped together with a single narrow meaning "throughout the statute." Nor could it: Congress uses these terms throughout the CEA to grant broad jurisdictional authority to the CFTC, in contexts where it would make no sense to interpret them as referring to "the instrument" to the exclusion of *trading* in the instrument. For example, the CEA empowers the Commission to issue regulations "reasonably necessary to effectuate any of the provisions of, or to accomplish any of the purposes of, this Act in connection with agreements, contracts, or transactions" in certain foreign currency instruments. 7 U.S.C. § 2(c)(2)(B)(iii). It would be absurd to suggest that the Commission nevertheless lacks the power to regulate "transactions," *i.e.*, trading, in those instruments. For another, CEA Section 21 requires the chief compliance officer of a swap data repository to "ensure compliance with this Act relating to agreements, contracts, or transactions." *Id.* § 24a(e)(2)(E). No chief compliance officer doubts that they are responsible for ensuring proper treatment of information about *trades*. If anything, regulating "transactions" is the *most* significant part of the CFTC's mission. *See* 7 U.S.C. § 5(a) (Congressional finding that "[t]he *transactions* subject to this chapter are … affected with a national public interest" (emphasis added)); *id.* § 2(a)(2) ("There is hereby established … a Commodity Futures *Trading* Commission."). And the "individual significance" of each term is bolstered by Congress's use of them separately elsewhere in

4

the Act. *See, e.g.*, 7 U.S.C. § 6a (prohibiting "excessive speculation in any commodity under contracts of sale of such commodity for future delivery . . . or swaps"); 7 U.S.C. § 6b (prohibiting fraud "in or in connection with …any contract of sale"); *Id.* § 6g (requiring registrants to provide to the Commission any reports regarding the "transactions and positions" of registered futures commission merchants and their customers). Nothing in the CEA indicates that where Section 5c(c)(5)(C) uses the words "transactions," "contracts," or "or," those words mean anything other than what they say.

Kalshi now accepts the ordinary meaning of "involve," Tr. 13-14 ("We don't actually disagree on what involve means; we disagree [contrary to the statute] on what has to involve what."), which includes "to relate to or affect," "to relate closely," to "entail" or to "have as a necessary feature or consequence." So understood, Section 5c(c)(5)(C) applies to an event "contract" that involves an enumerated category *as well as* to a "transaction" that involves an enumerated category. The Court should therefore apply the ordinary meaning of the statute to determine whether the contracts "or" transactions are (1) "based on" an event; and then (2) involve, without limitation, "gaming" or other enumerated activity. The Commission reasonably determined that Kalshi's offerings qualify.

2. Kalshi now incorrectly suggests that because the Commission has not prohibited the offering of award-show contracts, "gaming" cannot include betting or wagering on the outcome of "contests of others."

The Commission determined that Kalshi's contracts involve gaming because wagering on an election involves staking something of value on the outcome of a "contest of others." At the May 30, 2024 hearing, the Court asked the CFTC for another example of a "contest of others" that does not involve a "game" in the way that Kalshi defined gaming, but that might fit within the Commission's interpretation of "gaming." The CFTC responded (1) that, contrary to Kalshi's earlier suggestion, horse races are not called "games," and (2) that award contests such as the

5

Academy Awards are also an example of contests that are not games. Tr. 55. In rebuttal, Kalshi commented that award contests are "a fascinating example because Kalshi offers those and has offered those for a long time, and [the CFTC has] never subjected those to the review process." Tr. 76. Kalshi then argued "that really underscores the sort of outcome-driven aspect of this" which was "an attempt to get it in without a real coherent theory of what the statute means." Tr. 76. The implication was that because the Commission has not prohibited the offering of Kalshi's award-show event contracts, its reasoning that the Congressional Control contracts involve gaming because they involve staking something of value on the outcome of a contest of others is arbitrary. The argument is incorrect for a number of reasons.

As a threshold matter, betting on contests of others, be it awards shows or elections, are widely regulated as gaming. It is certainly wagering on the outcome of a contest of others. And State "Gaming" commissions across the country regulate wagers on contests that are not games, including the Emmy's and Academy Awards. *See, e.g.*, New Jersey Division of Gaming Enforcement, *available at* https://www.nj.gov/lps/ge/docs/SportsBetting/ApprovedEventsList.pdf (listing approved wagers on Emmy and Academy Awards, the Ultimate Fighting Championship, Indy Racing, and other contests that are not "games"). Far from an arbitrary distinction, the same is true of State and Tribal "Gaming" commissions that prohibit betting on elections: The Nevada Gaming Commission prohibits wagers on "any election for public office," Nev. Gaming Reg. 22.1205, as well as the Little River Band of Ottawa Indians Gaming Commission. Chapter 13 – Retail Sports Betting, *available at* https://lrboi-nsn.gov/wp-content/uploads/2020/05/Chapter-13-Retail-Sports-Betting-APPROVED-FINAL.pdf.

