**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KALSHIEX LLC,

      Plaintiff,

      v.

COMMODITY FUTURES TRADING
COMMISSION,

      Defendant.

Civil Action No. 23-3257 (JMC)

## <u>MEMORANDUM OPINION</u>

This lawsuit concerns the interpretation of the Commodity Exchange Act (CEA)'s special rule for the review of event contracts, a type of derivative contract whose payoff is based on the outcome of a contingent event. The special rule authorizes the Commodity Futures Trading Commission (CFTC) to review, and prohibit, event contracts that it determines are contrary to the public interest if, and only if, they involve specific activities, including "activity that is unlawful under any Federal or State law" and "gaming." 7 U.S.C. §§ 7a-2(c)(5)(C)(i)(I),(V).[1] Plaintiff KalshiEX LLC (Kalshi), a financial services company, tried to offer event contracts that would allow participants to take positions and trade on the outcome of United States congressional elections. The CFTC issued an order prohibiting Kalshi from offering the contracts after it determined that such contracts involve unlawful activity and gaming, and are contrary to the public interest. Kalshi filed this suit challenging the CFTC's decision as arbitrary, capricious, and otherwise not in accordance with the law under the Administrative Procedure Act (APA).

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

The CFTC's order exceeded its statutory authority. Kalshi's contracts do not involve unlawful activity or gaming. They involve elections, which are neither.

Although the Court acknowledges the CFTC's concern that allowing the public to trade on the outcome of elections threatens the public interest, this Court has no occasion to consider that argument. This case is not about whether the Court likes Kalshi's product or thinks trading it is a good idea. The Court's only task is to determine what Congress did, not what it could do or should do. And Congress did not authorize the CFTC to conduct the public interest review it conducted here.

Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment, ECF 17, and **DENIES** Defendant's cross-motion for summary judgment, ECF 30.

## I.    BACKGROUND

### A. Event Contracts

The CFTC is an independent federal agency that regulates financial derivative markets. A derivative is a financial instrument or contract whose price is "directly dependent upon (i.e.[,] derived from)" the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments. *See Futures Glossary: A Guide to the Language of the Futures Industry*, CFTC, https://perma.cc/63HY-DD7E. Derivatives take many forms, including "futures, options, and swaps." *Id.* [2] These instruments "provide a way to transfer market risk or

---

[2] These terms refer to various agreements or contracts. A "future" is "an agreement to purchase or sell a commodity for delivery in the future." *Futures Glossary: A Guide to the Language of the Futures Industry*, CFTC, https://perma.cc/63HY-DD7E. "Option" refers to a "contract that gives the buyer the right, but not the obligation, to buy or sell a specified quantity of a commodity or other instrument at a specific price within a specified period of time, regardless of the market price of that instrument." *Id.* The CFTC acknowledges that the definition of "swap" is "detailed and comprehensive," *id.*, but broadly it is "a type of derivative involving the exchange of cash flows from financial instruments." *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 373 (D.C. Cir. 2013).

credit risk between two counterparties." *Inv. Co. Inst. v. U.S. Commodity Futures Trading Comm'n*, 891 F. Supp. 2d 162, 168 n.3 (D.D.C. 2012) (citations omitted).

This case concerns a specific derivative called an "event contract." An event contract is a derivative contract "whose payoff is based on a specified event, occurrence, or value." *Contracts & Products: Event Contracts*, CFTC, https://perma.cc/CG2B-3YWY. For example, an event contract might involve the occurrence of a weather event (e.g., snowfall or hurricanes). *See id.*; ECF 38-2 at 23 (Comment Letter from John A. Phillips to U.S. Commodity Futures Trading Comm'n 3 (Sept. 23, 2022) [*hereinafter* Phillips Comment]). These contracts usually pose a yes-or-no question. The buyer of the event contract, for example, may take a "yes" position on whether the underlying event will happen, *see* ECF 38-1 at 35 (KalshiEX LLC, Commission Regulation 40.2(a) Notification (June 12, 2023) [*hereinafter* Kalshi Notification])—such as whether the level of snowfall in a certain region will exceed a specific amount in a given timeframe. The seller implicitly takes the opposite, or "no," position. *See id.*

Event contract prices are based upon the current probability that an event will occur and thus, like stock prices, fluctuate. *Id.* at 34–35; ECF 38-2 at 27 (Phillips Comment). The contract specifies the value to be paid on the contract. *See* ECF 38-1 at 34–35 (Kalshi Notification). Event contracts expire at a cutoff date and can be purchased and sold at any time before that date. *Id.* at 40. They are binary. When the contract expires, the seller must pay the buyer if the underlying event on which the buyer took a "yes" position occurs, but the buyer gets paid nothing if it does not. *Id.* at 35.

Like derivatives generally, event contracts can be used to mitigate risk. Kalshi provides an illustrative example in its brief concerning a beachfront property owner who might purchase an event contract predicting that a hurricane will reach landfall in the area. ECF 17-1 at 15. If the

hurricane hits as the owner predicted, the payout from the contract could offset the owner's loss of rental income incurred because of the storm. *Id.* But, like other investments, some buyers trade event contracts simply to seek some financial return.

### B.  The CEA's Special Rule for the Review of Event Contracts

The CEA, 7 U.S.C. § 1 *et seq.*, provides a "comprehensive regulatory structure" for the trading of commodities and futures. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 355–356 (1982). The CFTC is responsible for administering and enforcing the CEA, and the statute vests it with exclusive jurisdiction to regulate various types of commodities and futures on regulated exchanges, as well as to establish implementing regulations. *See* 7 U.S.C. § 2(a)(1)(A); 17 C.F.R. § 1 *et seq*. Event contracts are subject to regulation under the CEA as "excluded commodities",[3] and thus by the CFTC. 7 U.S.C. § 7a-2(c)(5)(C)(i). Pursuant to the statute, an entity seeking to offer event contracts must seek and receive CFTC designation as a regulated exchange (a designated contract market or "DCM") before listing and publicly trading its contracts. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100.