That aside, Kalshi's assertion that the Commission must not really believe betting on awards shows is "gaming" is at odds with both the CEA and APA.

First, as Kalshi knows but failed to mention, the Commission *never approved* Kalshi's award-show contracts. The contracts were "self-certified" under a statutory procedure that allows an exchange to *bypass* agency approval and list a contract simply by filing a notice with the Commission. 7 U.S.C. § 7a-2(c)(1). Under 17 C.F.R. § 40.2, a designated contract market may list a contract, without Commission approval, one business day after submitting required information, including a concise explanation and analysis of the product and a certification that the product complies with the CEA and Commission regulations. 17 C.F.R. § 40.2(a).[4] The Commission has drawn no conclusions about Kalshi's award-show contracts.

Second, Commission review of a gaming event contract is discretionary—it "may" make a public interest finding. *See* 7 U.S.C. § 7a-2(c)(5)(C). The fact that the Commission has not done so could mean any number of things: Perhaps the public interest considerations are not the same for betting on the Emmys as for betting on elections. Or perhaps the Commission has not commenced review of those contracts yet. An agency does not have to "make progress on every front before it can make progress on any front." *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 434 (1993). This does not mean that the Commission applied one definition of "gaming" to award-show betting and then arbitrarily applied a "contest of others" definition to election betting.

Third, Kalshi's argument is yet another example of its confusion between rulemaking and case-by-case adjudication. It is a basic APA principle that an agency "retain[s] power to deal with … problems on a case-to-case basis," which is especially warranted where, as here, "the agency may not

---

[4] The Commission can stay the listing of a self-certified contract only in limited circumstances, 17 C.F.R. § 40.2(c), but can initiate a review of a self-certified contract at any time after it is listed, *see* 17 C.F.R. § 40.11.

have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule." *See SEC v. Chenery*, 332 U.S. 194, 202-03 (1947).[5]

Nothing in the CEA or APA required the Commission to formulate a prospective rule of general applicability to define "gaming." Formulating prospective rules is legislative rulemaking. 5 U.S.C. § 551(4) ("'[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"); *see also ITServe Alliance, Inc. v. DHS*, 71 F.4th 1028, 1035 (D.C. Cir. 2023) (stating an adjudication was not a rulemaking because it "interpreted pre-existing law" and noting that "rulemaking typically announces 'generally applicable' legal principles," while "[a]djudicating a specific controversy requires identifying the governing law, which may involve resolving disputes about what that law means") (citation omitted)).

In that vein, where Congress intends to require the Commission to formulate a forward-looking definition in rulemaking, it says so expressly. *See, e.g.*, 7 U.S.C. § 6a(c)(2) (directing the

---

[5] Kalshi suggests that the Commission arbitrarily tailored its interpretation of "gaming" just to capture the Congressional Control Contracts, and that because the Commission referred to state statutes that define "gaming" to include staking something of value on the outcome of "contests of others," it would in the future be required to label as "gaming" *any* wager on a contingent event. But that is illogical. The Commission neither adopted any State statute, nor did it otherwise reach the question of the outer bounds of the term "gaming"—it did not need to in order to adjudicate Kalshi's case. Nor, given the statutory context, is it ever likely to adopt a definition so broad that that it would subsume all contracts on contingent events. As the CFTC has noted, Section 5c(c)(5)(C) was intended to subject only a subset of event contracts to the Commission's public-interest review. CFTC Br. 1-7 (describing the history of the statute). Indeed, the Commission has recently acknowledged as much in a notice of proposed rulemaking on event contracts. *See* Event Contracts, 89 Fed. Reg. 48,975 (proposed May 10, 2024), *available at* https://www.cftc.gov/media/10706/votingcopy051024_EventContracts/download (declining to define "gaming" as staking or risking something of value on any contingent event because that "could encompass event contracts that were not intended by Congress to be subject to the Commission's heightened authority pursuant to CEA section 5c(c)(5)(C)."). Nothing in the CEA or APA required the Commission to rigidify a rule to define "gaming" in an informal adjudication, *see Chenery*, 332 U.S. at 202, and it did not do so here.