The statute's requirements for listing event contracts on CFTC-approved and -regulated exchanges have changed over time. From 1974 to 2000, the CEA required DCMs to demonstrate to the CFTC that their contracts satisfied an "economic purpose test" and were not contrary to the public interest before they could trade their contracts. *See* Pub. L. No. 93-463, § 207, 88 Stat. 1389, 1400 (1974) (codified at 7 U.S.C. § 7(7) (1994)); Contract Market Designations, 40 Fed. Reg. 25849, 25850 (June 19, 1975). In other words, the statute required the CFTC to preapprove new event contracts before DCMs could offer them. In 2000, however, Congress amended the CEA to

---

[3] Relevant here, the CEA's definition of an "excluded commodity" subject to the statute's requirements includes "an occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract, agreement, or transaction" and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

remove the default rule that all event contracts be subject to a "public interest" review and instead to allow DCMs to self-certify that their proposed contracts complied with the statute and the CFTC's regulations, with no prior review required for many types of event contracts. *See* 7 U.S.C. § 7a-2(c)(1) (2006). Finally, in 2010, Congress further amended the CEA by enacting a "[s]pecial rule" for the review and approval of event contracts. 7 U.S.C. § 7a-2(c)(5)(C). The special rule, which remains in effect, is at issue in this case.

The special rule authorizes the CFTC to review certain event contracts to determine whether (or not) they can be traded. Under the CEA, as currently amended, DCMs can still self-certify that their contracts comply with the statute and applicable regulations, and can begin publicly trading those contracts within one business day of their certification. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. Or, DCMs can voluntarily request that the CFTC preapprove their contracts to confirm that they do not violate the CEA or the CFTC's regulations. 7 U.S.C. § 7a-2(c)(4)–(5); 17 C.F.R. § 40.3. But under the special rule, the CFTC is empowered to review, and prohibit, specific types of event contracts if it determines that those contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Specifically, the special rule provides:

> In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—
> | | |
> |---|---|
> | (I) | activity that is unlawful under any Federal or State law; |
> | (II) | terrorism; |
> | (III) | assassination; |
> | (IV) | war; |
> | (V) | gaming; or |
> | (VI) | other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest. |

*Id.*

As is apparent from the statute's text, the special rule applies only to those agreements, contracts, or transactions that involve the activities specifically enumerated in the statute. In other

words, the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves unlawful activity, terrorism, assassination, war, or gaming.[4] If the CFTC makes such a determination, the agreement, contract, or transaction cannot "be listed or made available for clearing or trading on or through a registered entity." *Id.* §§ 7a-2(c)(5)(C)(i)–(ii). On the other hand, if the agreement, contract, or transaction *does not* involve one of the enumerated topics, the special rule is not implicated, the CFTC has no occasion to make any public interest determination, and the contract should be listed for trading. *Id.* §§ 7a-2(c)(5)(C)(i), (c)(5)(B) ("The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations).").

The CFTC's implementing regulations set forth its process for reviewing event contracts under the special rule. 17 C.F.R. § 40.11. Pursuant to its regulations, the CFTC "may determine, based upon the review of the terms or conditions of a submission . . . that an agreement, contract, transaction, or swap based on an excluded commodity . . ., which may involve, relate to, or reference an ['enumerated' 'activity'], be subject to a 90-day review." *Id.* § 40.11(c). During the 90-day review period, the CFTC "shall request that a registered entity suspend the listing or trading" of the "agreement, contract, transaction, or swap." *Id.* § 40.11(c)(1). By the conclusion of its review period, the CFTC must issue an order either approving or disapproving of the contract. *Id.* § 40.11(c)(2).

---

[4] The Court recognizes that the special rule applies to "other" unspecified activities "similar" to those enumerated. 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI). But the CFTC can only designate such activities through formal rulemaking or regulation. *Id.* The CFTC has not exercised its authority to develop and issue any rule or regulation prohibiting event contracts involving any other similar activity. *See* ECF 38-1 at 150 n.16 (Dissenting Statement of Commissioner Caroline D. Pham Regarding the Review and Stay of KalshiEX LLC's Political Event Contracts (quoting 76 Fed. Reg. at 44786)) ("The Commission may, at some future time, adopt regulations that prohibit products that are based upon activities 'similar to' the enumerated activities. It has determined not to propose such regulations at this time."). Accordingly, the Court focuses on the statute's enumerated categories in discussing and interpreting the special rule and has no occasion to consider whether the contracts at issue involve activities that are similar to those enumerated in the CEA.

**C.  The CFTC's Order Prohibiting Kalshi's Congressional Control Contracts**

In 2020, the CFTC authorized Kalshi, a financial services company, to list event contracts for public trading as a DCM. ECF 38-1 at 209 (Comment Letter from Christopher Greenwood to U.S. Commodity Futures Trading Comm'n (Sept. 25, 2022)). The contracts Kalshi has offered on its exchange have involved a broad range of events—from the number of major hurricanes that will form over the Atlantic during a given year, to whether China's GDP growth will exceed a certain rate, and even whether a particular nominee will win in their category at the Oscars. *See id.*; ECF 38-2 at 23 (Comment Letter from Aristotle Intl., Inc. to U.S. Commodity Futures Trading Comm'n 3 (Sept. 23, 2022)). Kalshi has also offered event contracts concerning political events, such as whether the federal government will shut down or if certain nominees will be confirmed by the U.S. Senate. ECF 17-1 at 19 (citing *Events*, Kalshi, https://perma.cc/3PCC-TLE9).

The dispute between the Parties concerns a specific product that Kalshi attempted to offer that it refers to as "[c]ongressional [c]ontrol [c]ontracts." ECF 17-1 at 11. Kalshi's congressional control contracts allow buyers to predict which political party will control the U.S. House of Representatives or Senate on a specific, future date. ECF 38-1 at 33–39 (Kalshi Notification). The congressional control contracts are "yes"/"no" event contracts that pose the question: "Will <chamber of Congress> be controlled by <party> for <term>?" *Id.* at 34–35. The contracts expire on February 1 of the year that the relevant term begins, *id.* at 40, and the payout is determined by the party affiliation of the leader of a specific chamber of Congress (i.e., the Speaker of the House for the House of Representatives or the President Pro Tempore for the Senate), *id.* at 39. Upon the contracts' expiration, buyers who correctly predicted the electoral outcome will receive one dollar per contract purchased, but purchasers who made an erroneous prediction about congressional

7

control receive nothing in return for their investment. *Id*. at 34–35. To avoid potential conflicts of interest, Kalshi's congressional control contracts identify categories of prohibited traders to include candidates for any federal or statewide public office and paid employees with various political affiliations, including members of Congress, campaign staffers on congressional campaigns, employees of Democratic and Republican Party organizations and political action committees, and employees of major polling organizations, as well as the immediate family members of any prohibited traders, among other categories. *Id.* at 40–41.