Commission to "define what constitutes a bona fide hedging transaction"); *id.* § 1a(10)(B) (similar directive), 1a(11)(B) (similar).  It did not do so here, leaving the Commission free to assess whether contracts or transactions involve "gaming" on a case-by-case basis.  Courts often do much the same when they apply a statutory term to a set of facts without setting forth the "outer limits" of the statute's meaning. *See e.g.*, *Strothers v. City of Laurel*, 895 F.3d 317, 331 (4th Cir. 2018) ("[W]e need not test the definition's outer limits."); *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 643 (S.D.N.Y. 2011) (finding no "need[] to define the outer limits of the concept, [because] the term 'access' should be interpreted broadly enough to include Defendant's alleged conduct"); *see also United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) (noting "no issue arises concerning the outer limits of the meaning of 'danger to the community'" where the future misconduct that is anticipated concerns violent criminal activity).  That is an act of judicial restraint, not "gerrymandering," and it is particularly appropriate where, as here, "conduct falls squarely within" the ordinary meaning of the term.  *United States v. Wedd*, 993 F.3d 104, 124 (2d Cir. 2021) (holding that the case "[d]id not require the Court to define the outer limits of the term 'use'").  Kalshi's speculation about what the Commission might do in some hypothetical future case is not germane.

Indeed, partially in light of its experience adjudicating Kalshi's case, the Commission on May 10, 2024, released a notice of proposed rulemaking ("NPRM") containing proposed amendments to its rule implementing Section 5c(c)(5)(C).  *See* Event Contracts, 89 Fed. Reg. 48,968 (proposed May 10, 2024) (to be codified at 17 C.F.R. pt. 40) *available at* https://www.cftc.gov/media/10706/votingcopy051024_EventContracts/download.  In that proposed rule, the definition of "gaming" would extend to the outcome of award competitions, sporting events, elections, and other games or contests.  *See id.* at 48,981 (proposing a definition of gaming as "the staking or risking by any person of something of value upon: (i) the outcome of a contest of others; (ii) the outcome of a game involving skill or chance; (iii) the performance of one

9

or more competitors in one or more contests or games; or (iv) any other occurrence or non-occurrence in connection with one or more contests or games."). The NPRM's definition of "gaming" would encompass "the staking or risking of something of value upon the outcome of entertainment award contests such as the Emmys, the Oscars or the Grammys; athletics award contests such as the Heisman Trophy; or achievement award contests such as the Nobel Prize or Pulitzer Prize" as well as "a political contest, including an election or elections." *Id.* at 48,974-76. Although the proposed rule amendments are subject to the rulemaking process and may or may not become a final rule, the proposed definition of gaming in the NPRM is consistent with the CFTC's position here.

In short, Kalshi's insinuation that the Commission is defining "gaming" inconsistently by not exercising its discretion to do a public interest review of contracts trading on the Emmy awards is without merit. Under the APA, the Commission is free to do so in the future, or not, or to address the issue more broadly through rulemaking.

## CONCLUSION

For the foregoing reasons and those stated in the CFTC's Cross-Motion for Summary Judgment, the CFTC respectfully requests that this Court grant the Commission's motion for summary judgment, deny Kalshi's motion for summary judgment, enter judgment in favor of the CFTC and against Kalshi on all claims, and order any other relief that this Court determines is appropriate.

Dated: June 10, 2024　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　*/s/ Raagnee Beri*
　　　　　　　　　　　　　　　　　　　　　Raagnee Beri
　　　　　　　　　　　　　　　　　　　　　　*Senior Assistant General Counsel*

　　　　　　　　　　　　　　　　　　　　　Robert A. Schwartz
　　　　　　　　　　　　　　　　　　　　　　*General Counsel*

        Anne W. Stukes
          *Deputy General Counsel*
        Margaret P. Aisenbrey
          *Senior Assistant General Counsel*
        Conor B. Daly
          *Counsel*
        Commodity Futures Trading Commission
        1155 21st Street, NW
        Washington, D.C. 20581-0001
        Phone: (202) 418-5986
        rberi@cftc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2024, I served the foregoing on counsel of record using this Court's CM/ECF system.

*/s/ Raagnee Beri*