On June 12, 2023, Kalshi filed a self-certification to trade its congressional control contracts, pursuant to 7 U.S.C. § 7a-2(c)(1). *See* ECF 38-1 at 33 (Kalshi Notification). But on June 23, 2023, the CFTC sent a letter to Kalshi representing that it had exercised its authority to initiate a 90-day review of Kalshi's self-certified submission because it determined that the contracts "may involve, relate to, or reference an activity enumerated" in the CEA and applicable regulations. ECF 38-1 at 152 (Letter from Christopher J. Kirkpatrick, Secretary, U.S. Commodity Futures Trading Comm'n, to Xavier Sottile, Head of Markets, KalshiEX LLC). Consistent with 17 C.F.R. § 40.11(c)(1), the CFTC requested that Kalshi suspend any listing and trading of its congressional control contracts during the review period. ECF 38-1 at 152. The CFTC's letter also informed Kalshi that it decided to open a 30-day public comment period to assist it with its evaluation. *Id.*; *see also id.* at 153–56 (Press Release, U.S. Commodity Futures Trading Comm'n, CFTC Announces Review of Kalshi Congressional Control Contracts and Public Comment Period (June 23, 2023); CFTC, Questions on the KalshiEX LLC "Will <chamber of Congress> be controlled by <party> for <term>?" Contracts for Public Comment).[5] The CFTC's decision to commence a

---

[5] The administrative record reflects that the CFTC received many comments from various sectors. *See, e.g.*, ECF 38-1 at 157–236; ECF 38-2 at 8–234; ECF 38-3 at 8–109; ECF 38-4 at 8–132. Some commenters were in favor of the CFTC prohibiting Kalshi's congressional control contracts, and others urged the CFTC to approve the contracts for trading. *See generally id.*

review of Kalshi's congressional control contracts was not unanimous. Two of the five commissioners dissented because they did not agree that Kalshi's congressional control contracts involved any of the special rule's enumerated activities. *See* ECF 17-1 at 20 (citing Mersinger Dissenting Statement, CFTC.gov (June 23, 2023), https://perma.cc/XG2U-FNRZ; Pham Dissenting Statement, CFTC.gov (June 23, 2023), https://perma.cc/V9VB-Z24S); *see also* ECF 38-1 at 146-151 (Dissenting Statement of Comm'r Caroline D. Pham (Aug. 26, 2022)).

On September 22, 2023, at the conclusion of the review period, the CFTC issued an order prohibiting Kalshi from listing its congressional control contracts for trading pursuant to the special rule, ECF 38-1 at 8–30 (Commodity Futures Trading Comm'n, Order (June 12, 2023) [*hereinafter* CFTC Order]), with one commissioner dissenting and one abstaining from the decision. ECF 17-1 at 21 (citing Mersinger Dissenting Statement, CFTC.gov (Sept. 22, 2023), https://perma.cc/2G23-5XNF; Pham Abstention Statement, CFTC.gov (Sept. 22, 2023), https://perma.cc/7D8G-C3ET). In its order the CFTC determined that Kalshi's congressional control contracts involve two activities enumerated in the special rule—gaming and unlawful activity. *See, e.g.*, ECF 38-1 at 17, 19 (CFTC Order).

To reach its conclusion, the CFTC first considered what it means for a contract to "involve" an enumerated activity under the special rule. 7 U.S.C. § 7a-2(c)(5)(C)(i); ECF 38-1 at 12–14 (CFTC Order). Acknowledging that the CEA does not define the word "involve," the CFTC looked to its plain meaning derived from cited dictionaries that define "involve" to mean "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence." *Id.* at 12 (citations omitted). Applying these definitions of "involve," the CFTC rejected Kalshi's position that a contract "involve[s]" an enumerated activity "only if that activity is the contract's underlying." *Id.* at 13. The CFTC reasoned that the definition of the word "involve" in the statute

is broad enough to "capture both contracts whose underlying *is* one of the enumerated activities, and contracts with a different connection to one of the enumerated activities because, for example, they 'relate closely to,' 'entail,' or 'have as an essential feature or consequence' one of the enumerated activities." *Id.* at 14. The CFTC also reasoned that "the legislative history of [the statute] … indicates that the question for the Commission in determining whether a contract 'involves' one of the activities enumerated in [the special rule] is whether the contract, considered as a whole, involves one of those activities." *Id.* The CFTC reasoned that considering the contract "as a whole," *id.*, a contract could "involve" one of the special rule's enumerated activities "if trading in the contract amounts to the enumerated activity," *id.* at n.19.

After construing the word "involve," the CFTC then provided the bases for its determination that Kalshi's congressional control contracts involve "gaming." *Id.* at 15–17. Again, because the CEA does not define "gaming," the CFTC looked to the ordinary meaning of the term according to dictionaries and statutory definitions (specifically, in state statutes). *Id.* at 15–16. The CFTC reasoned as follows to conclude that the term "gaming" in the special rule "includes betting or wagering on elections": First, the order cited to various dictionary definitions of the word gaming that include, or cross-reference, "gambling" as part of its definition. *Id* at 15 & n.21. Then, the CFTC found that under "most state laws, 'gambling' involves a person staking something of value upon the outcome of a game, contest, or contingent event," citing numerous state penal statutes. *Id* at 15 & n.22.[6] The CFTC then cited the federal Unlawful Internet Gambling

---

[6] For example, the state statutes the CFTC cited include: KY. REV. STAT. ANN. § 528.010(6)(a) ("'Gambling' means staking or risking something of value upon the outcome of a contest, game, gaming scheme, or gaming device which is based upon an element of chance, in accord with an agreement or understanding that someone will receive something of value in the event of a certain outcome"); MICH. COMP. LAWS § 750.301 ("Any person or his or her agent or employee who, directly or indirectly, takes, receives, or accepts from any person any money or valuable thing with the agreement, understanding or allegation that any money or valuable thing will be paid or delivered to any person where the payment or delivery is alleged to be or will be contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain . . . ."); and N.Y. PENAL LAW § 225.00(2) ("A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a

Enforcement Act (UIGEA), 31 U.S.C. § 5361 *et seq.*, which defines the term "bet or wager" as "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome." ECF 38-1 at 16 (CFTC Order (citing 31 U.S.C. § 5362(1)(A)). Based upon the UIGEA's definition of "bet or wager," the CFTC determined that to "bet or wager on elections is to stake something of value upon the outcome of contests of others, namely, contests between electoral candidates." ECF 38-1 at 16 (CFTC Order). The order then recognized that "several state statutes . . . link the terms 'gaming' or 'gambling' to betting or wagering on elections." *Id.*[7] Accordingly, the CFTC found that Kalshi's congressional control contracts involve "gaming," and are thus subject to the special rule, because "taking a position in the [c]ongressional [c]ontrol [c]ontracts would be staking something of value upon the outcome of a contest of others," namely "the outcome of Congressional election contests." *Id.* at 17.

The CFTC also set forth the reason it determined that Kalshi's congressional control contracts involved unlawful activity under § 7a-2(c)(5)(C)(i)(I). It recognized that many states criminalize betting or wagering on elections. ECF 38-1 at 18 (CFTC Order).[8] Accordingly, the

---

future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome"). *See* ECF 38-1 at 15 n.22 (CFTC Order).

[7] For example, the state statutes  the CFTC cited include: 720 ILL. COMP. STAT. ANN. 5/28-1(a)(2) ("A person commits gambling when he . . . makes a wager upon the result of any game, contest, or any political nomination, appointment or election"); NEB. REV. STAT. § 28-1101(4) ("A person engages in gambling if he or she bets something of value upon the outcome of a future event, which outcome is determined by an element of chance, or upon the outcome of a game, contest, or election"); and N.D. CENT. CODE. ANN. § 12.1-28-01 ("'Gambling' means risking any money . . . upon lot, chance, the operation of gambling apparatus, or the happening or outcome of an event, including an election or sporting event, over which the person taking the risk has no control"). *See* ECF 38-1 at 16 n.24 (CFTC Order).

[8] For example, the state statutes  the CFTC cited include: ARIZ. REV. STAT. ANN. § 16-1015 ("A person who, before or during an election provided by law, knowingly makes, offers or accepts a bet or wager, or takes a share or interest in, or in any manner becomes a party to the bet or wager, or provides or agrees to provide money to be used by another in making the bet or wager, upon any contingency whatever arising out of such election, is guilty of a class 2 misdemeanor"); ARK. CODE ANN. § 7-1-103(20) ("No person shall make any bet or wager upon the result of any election in this state[.]"); and COLO. REV. STAT. ANN. § 31-10-1531 ("It is unlawful for any person, including any

CFTC determined that the congressional control contracts, which allow buyers to purchase and potentially receive a payout based on the results of congressional elections, amounted to activity that is illegal in many states. *Id.* at 19–20.

Finally, the CFTC found that Kalshi's congressional control contracts were contrary to the public interest. It reasoned that the control of a chamber of Congress does not have "sufficiently direct, predictable, or quantifiable economic consequences" for Kalshi's contracts to serve an effective hedging or risk mitigating function. *Id.* at 22. The order also identified the impact that such contracts could have on the integrity of elections and the perception of integrity, including, for example, by creating monetary incentives to vote for candidates or incentivizing the spread of misinformation by those trying to influence perceptions of a party or candidate to maximize potential financial gain. *Id.* at 27. Finding that the contracts involved enumerated activities and were contrary to the public interest, the CFTC's order prohibited Kalshi from listing and trading its contracts. *Id.* at 30.

Kalshi then brought this suit challenging the CFTC's order as arbitrary, capricious, contrary to law, and in excess of the CFTC's statutory authority under the Administrative Procedure Act. ECF 1 ¶¶ 86, 87 (citing 5 U.S.C. § 706(2)(A), (C)). Kalshi moved for summary judgment seeking vacatur of the order. ECF 17. The CFTC opposed Kalshi's motion and cross-moved for summary judgment, requesting that the Court affirm its determination prohibiting Kalshi from listing and trading its congressional control contracts. ECF 30.

---

candidate for public office, before or during any municipal election, to make any bet or wager with a qualified elector or take a share or interest in, or in any manner become a party to, any such bet or wager or provide or agree to provide any money to be used by another in making such bet or wager upon any event or contingency whatever arising out of such election."). *See* ECF 38-1 at 18 n.26 (CFTC Order).

## II.     LEGAL STANDARD

This Court reviews the CFTC's order under the APA to determine whether it is "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence." *Taylor v. USDA*, 636 F.3d 608, 613 (D.C. Cir. 2011) (quoting *Kleiman & Hochberg, Inc. v. USDA*, 497 F.3d 681, 686 (D.C. Cir. 2007)); *see* 5 U.S.C. § 706(2)(A), (E). When a court reviews agency action under the APA, the summary judgment standard set forth in Rule 56 does not apply. *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015). Instead, "the district judge sits as an appellate tribunal" and "the entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The court does not engage in fact finding and its review is "typically limited to the administrative record." *Kondapally v. U.S. Citizenship & Immigr. Servs.*, 557 F. Supp. 3d 10, 20 (D.D.C. 2021).

At the time this case was originally briefed, the two-step analysis set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), governed the Court's review of the CFTC's statutory interpretation. But in *Loper Bright Enterprises v. Raimondo*, the Supreme Court overruled *Chevron* and explained that the role of the reviewing court is "to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." 144 S. Ct. 2244, 2263 (2024). The Court therefore relies on "traditional tools of statutory construction" to resolve the Parties' motions. *Id.* at 2268.[9]

---

[9] In *Loper Bright*, the Supreme Court recognized that courts may seek aid from an agency's "body of experience and informed judgment." 144 S. Ct. at 2262 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Because the CFTC did not argue that the Court should do so here, the Court neither considers nor addresses the scope of deference owed to the CFTC in the wake of *Loper Bright.*

### III.    ANALYSIS

Relevant here, the special rule authorizes the CFTC to determine that an event contract is contrary to the public interest if it "involve[s]—activity that is unlawful under any Federal or State law" or "gaming."  7 U.S.C. §§ 7a-2(c)(5)(C)(i)(I), (V). Below, the Court considers two disputes about the statute's meaning. First, the Court resolves the Parties' disagreement about the definition of "gaming," ultimately finding that the word "gaming" in the statute carries its ordinary, plain meaning and involves playing a game. Second, the Court considers the function of the word "involve" in the statute and concludes that it broadly refers to the underlying subject of the event contract or transaction. Because Kalshi's congressional control contracts involve elections (and politics, congressional control, and other related topics) and not illegal activities or gaming, the Court concludes that the special rule is not triggered, which makes it unnecessary for the Court to determine whether the CFTC was right that these event contracts are contrary to the public interest.

### A.  Gaming Requires a Game

To determine whether Kalshi's congressional control contracts "involve" either "activity that is unlawful under any Federal or State law" or "gaming" under the CEA's special rule, 7 U.S.C. § 7a-2(c)(5)(C)(i), the Court first construes the meaning of the relevant, enumerated categories. The Court need not spend much time articulating a definition of the phrase "activity that is unlawful under any Federal or State law" because its definition is clear. The Parties disagree about what it means for an event contract to "involve" such an activity (which the Court addresses later), but both sides understand this phrase to encompass activity or conduct that is illegal, and no one presses the Court to attach a different meaning to this phrase beyond the obvious.

However, the Parties dispute the meaning of "gaming" as used in the CEA. Kalshi argues that the term "gaming" in the statute must be "defined by reference to 'games.'" ECF 17-1 at 39.

The CFTC advances a broader definition. Its order equates "gaming" with "gambling," and observes that "gambling" is often defined as "staking something of value upon the outcome of a game, contest, or contingent event." ECF 38-1 at 15 (CFTC Order). (Although it only advances a definition of gambling (or gaming) that includes betting on a contest in this litigation. ECF 30 at 39.) After considering the text of the CEA, the statute's structure and context, and the Parties' arguments, the Court must agree with Kalshi.

Start with the text. The CEA does not define "gaming." *See generally* 7 U.S.C. § 1 *et seq.* "When a term goes undefined in a statute, [courts] give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). To discern that meaning, courts often begin with a survey of dictionaries. *See id.* at 569. Dictionaries define "gaming" as "the practice or activity of playing games for stakes" and "the practice or activity of playing games." *Gaming*, Merriam-Webster.com, https://perma.cc/9JZW-SRS2; *see also Gaming*, Oxford English Dictionary, https://perma.cc/R99K-A2HD (defining gaming, in relevant part, as "[t]he action or practice of playing games . . . for stakes."). The ordinary meaning of the term "gaming" is thus consistent with Kalshi's position. The Court finds no reason to stray from the ordinary definitions of "gaming," which are "the practice or activity of playing games" and "playing games for stakes." Indeed, the statute's broader context and its structure compel the Court to reject the CFTC's more expansive definition and, therefore, the reasoning of its order.

First, the CFTC contends that "gaming" is synonymous with "gambling" and should be defined accordingly. ECF 30 at 39; ECF 38-1 at 15 (CFTC Order). The Court finds that definitions of "gambling" that are untethered to the act of playing a game are much too broad in the context of the CEA's special rule. The Court acknowledges that some dictionary definitions of "gaming" cross-reference gambling, or otherwise define "gaming" to include "gambling." The

Merriam-Webster dictionary, for example, (which, as observed above, defines "gaming" to include "the practice or activity of playing games") includes such a cross-reference. *Gaming*, Merriam-Webster.com, https://perma.cc/9JZW-SRS2. But it defines "gambling" to include "the practice or activity of betting" without any limitation on what is being bet upon. *Gambling*, Merriam-Webster.com, https://perma.cc/3FRP-QNBU; *see also Gaming*, Black's Law Dictionary (12th ed. 2024) (defining "gaming" as "gambling"); *Gambling*, Black's Law Dictionary (12th ed. 2024) (defining "gambling" as "[t]he act of risking something of value, especially money, for a chance to win a prize."). That definition is consistent with the order's articulation that "gambling" under many state statutes means to "stak[e] something of value upon the outcome of a game, contest, or contingent event." ECF 38-1 at 15 (CFTC Order), *id.* at n.22.[10] However, it quickly becomes clear that definition is unworkable in the context of this statute.

One glaring issue emerges given the CFTC's view that the special rule is implicated if the act of trading an event contract "amounts" to an enumerated activity. ECF 38-1 at 14 n.19 (CFTC Order). The Court addresses, and rejects, that reading below, but it is difficult to understand how the CFTC settled on such an expansive definition of gaming (or gambling) given its position. If the Court agreed with the CFTC's construction, all event contracts would be subject to review under the special rule because they all involve purchasing (and thus risking money on) some contingent event with the hope of receiving a payoff. *See* CFTC, *Contracts & Products: Event Contracts*, https://perma.cc/Q4LP-B6UY. Given that the CEA authorizes the CFTC to review

---

[10] In further support of its contention that gaming and gambling are interchangeable, the CFTC cites to a Supreme Court case in which the Court equated gaming with gambling. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014) ("The 'gaming activit[y]' is (once again) the gambling."). But this Court does not find the CFTC's argument persuasive, or helpful, in construing the meaning of "gaming" in the CEA. *Bay Mills* involved a question of tribal sovereign immunity under the Indian Gaming Regulatory Act, which required the Court to consider whether and where a tribe engaged in "gaming activities." *See* 572 U.S. at 791–93. The "gaming activities" at issue involved the operation of casinos, and the quote the CFTC relies on describes "gaming activity" to include "gambling in the poker hall." *Id.* at 792. Certainly gaming, as this Court has found it to mean in the CEA, can also be gambling. Playing poker is both "gaming" and "gambling." But that does not mean all forms of gambling are gaming.

event contracts only if they involve specific, enumerated activities, any definition of "gaming" that could be read to subject *all* event contracts to the special rule just cannot be right.[11]

Nor is the Court persuaded that the order's discussion of a more limited definition of gambling (and thus gaming) as "stak[ing] something of value upon the outcome of contests of others" should displace the plain and ordinary meaning of gaming that the Court has recognized. ECF 38-1 at 16. (Unless the contest at issue is some sort of game, which many are). That is because the Court does not find that the CFTC's sources for the definition it advances are particularly relevant. In considering the ordinary meaning of the word "gaming," the CFTC bypassed dictionary definitions of that term, cited above, which equate "gaming" with "games," in favor of more expansive definitions of gambling, which is not a term used in the statute. Similarly, it surveyed state statutes that prohibit gambling and cited some of those statutes' broader definitions of the term, but did not look to state statutes that expressly use or define the word "gaming." ECF 38-1 at 15–16 n.22 (CFTC Order). Notably, there are many state statutes that define "gaming" as tied to games, consistent with the definition of "gaming" Kalshi advances. *See, e.g.*, Iowa Code § 725.7(1)(a) ("illegal gaming" means "[p]articipat[ing] in a game for any sum"); Mass. Gen. Laws ch. 23K, § 2 (defining "gaming" as "dealing, operating, carrying on, conducting, maintaining or exposing any game for pay"); La. Stat. § 27:205 (defining legal "gaming operations" and "gaming

---

[11] The CFTC argues in its briefing that it did not adopt a definition of gaming that includes staking money on any contingent event. *See* ECF 30 at 38. But after observing that gaming and gambling are synonymous, the CFTC's order goes on to recognize a definition of gambling that includes "staking something of value upon the outcome of a game, contest, or contingent event." ECF 38-1 at 15 (CFTC Order). Yes, it ultimately reasoned that Kalshi's congressional control contracts concerned gaming because gaming means gambling, and gambling involves wagering on a contest, but the order includes numerous citations to definitions of gambling that make reference to betting on contingencies generally. *Id*. at 15–16 n.2. If the CFTC did not agree that the definition of gambling included betting on contingent events, it is not clear to the Court why it referred to definitions of gambling that included such language (and equated "gaming" and "gambling"). The CFTC cannot have it both ways: it cannot synonymize gaming with gambling, but simultaneously argue that only some gambling is gaming.

activities" as "the offering or conducting of any game or gaming device in accordance with" state law).

And while the CFTC's order also considered and pulled definitions from a federal statute, it did not look to the only one that the Court is aware actually uses the term "gaming"—the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701. Although the IGRA does not expressly define gaming, it refers to various "gaming" classes that, by statute or regulation, each concern categories of games.[12] Instead, the federal statute discussed in the order is the Unlawful Internet *Gambling* Enforcement Act (UIGEA), 31 U.S.C. § 5361 *et seq.* (emphasis added), which also does not define or use the term "gaming." That statute, instead, uses the terms "bet" and "wager" and defines those terms as "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that [someone] will receive something of value in the event of a certain outcome." *Id.* § 5362(1)(A). The CFTC borrowed this definition and applied it to "gaming" in the special rule, but the Court cannot understand why it did that. *See* ECF 38-1 at 16 (CFTC Order). The CEA does not use the terms "bet" or "wager" anywhere. *See generally* 7 U.S.C. § 1 *et seq.* The Court can think of no canon of statutory interpretation that counsels toward looking to an unrelated statute that defines a different term in a different context to determine a statute's meaning.[13] Accordingly, the Court

---

[12] IGRA sets forth three classes of gaming activity: "class I gaming" means social games; "class II gaming" means "the game of chance commonly known as bingo" and certain card games; and "class III gaming" is an undefined catch-all "class III gaming" category. 25 U.S.C. § 2703(6)-(8). Regulations define class III by reference to "[c]ard games such as baccarat, chemin de fer, blackjack (21), and pai gow;" "[c]asino games such as roulette, craps, and keno;" "slot machines" and other "game[s] of chance;" "sports betting," including "wagering on horse racing, dog racing or jai alai;" and "[l]otteries." 25 C.F.R. § 502.4.

[13] Even if the Court were to apply the UIGEA's definition of "bet" or "wager" to "gaming" under the special rule, it would have difficulty finding that an election is a "contest" under that statute. "The traditional canon of construction, *noscitur a sociis*, dictates that words grouped in a list should be given related meaning." *Dole v. United Steelworkers of Am.,* 494 U.S. 26, 36 (1990). The Court can accept the CFTC's argument that elections are sometimes referred to colloquially as "contests," but elections bear little relation to "sporting events" or "games of chance," which appear alongside the term "contest" in the UIGEA's definition of "bet" and "wager." 31 U.S.C. § 5362(1)(A). The Court is persuaded by Kalshi's argument that, considering the other terms in the definition, "contest" must refer to a similar

does not agree that "gaming" under the CEA includes wagering on contests that do not involve or closely relate to a game of some sort.[14]

In sum, the Court finds that "gaming," as used in the special rule, refers to playing games or playing games for stakes. The Court next considers the special rule's use of the word "involve."

### B.  "Involve" Interacts with the Instrument's Underlying Event

The special rule authorizes the CFTC to review, and potentially prohibit, event contracts that "involve" one or more of the enumerated categories. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Parties disagree about what this provision means. Kalshi argues that, under the special rule, an event contract "involves" an enumerated activity where the underlying event constitutes or relates to that activity. *See, e.g.*, ECF 17-1 at 25. In its order, however, the CFTC determined that an event contract "involves" an enumerated activity, not only if the contract's "underlying *is* one of the enumerated activities," but if the contract has a "different connection to one of the activities," ECF 38-1 at 14 (CFTC Order), including "if trading in the contract amounts to the enumerated activity," *id.* at n.19. After carefully scrutinizing the statute and considering the Parties' arguments, the Court again agrees with Kalshi and finds that its event-focused reading of the word "involve" is the only interpretation that makes sense in the context of this provision.

As always, the Court begins its analysis with the statute's text. *See, e.g.*, *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). And because "involve" is left undefined by the CEA, the Court first considers the ordinary meaning of that word. *See, e.g.*, *id.* As a preliminary matter, the Court observes that there is not much daylight between the Parties about what "involve" means in

---

event for entertainment that might not be characterized as a sporting event or a game of chance—a pageant might fit. *See* ECF 17-1 at 40.

[14] Although not dispositive, the Court observes that the CFTC has not subjected Kalshi's event contracts about whether certain nominees will win an Oscar to review under the special rule, ECF 41-1 at 7, even though, at least as the Court sees it, the Academy Awards are a contest.

ordinary parlance. The Parties offer definitions of involve from various dictionaries that are largely the same, such as "[t]o contain as a part; include," "to have as a necessary feature or consequence," ECF 17-1 at 25 (citing American Heritage Dictionary 921 (4th ed. 2009)), and "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence," *see* ECF 30 at 33 (citing Merriam-Webster, https://perma.cc/2RS8-ZRBJ; Random House College Dictionary 703 (rev. ed. 1979); Riverside University Dictionary 645 (1983)); *see also* ECF 38-1 at 12 (CFTC Order). Both sides agree that the term is defined broadly, *see* ECF 17-1 at 25, ECF 30 at 26, and thus, for example, is more expansive in scope than a phrase like "based upon" (which is used elsewhere in the CEA). ECF 30 at 34; ECF 36 at 12. Rather, the real disagreement between the Parties is the function of the word "involve" in the statute and how it interacts with the enumerated activities.

Construing the plain meaning of "involve" does not resolve the Parties' dispute. As the Supreme Court has recognized, "a statute's meaning does not aways turn solely on the broadest imaginable definitions of its component words." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (quoting *Epic Sys. Corp.* v. *Lewis*, 584 U.S. 497, 523 (2018)). Accordingly, the Supreme Court has instructed that where a statute includes terms whose plain meaning is broadly defined, courts should not construe the language "in isolation," but must "look to statutory context." *Dubin*, 599 U.S. at 119 (citing *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (considering the term "relate to" and recognizing that if "'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes" there would be no limits as "really, universally, relations stop nowhere")). To determine how "involve" operates in the statute, the Court can consider "traditional tools of statutory interpretation—text, structure, purpose, and legislative history." *In re Sealed Case*, 932 F.3d 915, 928 (D.C. Cir. 2019)

(quoting *Tax Analysts v. IRS*, 350 F.3d 100, 103 (D.C. Cir. 2003)). Considering many of these tools, and related canons of statutory construction, the Court rejects the CFTC's reading of the statute in favor of Kalshi's for several reasons.

First, the CFTC's argument that an event contract "involves" an enumerated activity if the act of trading the contract "amounts to" the activity cannot be applied consistently throughout the statute. "[S]tandard principle[s] of statutory construction provide[] that identical words and phrases within the same statute should normally be given the same meaning" and effect. *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). And where one term in a statute "applies without differentiation to" a set of defined categories, "[t]o give the[] same words a different meaning" for different categories "would be to invent a statute rather than interpret one." *Clark v. Martinez*, 543 U.S. 371, 378 (2005). Other than with respect to the two categories it claims are implicated here—unlawful activity and gaming—the CFTC's reading of "involve" does not work for any other activity enumerated in the special rule.

The "act of trading in" an event contract can never "amount to" war. The "act of trading in" an event contract cannot "amount to" terrorism. And no one would formulate a construction of the statute to read that an "act of trading in" an event contract could ever "amount to" assassination. With respect to those categories of the special rule, then, the Court is not remotely confused about how "involve" operates. An event contract can only involve war, terrorism, or assassination if the contract's subject itself relates in some way (admittedly broadly) to war, terrorism, or assassination. There is simply no other workable construction applied to those categories that the Court can think of. And the Court cannot identify any principled reason, consistent with applicable canons of construction, that it would treat the two enumerated categories at issue in this case any differently. In other words, the Court finds no basis to invite ambiguity into a statutory framework

that is otherwise clear by construing the relationship between "involve" and the unlawful activity and gaming categories—and only those categories—more broadly, and thus differently, than the others.

The CFTC further argues that the special rule is implicated when the act of trading a contract amounts to an enumerated activity, and not just when a contract's underlying involves an activity, because the special rule applies to "transactions." Specifically, the statute gives the CFTC authority to review "agreements, contracts, or *transactions*" that "involve" an enumerated activity. *Id*. Because the plain meaning of the word "transaction" includes "the formation, performance, or discharge of a contract," the CFTC contends that the statute's authorization of its review of "transaction[s]" that "involve" an enumerated activity is consistent with its reading of the statute—namely, that a transaction "involve[s]" an enumerated activity if the act of trading in the contract amounts to that activity. ECF 41-1 at 3 (citing *Transaction*, Black's Law Dictionary (11th ed. 2019)). Kalshi argues that "transaction," as used in this statute, refers to a financial instrument. ECF 42 at 2. The Court recognizes the ordinary meaning of the term "transaction," but also understands Kalshi's point. After all, the other terms that are listed alongside "transactions" in the statute—agreements, contracts, swaps—refer to various derivative instruments, which go by many names. 7 U.S.C. § 7a-2(5)(c)(ii). And the statute identifies a transaction as something that can be "list[ed]," further suggesting that it is referring to an actual financial instrument or the product being exchanged. *Id.*

But the Court finds it unnecessary to pick a side because, even using the CFTC's ordinary definition of "transaction," the Court still cannot adopt its "involve-means-trading-in-the-product-amounts-to-an-enumerated-activity" construction. A financial transaction on an exchange has an underlying subject just like a contract does. And again, the CFTC's reading does not lend itself to

a consistent application across the statute. Replacing "transaction" with the term "contract" changes no part of the Court's analysis. A transaction can only "involve" war, terrorism, or assassination if the offering underlying the transaction relates in some way to war, assassination, or terrorism. No one reading this provision would read the statute to mean that a transaction "involves" war because the discharge of contractual obligations somehow amounts to war, or that a transaction "involves" terrorism because performance on the contract amounts to terrorism, or that a transaction on a DCM can amount to assassination in some way. Indeed, the special rule is not the only provision of the CEA that uses the terms "transaction" and "involve" where it is clear that the statute can only be referring to the underlying commodity or subject of the transaction. *See, e.g.*, 7 U.S.C. § 6c(b) ("transaction *involving* any commodity regulated under this chapter"); *id.* § 23(b)(1) (referencing "transactions *involving* different commodities"); *id.* § 2(a)(1)(D)(i) ("contracts[] and transactions *involving* . . . a security futures product"). Overall, the Court declines to apply a construction of the statute that only works for some, but not all, of the enumerated categories.

Second, the CFTC's interpretation of the statute would render its reach too broad, and thus does not make sense to the Court in the context of the statute. This point is best illustrated through consideration of the special rule's "unlawful activity" category. According to the CFTC's order, Kalshi's congressional contracts "involve" unlawful activity, not because the subject matter of the contracts (Congress and elections) relates to anything unlawful, but because in many states it is unlawful to stake money on the outcome of an election. ECF 38-1 at 19–20 (CFTC Order). But as the order also recognizes, many states define unlawful gambling as staking money on any contingent outcome. *Id.* at 15 n.22. Event contracts, by definition, involve staking money on some contingent event. CFTC, *Contracts & Products: Event Contracts*, https://perma.cc/Q4LP-B6UY.

Accordingly, under the CFTC's logic, it could presumably review *any* event contract, because (1) a person or entity purchasing an event contract is putting money on the outcome of a contingent event and (2) many states define such conduct as "gambling" and make it unlawful. But no one would contend that reading represents a plausible construction of the statute. Not only because the CEA specifically preempts the application of state law over derivative markets, 7 U.S.C. § 2(a)(1)(A), but because it would swallow the special rule's provisions authorizing the CFTC to review only event contracts that relate to specific, enumerated topics, *id.* § 7a-2(c)(5)(C)(i); *see also Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809 (1989) (recognizing that it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").[15] Such an interpretation would also effectively undo the Congressional amendment to the CEA that eliminated the CFTC's across-the-board review. *See* Pub. L. No. 93-463, § 207, 88 Stat. 1389, 1400 (1974) (codified at 7 U.S.C. § 7(7) (1994)); Pub. L. No. 106-554, §§ 110(2), 113, 114 Stat. 2763, 2763A-384, 399 (2000) (codified at 7 U.S.C. §§ 7, 7a-2 (2006)). The only formulation of the interaction between "involve" and "unlawful activity" that actually works, then, is if the contract or transaction's underlying event relates in some way to activity that is illegal—not if the act of staking money on the contract's underlying would be unlawful under any state law.

Finally, the legislative history offers no support for the CFTC's position. The statute's legislative history is not dispositive to the Court's analysis, but the CFTC discusses it in its order

---

[15] The CFTC acknowledges this argument, but contends that preemption would operate as a backstop. It argues that because state laws banning futures contracts are preempted by the CEA, all event contracts would not (and could not) be considered "unlawful activity" and, therefore, the CFTC's definition of "involve" does not swallow the rule. ECF 31 at 46. The Court has trouble following the CFTC's argument. The CFTC does not provide a coherent justification as to why it argues that state laws that categorically ban all event contracts are preempted, but those that ban specific types of event contracts are not. To be clear, this Court does not make any decision or judgment on the preclusive scope of the CEA's special rule. But the friction the CFTC's interpretation creates further demonstrates why it is wrong.

and briefing here, *see* ECF 31 at 35; ECF 38-1 at 14 n.18 (CFTC Order), so the Court will too. The CFTC argues that the CEA's legislative history supports its conclusion that Congress was concerned about the overall characteristics of an event contract, and not just whether the underlying subject of the contract involved an enumerated activity. *Id.* In particular, the order cites to a colloquy on the Senate floor, in which one senator remarked that the provision ultimately enacted as Section 5(c)(5)(C) of the CEA was intended to "prevent gambling through futures markets" and restrict "'event contract[s]' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament." *Id.* (citing 156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010)). According to the CFTC, under the event-focused reading of the statute Kalshi advances, contracts involving these sporting events would not fall under the statute's gaming category because events like the Super Bowl themselves are games, not "gaming." ECF 31 at 35. The Court understands the CFTC to be arguing that these contracts could only be considered "gaming" if one considers the fact that someone bet money on them.

A couple points about the CFTC's invocation of the statute's legislative history. First, the order's point appears to be moot given the Court's conclusion that "gaming" includes the activity of playing games and playing games for stakes. Applying that definition, event contracts related to any of the sporting events the senator mentioned on the floor could implicate the gaming category. All these events can easily be construed as games; they can even be construed as games played for stakes (cash prizes and trophies, for example).[16] And second, the Court cannot take much from the remarks of one senator to elucidate the meaning of the statute. The D.C. Circuit has

---

[16] The CFTC argues that if "involve" only related to a contract's underlying, the gaming category would not include any event contracts at all because it is difficult for the CFTC "to conceive of a contract whose underlying event, itself, is 'gaming.'" *Id.* The Court has adopted the plain meaning of the word gaming, which is not limited to the act of betting money on a game. But even if the Court were to accept that narrower definition of gaming, it is not hard to think of examples—like an event contract asking buyers to predict who will win the World Series of Poker Tournament.

warned that "judges must 'exercise extreme caution'" with such floor exchanges. *Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 875 (D.C. Cir. 1996) (quoting *Gersman v. Grp. Health Ass'n, Inc.*, 975 F.2d 886, 892 (D.C. Cir. 1992)). In fact, if the Court were to take anything from this floor exchange, it would be that the senator would not have intended "gaming" to include elections given the examples offered.

To sum it up, the Court agrees that "involve" should be broadly construed.  The Court does not find (nor does Kalshi contend) that the instrument or contract must specifically refer to an enumerated event to "involve" or relate to it.[17] But a contract or transaction "involves" an enumerated activity if the event being offered and traded as part of that contract or transaction relates to that activity. That is the most natural, and only consistently workable, reading of the provision.

*   *   *

Kalshi's event contracts ask buyers to take a yes/no position on whether a chamber of Congress will be controlled by a specific party in a given term. That question involves (relates to, entails, has as its essential feature, or any other iteration of the word) elections, politics, Congress, and party control; but nothing that any Party to this litigation has identified as illegal or unlawful activity. Nor does that question bear any relation to any game—played for stakes or otherwise. Accordingly, the Court concludes that Kalshi's congressional control contracts do not involve unlawful activity or gaming. And thus the Court has no occasion to consider whether they are contrary to the public interest.

---

[17] Event contracts that "involve" war, for example, could include "whether there will be a war in X country," but might also cover events related to war, such as weapons trades or military deployments.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Kalshi's congressional control contracts do not involve activity that is unlawful under any Federal or State law, nor do they involve gaming. Accordingly, the Court must **GRANT** Plaintiff's Motion for Summary Judgment and **DENY** Defendant's Cross-Motion for Summary Judgment. A separate order has issued.

     **SO ORDERED.**

                                                  _____

                                                  JIA M. COBB
                                                  United States District Judge

Date: September 12, 2024